C511nex1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  NEXTEC APPLICATIONS, INC.,

4                 Plaintiff,

5           v.                          07 Civ. 6901 (TPG)

6  BROOKWOOD COMPANIES, INC.,

7                 Defendant.

8  ------------------------------x

9                                       May 1, 2012
                                        10:48 a.m.
10
   Before:
11
                        HON. THOMAS P. GRIESA,
12
                                        District Judge
13
                           APPEARANCES
14
   SHEPPARD MULLIN RICHTER & HAMPTON, LLP
15      Attorneys for Plaintiff
   BY:  STEPHEN S. KORNICZKY, ESQ.
16      DANIEL N. YANNUZZI, ESQ.
        MICHAEL MURPHY, ESQ.
17      RENA ANDOH, ESQ.

18 KING & SPALDING
        Attorneys for Defendant
19 BY:  ETHAN HORWITZ, ESQ.
        JONATHAN DAVID BALL, ESQ.
20      NATASHA H. MOFFITT, ESQ.
        KEVIN M. DINAN, ESQ.
21      JOHN A. CALABRO, ESQ.

22

23

24

25

C511nex1

```
 1              (Trial resumed)

 2              (In open court)

 3          THE COURT:  All right.  Let's resume.

 4          MR. KORNICZKY:  Plaintiffs call Dr. Meirowitz.

 5          THE COURT:  All right.

 6          THE CLERK:  Sir, you're still under oath.

 7          THE WITNESS:  Thank you.

 8   RANDY MEIROWITZ PhD, resumed.

 9  DIRECT EXAMINATION CONTINUED

10  BY MR. KORNICZKY:

11  Q.  Are you all set, Dr. Meirowitz?

12  A.  I believe so.  Thank you.

13  Q.  Okay.  Good morning, Dr. Meirowitz.

14  A.  Good morning.

15  Q.  I'd like to pick up where we left off yesterday in your

16  testimony, okay?

17  A.  Okay.

18  Q.  Okay.  Dr. Meirowitz, did you identify any examples of the

19  use of solvents in Nextec's patented technology for Brookwood's

20  counsel?

21  A.  Yes, I did.

22  Q.  And how did you present that?

23  A.  I presented it --

24          THE COURT:  What do you mean for Brookwood's counsel?

25          MR. KORNICZKY:  Brookwood's counsel had requested the
```

C511nex1                    Meirowitz - direct

1   information at his deposition, your Honor.

2           THE COURT:  I don't understand this method of

3   questioning.  He's testifying at trial.  Now --

4           MR. KORNICZKY:  Okay.  Your Honor, I can just put the

5   document up.

6           Could you put up what's been marked as Plaintiff's

7   Exhibit 532.

8   BY MR. KORNICZKY:

9   Q.  Dr. Meirowitz, do you recognize this document?

10  A.  Yes, I do.

11  Q.  And what is it?

12  A.  It's a list of places solvents are referenced in the patent

13  that Brookwood's counsel asked for.

14  Q.  Okay.  And what does it show?

15  A.  It shows solvents in various patents in the --

16          THE COURT:  Various what?

17          THE WITNESS:  It shows solvents in the '902 and '841

18  patent that have been incorporated by reference, incorporated

19  completely.

20          THE COURT:  Incorporated from what?

21          THE WITNESS:  Patents.

22          THE COURT:  What patents?

23  Q.  Dr. Meirowitz, do you understand the chain of priority --

24  I'm sorry -- chain of patent families?

25  A.  Yes, I do.

C511nex1                          Meirowitz - direct

1    Q.  What's your basis for saying that these examples are

2    included in the '902 and the '841 patents?

3    A.  Because in the '902 and '841 patents, they state these

4    patents and say they're incorporated entirely by reference.

5              MR. HORWITZ:  Objection, your Honor.

6              MR. KORNICZKY:  Your Honor, I move to admit this into

7    evidence.

8              MR. HORWITZ:  Your Honor, the caselaw is very, very

9    clear that merely saying you incorporate by reference does not

10   bring everything in.  You have to specifically say what it is

11   you want to bring in.  By contrast, the file wrapper of a

12   his -- of a patent can be used to understand the claims but the

13   actual text of the patent, unless you say in the patent --

14   repeat it in the patent or point out specifically an issue or

15   so on, it's not incorporated, and your Honor, we can hand up

16   the bench memo tomorrow if you wish, but it's un -- the caselaw

17   is clear that you just can't do this, incorporating by

18   reference and have the information in these patents.

19             THE COURT:  I'm going to just shortcut this.  That

20   exhibit means nothing.  It means nothing.  I mean, we have a

21   trial.  We're not at a deposition.  And if the witness has

22   testimony at the deposition about whatever it is, he can refer

23   to it, but that little sheet of paper has no meaning to me.

24   Now if there is something, if there's language in the patent

25   about incorporating by reference that you want him to refer to,

C511nex1                    Meirowitz - direct

1    then fine, but certainly the thing we're not incorporating is

2    incorporating by reference deposition exhibits.  If there's an

3    exhibit for the trial, but that exhibit really wouldn't be very

4    helpful.

5        MR. KORNICZKY:  Yes, your Honor.  I understand.  What

6    we can do is we can go through each one of these references and

7    identify --

8        THE COURT:  Well, where is the language about

9    incorporating by reference?

10        MR. KORNICZKY:  Can you pull up Exhibit 1, please.

11        Your Honor, in Exhibit 1, it's in column 1, where it

12    lists the history of the patents that led to the '902 patent.

13        THE COURT:  I've seen that, but I thought you said

14    there was language saying something about incorporating by

15    reference.  Where is such language?

16        MR. KORNICZKY:  If you go to the last sentence of this

17    paragraph, it says, "All of the above-referenced applications

18    are incorporated herein by reference in their entirety,

19    including any drawings."

20        THE COURT:  All right.  Well, then you've certainly

21    shown me what the language is.  Now is there an issue of law

22    about what that actually does?

23        MR. HORWITZ:  Yes, your Honor.  If you look at -- I

24    will hand up -- it's *Callaway v. Acushnet*, Federal Circuit

25    2009.  And, "To incorporate matter by reference, a host

C511nex1                    Meirowitz - direct

1    document must contain the language clearly identifying the

2    subject matter which is incorporated and where it is to be

3    found.  A mere reference to another application or a patent or

4    a publication is not an incorporation by reference of anything

5    there.  The host documents must identify with detailed

6    particularity what specific material incorporates and clearly

7    indicate where that material is found in the various

8    documents."  This is exactly what the Federal Circuit says you

9    cannot do, say, "I'm incorporating by reference" a whole bunch

10   of things and then -- and then do that.

11           Another case, *Advanced Display Systems*, again, the

12   Federal Circuit, your Honor, "To incorporate reference --

13   incorporate material by reference, the host document must

14   identify with detailed particularity what specific material it

15   incorporates and clearly indicate where the material is found

16   in the various documents."

17           MR. KORNICZKY:  Your Honor, that's what this paragraph

18   does.  I think he's trying to read that out of context.  This

19   is --

20           MR. HORWITZ:  Your Honor --

21           THE COURT:  Wait a minute.

22           MR. HORWITZ:  Your Honor, if I may finish.

23           THE COURT:  Yes.

24           MR. HORWITZ:  What's going on here, the Federal

25   Circuit has said, you can't incorporate a document by

C511nex1                        Meirowitz - direct

1    reference.  You can say, "I'm incorporating by reference the

2    specific discussion of X in the document found at page number

3    so and so, line so and so," but you cannot incorporate a

4    document as a whole the way this patent is trying to do.  And

5    your Honor, there's a whole string cite --

6            THE COURT:  Do you have a case there?

7            MR. HORWITZ:  Yes, your Honor.

8            MR. KORNICZKY:  Your Honor, that does not apply --

9            THE COURT:  Wait a minute.  I take it that you were

10    going to have this witness testify, or you would propose to

11    have this witness testify as to the references to solvents in

12    the various patents listed.

13            MR. KORNICZKY:  That's correct, your Honor.

14            THE COURT:  And I take it there will be an objection

15    to that testimony.

16            MR. HORWITZ:  Correct, your Honor.

17            THE COURT:  All right.  So I have to rule on that

18    objection.

19            MR. KORNICZKY:  And your Honor, that law doesn't --

20            THE COURT:  Just a minute.

21            MR. KORNICZKY:  Okay.

22            (Pause)

23            MR. KORNICZKY:  Your Honor, may I address that?

24            THE COURT:  Just a minute.

25            (Pause)

C511nex1                    Meirowitz - direct

1           THE COURT:  These two cases are about prior art.

2           MR. HORWITZ:  Well, your Honor --

3           THE COURT:  It does not necessarily follow that

4    patents which were part of what I think has been referred to

5    here as a continuation are really subject to the same law.  Do

6    you have any cases directly on point?

7           MR. HORWITZ:  I do not have cases directly on point,

8    but your Honor, I can get some.  But in addition --

9           THE COURT:  What do you mean you can get some?

10          MR. HORWITZ:  Meaning I have not done the research but

11   I can pick some up by the break or something and get them to

12   you.  But your Honor, I think these cases there stand for the

13   proposition generally that incorporation by reference of

14   anything, you must specifically point out what it is.

15          THE COURT:  Well, do you have any caselaw, Mr. --

16          MR. KORNICZKY:  Korniczky.  Yes, your Honor.  First,

17   it's standard patent practice that when you're referring to

18   patent applications that turn into patents, this is the way you

19   incorporate them by reference.  I haven't read the cases

20   counsel cited, but my guess is it was distinguished because it

21   didn't refer to patents or patent applications.

22          Mr. Murphy, can you read this court's -- I think it's

23   this court's decision on this issue.

24          MR. MURPHY:  Docket entry 118, on page 20 --

25          THE COURT:  What are you referring to?

C511nex1                    Meirowitz - direct

1          MR. MURPHY:  This is an order issued by this court

2     earlier in this case, and it deals --

3          THE COURT:  By what judge?

4          MR. MURPHY:  Judge Holwell, and there's caselaw

5     regarding incorporation by reference, and the case he cites is

6     *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316,

7     1329 (Fed. Cir. 2001).  And the quote he includes is, "When a

8     document is incorporated by reference in the host document,

9     such as a patent, the reference document becomes effectively

10    part of the host document as if it were explicitly contained

11    therein."  And this is in reference to incorporations --

12          THE COURT:  Quoting from whom?

13          MR. MURPHY:  He's quoting the Federal Circuit's case

14    *Telemac Cellular Corporation*.

15          MR. HORWITZ:  Your Honor, that's not -- that has

16    nothing to do with what we're talking about.  What that case

17    says is, when you incorporate it properly, here's the effect of

18    it.  What those cases I handed you say is, in order to

19    incorporate it properly, you must say specifically what you're

20    referring to as opposed to referring to a document as a whole.

21    One has nothing to do with the other.  Once it's incorporated

22    properly, he's correct, it's as if it was there.  But what

23    those cases stands for is, in order to incorporate it properly,

24    you cannot just say this entire document is in; you have to

25    point to specific pieces of it that you're referring to and

C511nex1                      Meirowitz – direct

1   explain, "I'm referring to the fact," "I incorporate these

2   documents by reference where they talk about solvents, on page

3   so and so," or line so and so or column so and so, line so and

4   so.  You can't just do it wholesale.

5           THE COURT:  I don't know whether you can or you can't.

6   I've been cited no cases that are on point.

7           MR. MURPHY:  Your Honor, may I address that.  The

8   specific footnote that I read that from is specifically

9   addressing incorporation by reference in Nextec's patents.  So

10  it's specifically on point, what Judge Holwell was ruling on.

11  It was specifically addressing --

12          THE COURT:  I mean, that's Judge Holwell; right?

13  That's my predecessor district judge on this case; right?

14          MR. MURPHY:  That is correct.

15          THE COURT:  Well, I mean, Judge Holwell's a great

16  judge, but it's not authority for me.

17          MR. MURPHY:  Well, I'm saying he cited caselaw that

18  would be --

19          THE COURT:  What caselaw did he cite?

20          MR. MURPHY:  He cited *Telemac Cellular Corporation*.

21          THE COURT:  What did that case deal with?

22          MR. MURPHY:  That case dealt with incorporation by

23  reference.

24          THE COURT:  Incorporation of what by reference in

25  what?

C511nex1                      Meirowitz - direct

1          MR. MURPHY:  I'll have to pull the case to get the

2      exact context.

3          THE COURT:  Why don't you do that.

4          MR. MURPHY:  Okay.

5          THE COURT:  Now look, let's proceed with the testimony

6      and see where it goes.  I am very, very leery of the idea that

7      references in these other patents or applications are going to

8      really reveal very much because ultimately we're dealing with a

9      claim, we're dealing with claim language, and so if you want to

10     take time with specific testimony about specific mentions of

11     solvents in these items, well, go ahead.  I'll take it for what

12     it's worth.  And if it ends up that it's not to be considered,

13     why, then it will not be considered.  But right now let's

14     proceed with the testimony.  But the little sheet of paper is

15     really -- I'm not going to even admit it into evidence.  It has

16     no meaning.

17         MR. KORNICZKY:  Okay, your Honor.  I'm sorry.  I was

18     just trying to shortcut where the information could be located.

19         THE COURT:  How could you shortcut it?

20         MR. KORNICZKY:  Because it's all listed there.

21         THE COURT:  But it doesn't say anything.

22         MR. KORNICZKY:  Understood.

23         So can you pull up the '051 patent, please.

24     BY MR. KORNICZKY:

25     Q.  Dr. Meirowitz, have you reviewed this patent?

C511nex1                          Meirowitz – direct

1    A.  Yes, I have.

2    Q.  And can you show us where silicone is addressed in this

3    patent.

4             THE COURT:  Does the patent talk about solvents?

5             MR. KORNICZKY:  I'm sorry.

6    A.  I believe the most appropriate reference that talks about

7    solvents is claim 58.

8    Q.  Can you move us to claim 58, please.

9             THE COURT:  Claim 58 in what?

10            THE WITNESS:  In this patent, your Honor.

11            THE COURT:  All right.  Claim 58.

12            Are we going to look at claim 58?  Is there a problem?

13            MR. KORNICZKY:  Yes.  I'm sorry, your Honor.  They're

14   locating it.  I think our system broke down.  I apologize.

15   Maybe we can just pull up a -- do we have a hard copy?

16            (Pause)

17   A.  "The method according to claim 47 that between the

18   saturating and the pressuring further comprises adding diluents

19   as required to the impregnant to decrease viscosity and adding

20   solids as required to the impregnant to increase viscosity in

21   order to adjust the viscosity of the impregnant to be within a

22   range of 5,000 to 2 million centipoise."

23   Q.  And can you explain how that shows solvents.

24   A.  Well, a diluent is a solvent.

25   Q.  Thank you, Dr. Meirowitz.

C511nex1                          Meirowitz – direct

1            THE COURT:  Let me read this.  Just a minute.

2            (Pause)

3            THE COURT:  I'm just going to say, that has no weight

4    on the issue as far as I can see; none whatever.  Why don't you

5    go on.  But you can argue later that it does, but it seems to

6    me it has no weight.  And the reason being, it is a claim.  It

7    is a claim.  It's its own claim.  It refers to claim 47 and

8    then talks about adding diluents.  Now that --

9            MR. KORNICZKY:  What that --

10           THE COURT:  Just a minute.

11           MR. KORNICZKY:  Sure.  I'm sorry.

12           THE COURT:  We have the claims in our case.  We have

13    the claims in our case.  And if that language had some bearing

14    to explain the claims in our case, that might be of interest,

15    but it doesn't.  Our claim language is completely different,

16    and as far as I know -- and I'm not trying to be sarcastic --

17    what this court is charged with in this case is dealing with

18    the claims that are at issue in our case, not claim 58 in some

19    other patent.

20           So let's go on with the next piece of testimony, but

21    this was entirely unhelpful.  Let's see if there's something

22    that is helpful.

23           MR. KORNICZKY:  Okay.

24           THE COURT:  Let's move on.

25           MR. KORNICZKY:  Can I ask one more question about this

C511nex1                          Meirowitz - direct

1    on how it does relate, your Honor?  May I just draw it out from

2    the witness?

3              THE COURT:  Sure.  How does it relate to what?

4              MR. KORNICZKY:  To the claims at issue.

5              THE COURT:  Oh, really?  Okay.

6    BY MR. KORNICZKY:

7    Q.  Dr. Meirowitz, how does this adjustment -- how does this

8    address the adjustment solvents before you shear thin?

9              THE COURT:  I don't understand the question.

10   Q.  Can you explain how this relates to the patent at issue.

11   A.  Yes, I can.

12   Q.  Okay.

13   A.  As your Honor pointed out yesterday, it's about shear

14   thinning and it's about decreasing the viscosity so something

15   flows into the substrate.  If the viscosity is too low, like

16   when you drop ink on a piece of paper, it wicks.  You can't

17   stop it.  The invention in this patent is -- I start at a

18   viscosity where it can't wick in.  By shear thinning, I make it

19   thin enough that it can go in, but then when I stop the shear,

20   it doesn't migrate further, like ink through a piece of paper.

21   What this is saying is, I can use solvents in my mixture to

22   adjust the viscosity where I want to process it from so that I

23   can decrease it enough for shear thinning.  Maybe I don't want

24   to be at 2 million centipoise because I have a machine from the

25   1960s.  Maybe I can only handle 20,000 centipoise.  So I

C511nex1                    Meirowitz - direct

 1   decrease it to there.

 2           THE COURT:  You're not answering the question.  The

 3   question was:  How does that relate to the language in our

 4   claim?

 5           THE WITNESS:  Yes, your Honor.

 6           THE COURT:  How does it?

 7           THE WITNESS:  The language in our claim is about shear

 8   thinning --

 9           THE COURT:  Yes.

10           THE WITNESS:  -- to get the material to flow into the

11   web.  And then it's stopping flowing.  Positioning it.

12   Controlled placement.  That means the flow stops.  It's not

13   uncontrolled wicking.

14           THE COURT:  I'll tell you, I'm not going to ask you

15   again -- and I don't mean to be in any way discourteous to you,

16   but that does not answer the question.  Let us go to another

17   question.

18           THE WITNESS:  Okay.

19           MR. HORWITZ:  Your Honor, I have an objection.

20           THE COURT:  The objection is overruled.  Let's

21   continue with the testimony.  Let's go to another question.

22           MR. KORNICZKY:  Okay.  Can you go --

23           THE COURT:  He has not answered the question on how it

24   relates to our claim.  Now let's go to another question.

25           MR. KORNICZKY:  Okay.  Can you go to column 24,

C511nex1                        Meirowitz - direct

1    line 66 and highlight that to column 25 -- I'm sorry --

2    column 24, line 66, to column 25, line 1.

3              THE COURT:  In what patent?

4              MR. KORNICZKY:  Same patent, your Honor.

5              THE COURT:  All right.  What's that language?

6    BY MR. KORNICZKY:

7    Q.  Dr. Meirowitz, can you review that language in the patent.

8              THE COURT:  What is the language?  Line what?

9              MR. KORNICZKY:  Line 66.  It says, "In such

10   compositions useful in the present invention, a control of

11   compositional rheology, and particularly of complex viscosity,

12   is accomplishable, if desired, by the selective addition of

13   diluent and additives."

14   Q.  Can you explain how that relates to the addition of

15   solvents into the polymer.

16   A.  Again, what the inventor was trying to describe here was

17   adjusting the viscosity of the starting mixture to where it was

18   processible by your equipment.  If the chemical you want is too

19   thick, you can dilute it.  If it's too thin, you can add other

20   things, like particulate, to make it thicker, so it processes

21   on your equipment but doesn't run through the fabric on its

22   own.

23   Q.  Okay.  Thank you.

24             MR. HORWITZ:  Your Honor --

25   Q.  And then as a person --

C511nex1                    Meirowitz - direct

1          MR. HORWITZ:  Your Honor, objection.

2          THE COURT:  Overruled.

3   Q.  As a person skilled in the art reviewing the '902 patent,

4   would your review and understanding include this patent as

5   well?

6   A.  Yes, it would.

7   Q.  Thank you.

8          MR. KORNICZKY:  Can we move to -- can we show

9   Exhibit 1000, please.  And can you please go to page 14.

10  Q.  I'd like you to focus on the last paragraph of this page.

11         THE COURT:  What --

12  Q.  I'm sorry.  The last full paragraph.

13         THE COURT:  I'm sorry.  I missed something.  Is this

14  one of the items --

15         MR. KORNICZKY:  This is the next question, your Honor,

16  next issue.

17  Q.  This -- do you recognize this document, Dr. Meirowitz?

18         THE COURT:  Is this one of the patents or the

19  applications in column 1?

20         MR. KORNICZKY:  This is the application process, the

21  office action in one of the patents, your Honor.

22         THE COURT:  Which patent?

23         MR. KORNICZKY:  It's the '792.

24         THE COURT:  Is that one of the patents listed in

25  column 1?

C511nex1                        Meirowitz - direct

1              MR. KORNICZKY:  No.  This is one of the pages that

2    was -- this is one of the issues that was raised yesterday

3    during the discussion about what -- whether or not solvents are

4    not included in the patent.

5              Can you turn to page 1000.

6              THE COURT:  What is this document?

7              MR. HORWITZ:  What is this?

8              MR. KORNICZKY:  This is the exhibit that you showed

9    yesterday.  It's Exhibit 1000.

10             MR. HORWITZ:  Could you give us a copy, please.

11   Because you're supposed to notify us when you use an exhibit.

12             MR. MURPHY:  You were notified of this.  It's been in

13   the binder for days.

14             THE COURT:  What is this document, please?

15             MR. KORNICZKY:  It's an office action, your Honor, for

16   the US Patent Number '792.

17             THE COURT:  And what is patent '792?

18             MR. KORNICZKY:  This was a reference that was used

19   yesterday by counsel to discuss what was and was not disclosed

20   in the patents at issue.

21             Maybe I can get to it a different way, your Honor.

22   BY MR. KORNICZKY:

23   Q.  Dr. Meirowitz, okay, if you go down to line -- 1, 2, 3,

24   4 -- 5, do you see that statement, "Applicant does not utilize

25   solvents and shear thins viscous materials"?

C511nex1                    Meirowitz - direct

1   A.  Yes, I do.

2   Q.  Do you recall counsel stating yesterday that Nextec's

3   patented technology cannot include the use of solvents?

4   A.  Yes, I do.

5   Q.  As one skilled in the field, does this paragraph indicate

6   to you --

7           MR. HORWITZ:  Objection, your Honor.

8   Q.  -- that Nextec's patented technology excludes the use of

9   solvents?

10          MR. HORWITZ:  Objection, your Honor.  Your Honor, this

11  is one paragraph.  The preceding paragraph explains in detail

12  how Lauchenauer uses solvents to control and then it goes down

13  to here and says, "Applicant does not utilize solvents."  You

14  need the whole thing in context.

15          THE COURT:  If I remember, Lauchenauer is prior art;

16  right?

17          MR. KORNICZKY:  Yes, your Honor.

18          MR. HORWITZ:  That's correct.

19          THE COURT:  Okay.  Now is this the Lauchenauer patent?

20          MR. KORNICZKY:  No, your Honor.  This is one of

21  Nextec's patents and they're addressing Lauchenauer and other

22  prior art.  Yesterday --

23          THE COURT:  I've asked several times what this

24  document is.

25          MR. KORNICZKY:  I'm sorry.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C511nex1                        Meirowitz – direct

1          THE COURT:  Can you just tell me.

2          THE WITNESS:  It's an office action, response to an

3    office action, your Honor.

4          THE COURT:  Well, you know, we have a procedure in our

5    court of introducing documents into evidence.  And is this

6    document in evidence?  Is it in evidence?  It's a --

7          MR. KORNICZKY:  Not yet, your Honor.

8          THE COURT:  Well, do you understand that documents

9    that are to be referred to must -- if we want to take the whole

10   route, they're marked for identification and then they're

11   offered into evidence.  Do you understand that?

12         MR. KORNICZKY:  Yes, your Honor.

13         THE COURT:  And do you wish to offer this into

14   evidence?

15         MR. KORNICZKY:  Yes, I do, your Honor.

16         THE COURT:  And what will its number be?

17         MR. KORNICZKY:  It's 1000, your Honor.  It's

18   Exhibit 1000.

19         THE COURT:  Exhibit 1000.  And what is it again?  It's

20   the --

21         MR. KORNICZKY:  It's an office action in response to a

22   patent examiner's -- okay.  Your Honor, the entire exhibit is

23   the file history behind the '792 patent.  So --

24         THE COURT:  What is the '792 patent?

25         MR. KORNICZKY:  That's one of the patents in the chain

C511nex1                    Meirowitz - direct

1    of patents for the '902 and '841 patents.

2              THE COURT:  Is that listed in column 1?

3              MR. KORNICZKY:  I believe it is.

4              THE COURT:  Well, let's see.  Let's see.  Let's see.

5    Can you show me where, what line, please.  My eye is very

6    capable of missing things, so -- but I don't see it.

7              MR. KORNICZKY:  Your Honor, I'm sorry.  In column 1 of

8    the '902 patent --

9              THE COURT:  Yes.

10             MR. KORNICZKY:  -- line 12, I believe --

11             THE COURT:  Okay.

12             MR. KORNICZKY:  -- you see it's highlighted on the

13   screen.  This is patent application '191, which ultimately

14   resulted in the '792 patent.  So the file history starts out as

15   a patent application, ultimately issues as the '792 patent.

16             THE COURT:  All right.  I'll take your word for that.

17   So then where do we go from there?

18             MR. KORNICZKY:  Okay.  So if we can go back to the

19   document -- I'm sorry -- back to the Exhibit 1000.

20             THE COURT:  Exhibit 1000 is the file history for the

21   '792 patent; is that right?

22             MR. KORNICZKY:  Correct.  It's one page in the file

23   history of the '792 patent.

24             And can you bring up that paragraph again.  And can

25   you highlight the language, "Applicant does not utilize

C511nex1                          Meirowitz – direct

1    solvents."

2    BY MR. KORNICZKY:

3    Q.   Now, Dr. Meirowitz, you just testified that this does not

4    exclude the use of solvents in Nextec's '902 and '841 patents;

5    correct?

6    A.   Yes, I did.

7    Q.   Why not?

8    A.   Because actually, as Mr. Horwitz said, it's completely

9    taken out of context.  That's one sentence in a three-page

10   argument as to the prior art.  The inventor summarizes on the

11   next page the entire argument.

12   Q.   What is the summary?

13   A.   Because --

14   Q.   Go to the next page, please.  And where do you see that

15   summary?

16   A.   Right there.

17   Q.   Okay.

18   A.   The fifth line from the bottom, basically, the inventor is

19   saying that the combined teachings of Baer and Lauchenauer that

20   he's addressed in the prior three pages do not alone or in

21   combination give rise to the teachings of this patent, and he

22   says, "Applicant's invention does not rely upon viscosity

23   reducing agents."

24   Q.   And so how do you understand that?

25   A.   I understand that I think the same way the patent examiner

C511nex1                    Meirowitz - direct

1    understood it, to mean that we are not limited to using

2    viscosity reducing agents.  We don't have to use solvents, but

3    we are allowed to use solvents.  They're not excluded.

4    Q.  And why do you think the examiner thought the same way you

5    did?

6    A.  Well, the examiner, after he read this, came back with an

7    examiner's amendment to the patent and added three claims.

8            MR. KORNICZKY:  Okay.  Can you turn to Exhibit 1000, I

9    think it's page 257.

10   Q.  Is this the examiner's amendment that you're referring to?

11   A.  I believe so.

12           MR. KORNICZKY:  Okay.  Can you turn to the dependent

13   claims, please.

14   Q.  So as one skilled in the art, what does this amendment mean

15   to you?

16           THE COURT:  I wish you would just drop this "as one

17   skilled in the art."

18           MR. KORNICZKY:  I will, your Honor.

19           THE COURT:  We don't need to have all this formality.

20   We don't have to have it.  It means nothing.

21           MR. KORNICZKY:  Okay.  I'm sorry.

22   Q.  Dr. Meirowitz, what does that method tell you?

23   A.  As I understand this -- and I'm not a lawyer -- independent

24   claims are broad and dependent claims have to narrow that down.

25   What the examiner did was he added 178, 179 and 180, all which

C511nex1                              Meirowitz - direct

1   end with --

2              THE COURT:  Added them to what, to the one --

3              THE WITNESS:  The '792 patent.

4              THE COURT:  '792 patent.

5              THE WITNESS:  All of these end with the phrase,

6   "whereby the polymer composition is essentially free of

7   solvent."  Again, in my reading, the independent claim doesn't

8   say that.  And the dependent claims now talk about "essentially

9   free of solvent."  Since the independent claim had to be

10  broader, then it's not essentially free of solvent.  It

11  doesn't --

12             THE COURT:  What's the independent claim?

13             THE WITNESS:  Can someone put that up.  I don't want

14  to quote something.

15             It says a controlled means of shear placement and it

16  doesn't mention solvents.  So with or without solvent.  Then

17  the examiner added three dependent claims saying --

18             THE COURT:  Dependent to what?

19             THE WITNESS:  Can someone put up the independent

20  claim.

21             MR. KORNICZKY:  Yeah, they're going to pull it up.

22             THE WITNESS:  Thank you.

23             MR. KORNICZKY:  But your Honor, what it is -- well,

24  I'll let the witness respond.

25             THE WITNESS:  You can explain it better.  I'm not a

C511nex1                    Meirowitz - direct

1   lawyer.

2              MR. KORNICZKY:  I want to know how you understand it.

3              THE WITNESS:  Okay.

4              MR. HORWITZ:  Your Honor --

5              THE COURT:  Just a minute.

6              THE WITNESS:  While they're looking for it, your

7   Honor --

8              THE COURT:  No.  Just a minute.

9              THE WITNESS:  Okay.

10             THE COURT:  You referred to an independent claim.  I

11  assume that they can put this on the screen.

12             THE WITNESS:  I hope so.

13             THE COURT:  What's the number of that claim?

14             MR. HORWITZ:  47, your Honor.

15             THE COURT:  All right.  Let's look at 47.

16             MR. HORWITZ:  Which does not refer to shear.

17             THE WITNESS:  Is it 47?

18             THE COURT:  You referred to an independent claim.  I

19  assume you have in mind what you're referring to.  What is

20  that?

21             THE WITNESS:  I'm not sure of the number, your Honor.

22  That's why I'm asking them to pull it up.

23             THE COURT:  Can it be scrolled so you can find it?

24             MR. KORNICZKY:  That's what they're trying to do, your

25  Honor.

C511nex1                        Meirowitz – direct

1           MR. HORWITZ:  It's claim 47, your Honor.  53 and 60

2    refer back to 47.  53 and 60 are both dependent claims,

3    dependent on 47.  Nowhere in 47 is the word "shear" used.

4           MR. KORNICZKY:  Can we go to the exhibit.

5           MR. HORWITZ:  If you look at patent 51, '051, and --

6           THE WITNESS:  This is the '792.

7           THE COURT:  Okay.  We're going to take a short recess

8    and then you can try to find what you're looking for.

9           (Recess)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C517NEX2                    Meirowitz - direct

1              THE COURT:  Before we go ahead with the witness, the

2      reason I took the break was just to think about what is going

3      on, and it seems to me that what is going on is to try to

4      display to the court things that are so attenuated, so kind of

5      remote from the patent in question, and they don't really prove

6      anything.  That's a startling statement for me to make, but at

7      least to me -- and I'm the jury here -- you're not saying

8      anything to me.

9              Now, what did say something was the witness directing

10     the court's attention to Table V in the 902 patent, and the

11     witness said that in order to get the substance so it would

12     flow properly a solvent was used.  He said this Nalco,

13     etcetera, is a solvent.  OK.  Now, I haven't heard anything

14     this morning that added to that, not anything.

15             Maybe there has been some rebuttal of some reference

16     that Mr. Horwitz made yesterday, but that's not the main.  The

17     main purpose of the plaintiff's case is to make the plaintiff's

18     case out.  And I would think that just as a matter of common

19     sense, even without seeing Table V, if somebody said to me as

20     the judge, well, you've got to get the material in shape so it

21     can flow along and be sheared and so forth -- the key word is

22     material in this claim one -- well, if you said that to me, I'd

23     say, sure, you can't have a rock flowing, you can't have

24     something that won't flow, you can't have something that

25     whatever flows or spread out over the fabric, whatever it is

C517NEX2                    Meirowitz – direct

1    supposed to do; you have to have something that is liquified or

2    viscous enough to do that.  You wouldn't even have to have

3    Table V.  I would say, well, sure.  And you could call it a

4    solvent, OK.  There has to be this thinnable material.

5            So, we spent a long time this morning trying to

6    illustrate references that are very strained and very remote

7    that that's the case.  Well, fine.  That is surely not the end

8    of the patent case.

9            I'm going to make a suggestion because I would like to

10   get somewhere with this case.  I think the way we would

11   progress the quickest with this case is to get evidence

12   immediately about the defendant's device.

13           MR. KORNICZKY:  Your Honor, I think you hit the nail

14   on the head.  If I may, you are correct, what we have been

15   trying to address is the comment that was made yesterday and in

16   opening argument about not being allowed to use solvents in the

17   shear thinnable material, so what I was trying to point out is

18   that the patents contemplate using solvents.  So, we have

19   pulled up --

20           THE COURT:  The thing is what is --

21           I want to repeat what I said yesterday, that the

22   patent has an emphasis, and that emphasis has meaning, and the

23   emphasis is on what is called shear thinnable material, that

24   is, a material which will be thinned by shearing.  It speaks of

25   shear thinning energy.  Now, that is the essence of the patent.

C517NEX2                    Meirowitz - direct

1          Now, if somebody comes along -- and I don't know how

2     this would happen -- but if they use solvents to do all of the

3     thinning necessary to get the material down into the fabric,

4     they don't infringe.  But the thing the patent talks about is

5     the idea that the operation of getting that material down into

6     the fabric is done by shearing.  Shearing.

7          Now, I believe -- and I am repeating myself -- I

8     believe that we would make the quickest progress in this case

9     if we had evidence now about the method used by the defense,

10    the machine used by the defense and so forth.

11         We've got the patent; the patent is quite

12    understandable.  And does the method, the machine -- or

13    whatever you call it -- of the defense infringe the patent?

14    Well, the thing that's going to tell the story is to find out

15    what the defense actually does.  So, let's have that evidence.

16    When can that evidence be put on, Mr. Horwitz?

17         MR. HORWITZ:  Your Honor, we can put up a witness

18    tomorrow morning to talk about the solvents that are used and

19    how that's done, and another witness to put on to discuss

20    exactly what's done with the machine.  The first thing tomorrow

21    morning we can be ready.

22         THE COURT:  You couldn't be ready any earlier than

23    that?

24         MR. HORWITZ:  Your Honor, I can try and be ready this

25    afternoon after lunch, but it would take some doing, but I will

C517NEX2                    Meirowitz - direct

1    move heaven and earth to do so, your Honor.

2           MR. KORNICZKY:  Your Honor, our expert on infringement

3    can be here probably in the next 30 to 45 minutes to prove

4    infringement.  We've got the background of the patent.

5           THE COURT:  Well, why don't we do this, let's go as

6    fast as we can.  Your offer of tomorrow morning is a very good

7    offer.  I'm not going to press this afternoon.  But then let's

8    have that expert on.

9           But what is going on right now with trying to find

10   these references to solvents in claim 58 of some other patent,

11   it has no weight.  It really doesn't have any weight

12   particularly to add to what is already known.  So, when can you

13   have your expert?  And I think we could really suspend

14   Dr. Meirowitz.

15          MR. KORNICZKY:  So, for the record, your Honor, we can

16   move to the infringement issues, but I guess the thought I had

17   yesterday was I thought you wanted us to pull up all the issues

18   with whatever Dr. Meirowitz was going to testify on.  But if

19   you want to break it up into liability, I would have to call

20   him back for rebuttal on their defenses.  Is that OK?

21          THE COURT:  Sure it is.

22          MR. KORNICZKY:  Oh, OK.

23          THE COURT:  When can your expert testify?

24          MR. KORNICZKY:  45 minutes, your Honor?  And we can

25   break for lunch and then start?

C517NEX2                         Meirowitz - direct

1                MR. HORWITZ:  Your Honor, if I may.

2                THE COURT:  Yes.

3                MR. HORWITZ:  I think your Honor is looking at the

4      claim, and one of the things the federal circuit says is you

5      have to look at how the applicant limited the claim.  The claim

6      language itself says one thing.  Then the applicant in this

7      patent, in these two patents, said no solvents, exactly what

8      was said here, we don't use solvents in getting the material

9      down, we use solely shear.

10               And if you look at exactly what he has been talking

11     to --

12               THE COURT:  I don't understand what you are talking

13     about.  Witnesses we have when?

14               MR. KORNICZKY:  They will be here in the next 30 to 45

15     minutes.  Mr. Murphy just went to get her, your Honor.

16               If we could break for a short lunch, she should be

17     here after lunch.

18               THE COURT:  That would be simply wonderful.

19               MR. KORNICZKY:  Thank you.

20               MR. HORWITZ:  Your Honor, could I have this witness

21     for cross-examination on that issue for a short amount of time,

22     to show what the file history of these patents say, that in

23     order to have the control that the patent claim requires you

24     cannot have these solvents?

25               MR. KORNICZKY:  Your Honor, this is claim

C517NEX2                          Meirowitz – direct

1   construction.

2           THE COURT:  We need to eat some lunch, and you can do

3   that cross at some point.

4           All right.  Let's have lunch.  Then we will be back in

5   45 minutes and start this witness.  That would be extremely

6   helpful.

7           MR. KORNICZKY:  Thank you, your Honor.

8           (Luncheon recess)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                           1:00 p.m.

 3             MR. HORWITZ:  Your Honor, I think you afforded me a

 4   half hour on the issue of solvents and --

 5             MR. KORNICZKY:  That's not right.

 6             THE COURT:  I thought we were starting with our

 7   expert.

 8             MR. KORNICZKY:  We are, and that's what the record

 9   reflects.

10             THE COURT:  That's what we're going to do.  Who is the

11   witness?

12             MR. KORNICZKY:  Plaintiffs call Dr. Christine Cole.

13   And Michael Murphy will be doing the direct.

14    CHRISTINE COLE,

15        called as a witness by the plaintiff,

16        having been duly sworn, testified as follows:

17             THE COURT:  State your name.

18             THE WITNESS:  My name is Christine W. Cole.

19             THE COURT:  C-o-l-e?

20             THE WITNESS:  That's correct, your Honor.

21             THE COURT:  All right.

22   DIRECT EXAMINATION

23   BY MR. KORNICZKY:

24   Q.  Good afternoon, Dr. Cole.  What do you do currently?

25   A.  I'm director of Clemson University Research Center, Clemson
```

C517NEX2                    Cole - direct

1    Apparel Research.

2    Q.  Why did you decide to specialize in apparel and textiles?

3    A.  As a scientist I find the richness of textiles, what you

4    can do with them, how you can design them, to be infinitely

5    intriguing, and I have enjoyed a lot of the projects that I

6    have worked on.

7    Q.  How long have you been involved with textiles?

8    A.  I have been involved in textiles actually from when I was a

9    child, growing up in a textile mill village in North Carolina.

10   More directly I have been involved as a faculty member at

11   Clemson University in since 1976.

12   Q.  Where did you receive your undergraduate degree?

13   A.  I received a Bachelor of Science in chemistry from the

14   University of North Carolina at Chapel Hill.

15   Q.  And where did you receive your doctorate from?

16   A.  I received a Ph.D. in physical chemistry from the

17   Massachusetts Institute of Technology.

18   Q.  What did you do after you left MIT?

19   A.  After I left MIT I came to Clemson University as a

20   post-doctoral research associate designing flame resistant

21   finishes for children's sleep wear.

22   Q.  And what positions have you held at Clemson?

23   A.  Since that time I have gone up through the usual academic

24   ranks of assistant professor, associate professor, and then

25   full professor since the 1980s, now in the School of Material

C517NEX2                        Cole - direct

1   Science and Engineering at Clemson University.

2   Q.  What is Clemson Apparel Research?

3   A.  Clemson Apparel Research is a research department of

4   Clemson University.  I was one of the founding people almost 25

5   years ago, and Clemson Apparel Research does research

6   production, so we actually make shirts for the U.S. military.

7   We also do a lot of research projects both for the Department

8   of Defense, for small businesses.  I tend to participate more

9   in the research projects including classified research.

10  Q.  And what is your role at CAR?

11  A.  I'm the director, so I have the usual managerial

12  responsibilities for budget as well as personnel.  My primary

13  direct responsibilities are participation in the military

14  research projects, however.

15  Q.  And you mentioned military.  What work have you done with

16  military textiles?

17  A.  It's been a variety.  I have been involved with the Defense

18  Threat Reduction Agency, DTRA, for many years, designing and

19  evaluating their research programs for chemical, biological

20  protective garments.  I do a lot of work on signature control,

21  that is, camouflage kinds of things.  I have worked with coated

22  fabrics for development of technologies for Marine Corps,

23  sleeping bag covers.  It's just a wide range of different kinds

24  of projects.

25  Q.  Thank you.  Let's talk a little bit about this case and the

C517NEX2                           Cole - direct

1  parties here.  Have you worked with Nextec before this case?

2  A.  No, I have not.

3  Q.  Have you worked with Brookwood before this case?

4  A.  No, I have not.

5  Q.  I'm going to ask your opinion about certain topics.  Have

6  you reviewed Nextec's 902 patent?

7  A.  Yes, I have.

8  Q.  OK.  And have you reviewed Nextec's 841 patent?

9  A.  Yes, I have.

10  Q.  Do you know what I refer to when I say the 902 patent?

11  A.  Yes, I do.

12  Q.  And do you know what I refer to when I say the 841 patent?

13  A.  Yes, I do.

14  Q.  To your left is a poster board with the language from claim

15  I of the 902 patent.  Do you see that?

16  A.  Yes, I do.

17        MR. MURPHY:  Your Honor, for the record you will

18  notice there are four fabrics listed there.  Plaintiffs have

19  chosen to withdraw their claims against one of the fabrics, I

20  believe, and I will confirm that it's 4951.  Yes, 4951, that is

21  what it is Bates labeled as.  And we hope that will speed along

22  the trial.

23        THE COURT:  It's hard for me to see the board.

24        MR. KORNICZKY:  Would your Honor like me to move it

25  closer?

C517NEX2                    Cole - direct

1          THE COURT:  Sure.  Oh, the board is on the screen.

2    What did you say was withdrawn?

3          MR. MURPHY:  There was a claim against a fabric.  Do

4    you see where there are BR numbers, those are Bates labels of

5    fabric samples that we had received from Brookwood, and there

6    had been a 4951 that had been accused of infringement, and we

7    have decided in order to move this case along, since there were

8    no commercial sales of that fabric and it didn't appear to be

9    very commercially viable, that we would withdraw.

10          THE COURT:  So, you are claiming against these

11    fabrics.

12          MR. MURPHY:  Against these fabrics is what we are

13    claiming against, yes, your Honor.

14          MR. HORWITZ:  Your Honor, in view of that withdrawal,

15    can we have judgment of noninfringement on that material?

16          THE COURT:  Why do we get into that with the testimony

17    of a witness?

18          MR. HORWITZ:  No, I'm saying for the one that they

19    have withdrawn, can we have judgment of noninfringement for

20    that specific fabric that's been withdrawn?

21          THE COURT:  I repeat, why do we get into that issue

22    when we have a witness testifying?  We will take care of that

23    later, whatever needs to be taken care of.

24          Go ahead with the testimony.

25

C517NEX2                    Cole - direct

1    BY MR. MURPHY:

2    Q.  Dr. Cole, have you reviewed of any samples of Brookwood

3    fabrics?

4    A.  Yes, I have.

5    Q.  Did you review a sample of Brookwood's GEN III Level V soft

6    shell fabric that was made using the M1074B polymer formulation

7    and has been Bates labeled BR4952?

8    A.  Yes, I did.

9    Q.  And is that the one on the left-hand column?

10   A.  That is correct.

11   Q.  I'm going to refer to that as the 1074B soft shell fabric

12   for short.  Is that OK?

13   A.  Yes.

14   Q.  And you will understand me if I refer to it that way?

15   A.  I will try to keep it straight.

16   Q.  And have you formed an opinion as to whether Brookwood's

17   method of making its 1074B soft shell fabric meets each and

18   every element of claim one of the 902 patent?

19   A.  Yes, I have.

20   Q.  And what is that opinion?

21   A.  In my opinion Brookwood's method for manufacturing the soft

22   shell parka with the M1074B polymer composition infringes on

23   each and every element of claim one of the 902 patent.

24   Q.  And did you review a sample of Brookwood's GEN III Level

25   VII parka fabric made using the M1074B polymer formulation?  I

C517NEX2                        Cole - direct

1    believe that's Bates labeled BR4953.

2    A.   Yes, I did.

3    Q.   I'm going to refer to that as the parka fabric.  Is that

4    OK?

5    A.   Yes.

6    Q.   OK.  And have you formulated an opinion of whether

7    Brookwood's method of making its fabric meets each and every

8    element of claim one of the 902 patent?

9    A.   Yes, I have formulated an opinion.

10   Q.   And what is that opinion?

11   A.   In my opinion Brookwood's method for manufacturing the

12   parka fabric with the M1074B polymer composition infringes on

13   each and every element of claim one of the 902 patent.

14   Q.   And did you review a sample of Brookwood's GEN III Level V

15   soft shell fabric made using the 52668 polymer formulation that

16   had been Bates labeled BRS0050?

17   A.   Yes, I did.

18   Q.   I'm going to refer to that as the 52668 soft shell fabric

19   for short.  Will you understand that if I use that terminology?

20   A.   Yes, I will.

21   Q.   Have you formed an opinion as to whether Brookwood's method

22   of making --

23             THE COURT:  The latter -- is which one of these?

24             MR. MURPHY:  The one on the far right, your Honor.

25             THE COURT:  Far right.

C517NEX2                          Cole - direct

1           MR. MURPHY:  Yes.

2           THE COURT:  All right.

3   Q.  And have you formed an opinion as to whether Brookwood's

4   method of making its 52668 soft shell fabric meets each and

5   every element of claim one of the 902 patent?

6   A.  Yes, I have.

7   Q.  And what is that opinion?

8   A.  In my opinion Brookwood's method for manufacturing the soft

9   shell parka fabric with 52668 infringes each and every element

10  of claim one of the 902 patent.

11  Q.  Finally, the third column, did you review a sample of

12  Brookwood's developmental GEN III Level V soft shell fabric

13  made using a polymer composition that included FR767?

14  A.  Yes.

15  Q.  Bates labeled BR4950?

16  A.  Yes, I did.

17  Q.  OK.  I'm going to refer to that as the developmental soft

18  shell fabric.  Is that OK?

19  A.  Yes.

20  Q.  OK.  Have you formed an opinion as to whether Brookwood's

21  method of making its developmental soft shell fabric meets each

22  and every element of claim one of the 902 patent?

23  A.  Yes, I have.

24  Q.  And what is that opinion?

25  A.  In my opinion Brookwood's method for manufacturing the

C517NEX2                        Cole - direct

1    developmental fabric, the soft shell fabric made which includes

2    FR767, infringes each and every element of claim one of the 902

3    patent.

4    Q.  And just so we know what we are talking about, have you

5    seen a finished GEN III soft shell garment?

6    A.  Yes, I have.

7    Q.  And have you seen a GEN III parka?

8    A.  Yes, I have.

9    Q.  And could you put up the demonstrative from the opening

10   day.

11          Are these pictures of those finished garments?

12   A.  Those appear to be the correct pictures, yes.

13   Q.  Thank you.  Dr. Cole, we have a lot of questions to go

14   through, so if you need some water at any time, please let me

15   know, and I will be happy to bring you some.

16   A.  Thank you.

17          MR. MURPHY:  Your Honor, may I approach?

18          THE COURT:  Certainly.

19   Q.  Dr. Cole, I'm going to hand you some very large binders.

20          Your Honor, sorry.  Can I have just one moment with

21   opposing counsel?

22          Dr. Cole, did you prepare a report in this matter on

23   January 16, 2009 regarding some of your opinions?

24   A.  Yes, I did.

25          MR. MURPHY:  I apologize for that delay, your Honor.

C517NEX2                        Cole - direct

1    Q.  Could you please look at Exhibits 3 through 50 of the

2    binder to your left -- sorry, 3 through 27.  Do those documents

3    constitute the report you prepared on January 16, 2009?

4    A.  They appear to be my report.

5    Q.  Did you also prepare a report on January 20, 2012 regarding

6    some of your opinions in this case?

7    A.  Yes, I did.

8            MR. MURPHY:  Your Honor, I can address -- the problem

9    is we have the binders being delivered, and they should be here

10   very shortly.  What I have given the witness are the joint

11   exhibit binders which contain her report but they are not

12   specific to this witness.

13           THE COURT:  You can go ahead and question her, can you

14   not?

15           MR. MURPHY:  I can.  I just noticed you were looking,

16   but I can continue on if that's all right.

17           THE COURT:  Of course.

18   Q.  And can you please look at Exhibit 676 through 729.

19           MR. HORWITZ:  Excuse me.  In view of the fact that we

20   have not gotten copies of this, could they put those up so that

21   we can see them at least on the screen?

22           THE COURT:  Well, let's see.  I assume we will have

23   questioning.

24           MR. MURPHY:  We will go through these in detail, your

25   Honor.

C517NEX2                        Cole - direct

1          THE COURT:  Well, let's have questioning about the

2    basis for her opinions.

3          MR. MURPHY:  Right.

4          THE COURT:  Of course you're going to do that.  Let's

5    go ahead right now with that, please.

6    Q.  Does this appear to be your report in which you set forth

7    several of your opinions in this case?

8          MR. HORWITZ:  Your Honor, objection.  As I understand

9    it, her report --

10         THE COURT:  Please, please, there is no basis for an

11   objection at the present moment.  I assume that she will

12   testify as to the basis, not refer to a report, but she will

13   testify in court about the basis for the opinions she has

14   given.  Am I correct?

15         MR. MURPHY:  Yes, you are.

16         THE COURT:  Then let's have that testimony.

17   Q.  Dr. Cole, I would like to focus on your opinion regarding

18   Brookwood a 56228 soft shell fabric.  Just to reiterate, what

19   was your opinion --

20         THE COURT:  I recall vividly her opinion was given

21   moments ago.

22   Q.  Let's break the elements of claim one of the 902 patent

23   down.  Do you see the first element?  And you can see it on the

24   board to your left.  Can you read that element?

25   A.  The first element in the preamble is "a method of

C517NEX2                        Cole – direct

1  controlling the effective pore size of a web".

2  Q.  And have you determined whether Brookwood -- have you

3  reached an opinion as to whether Brookwood's method of making

4  the 52668 soft shell fabric meets this element?

5  A.  Yes, I have.

6  Q.  What is that opinion?

7  A.  In my opinion Brookwood's method for making the soft shell

8  fabric with the polymer composition 52668 does meet this

9  element of claim one of the 902 patent.

10        THE COURT:  Look here, this is now just a repetition

11  of what she has given.  I assume that she will describe what

12  Brookwood does and explain why that method infringes.  Is she

13  going to do that?

14        MR. MURPHY:  She is going to go through her analysis

15  of why it infringes.

16        THE COURT:  I asked a specific question.  Is she going

17  to describe what it is that Brookwood does and explain why it

18  is that that infringes?

19        MR. MURPHY:  She is, your Honor.  She is going to do

20  that element by element.

21        THE COURT:  That will -- why?

22        MR. MURPHY:  Well, because that was the legal test for

23  establishing infringement.

24        THE COURT:  I know what the law is.

25        Look, can I just ask you, can you describe for me what

C517NEX2                          Cole - direct

 1    it is that Brookwood does.  Let's forget the patent for a

 2    moment.  What does Brookwood do?  What is their method?  What

 3    is their machinery?  What do they do?

 4            THE WITNESS:  Brookwood takes a woven textile fabric

 5    that they call Agility, they clean it up, they print it, they

 6    treat it with a durable fluorochemical water resistant

 7    material, and then they coat it.  And it is the fluoro chemical

 8    treatment in some cases which infringes on patents.  It is the

 9    coating process which in all areas infringes on Nextec's

10    patents.

11            THE COURT:  Can you describe in detail what they do?

12    Do they use a machine?  What do they do?

13            THE WITNESS:  Brookwood uses a machine, so --

14            THE COURT:  Just start at the beginning.  What

15    happens?  They have some fabric, right?

16            THE WITNESS:  Right, they have some fabric.

17            THE COURT:  They have some fabric.  Now, is the fabric

18    rolled along?  Is it pushed along?  What is done?

19            THE WITNESS:  There is a roll of fabric which has --

20            THE COURT:  There is a roll of fabric.

21            THE WITNESS:  Right.  The fabric as it came from

22    someone who wove it has now been cleaned up, so it's ready for

23    processing.  It has been printed with a camouflage pattern on

24    one surface.  It has been treated with a water repellant

25    chemical.  And you see that roll of fabric on your monitor.

C517NEX2                          Cole - direct

 1    The yellow arrow is pointing towards that roll of fabric.

 2                 THE COURT:  All right.  Now wait just a minute.

 3                 Again, things that are exhibits have to be received as

 4    exhibits.  Now, is this something you are offering now?

 5                 MR. MURPHY:  Yes, your Honor.

 6    Q.  Dr. Cole, is this a page from your expert report?

 7                 THE COURT:  It doesn't make any difference whether

 8    it's from her report.

 9                 Is it?

10                 MR. MURPHY:  It is.

11    Q.  Dr. Cole, do you know how this photo was taken?

12    A.  Yes.

13                 THE COURT:  I don't care.  Is this a photograph of

14    their machine?

15                 THE WITNESS:  Yes, it is.

16                 THE COURT:  All right.  What is the exhibit number?

17    What is the exhibit number?

18                 MR. MURPHY:  It is 699, your Honor.

19                 THE COURT:  Are you offering 699?

20                 MR. MURPHY:  Yes, we are.

21                 THE COURT:  Received.  Let's go ahead.

22                 (Plaintiff's Exhibit 699 received in evidence)

23                 THE WITNESS:  So, there is a roll of fabric which is

24    ready to be coated sitting on a stand.  The roll of fabric is

25    being unwound and pulled into the coating machine that

C517NEX2                       Cole - direct

1    Brookwood calls KK1.  This is the entry of that roll of fabric

2    into the equipment.

3         THE COURT:  Now, is it possible for you to take a

4    pointer or something and let me know where -- can we go back to

5    the earlier exhibit we just saw?

6         THE WITNESS:  Can we go back, please, one.

7         Do I have a pointer?

8         MR. MURPHY:  Is your screen touch sensitive?

9         THE WITNESS:  I don't see a reaction.  Oh, there is a

10   blue arrow now.  Where the blue arrow is, this is the roll of

11   clean printed fabric which is ready to be coated, and it's

12   going to be coated on this machine on the side that's not

13   printed with camouflage pattern, so it's going to be printed on

14   the side that looks kind of grayish.

15        THE COURT:  Is it rolling towards the right?

16        THE WITNESS:  Yes, it is, your Honor.  So, the fabric

17   is being unwound off of the stand, and the fabric is moving

18   continuously towards the right.  The fabric appears to

19   disappear underneath the floor, which is on the right-hand side

20   of the image.

21        THE COURT:  Very good.  OK, go ahead.

22        THE WITNESS:  If I could have the next slide, please.

23        The next image is --

24        THE COURT:  What is this number?

25        MR. MURPHY:  This is Exhibit 701, your Honor.

C517NEX2                    Cole - direct

1         THE COURT:  You're offering 701?

2         MR. MURPHY:  We are.

3         THE COURT:  Can you please go through this procedure.

4    You offer the exhibit, we will receive it, but then the record

5    is complete.  If we don't have a record of that, we don't have

6    a record.

7         MR. MURPHY:  Your Honor, we offer Exhibit 701.

8         THE COURT:  Received.  All right.

9         (Plaintiff's Exhibit 701 received in evidence)

10        THE WITNESS:  The roll of fabric is seen again on the

11   left-hand side of the picture.  It's a slightly different angle

12   as the roll of fabric is being pulled in to the first station

13   on KK1.  This first station, which appears to have the cover on

14   it and the shiny metal on it, this station is not really being

15   used in this process, it's simply there for other fabrics

16   Brookwood might process.

17        If we could see the next image, please.

18        MR. MURPHY:  We offer 702.

19        THE COURT:  702 is received.  All right.

20        (Plaintiff's Exhibit 702 received in evidence)

21        THE WITNESS:  Again we are walking our way down the

22   process line from left to right.  Where you see the gentlemen

23   gathered, this is the area where the actual coating on the back

24   side of the fabric is going to take place.  You see on the

25   right-hand side, to the right of one of Brookwood's counsel, a

C517NEX2                            Cole - direct

1    drum, a black drum.  This black drum contains the polymer

2    composition.

3            THE COURT:  I don't see the black drum.

4            THE WITNESS:  This is immediately to the right of I

5    believe it's Mr. Ball, counsel.  So, it's approximately a

6    quarter of the way in from the right-hand side of the screen,

7    about halfway up the screen.  There is a red vertical -- one

8    has a pointer, thank you.  On my screen I see a yellow pointer

9    on the black drum.  So, the black drum is the reservoir for the

10   polymer composition 52668.  This is what's going to be placed

11   onto the back side or the application side of the fabric.  At

12   the coating station where --

13           THE COURT:  And what do you call this?  This is the

14   polymer?

15           THE WITNESS:  This is the polymer composition, your

16   Honor.

17           THE COURT:  Polymer composition.  OK, very good.

18           THE WITNESS:  If I could have the next image, please.

19           MR. MURPHY:  We offer 703.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 703 received in evidence)

22           THE WITNESS:  This is a picture of the coating station

23   as --

24           THE COURT:  The what?

25           THE WITNESS:  This is the coating station where the

C517NEX2                        Cole - direct

1      actual shear thinning of the polymer composition is going to

2      take place that I suspect we are going to be talking about in

3      great detail in a few minutes.

4              What you are seeing is the coating station as it is

5      being set up.  We do not have a fabric running in this area.

6      When the fabric is running, the shiny table to the right will

7      be covered with the fabric.  So, the fabric is coming off the

8      roll, it's going through that unused station 1, it's being

9      pulled through, it will be pulled back-side up over the shiny

10     table, under the coating knife, which is immediately in the

11     center.

12             So, there is a blue arrow on my screen which is

13     showing a couple of tongue depressors.  The area there is

14     actually clamping the knife, so the knife is this very wide

15     back material which runs diagonally from the lower right up to

16     the center of the screen.  That's the coating blade.

17             THE COURT:  That's the what?

18             THE WITNESS:  That's the coating blade.

19             THE COURT:  Coating blade.

20             THE WITNESS:  Coating blade.  Sometimes I will refer

21     to it as a coating knife.  And then the fabric will exit from

22     under the coating blade, go off to the left-hand side into an

23     oven where a lot of the solvent in the fabric is extracted for

24     recovery.  The fabric will then be rolled up at the end of the

25     line.  And I think we have an image of the roll-up on the end

C517NEX2                          Cole - direct

1   of the line.

2              MR. MURPHY:  726 shows a roll up.

3              Your Honor, would you like to see the table with the

4   fabric on it?

5              THE COURT:  Would I like to what?

6              MR. MURPHY:  Could we go to 717 before we go to the

7   roll-up, please.

8              THE COURT:  What is 717?

9              MR. MURPHY:  We would like to offer this.

10             THE COURT:  Received.

11             (Plaintiff's Exhibit 717 received in evidence)

12             THE WITNESS:  What we're looking at now is the coating

13  area from the opposite side than what we just looked at, so

14  we're standing roughly where Mr. Ball and the drum were

15  standing looking across the machine KK1.

16             What we're looking at is on the left-hand side of the

17  image we see the back-side of the soft shell fabric, so we are

18  looking at the reverse side of the camouflage print.  The

19  fabric is traveling from left to right.

20             Immediately in I guess about just to the left of

21  center line you see a translucent material.  This is the

22  polymer composition 52668.  It's sitting riding on the back of

23  the fabric as the fabric is traveling.  This bead is rolling on

24  top of the surface of the material.

25             Immediately to the right of the polymer composition

C517NEX2                         Cole - direct

1   you see another view of the blade.  This is the top edge of the

2   blade, so this is what is actually shearing the polymer

3   composition 52668.

4          Then on the right-hand side of the screen, it's a

5   little difficult to tell on this image, but the back of the

6   fabric is a little bit shiny because it is wet with a polymer

7   composition 52668.  Now the fabric is going to go directly off

8   the right, into the solvent extraction and curing oven.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C511nex3                    Cole - direct

1          THE COURT:  Okay.  Now look, going to the far left,

2      that is the fabric coming into this part of the apparatus;

3      right?

4          THE WITNESS:  That is correct, your Honor.

5          THE COURT:  And then the fabric, does it stay at that

6      level or does it -- I guess it doesn't go up over those, it

7      just stays at that level; right?

8          THE WITNESS:  It stays approximately at that level

9      going underneath the coating blade.  You notice that there's a

10     little difference in level as the fabric exits from out

11     underneath the blade.  There's a rise because underneath the

12     fabric where we can't see it, there's a metal bar called a

13     T-bar, so fabric is making an upward angle as it comes out from

14     underneath the blade.

15         THE COURT:  Now the device that you said contained the

16     polymer, can you have the arrow over there.  Can somebody --

17         THE WITNESS:  This translucent material is the

18     polymer, so it's being pumped out of the drum by the hose that

19     you see in the lower center portion.

20         THE COURT:  I don't see anything that looks

21     translucent.

22         THE WITNESS:  It looks grayish, kind of glossy.  So it

23     looks like --

24         THE COURT:  We're looking at a metal cover.  Am I

25     actually looking at --

C511nex3                        Cole - direct

1            THE WITNESS:  You're actually looking at the polymer,

2       your Honor.  If you -- let me see if I can draw.  The polymer

3       is this area, so all of this is polymer (indicating).  That's

4       just liquid, which is rolling on top of the fabric.

5            This is another view, so again, it's the uncoated

6       fabric coming in, the polymer is filling the reservoir in front

7       of the knife right now, so that's the liquid, the 52668, and

8       the blade, which is going to be coating the polymer onto the

9       back of the fabric, is this shiny metal bar (indicating).  It's

10      about 6 inches high that runs across the lip of the machine.

11           MR. MURPHY:  Your Honor, we offer Exhibit 715.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 715 received in evidence)

14           THE COURT:  Okay.  Let's stick to 715 a minute.  Will

15      that liquid spread out so that it covers the width of the

16      fabric?  What happens?

17           THE WITNESS:  It does spread out to seal the wick, so

18      for instance, the polymer will end up -- if you go all the way

19      up to the left-hand side, there's a vertical piece of metal

20      here, which is a dam.  This dam is used to keep the polymer

21      from falling off the left-hand side of the table and covering

22      up the salvage, but there's a hole of about a quarter of an

23      inch, 3/16 or a quarter of an inch between the fabric and the

24      bottom edge of the dam.  The liquid is viscous enough that it

25      does not flow out underneath that slot.

C511nex3                    Cole - direct

1              THE COURT:  Now what about, does it go the other way?

2              THE WITNESS:  It will flow to the right towards the

3    dam that we see immediately in front of this vertical red

4    control, so this is the right-hand dam, and again, its purpose

5    is to try to keep the polymer on top of the back of the fabric

6    so that the edge, salvage edge of the fabric stays free of the

7    polymer, it stays clean.

8              THE COURT:  Okay.  Now when the operation is going,

9    this fabric is moving continuously; right?

10             THE WITNESS:  Correct.

11             THE COURT:  Through this.

12             THE WITNESS:  Correct.

13             THE COURT:  Now what obviously is shown here is the

14   stage before it moves; right?

15             THE WITNESS:  The fabric is actually starting to move

16   at this point, but this is as the machine is being set up.  The

17   previous image shows the machine as it's actually operating.

18             THE COURT:  Can we see the previous image.

19             THE WITNESS:  Yes.  In this image the fabric is

20   actually being coated so that polymer material, which was

21   starting to spread out in front of the knife, has now spread

22   all the way out to the dam.

23             THE COURT:  Just a minute.  I just don't get a very

24   clear impression from this picture.  It looks almost as if

25   there is a round drum in front, to the left of the knife, so

C511nex3                          Cole – direct

1  I'm probably not getting an image correctly in my mind.

2               THE WITNESS:  Your Honor --

3               THE COURT:  Is it actually flat?  It looks as if it's

4  kind of a drum, but that's an optical illusion, I take it.

5               THE WITNESS:  You're actually looking at the polymer.

6  There's no container which is holding the polymer.  The polymer

7  is viscous enough that it holds its shape.

8               THE COURT:  And the polymer comes up about how high

9  from the fabric?

10               THE WITNESS:  The polymer is about -- let's see.  The

11  fabric is there, the top of the polymer is right here.  That's

12  about an inch and a half to 2 inches.  So that's just liquid.

13  There's no container which is holding it.  It's holding by its

14  thickness, its viscosity.

15               MR. MURPHY:  Your Honor, may I approach.  I have some

16  of the demonstrative polymer samples that you saw the other

17  day.

18               THE COURT:  I don't need that.

19               Where is the dam?

20               THE WITNESS:  The dam is the vertical metal piece that

21  is I guess center and to the left.  Yes, the box is around the

22  dam.  If we can slide the box down just a little bit.

23               MR. HORWITZ:  Your Honor, there's a line drawing in

24  one of the patents that I think may be very helpful.

25               THE COURT:  Where is that?

C511nex3                        Cole - direct

1          MR. HORWITZ:  Right here, your Honor.  It's the Rudman

2     patent.

3          MR. MURPHY:  Excuse me, your Honor.  I thought we were

4     talking about what Brookwood actually does.

5          THE COURT:  Is there a drawing somewhere?

6          MR. MURPHY:  Your Honor, that's prior art.  The

7     Federal Circuit has said very clearly that you do not look at

8     prior art when considering infringement.

9          MR. HORWITZ:  What?

10         THE COURT:  Is there a drawing?

11         MR. HORWITZ:  Yes.

12         THE COURT:  Okay.  Where is the drawing?

13         MR. HORWITZ:  Right here, your Honor.

14         THE WITNESS:  Is there a drawing in the '902 patent,

15    which would be more appropriate than showing prior art

16    drawings?

17         THE COURT:  Well, I'm just trying to get some help in

18    visualizing this.  That's all.  Is there a drawing?

19         MR. HORWITZ:  That shows --

20         THE COURT:  Maybe it will help me.  I'm not trying to

21    be --

22         MR. HORWITZ:  It shows the knife, it shows the two

23    side pieces that make the dam.

24         (Pause)

25         THE COURT:  Well, I don't want to waste everybody's

C511nex3                          Cole - direct

1    time.  I hear your testimony.  I'm sure that you're describing

2    it exactly right.  In other words, what I see to the left of

3    the knife is an area of polymer going from side to side.  Is

4    that right?

5             THE WITNESS:  That is correct, your Honor.

6             THE COURT:  Okay.  Why don't you go ahead with the

7    testimony, or your question.

8    BY MR. MURPHY:

9    Q.  Dr. Cole, what happens to fabric after it leaves the knife

10   here?

11   A.  Well, what's happening --

12            THE COURT:  What does the knife do?

13            THE WITNESS:  Okay.  What's happening here is on the

14   left-hand side of the image we have the uncoated fabric.  And

15   you're seeing the back side of the fabric.  The polymer is on

16   top of the fabric for a short period of time.  Then the polymer

17   is drawn in between the back of the fabric and the lower edge

18   of the knife that we see here.  Some of the polymer is

19   deposited into the fabric so the fabric on the right-hand side

20   exiting has been coated on the back side with the polymer

21   52668.  So the fabric is wrapping around the bottom edge of

22   this fairly sharp knife, forming a seal, so the polymer --

23            THE COURT:  Wait a minute.  Wait a minute.  Wrapping

24   around.  What do you mean?

25            THE WITNESS:  Your Honor, if you can imagine taking a

C511nex3                         Cole - direct

knife blade, putting a piece of fab -- putting a piece of paper

underneath it (indicating), that's the situation that we have.

The vertical line, the fabric is coming underneath it.  These

two are very close in contact with each other.  The fabric's

actually being pulled slightly upward as it comes out, so we

form a seal at the knife edge.  And it's at that point that the

shearing action occurs and the polymer is placed within the

fabric.

          THE COURT:  Can you do that again.

          THE WITNESS:  I'll try to, your Honor.  A vertical

knife, which is rather sharp, fabric, coming in (indicating) --

it would be easier if I put my hands in the same direction as

you see the image.

          So you have a vertical knife, the fabric is coming in,

forming a seal underneath the knife edge (indicating).  The

polymer is under here, under my knuckles.  So the polymer is

being carried between the fabric and the knife edge.  The

fabric forms a seal underneath and now the back coated fabric

comes out the right-hand side (indicating).

          THE COURT:  Well, what happens to the polymer?

          THE WITNESS:  Some of the polymer is planted into the

fabric, a large amount of the polymer stays in the reservoir,

which is before the knife, so as the machine -- as the run

progresses and we continue to back coat the fabric, more of the

polymer is pumped out of the reservoir into this area in front

C511nex3                          Cole - direct

1    of the blade.

2                    THE COURT:  Now when the fabric passes past the knife,

3    there's no polymer sitting on top.

4                    THE WITNESS:  The polymer is sitting on -- some of the

5    polymer is sitting on top, much of the polymer is in the

6    fabric, but there is no more shearing, there's no more movement

7    of the polymer within the fabric at that point --

8                    THE COURT:  Okay.  Go ahead.

9                    THE WITNESS:  -- because it's immediately going into

10   an oven.

11                   THE COURT:  All right.

12                   THE WITNESS:  And these are curable polymers.

13                   MR. MURPHY:  I'd like to offer Exhibit 722, your

14   Honor.

15                   THE COURT:  Received.

16                   (Plaintiff's Exhibit 722 received in evidence)

17   BY MR. MURPHY:

18   Q.  What is this, Dr. Cole?

19   A.  What you're looking at is the fabric has been coming out of

20   the coating area we just saw, roughly where the vertical

21   red/orange bar is, and then fabric comes into the oven.  In the

22   oven, the -- a lot of the solvent is removed, or recovered for

23   environmental reasons, the fabric is heated, at least some of

24   the cure gets started here, so the fabric is coming through the

25   oven and it's going to end up getting wound up on a roll that's

C511nex3                        Cole - direct

1    out of the picture to the bottom right.  So this is the exit

2    end of the oven that we're looking at.

3              THE COURT:  Okay.  Now going back to when it passes

4    through, the fabric passes under the knife, can you describe --

5    you probably have so just forgive me, but describe the

6    condition of the fabric after it has passed under the knife.

7    Does it have excess this or that which has to be washed off or

8    dried off?  What is the condition of the fabric?

9              THE WITNESS:  The polymer is wet, the polymer needs to

10   have the extra solvent taken off of it for environmental

11   reasons, and the polymer needs to be cured; that is, it needs

12   to be immobilized in the fabric so when we take fabric and

13   garments away from it, we can wash them and not have this

14   water-resistant coating wash off.

15             THE COURT:  So after the fabric goes under the knife,

16   it has -- see if I'm correct.  What is the objective of

17   Brookwood to put a coating of polymer on top of the fabric, or

18   is it to get the polymer down into the fabric?  What is the

19   objective of this process?

20             THE WITNESS:  Okay.  Brookwood's overall objective is

21   to make a breathable, water-resistant fabric.  In order to do

22   that, they have to take a textile fabric, which is very

23   breathable but it has minimal water resistance, so what they're

24   doing is they're putting a polymer coating on the fabric, they

25   close up a number of the pores in the fabric so that water

C511nex3                      Cole - direct

1    droplets can't go through the fabric but the fabric still

2    remains very breathable and comfortable to wear.  In coating,

3    what's happening --

4              THE COURT:  Wait a minute, wait a minute.  That they

5    put -- is that the coating on top or is it down into the fabric

6    or --

7              THE WITNESS:  It's both.  It's both, your Honor.  The

8    traditional back-coated fabrics would have had the polymer

9    strictly on top of so it was like an extra layer on top of the

10   back of the fabric.  Those coatings didn't -- were very water

11   resistant but they didn't breathe very well so they weren't

12   comfortable to wear, and in particular they didn't keep the

13   water out of the rest of the fabric.  I believe Mr. Meirowitz

14   may have mentioned that moisture can condense in those fabrics

15   in cold climates and people who wore the garments were still

16   very cold.  So the idea here is that you make the fabric

17   breathable still, you sacrifice some of the breathability by

18   putting the polymer coating on it, but you retain a high level

19   of breathability, you add a high level of water resistance, but

20   in addition, by encapsulating some of the fibers in the fabric,

21   we also end up minimizing the fabric's absorption of water.  So

22   it's a fairly complicated process that we're going through.

23             THE COURT:  All right.  Just go back, more slowly.  I

24   think what you're saying is, you think of fabric as

25   three-dimensional, although the third dimension isn't big.

C511nex3                    Cole - direct

1    You're saying that some of the polymer goes, what I would say

2    in layman's terms, into the fabric.  And some of it is a

3    coating on top.

4            THE WITNESS:  Your Honor, could I show you some of the

5    pictures of the fabric?  I think it might make it a little bit

6    more clear.

7            THE COURT:  Sure.

8            THE WITNESS:  Could we show a picture of the uncoated

9    side of the agility substrate, please.

10           Your Honor, what we're looking at here is what the

11   whole fabric -- both sides of it would have looked like prior

12   to being processed on this machine that we're looking at.  So

13   this is a woven fabric.  You're looking at the yarns that run

14   lengthwise in the fabric and the yarns that run perpendicular

15   in the cross-direction of the fabric.

16           THE COURT:  Have we got an exhibit number for this?

17           MR. MURPHY:  Yes.  This is page 2 from Exhibit 21.

18   We'd like to offer it.

19           THE COURT:  What's Exhibit 21?

20           MR. MURPHY:  Exhibit 21 are SEM photomicrographs that

21   were taken at Dr. Cole's direction.  We can go through the

22   entire -- the entire group if you'd like, your Honor.

23           THE WITNESS:  Could we show the fabric, the soft shell

24   fabric coated with the 52668 exhibits rather than this one,

25   please?

C511nex3                          Cole - direct

1            THE COURT:  We've got to keep the record in order.

2       This is part of, what did you say, Exhibit 21?

3            MR. MURPHY:  Yes, your Honor.

4            THE COURT:  And Exhibit 21 is what?

5            MR. MURPHY:  It is -- these are photomicrographs of

6       Brookwood's 1074D soft shell fabric, and they were taken at

7       Dr. Cole's direction, I believe.

8            THE WITNESS:  That is correct.

9            THE COURT:  Are you offering Exhibit 21?

10           MR. MURPHY:  We are offering Exhibit 21.

11           THE COURT:  I'll receive it.  Thank you.

12           (Joint Exhibit 21 received in evidence)

13           THE COURT:  So go ahead, please.

14           THE WITNESS:  This picture is what the fabric looks

15      like before it's coated.  The large groups of fibers that

16      appear to be loaded as one -- one block are a yarn.  So we have

17      yarns that are running lengthwise in the fabric and we have

18      yarns that are running crosswise in the fabric.  The fibers in

19      this fabric are very small.  Each fiber is only about

20      12 microns in diameter.  That gives us a little bit of a sense

21      of the scale of what we're looking at.  And there are tens of

22      these yarns per inch of fabric in each direction.

23           If we can take a look at what the coated side of 52668

24      looks like, please.

25           MR. MURPHY:  Your Honor, this is Exhibit 728.  We

C511nex3                         Cole - direct

1    offer it into evidence.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 728 received in evidence)

4              THE WITNESS:  This is what the side of the fabric

5    which was towards that polymer composition and towards the

6    coating knife looks like after it has gone under the coating

7    knife so that --

8              THE COURT:  All right.  Now what do we see there?

9              THE WITNESS:  If you -- can we split screen and show

10   the fabric before it's coated and after it's coated, please.

11             MR. MURPHY:  Go to JX 21-2.  We had it on earlier.

12             THE WITNESS:  The image on the left-hand side is the

13   fabric before it's coated, and the image that should be coming

14   up on the right-hand side is the picture of the fabric after

15   it's been coated.  We'll get out -- the other image back.

16             THE COURT:  What are we seeing in the pictures?

17             THE WITNESS:  We're seeing what the coated side of the

18   fabric looks like after coating, your Honor.  So on the

19   left-hand side, on the uncoated fabric, we see smooth round

20   fibers, and on the right-hand side it appears that many of

21   these fibers have been covered with a fairly viscous material.

22   This is the coating.  So we've put a layer of the polymer on

23   this coated side, we've scraped it into the fabric very deeply

24   and this is --

25             THE COURT:  What do you mean you scraped it very

C511nex3                          Cole - direct

1    deeply?

2              THE WITNESS:  With the knife blade, running it across

3    the top of the fabric, this is forcing some of the polymer to

4    flow into the fabric.

5              And if we could have a cross-section, please, with the

6    soft shell fabric coated with 52668.

7              Could we have one that's a little bit lower

8    magnification than this, please.

9              THE COURT:  So I gather what you're saying is that --

10             MR. MURPHY:  Your Honor, it's from Exhibit 727.  We're

11   offering it.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 727 received in evidence)

14             THE COURT:  What you're saying is that the polymer is

15   laid onto the fabric, then the fabric passes under the knife.

16   Now I guess it would be possible to construct a knife that

17   would act like a dam; right?

18             THE WITNESS:  Correct.  It does act slightly as a dam.

19             THE COURT:  But it isn't like it a hundred percent

20   acts like a dam.  There's enough room or whatever you want to

21   call it that --

22             THE WITNESS:  It's a very leaky dam at the base of it.

23             THE COURT:  It's a what?

24             THE WITNESS:  It's a very leaky dam at the base of it.

25   So the polymer comes under the bottom of the dam.

C511nex3                          Cole - direct

1          THE COURT:  So it can move and be subjected to

2    pressure.

3          THE WITNESS:  Correct.

4          THE COURT:  And that pressure presses some of it in

5    and leaves some of it, of the coating on top; right?

6          THE WITNESS:  Pressure is one possible mechanism,

7    which is mentioned higher up.

8          THE COURT:  I'm not talking in the legalistic sense, I

9    was just saying using my own layman's terms.  But anyway, so

10   now, just to go over, I'm sure you've said it 15 times, but the

11   knife does what?  Just again.

12         THE WITNESS:  In these -- for this particular polymer,

13   the knife performs a very important function.  First of all, it

14   meters the polymer composition on so that if you look at the

15   back of the fabric, you see a uniform amount of the polymer

16   across the width of the fabric and down the length of the

17   fabric.  So it's controlled.  The knife is doing the control.

18   But in addition, the knife is forcing the viscosity of that

19   very thick polymer that you see to be reduced and then the

20   polymer flows into the fabric by its viscosity being reduced.

21   If we --

22         THE COURT:  And then -- now again, I asked this

23   numerous times.  After it's gone under the blade, under the

24   knife, then there's some things that have to be removed and

25   then there's this curing, but there is some residue that you

C511nex3                       Cole - direct

1   don't want; right?

2          THE WITNESS:  The fabric's not washed after this.

3          THE COURT:  I'm not talking about washing, but

4   somehow, I think you said some solvents are removed and so

5   forth.

6          THE WITNESS:  Correct.  In the case of this particular

7   polymer composition, it's toluene that needs to be removed.

8          THE COURT:  It's what?

9          THE WITNESS:  There's toluene, a solvent, which needs

10  to be removed from it.

11         THE COURT:  What's the name of that solvent?

12         THE WITNESS:  It's toluene, your Honor.

13         THE COURT:  How do you spell that?

14         THE WITNESS:  T-O-L-U-E-N-E.

15         THE COURT:  Toluene.

16         THE WITNESS:  Toluene.

17         THE COURT:  Toluene.  Okay.  You go ahead with your

18  questions.  Thank you very much.

19         Go ahead.

20  BY MR. MURPHY:

21  Q.  Dr. Cole?

22  A.  Yes.

23  Q.  Let's go back to the claim element, okay?

24  A.  Okay.

25  Q.  Now how did you determine that Brookwood practices a method

C511nex3                    Cole - direct

1  of controlling the effective pore sized of the web?

2  A.  I used a combination of physical test data and my

3  inspection of the fabric using electron microscopy.

4  Q.  And physical test data --

5          MR. MURPHY:  Could we please bring up Exhibit 683.

6  Q.  Can you turn to Exhibit 683, Dr. Cole.

7          Okay.  Dr. Cole, is this a chart of physical test data

8  that you had run at your direction?

9  A.  Yes, it is.

10         MR. MURPHY:  Your Honor, we offer this into evidence.

11         THE COURT:  I'll receive it.

12         (Plaintiff's Exhibit 683 received in evidence)

13  Q.  Dr. Cole, can you explain which tests tell you -- show you

14  that Brookwood is controlling the effective pore size of the

15  web.

16  A.  The first column, which is the air permeability, shows that

17  Brookwood is controlling the effective pore size.

18         THE COURT:  The effective what?

19         THE WITNESS:  Pore size.

20         THE COURT:  Pore size.

21         THE WITNESS:  Pore size, the permeability of the

22  fabric.  In this particular case the air permeability testing

23  measures how much air will flow through the fabric under a

24  constant air pressure, and you can see from my table of data

25  that the uncoated fabric -- that is what Brookwood calls

C511nex3                         Cole - direct

1    agility -- has an air permeability of approximately 30 cubic

2    feet per minute, per square foot of fabric.  However, the

3    coated fabric -- and I did three sets of tests of the coated

4    fabric, so that's ones I have labeled X, Y, and Z for these

5    fabrics.  It's all the same fabric, which is the soft shell

6    coated with the 52668.  But you see that the air permeability

7    has been reduced from approximately 30 down to approximately 1.

8    So the permeability of the fabric has been controlled by having

9    a coating added to it.

10           In addition, the hydrostatic head, which is the

11   capability of the fabric to hold a column of water on top of

12   it, gives an idea of the water resistance of the fabric.  The

13   table doesn't show the value for the agility fabric.  The --

14   it's contained elsewhere.  The agility fabric would have a

15   value here of less than 1.5 millibars.  It's literally down

16   below the lower limit of what the test method will permit you

17   to measure.  However, after Brookwood puts the coating material

18   onto the fabric, the hydrostatic head goes up immediately to

19   approximately 12 to 15 inches.  So it's quite an increase in

20   the amount of water that the fabric can hold out.

21           In addition, I did the moisture vapor transport, which

22   is another standard physical test used by the industry to look

23   at the permeation of water vapor, such as perspirations, for

24   fabric.  This measurement again is related to how comfortable

25   the fabric is going to be, and again, we see that the agility

C511nex3                    Cole - direct

1    fabric, the uncoated fabric starts at approximately 1300, and

2    after coating, the value of the MVTR is down below a thousand.

3    Q.  Dr. Cole?

4    A.  Yes.

5    Q.  Could we take -- could we break that down I think a little

6    more slowly, please.

7    A.  Certainly.

8    Q.  What does air permeability measure?

9    A.  Air permeability measures the porosity of the fabric to the

10   passage of air.

11   Q.  What does hydrostatic head measure?

12   A.  Hydrostatic head measures water resistance of a fabric.  In

13   the case of hydrostatic head, the higher the number, the more

14   water resistant that a fabric is.

15   Q.  And how does that relate to the pore sizing?

16   A.  For hydrostatic head?

17   Q.  Yeah.

18   A.  Very large pores are unable to support a large hydrostatic

19   head.  The water will simply pour through these large openings

20   or voids in the fabric.

21   Q.  Does hydrostatic head reading correlate with the larger

22   size pores?

23   A.  Yes, it does.  When you do this measurement, what you're

24   looking for is the amount of water pressure at which three

25   drops of water start coming through the fabric at different

C511nex3                    Cole - direct

1    locations.  This test has another name in the industry.  It's

2    also called a Suter hydrostatic head.

3    Q.  Do you know if Brookwood uses the Suter test as a standard

4    quality control test?

5    A.  I have seen Brookwood mention using the Suters for checking

6    the integrity of the coating at KK-1.  I've also seen it in

7    their lab test reports.

8    Q.  In your opinion would measuring the Suters and

9    controlling -- withdrawn, your Honor.

10           In your opinion, would measuring the Suters allow you

11   to control the pore size of the web?

12   A.  Measuring the Suters would give you an idea of whether or

13   not you are controlling the pore size in the web, so the higher

14   the Suters are, the smaller the effective pore sizes.  But I

15   also measure the actual pore sizes as well.

16   Q.  And if you could turn the page.  That's 683-2.  Is that

17   where the -- I'm sorry -- the average pore size S?

18   A.  Yes.  The second yellow column is the average pore size, so

19   this is a direct measurement that was made at my direction.  We

20   don't have the identification on the left as to what all those

21   rows of numbers mean, but the top row corresponds to the

22   agility fabric, the uncoated fabric, and then after coating,

23   the average pore size has been reduced by approximately

24   50 percent.  So the average pore size has been effective -- for

25   this effective pore size has been changed.

C511nex3                          Cole - direct

1    Q.  You also mentioned that you looked at SEM.  Do you recall?

2    A.  Yes, I did.

3    Q.  What is an SEM?

4    A.  An SEM is a scanning electron microscope photograph.  The

5    photographs that we've been looking at are -- the fibers in the

6    fabrics are all taken on electron microscope.  For someone in

7    textiles like me, the advantage of the electron microscope is

8    that it has a tremendous depth of field.  Fabrics are very

9    three-dimensional, have a lot of thickness, so the setup on the

10   electron microscope lets me be able to look and have the focus

11   at the same time fibers which are on the top side, the middle

12   of the fabric, and the bottom of the fabric.  If I tried to use

13   an optical microscope, I would find that I would have a small

14   amount of the fabric which was in focus at any one time and I

15   would have to go down picture after picture to look throughout

16   the difference in fabric.

17          MR. MURPHY:  Can we turn to Exhibit 727-14, please.

18   And your Honor, we've already offered 727 into evidence.

19          THE COURT:  I know.

20   A.  So this again is the uncoated fabric --

21          THE COURT:  We've seen this kind of thing over and

22   over again.

23          THE WITNESS:  There are lots of pictures of different

24   fabrics, I'm afraid, your Honor.  So this is the -- this is the

25   fabric, the fabric has been coated on the other side from this,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C511nex3                    Cole - direct

1    so this is the side that was not towards the polymer

2    composition.

3    Q.   And how does this show that Brookwood is controlling the

4    effective pore size in fabric when it makes this 52668 soft

5    shell fabric?

6    A.   This picture forms part of the story.  If we look in this

7    area -- if we could have the little pointer over here -- this

8    area where the yarns cross is a very large pore, a macroscopic

9    pore.  If we leave that pore open, we're going to have a very

10   breathable, comfortable fabric, but it's not going to hold that

11   water very well.  So we need to plug that pore.  We also need

12   to do something --

13             THE COURT:  Can I interrupt.  I take it what you're

14   saying is that you reach a kind of compromise.  Obviously if

15   there are lots of pores, the fabric is breathable, breathes

16   well.

17             THE WITNESS:  That is correct, your Honor.

18             THE COURT:  But it may be a little chilly and it may

19   let in some water.

20             THE WITNESS:  That is also correct.

21             THE COURT:  Now if you want to have some degree of

22   water resistance or waterproofing, whatever you call it, and

23   still have it breathe, you have to compromise.

24             THE WITNESS:  That is correct.

25             THE COURT:  And so you limit maybe the number and size

C511nex3                         Cole - direct

1    of the pores but you don't shut them all off, and you try to

2    achieve a limit where you've got some resistance to water but

3    still have some breathing; right?

4              THE WITNESS:  That is correct, your Honor.

5              THE COURT:  So that's the whole meaning of controlling

6    the effective pore size; isn't that right?

7              THE WITNESS:  That's correct.

8              THE COURT:  Okay.  Now can we go on to something else?

9              MR. MURPHY:  Yes, your Honor, we can.

10             THE COURT:  I am very eager.  I confess to being

11   eager.

12             Does the Brookwood method accomplish shear thinning?

13             THE WITNESS:  Yes, your Honor, it does.

14             THE COURT:  And I think I know what you're going to

15   say because I think you've said it, but explain it again.  And

16   I take it that you consider the polymer that they use to be

17   shear thinnable material; right?

18             THE WITNESS:  That is the first step.

19             THE COURT:  And obviously I'm referring to the patent

20   language.  You know this.  And then the patent says,

21   "subjecting said shear thinnable material to sufficient shear

22   thinning energy," etc., etc.  So does the Brookwood method do

23   that?

24             THE WITNESS:  Yes, it does, your Honor.

25             THE COURT:  And I think you've explained it, but

C511nex3                         Cole - direct

1    explain it with specific reference to the patent language.

2               THE WITNESS:  Yes, your Honor.

3               Could I have a copy of the rheology curve for 52668,

4    please.

5               THE COURT:  Now what is 52668?  I really didn't keep

6    copies of all those things.  What is that?

7               THE WITNESS:  The polymer composition 52668, this is

8    the material that Brookwood coats onto the fabric.  This is the

9    polymer that's pumped out of the drum and it ends up --

10              THE COURT:  Oh, it's called what?

11              THE WITNESS:  Their chemical supplier calls it by a

12   number rather than a name.  They call it 52668.

13              THE COURT:  So that is Brookwood's polymer; right?

14              THE WITNESS:  That's correct.

15              THE COURT:  All right.  Very good.

16              THE WITNESS:  If I could have the rheology curve for

17   52668, please.

18              What we're looking at is a plot of apparent shear

19   viscosity versus shear rate.  What has been done -- and this

20   was done in the chemical and --

21              THE COURT:  What exhibit is this?

22              MR. MURPHY:  Your Honor, this is Exhibit 690.  We

23   offer it.

24              THE COURT:  Received.

25              (Plaintiff's Exhibit 690 received in evidence)

C511nex3                              Cole – direct

1          THE COURT:  Okay.  Go ahead.

2          THE WITNESS:  Could we blow up just the chart portion

3    of this exhibit.  No.  You had it before.

4          Thank you.

5          What we're looking at is, I take a sample of the

6    polymer and I force it under high pressure through a capillary

7    and I measure the flow pressure that's developed in the

8    rheometer.

9          THE COURT:  In the what?

10         THE WITNESS:  In the rheometer.  The rheometer is

11   simply a laboratory --

12         THE COURT:  How do you spell rheometer?

13         THE WITNESS:  R-H-E-O-M-E-T-E-R.  A rheometer is

14   simply a device for being able to measure the properties of a

15   fluid.  So I take the liquid polymer from Brookwood and I

16   increase the rate at which I shear the material, and I measure

17   the viscosity with results.  This curve shows the apparent

18   viscosity decreasing as I increase the shear rate, meeting the

19   court's definition of shear thinning.

20         THE COURT:  This is not anything taken from the

21   machine.

22         THE WITNESS:  The machine gives me the -- well, the

23   plot comes -- this did not come from Brookwood's machine.  This

24   comes from a laboratory machine that's located at Clemson

25   University.  So Brookwood shipped me a sample of the polymer --

C511nex3                         Cole - direct

1           THE COURT:  Does the Brookwood machine do shearing?

2    There are lots of things you can do with a knife, I take it.

3    Does Brookwood do shearing?

4           THE WITNESS:  Yes.  I did a calculation of the

5    shearing which can occur -- which does occur at the knife on

6    the coater at Brookwood.

7           MR. HORWITZ:  Objection, your Honor.  Your Honor, it

8    was not in her report.  At her deposition she said she had no

9    idea what the shear rate was.  This comes -- this is a total

10   surprise.  That's not what she based her opinion on because she

11   specifically testified not only did she not know what the shear

12   rate was but she couldn't even see the interface between the

13   knife and the polymer and the fabric.  So this is stuff that

14   was made up afterwards, after they realized, through

15   deposition, what the problem with her reports were.

16          MR. MURPHY:  Your Honor, may I address that.  You

17   don't need --

18          THE COURT:  Just a second.  With all courtesy to you,

19   let me have a little discussion.

20          Again, I want to keep up to date on the issues, so

21   obviously the plaintiff has to -- I mean, there would be no

22   case at all unless the plaintiff could show that the Brookwood

23   device did shearing.

24          MR. HORWITZ:  Exactly our point, your Honor.

25          THE COURT:  Yeah.  There would be no case.

C511nex3                        Cole - direct

1              MR. HORWITZ:  Yes.

2              THE COURT:  Now let me just turn to Mr. Horwitz.

3              MR. HORWITZ:  That's me.

4              THE COURT:  Do you contend there is no shearing?

5              MR. HORWITZ:  We contend two things.  One is, there is

6    no shearing, and the second is, is that this witness --

7              THE COURT:  No, let's not talk about this witness.

8              MR. HORWITZ:  Okay.

9              THE COURT:  I want to know what Brookwood's contention

10   is.

11             MR. HORWITZ:  The contention is that there is no

12   shearing.

13             THE COURT:  What do you say goes on?  There is this

14   thing there.

15             MR. HORWITZ:  Right.  The same thing that's gone on in

16   the prior art, the same thing that we've been doing since 1964,

17   which is pressuring it in.  There's a difference between

18   pressuring it in, that's throughout the prior art, and

19   shearing.  And here the fact that there's just --

20             THE COURT:  What is that difference --

21             MR. HORWITZ:  The difference is, your Honor --

22             THE COURT:  -- according to what you say?

23             MR. HORWITZ:  Okay.  Number one, the definition of

24   shear thinning is, according to Judge Holwell and according to

25   this witness and according to our expert, the fact that not

C511nex3                          Cole - direct

1    only is there a shear there but there is an increasing shear

2    rate, in other words, the shear is going up, so --

3              THE COURT:  What does that mean?

4              MR. HORWITZ:  Meaning if you just have a constant

5    shear, that's not shear thinning.

6              MR. MURPHY:  Your Honor, that's completely incorrect.

7              MR. HORWITZ:  Your Honor, and then -- but the other

8    thing is, even according to the definition that they want,

9    there's no shear thinning for a number of reasons.  Number one,

10   this is the machine since 1964 doing it exactly the same way,

11   the same knife, the same table, the same everything.  Your

12   Honor --

13             THE COURT:  Whether '64 or not, just go a little

14   slower.  Go a little slower.

15             MR. HORWITZ:  Okay.

16             THE COURT:  Just so I understand the issue.

17             MR. HORWITZ:  Okay.  What's going on here is, there

18   has been a traditional way of coating the fabric that goes back

19   to the 1800s.  You have a fabric, and just like you put butter

20   on a piece of bread --

21             THE COURT:  Can you give me more specifically --

22             MR. HORWITZ:  Yes.

23             THE COURT:  -- an answer to my question.

24             MR. HORWITZ:  You asked me what the difference between

25   pressure and shear was.

C511nex3                           Cole - direct

1              THE COURT:  First of all, I asked what you do.

2              MR. HORWITZ:  Right.  And here's what we do.  Exactly

3    what she said is, if you look at the way a knife puts butter on

4    bread --

5              THE COURT:  Right.

6              MR. HORWITZ:  -- the only difference is that our knife

7    is stationary and we move the bread.  That's what's happening

8    here.  We are just putting it on the same way when you butter

9    bread, period.

10             THE COURT:  Well, now let me ask this:  Is there no

11   shearing that goes on under that knife?

12             MR. HORWITZ:  No, your Honor, none.

13             THE COURT:  No?

14             MR. HORWITZ:  No.

15             MR. MURPHY:  Your Honor, may I --

16             THE COURT:  Just a minute.

17             MR. HORWITZ:  The testimony of the person who is --

18   this witness has said she's not an expert in rheology.  She's

19   not an expert in this issue.

20             THE COURT:  Let's not talk about this witness.

21             MR. HORWITZ:  We have an expert in rheology.

22             THE COURT:  I want to know what your position is, what

23   Brookwood's position is.

24             MR. HORWITZ:  Right.

25             THE COURT:  What you're saying is, there is no

C511nex3                          Cole - direct

1    shearing.

2             MR. HORWITZ:  Right, your Honor.

3             THE COURT:  Meaning --

4             MR. HORWITZ:  Meaning the knife -- in order to shear,

5    you have to have a certain amount of shear forces applied for a

6    certain amount of time.  Even if there are shear forces here,

7    which there's no proof that there is, it's not enough time

8    under the knife to cause shear thinning.

9             THE COURT:  So are you saying that when the fabric

10   passes under that knife -- do you call it a knife?

11            MR. HORWITZ:  Yes.

12            THE COURT:  All right.  Passes under the knife,

13   then --

14            MR. HORWITZ:  It's pressure.

15            THE COURT:  -- the polymer does not -- are you saying

16   it doesn't thin down?

17            MR. HORWITZ:  No, your Honor.  It's already been

18   thinned down.  It's been thinned down through solvents and it

19   gets pressured in.  It's the same way we've been doing it --

20            THE COURT:  I want to just make absolutely clear I

21   understand -- sure I understand.  You're saying of course the

22   fabric which has the polymer laid down on it, the fabric has

23   polymer laid down.  We saw pictures of that; right?

24            MR. HORWITZ:  Right.

25            THE COURT:  And it passes under the knife.

C511nex3                          Cole - direct

1          MR. HORWITZ:  Correct.

2          THE COURT:  And you're saying that no thinning action

3     occurs as a result of passing under that knife; is that what

4     you're saying?

5          MR. HORWITZ:  Correct, your Honor.  We're saying that

6     there is not -- even if theoretically there were shear forces

7     there, there is not enough time -- it's like saying, your

8     Honor, I've got a kettle of water and there's a fire there, and

9     I'm going to put the kettle on for half a second.  Well, the

10    fire -- it's not enough time to heat it up.  Whatever's going

11    on under there, there's not enough time for it to shear thin at

12    all.

13         THE COURT:  You're saying whatever degree of thinning

14    is necessary --

15         MR. HORWITZ:  Yes, your Honor.

16         THE COURT:  -- has been done by the nature of the

17    material.

18         MR. HORWITZ:  The nature of the material, yes, and

19    then the knife pushes it in, not shears it in.  Pressure, not

20    shear.

21         THE COURT:  Let's go back to the witness.  Thank you.

22         MR. HORWITZ:  But your Honor, my objection is that we

23    specifically asked this witness at deposition whether she had

24    any idea of the shear forces under the knife and she testified

25    no.  Now she's testifying to what they are.  We asked her --

C511nex3                    Cole - direct

1            THE COURT:  Do you have the deposition testimony?

2            MR. HORWITZ:  Yes.

3            MR. MURPHY:  Your Honor, may I address this?

4            THE COURT:  Let's just get this.

5            MR. HORWITZ:  Your Honor, page 262 of her deposition,

6       line 24.

7            "You also don't know what the shear forces are at the

8       blade at the KK-1 at Brookwood's coater apparatus; isn't that

9       right?

10           "A.  That's correct."

11           And now she's testifying to exactly what she said she

12      didn't know.

13           THE COURT:  Read it again.

14           MR. HORWITZ:  "Q.  You also don't know what the shear

15      forces are at the blade at the KK-1 --" KK-1 is Brookwood's

16      coater, your Honor "-- at the KK-1 coating apparatus; isn't

17      that right?"

18           "A.  That's correct."

19           Your Honor, this was also pointed out in Judge

20      Holwell's decision in footnote 19, where he also says,

21      "Dr. Cole did not offer opinion regarding the rate of shear

22      necessary to achieve the result."  She doesn't know what the

23      shear is and she doesn't know what shear is required to achieve

24      the result.  It's not in her report.  She testified that she

25      doesn't know.  This is -- this testimony is, after pointing out

C511nex3                         Cole - direct

1    the problems, being made up after the fact.  She's limited to

2    what her report was and to what her deposition was.

3              THE COURT:  Look, I really jumped ahead of where

4    Mr. Murphy was.  He was dwelling on controlling the size of the

5    pore.  And so I've jumped ahead.  Maybe I shouldn't have done

6    that.  But anyway, we're going to get there inevitably anyway.

7              MR. HORWITZ:  Yes, your Honor.

8              THE COURT:  I assume, Mr. Murphy, you were going to

9    ask her if, in her opinion, this knife accomplished shear

10   thinning.  You were going to get there; right?

11             MR. MURPHY:  I was going to get there, your Honor.

12             THE COURT:  Okay.  Why don't you do the questioning.

13   We'll see if there's still objection.  It is better that you

14   question than I question.  But let's stay at that point,

15   please.

16             MR. MURPHY:  Would you like me to go back to where I

17   was and walk through the claim elements or stick with shear?

18             THE COURT:  Let's just get to the shear thinning.  We

19   don't have to spend a lot more time on pores.

20             MR. MURPHY:  Okay.

21   BY MR. MURPHY:

22   Q.  Dr. Cole, what is shear?

23   A.  Shear is a lateral force.  I mean, most of us are

24   accustomed to tension forces that are directed on axes.  The

25   lateral force is directed like a sweeping motion, as an example

C511nex3                         Cole - direct

1    of a shear force.

2    Q.  So if there is contact between the fabric and the blade and

3    the fabric is moving, would there be shear there?

4    A.  Yes, there is.  The example which has been cited, taking

5    butter and spreading it on bread, is an example of shear.

6    Q.  And what is shear thinning?

7    A.  Shear thinning is a reduction in viscosity of a fluid as a

8    result of increasing shear rate.

9    Q.  Is the shear rate that's -- is the shear rate on the

10   polymer, on the KK-1 machine, does that increase when the

11   polymer comes in contact with the blade?

12              MR. HORWITZ:  Objection, your Honor.

13              THE COURT:  Well, just a minute.  I'd like to get a

14   little better idea what you're talking about.  The material

15   moves under the blade, under the knife; right?

16              THE WITNESS:  That's correct.

17              THE COURT:  And you say that that is the kind of

18   movement that involves shear; right?

19              THE WITNESS:  That's correct.

20              THE COURT:  Or shearing?

21              THE WITNESS:  That's correct, your Honor.

22              THE COURT:  And I wish I had a little better picture

23   of that in my mind.  What is actually involved in shearing?

24              I can picture, if the fabric was lying still and had

25   some kind of polymer on it and I just took a knife and went

C511nex3                        Cole - direct

1    over it, that would cause shearing; right?

2              THE WITNESS:  That's correct.

3              THE COURT:  And shearing involves what?

4              THE WITNESS:  Shearing basically is a lateral

5    movement.  So to use your example, your Honor, if you move the

6    knife very slowly, that's a very slow way to shear.  If you

7    increase the rate at which you move the knife, then you

8    increase the shear rate.

9              In the case of the coater KK-1, with the polymer

10   composition, that bead in front of the knife is just sitting on

11   top of the fabric.

12             THE COURT:  Let's forget that for a minute.  Let's go

13   back to my knife, move my knife, and I think we've had a

14   discussion of this with the lawyers, but what happens inside

15   the fabric?  What is transformed and in what way?

16             THE WITNESS:  If I go back to --

17             MR. HORWITZ:  Your Honor --

18             THE WITNESS:  If I go back to --

19             MR. HORWITZ:  Your Honor, if I may, this is completely

20   what she said she didn't know in her deposition.  To allow her

21   to testify to this, where she doesn't know the shear rate, your

22   Honor --

23             THE COURT:  I'm not talking about shear rate.  I'm

24   just talking about what shear is.  I assume she knows what it

25   is.

C511nex3                    Cole - direct

1              MR. HORWITZ:  Well, I think you just asked what was

2      happening inside the fabric.

3              THE COURT:  I'm talking about hypothetical fabric,

4      where I move a knife across it.  I just want to know -- and

5      obviously you know what shearing is.

6              THE WITNESS:  Yes, your Honor.  If I could, I could go

7      back to your example of putting butter on top of your bread.

8              THE COURT:  That was not my example.  Let's forget

9      that.

10             THE WITNESS:  Okay.

11             THE COURT:  I'm talking about what happens inside a

12     fabric, some fabric, if it's coated with something and I take a

13     knife and run the knife over it, what happens inside.  I think

14     we've had this in discussion, and what it involves is changing

15     the layout of the fibers or something happens; right?

16             THE WITNESS:  If what you're coating on it is shear

17     thinnable, then you will greatly decrease or -- decrease the

18     viscosity of the material that's inside the fabric.

19             THE COURT:  What makes the difference in viscosity?

20             THE WITNESS:  The shear rate, the rate at which you

21     pull your knife, the rate at which you do your coating, as well

22     as the thickness that you put on.  If you try to take your

23     knife across the very thick coating, you use a low shear rate.

24     If you put a very thin coating, then the shear rate goes up

25     directly related to the thickness of that coating.

C511nex3                          Cole - direct

1                THE COURT:  No, I'm not --

2                MR. HORWITZ:  Your Honor, this is exactly --

3                THE COURT:  Just a minute.  What I sort of remember

4       from the discussion with the lawyers is, a fabric has

5       certain -- I don't know whether you call them fibers or they're

6       molecular structures or what, but if there is -- oh, the

7       shearing acts not upon the fabric but upon the material on the

8       fabric; right?

9                THE WITNESS:  On the polymer composition, your Honor.

10               THE COURT:  All right.  I'd forgotten that for a

11      moment.

12               Now if the polymer has a very low viscosity, it means

13      that things inside are running in the same direction; right?

14               THE WITNESS:  If a -- if a material has a very low

15      viscosity, then it's very liquid, it would tend to run very

16      readily --

17               THE COURT:  Wait a minute.  Let me go back.  If it has

18      a high viscosity, that means it's very thick; right?

19               THE WITNESS:  That's correct.

20               THE COURT:  High viscosity means thick.  That means

21      things are running along the same direction inside it.

22               THE WITNESS:  Well, at a high viscosity, it wouldn't

23      tend to run anywhere.  It tends to stay in one place.

24               THE COURT:  But something happens inside the material,

25      inside this material as a result of shearing, and that's what

C511nex3                    Cole - direct

1    I'm trying to get a picture of.  Do you know that or don't you?

2              THE WITNESS:  If we -- if we take a material which is

3    at very high viscosity and we subject it to sufficient shear,

4    the viscosity drops and the thick material, which would not

5    run, now will run.

6              THE COURT:  All right.  Well, that isn't quite the --

7    all right.

8              MR. MURPHY:  Maybe I can enlighten.

9              THE COURT:  Go ahead.

10   BY MR. MURPHY:

11   Q.  Are there different -- does shear have different effects on

12   polymers?

13   A.  Yes, it does.

14   Q.  What are some of the mechanisms of shear thinning?

15   A.  Well, we academicians tend to think that shear thinning

16   represents a reorganization of the structure of the polymer

17   within the fluid, and in particular we think chemically about

18   reorganizing hydrogen bonds and interactions within the

19   molecules as well as between the molecules.

20   Q.  Let's break that down a little bit.  Are there different

21   ways that the molecule can be reorganized?

22   A.  Yes.

23   Q.  Can it be destruction of larger polymer chains under shear?

24   A.  Normally the force, the shear energy, is low enough that we

25   don't take -- think about actually breaking the chemical bonds

C511nex3                    Cole - direct

1   within the polymers.  Instead, what's happening is we're

2   breaking the bonds that cause the polymers to coil, for

3   instance.

4   Q.  So they can be deformed; is that it?

5   A.  Right.  They're really being deformed.  They're not being

6   destroyed.

7   Q.  And is another mechanism relaxation of the polymer chains?

8   A.  Relaxation refers to, we've taken a polymer, we do

9   something to it to disturb it, and now we're looking at the

10  amount of time necessary for our disturbed material to come

11  back to the way it was in the beginning.

12  Q.  So relaxation occurs after the shear thinning has occurred;

13  that's what you're saying.

14  A.  That's correct.

15          THE COURT:  Now let's get back to the issue that

16  Mr. Horwitz -- getting away from the theoretical, which you

17  asked about the last few minutes, and that's been helpful to

18  me, but what is it that you want to ask her?  And you probably

19  asked it, but let's go over it again because there was an

20  objection.  What is it that you wish to ask her about the

21  patent in this case versus Brookwood's device?  What are you

22  asking?  And then we'll hear the objection and see whether I'll

23  overrule it or sustain it, okay?

24          (Continued on next page)

25

C517NEX4                      Cole – direct

1          MR. MURPHY:  I'm not sure precisely which question

2    drew the objection frankly, your Honor, so I will just go back

3    down and find the questioning.

4          THE COURT:  Let's just back up a little bit.  It won't

5    hurt anything.

6    BY MR. MURPHY:

7    Q.  So, this measurement you took, how does it show that the

8    52668 polymer is shear thinnable?

9    A.  This measurement, which is in my 2012 expert report, shows

10   that with increasing shear rate that the apparent viscosity of

11   52668 decreases.  This reduction in viscosity with the

12   application of recent shear rate meets the court's definition

13   for shear thinnable.  This shows that the polymer which

14   Brookwood uses for coating the soft shell fabric does meet the

15   definition of a shear thinnable material.

16   Q.  Now, you referred to this as apparent viscosity.  Do you

17   recall that?

18   A.  Yes.

19   Q.  What did you mean by apparent viscosity?

20   A.  Apparent viscosity means that it hasn't gone through all of

21   the corrections that we academics tend to be very fond of

22   doing.  So, this is the kind of viscosity which you will

23   frequently see in textbooks but you will also see industry

24   using.

25         THE COURT:  I am a little –– we've got to focus now on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C517NEX4                          Cole - direct

 1   the objection.  What is the testimony that you object to, Mr.

 2   Horwitz?

 3           MR. HORWITZ:  The question was what is the shear rate

 4   under the knife in the KK1 Brookwood coater, exactly what she

 5   said she didn't know in her deposition.  That was the question.

 6           THE COURT:  Well --

 7           MR. HORWITZ:  Your Honor, she formed her opinion.

 8           THE COURT:  Wait a minute.  And this exhibit which I

 9   have on the screen shear viscosity versus shear rate is talking

10   about shear rate, right?

11           MR. HORWITZ:  Your Honor, this is not objectionable.

12   What this says is if I apply a shear of so much, I will thin it

13   so much.  That we don't object to.

14           THE COURT:  You mean you don't object to this exhibit.

15           MR. HORWITZ:  No.  The question was what shear rate is

16   under the Brookwood knife so that you can then see what the

17   shear is.  That's the objectionable question, because she said

18   she didn't know what the shear rate was.

19           THE COURT:  I'm not sure that question was even asked.

20           MR. HORWITZ:  I think it was, your Honor, when I first

21   objected.

22           THE COURT:  Mr. Murphy, are you asking what she would

23   say about the shear rate under that knife?

24           MR. MURPHY:  I hadn't yet.  I can.

25           THE COURT:  I don't think he had asked that yet.  So,

C517NEX4                         Cole - direct

1   let's -- maybe you won't ask that question, and maybe there

2   won't have to be -- I don't know whether -- let's just

3   continue.  Maybe there will be questions that are not

4   objectionable.  OK.  Go ahead.

5   Q.  To back up once again, is apparent viscosity often used in

6   the textile industry for measuring shear?  I'm sorry, let me

7   withdraw it.

8        Is apparent viscosity often used in the textile

9   industry for measuring the shear thinability of a polymer

10  substance?

11  A.  Yes, it is.

12  Q.  What is a Rabinowitz correction?

13  A.  A Rabinowitz correction is a correction that's frequently

14  applied for shear thinning fluids where the rheology is

15  measured using a capillary rheometer.

16  Q.  Did you perform a Rabinowitz correction when calculating

17  this curve?

18  A.  I did not initially, however, later I did which was entered

19  as an exhibit --

20        MR. HORWITZ:  Objection, your Honor.

21  A.  -- at Dr. Pine's deposition.

22        MR. HORWITZ:  Objection, your Honor.  At her

23  deposition she said she had not done so.  In her report she

24  said she had not done so.

25        THE COURT:  Had not done what?

C517NEX4                           Cole - direct

1          MR. HORWITZ:  Had not done this Rabinowitz correction.

2          In other words, what happens here is when you take

3    certain measurements there is a problem with how you take the

4    measurements, and the Rabinowitz correction is supposed to

5    account for --

6          MR. MURPHY:  Your Honor.

7          MR. HORWITZ:  The Rabinowitz correction is supposed to

8    account for the specific issues with this way of taking the

9    shear rate.  There are many, many measurements.  There is one

10   machine that you need to use this Rabinowitz correction for

11   various reasons.  What she said in her report was that she had

12   not done it.  What she said at her deposition was that she had

13   not done it.

14         MR. MURPHY:  Your Honor --

15         THE COURT:  Look, I want to get back.

16         MR. MURPHY:  Mr. Horwitz --

17         THE COURT:  Please, we start with a very basic

18   question.  We don't start with the Rabinowitz correction.  We

19   don't start with shear rate.  We start with a very basic

20   question, and that is the question that arises under the patent

21   language, and that's what I jumped ahead a little bit and asked

22   her.  And I simply asked:  Does Brookwood use shear thinnable

23   material?  And does Brookwood use sufficient shear thinning

24   energy to cause the shear thinnable material to flow into the

25   web and so forth?  I asked you that question, did I not?

C517NEX4                    Cole - direct

1        THE WITNESS:  Yes, you did, your Honor.

2        THE COURT:  And she answered yes.  And I take it that

3   that question and that answer is not subject to objection under

4   the deposition or anything, right?

5        MR. HORWITZ:  Yes, your Honor, it is.  She testified

6   she did not know what shear energy there was under the knife,

7   and now she is saying that it was enough to do certain things.

8   She doesn't know what it was.

9        MR. MURPHY:  Your Honor --

10       MR. HORWITZ:  She not only doesn't know what it was,

11  but she said I based my opinion on three things:  The SEM, and

12  she says --

13       THE COURT:  Can I literally see the deposition,

14  please?

15       So, you are saying that a basic answer as to --

16       MR. MURPHY:  Your Honor, there has never been a

17  dispute --

18       THE COURT:  Please.

19       Mr. Horwitz, you are saying that it's improper to have

20  her testify to the basic issue under the patent.  Are you

21  saying that?

22       MR. HORWITZ:  Yes, your Honor.

23       THE COURT:  All right.  Let me see the deposition.

24       MR. HORWITZ:  Your Honor, if you look at the bottom of

25  page 262 to the top of page 263, the question and answer there.

C517NEX4                         Cole - direct

1              THE COURT:  Let me see, please.

2              MR. MURPHY:  May I see it also?

3              MR. HORWITZ:  Your Honor, it's on the screen, if you

4    wish.

5              THE COURT:  Can I see a previous page, page 261?

6              MR. HORWITZ:  Just tell us how fast you want us to

7    scroll.  Your Honor, in this figure 2 --

8              THE COURT:  Just a minute.  Well, what is figure 2?

9              MR. HORWITZ:  It's figure 2 and a piece of prior art,

10   your Honor.

11             This is the Caldwell --

12             THE COURT:  Just a minute, please.  Scroll down.

13             Who is doing the questioning?

14             MR. HORWITZ:  Your Honor, this is questioning by

15   Brookwood's former counsel.

16             THE COURT:  I don't see any basis for the objection.

17             MR. HORWITZ:  If you go further down, your Honor.

18             THE COURT:  Down where?

19             MR. HORWITZ:  Down at the bottom of that page.

20             THE COURT:  Down at the bottom of what page?

21             MR. HORWITZ:  The page you are looking at.

22             THE COURT:  What page?  262 or 263?

23             MR. HORWITZ:  Your Honor, you have my copy up there.

24   The bottom of 262, the top of 263.

25             THE COURT:  Now, look, Mr. Horwitz, what is being

C517NEX4                        Cole - direct

1    asked there is asking her about how could she say that there is

2    basically infringement here but there wouldn't be under the

3    Caldwell patent.

4            MR. HORWITZ:  And she says I don't know on the

5    Caldwell patent because I don't know the shear forces there.

6    The next question:  Well, you don't know the shear forces of

7    Brookwood's product either?  This is exactly the same question.

8            THE COURT:  Mr. Horwitz, there is no basis for that

9    objection because she is being asked to compare -- she is being

10   asked about a comparison between Brookwood and some other prior

11   art.  Now, that undoubtedly is of interest, but that does not

12   mean in my view that she cannot testify about the patent at

13   issue in this case --

14           MR. HORWITZ:  Yes, your Honor.

15           THE COURT:  -- when asked a very simple, direct

16   question about the patent in this case.  And to say that she

17   can't offer an opinion about the patent in this case --

18           MR. HORWITZ:  That's not what I'm saying --

19           THE COURT:  -- because of this rather complex --

20           MR. HORWITZ:  That's not what I'm saying.

21           THE COURT:  -- please -- rather complex questioning

22   here about prior art and so forth, I will not block that

23   testimony.

24           MR. HORWITZ:  Your Honor, if I may just explain for a

25   moment.  She was asked:  Will the prior art shear thin?  She

C517NEX4                        Cole - direct

1    says I don't know.

2              Why don't you know?

3              Because I don't know what the shear forces are in that

4    prior art.

5              Next question:  But you don't know what the shear

6    forces are in the KK1 machine, isn't that correct?

7              Correct.

8              So, she said I don't know what the shear forces are in

9    Brookwood's machine.  Now she is being asked exactly that

10   question, what are the shear forces there.  Exactly what she

11   said she doesn't know she is now asked to testify about.

12             THE COURT:  Well, to me, to be asked what the shear

13   forces are, I'm not sure I even know the meaning of that

14   question.

15             MR. HORWITZ:  Your Honor, if you look at the curve,

16   what it says -- if you go back to the curve that was put up, if

17   you look at this curve, your Honor, the side is the viscosity

18   and the bottom is the shear rate.

19             So, for example, if you look at the bottom where it

20   says 1000, and you go up to the dot it tells you what the

21   viscosity is.  So, it's telling you for each shear rate what do

22   you end up, what is the viscosity you end up with.  So, in

23   order to know whether there is any reduction in viscosity due

24   to shear you have to know what the shear rate is.  She says she

25   didn't know.

C517NEX4                          Cole - direct

1          THE COURT:  Why don't you ask her that on cross?

2          MR. HORWITZ:  Your Honor --

3          THE COURT:  Look, I'm not going to prolong it.  The

4     objection is overruled.

5          MR. HORWITZ:  Thank you, your Honor.

6          THE COURT:  Let's go ahead.

7          THE WITNESS:  Could I have something to drink, please?

8          MR. MURPHY:  Your Honor, may I get the witness a glass

9     of water?

10         THE COURT:  Oh, of course.

11         I would really like now -- now that we have cleared

12    away the objection, I would like to know really here, even

13    though it's repetitious, her basic testimony before we get to

14    the Rasmussen test or a lot of other technical minutia.  Let's

15    get her full testimony about the basics and see what she says.

16    Of course she will be cross-examined later.

17    BY MR. MURPHY:

18    Q.  Dr. Cole, have you estimated the shear rate --

19         THE COURT:  I don't care about the shear rate for the

20    moment.  I want to know.  I take it you now say that the

21    material used was shear thinnable, right?

22         THE WITNESS:  That's correct, your Honor.

23         THE COURT:  By Brookwood.

24         THE WITNESS:  That's correct.

25         THE COURT:  And you say that there was shearing going

C517NEX4                        Cole - direct

1    on which caused it to thin, right?

2              THE WITNESS:  Correct, your Honor.

3              THE COURT:  And are you saying that this shearing was

4    done by that knife?

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  OK.  Where do we go from there?

7    Q.  How did you determine that the material is shear thinnable?

8    A.  By looking at the viscosity curve that we have seen

9    previously.

10             THE COURT:  Looking at the what?

11             THE WITNESS:  This viscosity curve versus shear rate

12   that we have seen previously, it tells me that the polymer is

13   shear thinnable.

14   Q.  And this is an apparent viscosity curve, is that correct?

15   A.  Yes, it is.

16             THE COURT:  Is it what's on the screen now?

17             THE WITNESS:  Yes, it is, your Honor.  This curve

18   shows that the apparent viscosity is reduced approximately four

19   fold over the range at which I measured the viscosity.  So, it

20   goes --

21             THE COURT:  What is this exhibit?

22             THE WITNESS:  This exhibit shows that a polymer that

23   initially starts with a viscosity that's fairly thick, when I

24   shear it at a rapid rate the viscosity drops by about a factor

25   of four.

C517NEX4                          Cole - direct

1           THE COURT:  Does this have anything to do with the

2    actual material used by Brookwood?

3           THE WITNESS:  Yes, it does.  This is the material used

4    by Brookwood, your Honor.

5           THE COURT:  Oh, it is.

6           THE WITNESS:  Yes.  This one which is Bates labeled as

7    049 is the polymer composition which Brookwood uses.  So, this

8    is the same as the material that was being pumped out of the

9    drum into the reservoir in front of the knife blade at the

10   coating station.

11          THE COURT:  And so I really didn't -- I somehow missed

12   that.  So, this shows it is thinnable, right?

13          THE WITNESS:  That is correct, your Honor.

14          THE COURT:  By shearing.

15          THE WITNESS:  That is correct.

16          THE COURT:  Go ahead.

17   Q.  Did you also prepare a curve of the true viscosity?

18   A.  Yes, I did.

19          MR. MURPHY:  Just pull up Exhibit 765.

20          Your Honor, we would like to offer this.  This is

21   another curve of Brookwood's 52668 polymer composition.

22          THE COURT:  Dr. Cole, what does this show?

23          THE WITNESS:  Your Honor, this is exactly the same

24   measurements which we saw in the previous graph.  The only

25   difference is I have made one of those corrections to the shear

C517NEX4                          Cole - direct

1    rate used in the instrument, which is one of the corrections

2    that Mr. Murphy referred to before.  That correction increases

3    the --

4                THE COURT:  What correction is that?

5                THE WITNESS:  That correction is only on the shear

6    rate.  It increases the values on the X axis by approximately

7    15 percent, so it does not affect viscosity values at all; it

8    simply pulls the chart out slightly to the right.

9                THE COURT:  I don't understand what you are saying.

10               THE WITNESS:  If we compare the two charts, then it's

11   a little difficult to see that there is any change at all as a

12   result of making this correction, because it is so small.

13               THE COURT:  What is the correction you made?

14               THE WITNESS:  The correction that I have made

15   increases the apparent shear rate slightly by about 15 percent.

16               THE COURT:  Why did you make that correction?

17               THE WITNESS:  Because Mr. Horwitz asked why I hadn't

18   made the correction.  I didn't make the correction originally

19   because I knew it was such a small correction and that apparent

20   viscosity is used in the industry.  Quite frankly, it seemed

21   more the sort of thing an academic would do rather than someone

22   in a manufacturing company, but since he raised the point I

23   kind of felt like I needed to make the correction, and that's

24   what is shown here in this graph.

25               THE COURT:  All right, go ahead.

C517NEX4                         Cole - direct

1            THE WITNESS:  So, the graph still shows a reduction in

2     viscosity of approximately four fold from when the polymer

3     composition would be placed on top of the fabric.  And you

4     remember, it's thick enough that it doesn't flow out of that

5     roughly 16th inch slot.  So, it's pretty thick, it's sitting on

6     top of the fabric.  But by the time we reach a high rate of

7     shear, the viscosity has dropped up to four fold on it, so it

8     has become considerably thinner.  It's more runny, more water

9     like.

10           THE COURT:  OK.  Go ahead.

11    Q.  And did you also look at any Brookwood documents that

12    showed that the 52668 polymer was shear thinnable?

13    A.  Yes, I did.  I looked at the rheology curves which were run

14    by Mr. David Capwell.

15           MR. MURPHY:  Can you put up 6925.

16    Q.  And how does this show that the polymer is shear thinnable?

17    A.  First of all, can we turn the curve over?  OK.  And what we

18    want to focus on is this bottom portion of the curve.

19           THE COURT:  What is this, please?

20           THE WITNESS:  OK.  Can we box up and expand the bottom

21    portion of the curve, please?  That is the curve -- no, just

22    the curve through this section, please.

23           This upper line is simply a measurement of

24    temperature, and it's roughly constant during the time the

25    testing was done.

1          Your Honor, what we are looking at here is again on

2    the Y vertical axis we are looking at the apparent viscosity,

3    and we have on the X axis, the horizontal axis, increase in

4    shear rate.  So, Mr. Capwell has run a similar experiment to

5    what I have done, he has just used a different rheometer.

6          THE COURT:  And who is he?

7          THE WITNESS:  Mr. Capwell is a chemist at Brookwood's

8    manufacturing facility.  So, he has used a rheometer which

9    measures at a lower shear rate than what I did.  The effects

10   are the same.  However, we see that when he starts his curve

11   down here at zero that the initial viscosity is a little above

12   4000, and then as we increase the shear we come downhill to the

13   right on the top of these lower curves until we get to a shear

14   rate of about, I think that's about 370 reciprocal seconds.

15   Then he stops, and he decreases the shear rate coming back --

16   excuse me -- he decreases the shear rate, the viscosity

17   rebuilds, so it comes back close to its initial value, and then

18   finally he stops the test again.

19          So, this reduction in viscosity with increasing shear

20   rate again meets the court's definition of shear thinnable.

21   Q.  Just to focus us in on the fabric we were talking about, we

22   were talking about Brookwood's soft shell fabric made with the

23   52668 polymer composition.  How do you know that composition

24   was actually applied to Brookwood's fabric?

25   A.  Because I viewed Brookwood's manufacturing facility in

C517NEX4                         Cole - direct

1    January 2012, and at that time I took a series -- well, had

2    taken a series of photographs, including the photograph of the

3    drum, the label on the drum which shows the number 52668.  I

4    watched the material being -- this is the drum, so this is the

5    drum of 52668.  And we should have another picture which shows

6    the number 52668 as the polymer position in the drum.  And our

7    next picture should be one of the polymer being pumped out of

8    the drum.

9              MR. MURPHY:  Can we go back.  One more, please.

10             Your Honor, this is Exhibit 713.  We offer it.

11             THE COURT:  Received.

12             (Plaintiff's Exhibit 713 received in evidence)

13             MR. MURPHY:  Next one, please.  We also offer Exhibit

14   714.

15             THE COURT:  Receive.

16             (Plaintiff's Exhibit 714 received in evidence)

17   Q.  Go to 715, please.

18   A.  And this is the picture you have seen previously, which is

19   showing the hose coming in from the right from the drum that we

20   were just seeing and the polymer composition 52668 being placed

21   on the backside of the fabric in front of the shearing knife.

22             MR. MURPHY:  We offer this also, your Honor, or we may

23   have before.

24             THE COURT:  I think we already have it but, anyway,

25   received.

C517NEX4                    Cole - direct

1                    (Plaintiff's Exhibit 715 received in evidence)

2    Q.  Go to 717.  We have already seen this.

3    A.  Right, this one a few minutes later when the reservoir has

4    already built out to the full width of the fabric.

5    Q.  And, Dr. Cole, were you present when these photographs were

6    taken?

7    A.  Yes, I was.

8    Q.  So, just to recap, what is your opinion regarding whether

9    Brookwood's method of making its 52668 soft shell fabric meets

10   its limitation of claim one of the 902 patent, that is, it

11   applies a curable shear thinnable material to the fabric?

12   A.  In my opinion Brookwood's method for manufacturing the soft

13   shell parka with the polymer composition 52668 meets this

14   element of claim one of patent 902.

15   Q.  And you said soft shell parka.  Did you mean --

16   A.  I'm sorry, soft shell.

17   Q.  Have you formed an opinion whether Brookwood subjects the

18   shear thinnable material to sufficient shear energy to cause

19   the material to flow into the fabric?

20   A.  Yes, I have.

21   Q.  What is that opinion?

22   A.  In my opinion Brookwood's method for manufacturing the soft

23   shell with the 52668 polymer composition does meet this claim

24   element.

25   Q.  And how did you reach that opinion?

C517NEX4                    Cole - direct

1    A.   I reached that opinion by a combination of my observation

2    of the properties we just saw of the polymer composition, that

3    is, that it is shear thinnable; my observations of the

4    manufacturing process; and my observations by my scanning

5    electron micrographs of the fabrics produced.

6    Q.   Did you also estimate a shear rate occurring on the KK1

7    machine?

8    A.   Yes, I did.

9    Q.   And what was that shear rate that you estimated?

10   A.   That shear rate depends on the line speed and the thickness

11   of the layer.

12        MR. HORWITZ:   Objection.   Just so I have a continuing

13   objection here.

14        THE COURT:   Overruled.

15   A.   The calculation of the shear rate is found in the reference

16   which I provided in my 2012 expert report.   That is, it is Dr.

17   Dr. Makasko's reference book.   In that book you will find a

18   formula that I use for the calculation, that is, that the shear

19   rate is equal to the rate at which shear is applied, divided by

20   the thickness of the layer which is formed.

21   Q.   Is that a standard calculation done in the textile

22   industry?

23   A.   It is a calculation not so much done in the textile

24   industry; it's more done by mechanical engineers which service

25   the textile industry.

C517NEX4                              Cole - direct

1    Q.   And is that calculation generally considered accurate by

2    mechanical engineers who service the textile industry?

3    A.   Dr. Makasko is considered probably the leading expert in

4    rheology of these kinds of materials.

5    Q.   Can you walk us through how you prepared that calculation.

6    A.   That calculation of the shear rate is formed by taking the

7    speed at which the polymer composition is applied.  The speed

8    at which the polymer composition is applied is the line speed

9    that the fabric processes through KK1.  I divide the line speed

10   by the thickness of the layer which is deposited, and I find

11   the thickness of the layer which is deposited by looking at my

12   electron micrographs of the fabric which is coated with the

13   52668 polymer composition.

14   Q.   And could we turn to Exhibit 727-12.  Is this an example of

15   one of the SEMs that you looked at to calculate the shear rate?

16   A.   Yes, it is.

17   Q.   Can you explain how you used this exhibit.

18   A.   First you need a measuring tape, if you wish.  And there

19   are two measuring tapes in this photograph.  The first one is

20   the scale that's down on the lower right-hand portion of the

21   slide.  The ten tick marks there add up to the number

22   underneath, that is a hundred microns.  So, the space between

23   any two adjacent tick marks is ten microns.  And by way of

24   comparison, if we take that little space and we put it on top

25   of one of the fibers, we find that each fiber is about 12 to 14

C517NEX4                         Cole - direct

1    microns in diameter.

2              I can also take either the size of the fibers or that

3    scale, and I put it on top of where the polymer composition has

4    flowed into the web.  Now, we see the fibers, they are the

5    roughly round objects that are pointing towards me.  The

6    material that looks like it's flowed, that's the polymer

7    composition 52668.

8              In this slide what Brookwood did at the line that we

9    saw is they took the polymer composition 52668, placed it on

10   top, so it's going up near the top part of this image, right on

11   top of that portion of the fabric.  Then when we get to the

12   blade, the polymer composition flows into the fabric as a

13   result of shear at the blade.

14             So, for the thickness of the layer, again let's look

15   at the left-hand portion where we see white polymer composition

16   that's flowing in around the fibers, my estimate is --

17   left-hand side, please, the portion where we had the fibers

18   that are pointing directly out of the picture, please.  So, if

19   we could trim the height of that a little bit.  Right.  Thank

20   you.

21             When I look using my ten micron ruler, I say, you

22   know, the thickness of this, it looks like it's somewhere

23   between ten microns and perhaps as much as 40 microns.  The

24   thickness of the layer does change, there are fibers in there,

25   so I felt comfortable saying at a minimum it's ten microns, 40

C517NEX4                        Cole - direct

1  microns probably represents an upper limit.  So, ten to 40

2  microns set my limit for the thickness of the layer which was

3  being applied by Brookwood.

4  Q.  And what was the line speed that you used to calculate?

5  A.  The line speed I got from Brookwood's coating card.  This

6  is a production document that they produce.  There is one in my

7  2012 expert report.

8  Q.  Do you recall what that line speed was?

9  A.  That line speed is listed as a range between 9 and 10.5

10  yards per minute.

11  Q.  Look at Exhibit 3, 693-2.

12  A.  This is the document for the particular run where I was

13  there, and you can see about a third of the way up from the

14  lower right-hand corner handwritten in speed 10.5 yards per

15  minute.  So, my calculation became take roughly 10.5 yards per

16  minute and divide it by ten microns to give me the upper limit

17  of what the shear rate is, divide it by 40 microns to give me a

18  lower limit for what the shear rate is.

19        THE COURT:  And these documents come from where?

20        THE WITNESS:  This document comes from Brookwood's

21  manufacturing, your Honor.

22        THE COURT:  And this deals expressly with shear rate?

23        THE WITNESS:  This document deals specifically -- if

24  we could blow back up and look at the entire exhibit, please.

25  This deals with set-up for the coater KK1.

C517NEX4                         Cole – direct

1          THE COURT:  Does it have anything expressly to do with

2    shear?

3          THE WITNESS:  It shows you the conditions under which

4    the shear has been applied.

5          THE COURT:  Another question:  Does it have anything

6    expressly dealing with shear or shear rate, expressly dealing

7    with that?

8          THE WITNESS:  It does not mention those terms

9    expressly, your Honor, but it gives me some of the numbers that

10   I need to be able to calculate the shear rate.

11         THE COURT:  OK, go ahead.

12   Q.  So, the speed, that's the speed that the fabric moves under

13   the blade, is that correct?

14   A.  That is correct.

15   Q.  And is it that movement of the fabric under the blade that

16   is applying or causing the shear?

17   A.  That's correct.

18   Q.  About how long did it take you to calculate or to estimate

19   the shear rate at the KK1 machine?

20   A.  To actually do the calculation, a few minutes, and then to

21   double check the calculation a few more minutes to do it.  But

22   I was using the formula which is in my reference book from my

23   2012 expert report.

24   Q.  And do you recall what that estimate was?

25   A.  Well, the estimate on the lower end is about 3,000

C517NEX4                         Cole – direct

1   reciprocal seconds; at the high end it's about 15,000

2   reciprocal seconds.

3           THE COURT:  What's the word you used before seconds?

4   Reciprocal?

5           THE WITNESS:  Reciprocal seconds.

6           THE COURT:  What does that mean?

7           THE WITNESS:  Shear rate is measured in inverse time,

8   your Honor, so it's the rate, the speed, how many miles per

9   hour that I go where time is in the denominator, so it's

10  seconds to the minus one.

11  Q.  Now, when you looked at the SEM that we saw -- I believe it

12  was 727 -- and you estimated I believe you said the coating in

13  some areas about 40 microns thick, is that correct?

14  A.  That's correct.

15  Q.  Could some of that have actually been due to flow?

16  A.  Yes, it could.  I mean I was more comfortable being

17  generous with what I thought the thickness was.

18  Q.  And if you had been generous with what you thought the

19  thickness was, what would that do with the calculation of shear

20  rate?

21  A.  Well, if I was too generous, that is, if I said the coating

22  is thicker than what it actually was, that would tend to

23  underestimate what the shear rate actually was.

24  Q.  Have you formed an opinion as to whether or not the 52668

25  polymer composition flows into the fabric when Brookwood makes

C517NEX4                          Cole – direct

1    its soft shell fabric with the 52668 composition?

2    A.   Yes, I have formed an opinion.

3    Q.   And what is that opinion?

4    A.   In my opinion the polymer composition 52668 does flow into

5    the web as Brookwood is making its soft shell fabric with the

6    52668 polymer composition, that is when it makes this fabric

7    that you see.

8    Q.   And how did you form that opinion?

9    A.   Well, you recall when I said to you about the Brookwood

10   process, that is, the polymer composition is laid onto the top

11   of the fabric up here near the top of the photograph, so that's

12   where the polymer composition starts out, and we see in the

13   photograph where the polymer composition ends up, that is, the

14   polymer composition has flowed into the web.

15              THE COURT:  OK.  Let's take a little break.

16              (Recess)

17              (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C511nex5                          Cole - direct

1              (In open court)

2              THE COURT:  Could we have the witness return, please.

3              Okay.

4    BY MR. MURPHY:

5    Q.  Welcome back, Dr. Cole.  Are you ready?

6    A.  Yes, I am.  Thank you.

7    Q.  Have you formed an opinion whether Brookwood's method of

8    making the 52668 soft shell fabric causes the 52668 material to

9    selectively position within the fabric?

10   A.  Yes, I have.

11   Q.  What is that opinion?

12   A.  In my opinion Brookwood's method for manufacturing the soft

13   shell fabric made with the 52668 polymer composition does

14   infringe on this portion of the claim element.

15   Q.  And how did you reach that opinion?

16             THE COURT:  I don't even know what "selectively

17   position" means.  What does it mean?

18   Q.  Dr. Cole, do you have an opinion on "selectively position"?

19   A.  Your Honor, to me, "selectively position" means to locate

20   the polymer within a particular location, a particular region

21   within the fabric.  That is, we don't find the polymer

22   everywhere, we find it in a particular area, and in particular,

23   if we look at different samples of the material, we tend to

24   find polymer in similar locations from every representation of

25   the fabric.

C511nex5                          Cole - direct

1          THE COURT:  Well, you mean the material that was shown

2   in those illustrations, there was a big drum, and what was it,

3   5 feet wide or what?

4          THE WITNESS:  It's about 60 inches wide, your Honor.

5          THE COURT:  About 60 inches wide.

6          THE WITNESS:  About that, right.

7          THE COURT:  So you've got a roll, continuous long,

8   long roll; right?

9          THE WITNESS:  Yes.

10          THE COURT:  60 inches wide.  And how does "selectively

11  position" relate to that long roll 60 inches wide?

12          THE WITNESS:  Your Honor, I interpreted the term in

13  this patent claim of "selectively position" as, if I take a

14  section of the fabric, let's say at one portion of that roll of

15  fabric, and I look for where the polymer is located within the

16  fabric, I find it at a particular position within that fabric.

17  If I take another piece of that fabric someplace else or

18  perhaps another lot of that fabric going through production and

19  I look, I find the polymer in a similar location.

20          THE COURT:  Is that really an issue in this case?

21          MR. HORWITZ:  Absolutely, your Honor.

22          THE COURT:  Absolutely, Mr. Horwitz says.

23          MR. HORWITZ:  The patent says --

24          THE COURT:  Mr. Horwitz is very absolute.  Okay.

25          MR. HORWITZ:  Yes, on this issue, I am, your Honor.

C511nex5                          Cole - direct

1          THE COURT:  All right.  Then we'll go into this.

2          All right.  I still don't understand.  You mean the

3     polymer is not being laid down over the whole 60-inch width and

4     along the whole length; is that right?

5          THE WITNESS:  No, that's not the correct

6     interpretation, your Honor.

7          THE COURT:  Then I don't understand what it means.

8          THE WITNESS:  What I interpret it to mean, your Honor,

9     is that if we look at the fabric, we find all of the fabric,

10    that whole 60-inch width, the whole length of the roll, is

11    similar in --

12         THE COURT:  Is what?

13         THE WITNESS:  Is similar in where we find the polymer

14    within any section of that.  So for instance, if we look at the

15    graphic which is up on the monitor, we find the polymer

16    composition is located -- it's selectively positioned near the

17    top side of the fabric.

18         If I could have a cross-section that's at perhaps

19    lower magnification so we can see the bottom surface as well as

20    the top surface.

21         MR. MURPHY:  749-40.

22         THE WITNESS:  If we can make that a little bit larger,

23    please.

24         This is a lower magnification view of the

25    cross-section of the fabric, so we're looking through the

C511nex5                         Cole - direct

1    thickness of the fabric, and again, to orient us, the polymer

2    composition, Brookwood laid down on the top of this fabric.  So

3    they put a layer down on top of the fabric, it goes under the

4    knife, and the polymer composition flows from the top into the

5    fabric, but notice that the polymer composition has only flowed

6    in a few fiber diameters.  If we look down in the middle of the

7    fabric, we see that there is no hole.  It's all fibers and air.

8    And if we look down on the bottom surface of the fabric -- that

9    is the outside of what would be the garment -- we don't see

10   polymer at all.  So the polymer has been selectively positioned

11   or selectively located in a specific region within the

12   thickness of the fabric.

13             THE COURT:  Within the thickness.

14             THE WITNESS:  Correct, within the thickness of the

15   fabric.

16             THE COURT:  That's the meaning of this.

17             THE WITNESS:  That's how I interpret the meaning.

18             THE COURT:  All right.  Very good.  I understand.  Go

19   ahead.

20   BY MR. MURPHY:

21   Q.  Are you familiar with the term "strike-through"?

22   A.  Yes, I am.

23   Q.  What does that mean?

24   A.  "Strike-through" means, do we get penetration of a material

25   from one surface of the fabric to the opposite surface of the

C511nex5                        Cole - direct

1    fabric.  That is, does the material go through the thickness of
2    the fabric.

3    Q.  Do you know whether Brookwood selectively positioned its
4    polymer to avoid strike-through?

5    A.  Yes, I do.  There is a deposition clip from Mr. Bernie
6    Gilbert's deposition that I'd like to play, if we could.

7             MR. MURPHY:  Actually, your Honor, we can offer the
8    deposition clips in at a later date.  But we'll bring them in
9    to support her testimony.

10             THE COURT:  Again, you're using a term I have no
11    understanding of.  Strike-through?

12             THE WITNESS:  Yes, strike-through.

13             THE COURT:  What does that mean?

14             THE WITNESS:  Well, for instance, let's think about
15    this polymer.  The side of the fabric that it's coated on would
16    be towards your body when you're wearing a garment, a soft
17    shell made from this, so the coating is towards your body.  You
18    don't -- the military doesn't want that coating to come through
19    to the outside of the garment.  If it comes through to the
20    outside of the garment, then it might interfere with the
21    camouflage nature of the print on the fabric, it might
22    interfere with the hand of the fabric, so there are a lot of
23    reasons the textile industry tries to position, to locate
24    materials so that they don't come from one surface and go to
25    the adjacent surface.

C511nex5                          Cole - direct

1          THE COURT:  Now the term "strike-through" is not in

2     claim 1, but is it relating to the selective position?

3          THE WITNESS:  Yes, it does, your Honor.

4          THE COURT:  All right.  I think I understand.  Go

5     ahead.

6          MR. MURPHY:  Would you like to see the deposition

7     testimony, your Honor?

8          THE COURT:  No.

9          MR. MURPHY:  Okay.  We'll enter it another time.

10    BY MR. MURPHY:

11    Q.  And does selective positioning have anything to do with

12    reproducibility?

13    A.  Yes, it does.  It's very important in making fabrics that

14    you're able to make the same fabric or pretty close to the same

15    fabric day after day.  Otherwise, you don't have any quality

16    control.  Your customers that might be ISO 9000 certified

17    definitely wouldn't be happy with you if you could not

18    reproducibly make a fabric.

19    Q.  Have you formed an opinion whether Brookwood's method of

20    making the 52668 soft shell fabric causes the 52668 material to

21    form a thin film substantially encapsulating at least some of

22    the structural elements of the fabric?

23    A.  Yes, I have.

24    Q.  And what is that opinion?

25    A.  In my opinion, Brookwood's method for manufacturing the

C511nex5                    Cole - direct

1   soft shell fabric with the 52668 polymer composition does

2   infringe this portion of the claim element of claim 1 of the

3   '902 patent.

4   Q.  And how did you reach that opinion?

5   A.  I reached that opinion by looking primarily at my scanning

6   electron micrographs of the coated fabric.

7          MR. MURPHY:  Would you pull up 727-3, please.

8   Q.  What is this?

9   A.  This is a photograph of the coated side of Brookwood's

10  fabric, so we're looking at the fibers as they have been coated

11  with the 52668 polymer composition, and the polymer composition

12  has been cured onto the fabric, so --

13  Q.  And how does it show encapsulation with a discrete thin

14  film?

15  A.  If you look for it, it says -- at the fiber right here in

16  front of us, you can see that it's no longer round and smooth

17  the way that the uncoated fibers are, so this fiber indicates

18  that there's polymer composition which is spread partially or

19  completely around it.  We can look at other fibers in here.

20  For instance, the fiber over here by the hole, that particular

21  one shows encapsulation.

22          It's probably easier for me to tell you what's not

23  encapsulated by the definition.  This cluster of fibers over

24  here, where we don't have individual fibers but instead we have

25  a group of fibers, would not meet the definition of discrete.

C511nex5                        Cole - direct

1  Q.  And over here (indicating), are these also --

2  A.  Oh, these would be encapsulated, yes.

3          MR. MURPHY:  Could we go to 729-3, please.

4  Q.  And does this also show encapsulation?

5  A.  Yes, it does.  This is another picture of the fabric.  The

6  first fabric we were looking at was one where I was present for

7  the manufacturing of it.  It was later shipped to me.  This

8  fabric is the one that was -- actually came to me Bates

9  labeled.  So we're looking at the same fabric style but just

10 run at two totally different times.  If we look at the fiber,

11 this loop, which is near the center of the page with the hole

12 in the middle of it, the portion near where the hole is, that

13 section of the fiber would be considered encapsulated, and we

14 can look at the fiber which is looping right next to it, that

15 would also be considered encapsulated through this region.

16         MR. MURPHY:  Your Honor, these come from Exhibit 729.

17 I know we've offered 727.  I don't know if we've offered 729.

18         THE COURT:  I'll receive it.

19         MR. MURPHY:  Thank you.

20         (Plaintiff's Exhibit 729 received in evidence)

21         MR. MURPHY:  Would you move to 729-38, please.

22 Q.  And what is this document?

23 A.  This is another cross-sectional view of Brookwood's fabric.

24 This one again is the fabric which I originally received as the

25 Bates-labeled fabric, so this is again the soft shell fabric

C511nex5                        Cole - direct

1    which was made with the 52668 polymer composition.  Again, we

2    can see encapsulated fibers.  If we look up near the upper

3    left, for instance, the fibers in this area have been coated

4    with the polymer composition, but they're individual fibers.

5    And there are a number of others.  The one over here that's

6    kind of looking like a sea monster (indicating), it's not clear

7    from this particular view whether that's one fiber or several

8    fibers.  If it's one fiber, then it's encapsulated.  If it's

9    several fibers, then it would not meet the definition.

10   Q.  And what is your estimate of the thickness of the film that

11   is encapsulating the fiber?

12   A.  Well, if we could blow up the film on the fiber towards the

13   upper left, this one right here (indicating).

14          Remember, this film is obviously starting to crack off

15   of this particular fiber due to some problems in processing.

16   Remember, the fiber diameter is about 12 to 14-microns, so I

17   would estimate from this portion of the figure that the film is

18   probably on the order of 1 -- a few microns.

19          MR. MURPHY:  Can you pull up 729-44, please.

20   Q.  And again, what is your estimate on the thickness of the

21   film that's encapsulating the fibers here?

22   A.  Well, the one that I would say is probably encapsulated is

23   this one over here (indicating) on -- towards the upper right.

24   This view, it's difficult to estimate precisely what the

25   thickness is, but again, if I use my ruler that the fiber

C511nex5                          Cole - direct

1    diameter is about 12 to 14-microns, it, again, looks like the

2    thickness of the film is probably on the order of a few

3    microns.

4            MR. HORWITZ:  Your Honor, objection.  This again is

5    totally beyond her expert report and beyond her deposition.

6            MR. MURPHY:  Your Honor, this is from her expert

7    report.

8            MR. HORWITZ:  The picture is from the expert report.

9    The opinion about the picture is not.  This is --

10           THE COURT:  Overruled.

11           MR. HORWITZ:  Thank you.

12           THE COURT:  You can cross-examine.

13           Go ahead.

14   BY MR. MURPHY:

15   Q.  Just to recap, what is your opinion as to whether Brookwood

16   subjects the shear thinnable material sufficient shear

17   thinning -- let me rephrase that.  Pardon me.

18           What is your opinion as to whether Brookwood subjects

19   the shear thinnable material to sufficient shear thinning

20   energy to cause the shear thinnable material to flow into the

21   web when it makes its soft shell fabric with the 52668 polymer

22   composition?

23           THE COURT:  It seems to me she's testified to that

24   over and over, that that happens.

25           MR. MURPHY:  Okay.  I'm just trying to pull it all

C511nex5                    Cole - direct

1    together, your Honor.  That's one long claim element.

2                THE COURT:  Okay.  It would be good to finish this

3    witness today and have the cross.  Can we conclude the direct?

4                MR. MURPHY:  Your Honor, our concern is that we need

5    to set a limitation-by-limitation proof of infringement for

6    each and every element of the claim for each and every fabric

7    and --

8                THE COURT:  Look, what you're really going to subject

9    everybody to is endless repetition.  There are not 85 different

10   issues here.  There are a few issues.

11               MR. MURPHY:  Your Honor, we --

12               THE COURT:  And what we've talked about I'm sure is

13   typical of the different fabrics, and we don't need a lot of

14   repetition.

15               MR. MURPHY:  Your Honor, we agree, and if Brookwood

16   would be willing to stipulate --

17               THE COURT:  No.  I'm telling you we don't need

18   repetition.  And if we could have the cross and finish this

19   witness, it would be very, very helpful.

20               Why don't we have the cross now.  Let's cross.  Thank

21   you.

22   CROSS-EXAMINATION

23   BY MR. HORWITZ:

24   Q.  Dr. Kline, I think you have in front of you the claim, and

25   if you --

C511nex5                          Cole - cross

1           THE COURT:  Dr. Who?

2           MR. HORWITZ:  I'm sorry.  Dr. Cole.  Sorry, your

3    Honor.

4    Q.  If you look at it, it says, "Subjecting said shear

5    thinnable material to sufficient shear thinning energy to cause

6    the shear thinnable material to flow into the web, selectively

7    positioned within the web."  Do you see that?

8    A.  Yes, I do.

9    Q.  Okay.  So let's look at the '841 patent.

10          MR. MURPHY:  Your Honor, this is not the patent which

11   she just testified about.  This is not cross.  She testified

12   about the '902 patent and he's asking her about the '841.

13          MR. HORWITZ:  Your Honor, she spoke about meeting that

14   limitation of the '902, and to understand what that limitation

15   is all about, we've agreed that the '841 and the '902 mean the

16   same thing.

17          THE COURT:  I'll hear your question.  What is your

18   question?

19          MR. HORWITZ:  I'm asking -- I'm referring her to the

20   '841 patent.

21          THE COURT:  Where?

22          MR. HORWITZ:  In column 5, lines 21 through 26.

23          THE WITNESS:  Could I ask --

24          THE COURT:  Just a minute.  Just a minute.  Just a

25   minute.  Line what?

C511nex5                          Cole - cross

1            MR. HORWITZ:  21 through 26.

2            THE COURT:  I'm sorry.  What column?  What column?

3            MR. HORWITZ:  Column 5, your Honor.

4            THE COURT:  And what's the question?

5            MR. HORWITZ:  It's on the monitor, your Honor.

6            THE COURT:  What's the question?

7            MR. HORWITZ:  The question is, is:

8   Q.  It talks here about positioning it with great internal

9   precision of the internal placement.  Do you see that?

10           MR. MURPHY:  Your Honor, we object.  This is not the

11  patent that she testified about.

12           THE COURT:  Overruled.

13  Q.  Now the SEMs that you --

14           THE COURT:  What is the question?

15  Q.  Okay.  The SEMs that you showed us, was that internal

16  precision or was it random?

17           THE COURT:  What are you referring to?  What did she

18  show us?

19           MR. HORWITZ:  The pictures that were shown.

20           THE COURT:  Yeah.

21  BY MR. HORWITZ:

22  Q.  Was that -- was precision that was put in there or it was

23  random, sometimes thick, sometimes thin, or all over the place?

24           MR. MURPHY:  Objection.  Vague, your Honor.

25           THE COURT:  Overruled.

C511nex5                         Cole - cross

1   A.  I'm not quite sure I understand the question because --

2   Q.  Okay.  Let me rephrase it properly.  Let me phrase it

3   differently.

4          As I understand great internal precision, and what you

5   said was reproducibility, that is all the same.  Even looking

6   at that one SEM with the one yarn there, was that with

7   precision or was it sometimes thick, sometimes thin?  Was that

8   with internal precision?

9   A.  There are different ranges of precision.  I mean, literally

10  it ranges from having a very close tolerance, if you wish, such

11  as we tend to think about machining on metal parts where we

12  talk about precisions of thousandths of an inch, perhaps, to

13  the precision which you get when you, for instance, might ask

14  me to estimate what's the distance between here and the back

15  wall of this room, and I tell you, well, it's greater than

16  25 feet.

17  Q.  Okay.  So in your --

18          THE COURT:  I thought that cross-examination would

19  relate to the direct.

20          MR. HORWITZ:  It does, your Honor.

21          THE COURT:  Now we start on something that was not --

22          MR. HORWITZ:  She spoke at length about "selectively

23  position."

24          THE COURT:  All right.  Well, why don't you ask her

25  about that.

C511nex5                    Cole - cross

1            MR. HORWITZ:  I am asking her about that.  It says

2    "selectively position within the web."

3            THE COURT:  Right.

4            MR. HORWITZ:  And when it says "selectively position,"

5    it's supposed to position with great internal precision.

6            MR. MURPHY:  Objection, your Honor.  He's mixing the

7    '902 patent and the '841.

8            THE COURT:  Sustained.

9            MR. HORWITZ:  Your Honor, we stipulated that it means

10   the same thing in both patents.

11           THE COURT:  What means the same thing in both patents?

12           MR. HORWITZ:  The term "selectively position within

13   the web."

14           THE COURT:  Means the same thing as what?

15           MR. HORWITZ:  Means the same thing as in the '841

16   "placed within the web."

17           THE COURT:  What's the language?  What's the claim

18   language in '841?

19           MR. HORWITZ:  "Selectively placed within the web."

20   And the parties have agreed in the *Markman* briefing that means

21   the same thing.

22           THE COURT:  I'm trying to find out what it is that

23   means the same thing.  Are you talking about claim -- what's

24   the claim in '841?

25           MR. HORWITZ:  Could you put up the claim in '841,

C511nex5                              Cole - cross

1    claim 1.

2                 THE COURT:  I should have made a note of that.  But

3    what claim are you talking about in '841?

4                 MR. HORWITZ:  Claim 1, your Honor.

5                 THE COURT:  Claim 1.  All right.  Very good.  And

6    what's the language there, please?

7                 MR. HORWITZ:  The language there is, "and selectively

8    place it into the tensioned web."  And the parties have agreed

9    in *Markman*, those two mean the same thing.

10                THE COURT:  All right.  Very good.  Now what's your

11   question?

12                MR. HORWITZ:  And my question was, is:

13   Q.  Looking at the cross-sections that we saw before, was that

14   with great internal precision?

15   A.  Could we go back to where you're referring to in the '841

16   patent, please.

17   Q.  Sure.  Column 5, 21 through 26.

18                MR. MURPHY:  Your Honor, I have to object.  This is

19   not the claim construction that the defendant had offered for

20   "selectively placed."  They did not offer or argue for the

21   "great internal precision."

22                MR. HORWITZ:  Your Honor, it is in our *Markman*, and if

23   plaintiff wants to limit me to what was said before, this

24   witness certainly has not been limited in that way.

25                So let's look at the SEM --

C511nex5                        Cole - cross

1          THE COURT:  Mr. Horwitz, I just happen to be the judge

2     here, and I deal with the language of the claims, and I'm

3     becoming better and better educated by everybody about that

4     language.  Now all I have to just simply tell you, that all of

5     a sudden we have you referring to -- I guess you called it the

6     specification or whatever in the '841 patent, column 5, line --

7          MR. HORWITZ:  21 to 25, your Honor.

8          THE COURT:  And I don't know what it has to do with

9     the actual plain language.  Suddenly we're talking about "great

10    internal precision," which appears in a long, long paragraph,

11    and I have to tell you as the judge, I don't know what the

12    significance of that language is.

13         MR. HORWITZ:  Your Honor, the significance of the

14    language is that this patent -- these two patents talk about

15    "great precision," and in the file wrapper -- and the "great

16    precision" relates to the control at the beginning of the

17    claim.  That control is done to place it with "great

18    precision."  And the prior -- and in the file wrapper they

19    said, you don't get the precision when you have so much

20    solvents and --

21         THE COURT:  I have none of the background that you're

22    talking about, so --

23         MR. HORWITZ:  That's why I'm trying to do it -- your

24    Honor, if your Honor will bear with me, I'll give you the

25    background.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C511nex5                         Cole - cross

1           THE COURT:  Well, we have a witness on the stand who

2     should be cross-examined about her direct.

3           MR. HORWITZ:  Yes, your Honor.  This is her direct.

4     She spoke about --

5           THE COURT:  Did she talk about "great internal

6     precision"?

7           MR. HORWITZ:  No, your Honor.  That's the whole point.

8     When she spoke about placement of the polymer within --

9           THE COURT:  Is there anything that you can -- there

10    are many subjects that relate directly, specifically,

11    expressly, to her -- there are many subjects of potential

12    subjects of cross that don't bring in some new terminology but

13    might relate to the things that she testified to on direct, and

14    relate directly to those.  And I would appreciate very much

15    hearing cross-examination that is related directly, expressly,

16    to the direct.

17          MR. HORWITZ:  It is, your Honor, and if you'll bear

18    with me, this is -- when you say you haven't heard it before,

19    this is the first question I've been able to ask.

20          THE COURT:  I'll tell you, you go ahead, but at 4:30,

21    her cross-examination is going to end, and if you spend a lot

22    of time on other language that she didn't even go into on

23    direct, then that's your problem.

24          MR. HORWITZ:  Your Honor, you're just going to give me

25    a half hour for cross?

C511nex5                          Cole - cross

1              THE COURT:  That's right.  She's finishing today.

2              MR. HORWITZ:  Okay.

3     BY MR. HORWITZ:

4     Q.  In your testimony you said that you based your opinion on

5     shear thinning on three things: the SEM; the machine; and the

6     rheology.  Did you say that?

7     A.  That's correct.

8     Q.  Okay.  So let's look at your 2009 report, please.  Can you

9     show me where you saw the rheology of that in your original

10    2009 report.  Where was the analysis you did of the rheology of

11    defendant's polymer?

12             MR. MURPHY:  Your Honor, she just testified regarding

13    the 52668.

14             THE COURT:  The objection is overruled.

15             MR. MURPHY:  He's citing from the wrong report, your

16    Honor.

17    BY MR. HORWITZ:

18    Q.  I'm asking with respect to the 2009 report.  You gave an

19    opinion that that infringed, that that product infringed; did

20    you not?

21    A.  Yes, I did.

22    Q.  And you testified before -- you testified at your

23    deposition --

24    A.  Excuse me.

25    Q.  -- that you based it upon three things: the machine; the

C511nex5                    Cole – cross

1    rheology; and the SEM; isn't that correct?

2              MR. MURPHY:  Your Honor, objection.  Badgering the

3    witness.

4              THE COURT:  Objection is overruled.

5    Q.  Isn't that correct?

6    A.  I'm not sure I understand what the question is.  Could you

7    please repeat the question, sir.

8    Q.  Is it correct that you said, "My opinion about infringement

9    about whether there's shear thinning is based upon three

10   things: the SEM; the rheology of the material; and the

11   machine"?  Isn't that correct?

12   A.  If you could show me the exact line in my 2009 deposition,

13   I would appreciate it, rather than it being quoted by --

14             THE COURT:  Are you talking about the report or the

15   deposition?

16             MR. HORWITZ:  I'm talking about the deposition and her

17   testimony earlier today.

18             THE COURT:  Do you have her deposition testimony here?

19             MR. HORWITZ:  I cannot find it.

20   Q.  Didn't you testify to that earlier today, that those were

21   the three bases for your opinion?

22   A.  Correct, on the 52668.

23   Q.  Okay.  So let's look at the 5 -- the 2009 report.  Was your

24   opinion based upon that?

25             2009 you said there was infringement.  Was it based

C511nex5                          Cole - cross

1    upon the SEMs?

2    A.  I didn't say the 52668 infringed in 2009.  I don't believe

3    it existed at that time.

4    Q.  No, I asked about the product in your 2009 report,

5    defendant's product that you accused of infringement in your

6    2009 report, where you said there was shear thinning.  Was that

7    based upon the SEMs?

8    A.  It was based upon the SEMs.

9    Q.  Was it based upon the rheology?

10   A.  It was based upon my general understanding of the rheology

11   of polymers which are used for such purposes in the textile

12   industry.

13   Q.  So it was based on the rheology, was it not?

14   A.  The general rheology; not the rheology of that specific

15   polymer.

16   Q.  Not the rheology of that specific polymer.  Okay.

17   A.  That's correct.

18   Q.  And was it based upon the machine?

19   A.  Yes, it was.

20   Q.  Now wasn't it true that you could not see the machine when

21   you went and you did your inspection, you could not see the

22   interface between the blade and the fabric and the polymer;

23   isn't that correct?

24   A.  That's correct.

25   Q.  So you based upon looking at the machine without seeing

C511nex5                         Cole - cross

1    exactly where you said there was shear thinning.

2    A.   That's not true.

3    Q.   Well, you said there was shear thinning at the blade, at

4    the blade interface with the fabric in the polymers.  That's

5    where the shear thinning took place; is it not?

6    A.   That's correct.

7    Q.   And you couldn't see that in combination, it was blocked

8    from your vision; was it not?

9    A.   In 2009, on my inspection visit to Brookwood's

10   manufacturing facility, I could see the blade, I could see the

11   fabric, and the orientation of the fabric relative to the

12   blade, I could see the polymer after it had been placed in

13   front of the blade.  You're correct that I can't see all three

14   at once because it's not possible to be able to look through

15   the polymer.  In addition, Kenyon's personnel, Brookwood's

16   personnel would not stop the machine once they started it.  So

17   it was possible to see the conditions although not to see the

18   complete figuration at one time.

19   Q.   So according to the declaration of your attorney, Michael

20   Murphy --

21        MR. HORWITZ:  If we could put that up.

22   Q.   "-- because Brookwood continued to run the fabric through

23   the KK-1 coater and continued to pump polymer in front of the

24   knife blade, the polymer formed a large rolling breed and

25   obscured any close examination of the knife/fabric interface."

C511nex5                         Cole - cross

1              THE COURT:  What is your question?  Just make that

2     clear.

3     Q.  Well, isn't it true that that interface is where the shear

4     thinning takes place?

5     A.  Excuse me.  What are these documents I'm looking at?

6     Q.  I'm sorry?

7     A.  What are the two documents that I'm looking at?  It doesn't

8     appear to be one document.

9     Q.  That's a declaration by your attorney as to what happened

10    at the inspection in 2009, that you could not see the

11    knife/fabric interface, by Mr. Murphy sitting right over there.

12    A.  Could we -- could we slide the bottom page up far enough

13    that I can see the signature on it.

14    Q.  Sure.  Michael Murphy.

15             So when you say you formed it with three things, isn't

16    it true that you said that the SEMs -- you can't tell from

17    looking at SEMs whether something has been pressured in or

18    whether it's been shear thinned in; isn't that correct?

19    A.  You want additional information to back up an assertion.

20    Q.  No, I'm asking you a specific question.  Is it or is it not

21    true that you said, looking at an SEM, you cannot tell the

22    difference between something that has been shear thinned in and

23    that has been pressured in?

24    A.  You -- I also I believe told you that I wanted --

25             THE COURT:  Wait a minute.

C511nex5                          Cole - cross

1    Q.  I just asked you a question.  Could you please answer --

2              THE COURT:  Is that at a deposition or what?

3              MR. HORWITZ:  At a deposition, yes, your Honor.

4              THE COURT:  The question is:  Did you say that at a

5    deposition?  That's the question.

6              THE WITNESS:  Then, your Honor, I'd like to see that

7    wording at the deposition.

8              THE COURT:  Okay.

9    Q.  So:  "Q.  You would not be able to tell from examining two

10   fabrics whether the coating was introduced by what you've

11   termed pressured introduction or by shear thinning; isn't that

12   right?"

13             "Not just by looking at the fabric.  You have to know

14   the chemistry and the rheology of the coating fabric, coating

15   composition."

16             Right?  That's your testimony?

17   A.  That's correct.

18   Q.  Okay.  So did you know the rheology of the coating

19   composition in 2009 when you gave your opinion that the fabric

20   infringed?

21   A.  At the time of my deposition I believe that we received the

22   expert reports from Brookwood's expert, Mr. Colosanto.

23   Q.  I didn't ask you that.  I asked if you gave it -- at the

24   time you rendered your opinion in your report, did you have

25   that rheology?

C511nex5                          Cole - cross

1    A.  But you're quoting testimony that I gave at a deposition,

2    which is not the same thing as my expert report, sir.

3    Q.  That's right.  I'm asking, in your expert report, did you

4    know the rheology before you gave an opinion of infringement?

5    A.  I did not know the rheology of N1074 at the time that I

6    wrote the 2009 expert report.  However, at the time that this

7    testimony you put up on the screen was made, I had received

8    additional information from your expert, Mr. Colosanto, which

9    showed definitely the N1074B, the polymer composition in

10   question, shear thinned.

11   Q.  So let me repeat:  At the time you gave your opinion, you

12   couldn't see the interface between the fabric, the knife, and

13   the polymer.  You didn't know what the rheology was until

14   later.  You had an SEM where you can't tell from the SEM, and

15   that didn't stop you from giving an opinion, did it?

16          THE COURT:  Oh, please.  Don't stand there and argue

17   with the witness.  Let's have questions and she'll --

18   Q.  Okay.  Isn't it true that, number one, you couldn't tell

19   the difference between an SEM from pressure and an SEM from

20   shear thinning?

21   A.  There's suggestions within the SEMs as to which way the

22   polymer composition gets in.  I would be reluctant to say that

23   an SEM by itself is definitive as to how the material gets in.

24   However --

25   Q.  You said you could not tell the difference --

C511nex5                          Cole - cross

 1            THE COURT:  You're --

 2  A.  You're omitting the word "just."

 3  Q.  Right.  Just from the SEM, you could not tell whether there

 4  was shear thinning or pressure that put the polymer in.

 5  A.  Mr. Horwitz, I believe that you're misrepresenting the

 6  testimony, which is up in front of the screen.

 7  Q.  That's right.  The testimony says just from the SEM, you

 8  couldn't tell; isn't that right?

 9  A.  That's not --

10            THE COURT:  We've been over this.  I've seen the

11  deposition testimony, and we don't have to keep repeating it.

12  Q.  Okay.  So let's go to the next one.  At the time you

13  rendered your opinion in 2009, you did not know the rheology,

14  you did not have the curve or the equivalent curve that you put

15  up in front of the judge earlier for the rheology curve; is

16  that correct?

17  A.  At the time that I wrote my 2009 expert report, I did not

18  have the rheology curve; that is correct.

19  Q.  And at the time --

20            THE COURT:  Rheology curve is on that --

21            THE WITNESS:  The curve which shows the apparent

22  viscosity versus shear rate.

23            THE COURT:  The shear rate.  All right.

24            THE WITNESS:  Correct.

25            THE COURT:  The one we looked at quite a bit.

C511nex5                          Cole - cross

1                    THE WITNESS:  Correct.

2                    THE COURT:  That's a rheology?

3                    THE WITNESS:  It's a rheology curve, a viscosity

4      curve.

5      BY MR. HORWITZ:

6      Q.  And you did not have that in 2009 when you wrote your

7      opinion stating that it was your opinion that there was shear

8      thinning.

9      A.  I did not have it at the time that I wrote my 2009 expert

10     report, that is correct.

11     Q.  At the time you rendered your opinion that there was shear

12     thinning.

13     A.  That's correct.

14     Q.  Okay.  And at the time you rendered your opinion that there

15     was no shear thinning, you did -- you could not see the

16     interface between the three things?

17                   THE COURT:  You've asked this many times.

18                   MR. HORWITZ:  Okay.

19     Q.  Okay.  So do you recall stating that the way you would

20     differentiate that, the way you would differentiate between

21     penetration of a coating into the fabric in a manner that you

22     believe is significant for the purposes of your evaluation for

23     infringement as opposed to penetration that was conventional is

24     based upon encapsulation?

25                   MR. MURPHY:  Objection.

C511nex5                    Cole - cross

1    A.  If you can show me that text, I would certainly appreciate

2    it, sir.

3    Q.  Sure.  "That's the way you differentiate between

4    penetration and the patented shear thinning method, by

5    encapsulation."

6              MR. MURPHY:  Your Honor, we have an objection to form

7    in there.

8              THE COURT:  Overruled.  Let me just read that, please.

9              (Pause)

10             THE COURT:  Who asked that question?

11             MR. HORWITZ:  Counsel, prior counsel for Brookwood,

12   your Honor.

13             THE COURT:  Now I've read that long question.  What is

14   your question?

15             MR. HORWITZ:  My question is:

16   Q.  Doesn't that say that the way to tell the difference

17   between shear thin and pressure of the prior art --

18             THE COURT:  This is a question, and so what was the

19   answer, if any, to that question?

20             MR. HORWITZ:  If you look down, it says, "if there is

21   any difference."  "A.  One would look for encapsulation."

22             MR. MURPHY:  Your Honor, he didn't read the whole

23   question.  It was asked what would be significant for purposes

24   of evaluation --

25             THE COURT:  The objection is overruled.  Now we see

C511nex5                              Cole - cross

1    the question, we see the follow-up question, and then we see

2    the answer.  Now what is your question, Mr. Horwitz?

3    BY MR. HORWITZ:

4    Q.  Isn't it true that encapsulation is not a technique that

5    was made in the present invention?

6               THE COURT:  What do you mean by "the present

7    invention"?

8               MR. HORWITZ:  Meaning the invention of the '902 and

9    the '841.

10   Q.  You said that you would look for encapsulation to see

11   whether it was part of the invention, whether the fabric was

12   made by the invention, but isn't it true that encapsulation is

13   not something that was invented in these patents?

14              MR. MURPHY:  Objection, your Honor.

15   A.  I'm not sure where that question comes from, from what I'm

16   reading from my deposition in 2009.

17   Q.  Well, isn't it true that you --

18   A.  The deposition says, "differentiate between penetration and

19   coating."

20   Q.  Right.  And is significant for purpose of your evaluation

21   of infringement, so encapsulation was significant in

22   determining whether there was infringement or not; isn't that

23   correct?

24   A.  Mr. Horwitz, if you look at --

25   Q.  Excuse me.

C511nex5                      Cole - cross

1   A.  If you look --

2   Q.  Is it correct or not?

3   A.  I'm trying to answer your question, sir.

4   Q.  The answer is a yes or no.

5   A.  If you look --

6   Q.  It's correct or it's not correct.

7           THE WITNESS:  May I be permitted to answer the

8   question, your Honor?

9           THE COURT:  The problem I have with your question,

10  Mr. Horwitz, is, you're really asking her, as I understand it,

11  whether encapsulation was an invention.  Now that's not part of

12  her direct, it's not part of her -- whatever she is, she's not

13  a lawyer determining what was an invention or what wasn't an

14  invention.  So the objection is sustained to that question.

15  Q.  So let me ask this:  You stated before that it was your

16  opinion that the section of the patent relating to

17  encapsulation was infringed; was it not?  Was that your

18  opinion?

19  A.  Which patent are we talking about?  I'm sorry.  I'm not

20  that familiar with this particular section of my deposition.

21  Q.  The '902.

22  A.  Is that where the relationship in this line of questioning

23  by Mr. Arroyo was from?

24          THE COURT:  You did testify about infringement of

25  claims of the '902 patent.  So what is your question,

C511nex5                         Cole - cross

1    Mr. Horwitz?

2              MR. HORWITZ:  My question is:

3    Q.  Doesn't this say that the way to determine infringement,

4    the way to determine whether there was shear thinning is by

5    looking at encapsulation?

6              THE COURT:  Well, what says that?

7              MR. HORWITZ:  "How do you differentiate between

8    penetration of a coating into the fabric in a manner that you

9    believe is significant for purposes of your evaluation issued

10   in the infringement in this case as opposed to penetration?"

11             "A.  One would look for encapsulation."

12   Q.  But isn't it true that --

13             THE COURT:  What is your question?

14   Q.  But isn't it true that encapsulation is not something that

15   was invented -- that is the invention in this -- in these two

16   patents?

17             MR. MURPHY:  Objection.

18             THE COURT:  The objection to that is sustained.  Now

19   let's have another question.

20   Q.  Okay.  Okay.  Do you recall testifying that for the

21   Caldwell patent, you couldn't definitively say whether there

22   would be shear thinning?

23   A.  This is the J.R. Caldwell patent?

24   Q.  J.R. Caldwell patent, yes.

25   A.  That was --

C511nex5                    Cole - cross

1   Q.  This patent right here.

2          MR. MURPHY:  Your Honor, this is beyond the scope of

3   direct.  It goes to prior art.  The direct was on infringement.

4          MR. HORWITZ:  Your Honor, this is exactly what the

5   objection was about, exactly what you said I should bring up on

6   cross.

7          THE COURT:  Well, if she can answer the question, why,

8   she can answer it.

9   A.  Mr. Horwitz, if you read -- could I see the J.R. Caldwell

10  patent, please.

11  Q.  It's up in front of you on the screen.

12  A.  There's a graphical, which I believe is from one of the

13  pages in the patent.  Could you give me the -- excuse me.

14  Could you supply me with a copy of the patent.  Thank you.

15         Could you please repeat the question.

16  Q.  Didn't you testify that you could not tell definitively

17  whether the arrangement shown in the Caldwell would shear thin?

18  A.  That's correct.  However --

19  Q.  And didn't you say that you -- the reason for that was, you

20  did not know what shear forces are at that blade?

21  A.  That's correct.

22  Q.  And didn't you say that similarly, you did not know the

23  shear forces that were at Brookwood's coating blade?

24  A.  I told you earlier today --

25  Q.  I just asked whether you said that.

C511nex5                          Cole - cross

1          THE COURT:  Are you referring to a deposition?

2          MR. HORWITZ:  Yes, your Honor.

3          THE COURT:  Now what is the deposition testimony

4     you're referring to?

5          MR. HORWITZ:  The deposition testimony was --

6          THE COURT:  Let's see it on the screen.

7          MR. HORWITZ:  With respect to Caldwell --

8          THE COURT:  You just asked about --

9          MR. HORWITZ:  That's right.

10          THE COURT:  -- shearing forces with the Brookwood

11     machine.  And where is that testimony?

12          MR. HORWITZ:  Line 24 through line 2 of the next page.

13          MR. MURPHY:  Your Honor, I believe he mischaracterized

14     the testimony in the last two questions.

15          THE COURT:  Please.

16          (Pause)

17          THE COURT:  All right.  Now do you see that question

18     and answer?

19          "Q.  You also don't know what the shear forces are at

20     the blade of the KK-1 coating apparatus; isn't that right?"

21          "A.  That's correct."

22          So that is your deposition testimony.  Now what is

23     your question?

24     BY MR. HORWITZ:

25     Q.  Isn't it true that you did not know the shear forces at the

C511nex5                          Cole - cross

1    blade of the KK-1 machine and therefore, similarly, cannot

2    definitively say that there would be shear thinning?

3            MR. MURPHY:  Objection, your Honor.

4            THE COURT:  Overruled.

5    A.  At the time in 2009, this deposition does reflect my

6    knowledge that I did not know what the shear forces were

7    precisely at the blade, only that the blade was capable of

8    shearing.

9    Q.  And you said nevertheless that there was infringement in

10   that opinion when you did not know that information.

11           THE COURT:  Don't argue.  Don't argue, please.

12   Q.  You also talked about "selectively position" in the '902;

13   did you not?

14   A.  I think so.

15           THE COURT:  Talked about in the deposition?

16           MR. HORWITZ:  No.  This morning -- this afternoon in

17   her testimony.

18           THE COURT:  Of course she did.  Of course she did.

19   Q.  Okay.  Now looking at the '902, did that talk about the

20   Rudman patent?  You said you read the patent.

21   A.  Excuse me.  My discussion this afternoon was about

22   infringement on claim 1 of the '902, not prior art.

23   Q.  So you said you read the '902 patent; did you not?

24   A.  That is correct.

25   Q.  Okay.  And the '902 patent refers to Rudman; does it not?

C511nex5                    Cole - cross

1   A.  Yes, it does cite Rudman as prior art.

2   Q.  Okay.  And what it says --

3           MR. MURPHY:  Your Honor, it's improper --

4           THE COURT:  Overruled.  Please don't interrupt.

5   You're constantly interrupting.

6   Q.  Okay.  And what it says about Rudman is that "prior

7   treatments of the web that forced the composition into the

8   spaces of the web while maintaining some breathability have

9   relied on low viscosity composition or solvents to aid in the

10  flow of composition."

11          THE COURT:  Where are you reading from?

12          MR. HORWITZ:  The screen, your Honor, line 40.

13          THE COURT:  Oh.  Look.

14          MR. HORWITZ:  U.S. patent number --

15          THE COURT:  Is this in the '902 patent?

16          MR. HORWITZ:  Yes, your Honor.

17          THE COURT:  What column?

18          MR. HORWITZ:  Column 2, your Honor.

19          THE COURT:  All right.  Column 2.

20          MR. HORWITZ:  So -- and then it cites the '213 patent,

21  which is Rudman.

22  BY MR. HORWITZ:

23  Q.  Do you have that in front of you?

24  A.  The Rudman patent?  No, I do not.

25  Q.  I'm sorry.  The Rudman patent.  "Describes a process for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C511nex5                    Cole - cross

1    impregnating or coating fabrics with liquefied composition to

2    create a breathable fabric."  Do you see that?

3    A.  Yes, I do.

4    Q.  "Thus, the method of this patent imparts no energy into the

5    composition to liquefy it while forcing it into the spaces of

6    the web, because the composition is substantially liquefied

7    before placement onto and into the web."  Do you see that?

8    A.  Yes, I do.

9    Q.  Did you look at the liquid -- how liquefied that was?  Did

10   you look at the viscosity of that in forming your opinion as to

11   whether the viscosity of the accused infringement was of

12   greater -- was a lesser viscosity and was even more liquid and

13   therefore would be more prone not to have imparted energy,

14   shear energy to it?  Did you look at that?

15           MR. MURPHY:  Objection.  Incomprehensible.

16   Q.  This says that with something so liquefied, it imparts no

17   energy to the composition to liquefy it.  Do you see that?

18   A.  It says that the Rudman patent calls for imparting no

19   energy to liquefy it.

20   Q.  Right.

21   A.  Liquefy the polymer composition.

22   Q.  Right.  Because it was already liquefied; correct?

23   A.  Because the composition is substantially liquefied before

24   placement onto and into the web.

25   Q.  Okay.  And did you investigate how liquefied this polymer

C511nex5                    Cole – cross

1  was of Brookwood compared to the Rudman polymer?

2  A.  Rudman calls for --

3  Q.  I asked you whether you investigated that.

4  A.  I have investigated it, yes.

5  Q.  What was the rheology -- what was the viscosity of the

6  polymer in Rudman?

7  A.  Rudman mentions a number of polymer viscosities.

8  Q.  Okay.  What are they?

9  A.  If you could give me a copy of the Rudman patent, I would

10  be glad to read them back to you.

11         Rudman's example 1 mentions having a polyurethane

12  which has a viscosity of 20,000 centipoise.

13  Q.  Yes.  That's 20,000 centipoise.  Go ahead.

14  A.  Example 2 mentions a viscosity of 10,000 centipoise.

15  Q.  Okay.

16  A.  Example 3 does not mention a viscosity.

17         Example 4 does not mention a viscosity.

18         Example 5 does not mention a viscosity.

19         Example 6 mentions a viscosity of -- it appears he's

20  talking about second penetration by a silicone, and Rudman says

21  the silicone material had a viscosity of 25,000 centipoise.

22  Q.  Okay.  And on the sheet that you were shown 4, what was the

23  viscosity of the Brookwood polymer?

24  A.  I assume you're talking about 52668, or are you talking

25  about N1074B?

C511nex5                         Cole - cross

1   Q.   Either one.  Either one.  What was the viscosity?

2   A.   The starting viscosity measured at low shear rate for 52668

3   is generally considered to be about 5,000 centipoise.

4   Q.   So that's more viscous than the Rudman example?

5   A.   No.

6   Q.   More liquid than the Rudman example.  5,000 compared to

7   15,000, 20,000, 10,000, is more liquid than Rudman.

8   A.   It's lower viscosity.

9   Q.   More liquid than Rudman or not?

10  A.   More fluidlike.

11  Q.   You just can't agree with me.  Is it more liquid or is it

12  not?

13          MR. MURPHY:  Objection, your Honor.

14  A.   Mr. Horwitz, it would be much easier to agree with you if

15  you were more precise in your terminology.

16          THE COURT:  All right.  I have to say that I think

17  Mr. Horwitz's questions are quite clear at this point and they

18  go to an issue.  Now let's just try to answer those questions.

19  Q.   Let me go on.  In the '902 prosecution -- this is a

20  response in the '902 prosecution --

21          MR. MURPHY:  Your Honor, this is also outside the

22  scope of direct.

23          THE COURT:  What?

24          MR. MURPHY:  This is well outside the scope of direct.

25          THE COURT:  Overruled.

C511nex5                        Cole - cross

1    Q.  Now it says, "The teaching of Rudman would be expected to

2    produce --"

3              MR. HORWITZ:  could you move the yellow arrow over to

4    the side, please.

5    Q.  "-- expected to produce an impregnated fabric with little

6    control over porosity.  The liquid material utilizes solvents

7    and would be expected to saturate the fabric, resulting in a

8    different product than described by the present invention."

9              THE COURT:  What is this document?

10              MR. HORWITZ:  This is part of the file wrapper of the

11   '902 patent.

12              THE COURT:  Who wrote this?

13              MR. HORWITZ:  Nextec did.

14              THE COURT:  Okay.  All right.

15   BY MR. HORWITZ:

16   Q.  So could you read the title of Rudman, please.

17   A.  The title of the '213 patent which we refer to as Rudman

18   is, "Process for controlling porosity in fibrous webs."

19   Q.  So what the patent -- what the Nextec was saying was,

20   despite the fact that Rudman's title is control over porosity,

21   it says it would have little control over porosity because it

22   utilizes solvents; isn't that correct?

23              MR. MURPHY:  Objection.

24   A.  The second sentence suggests that perhaps part of the

25   reason why they would anticipate that Rudman would have little

C511nex5                          Cole - cross

1    control over porosity is due to the use of solvents.

2            THE COURT:  Let me interrupt.  We're at 4:30, and I

3    really -- if I said that you had to complete your cross by

4    4:30, I certainly should not carry out such a ruling, but

5    here's the thing, Mr. Horwitz.  It seems to me the

6    cross-examination should relate to what she saw and what she

7    did.  To cross-examine her about things that may contradict her

8    but she had no personal relationship with -- maybe she did.  If

9    she saw the file wrapper history, if it's something that was

10   part of her investigation or whatever, then that's a fair

11   question, but simply to show her things from some source that

12   might be different from what she has said is not very helpful.

13           MR. HORWITZ:  Your Honor --

14           THE COURT:  Now the thing is that it is helpful to

15   understand exactly what is the degree of her observation -- and

16   you certainly went into that -- what is the degree of her

17   observation or physical sampling or whatever a person would do,

18   and if there is a need for her to come back tomorrow for such

19   questioning, I'll ask her to do that.  But I don't want to have

20   her come back to simply cite to her things from some source

21   that you can make use of but it isn't really helpful to have

22   her cross-examined about that.

23           Now is there some more questioning you have of her

24   about her viewing, her observation, her sampling, her use of

25   technical materials, something that she did?

C517NEX6                              Cole - cross

1              MR. HORWITZ:  Yes, your Honor.

2              THE COURT:  How much of that do you have?

3              MR. HORWITZ:  I'd say an hour, maybe an hour and a

4     half.

5              THE COURT:  And what will that go into?

6              MR. HORWITZ:  That will go into a number of her

7     observations with the SEMs that were shown, the pictures that

8     were shown, a number of her observations with respect to the

9     machine, a number of her observations with respect to the

10    rheology that she put in her report.

11             THE COURT:  Well, OK.  Look, let me say this:  You

12    pose the issue.  You say that Brookwood, whatever degree of

13    thinness or low viscosity, or whatever it is, you say flatly

14    that did not change under the knife.  You have told me that,

15    right?

16             MR. HORWITZ:  Correct, your Honor.

17             THE COURT:  OK.  Now, that is obviously very

18    important.

19             MR. HORWITZ:  Yes, your Honor.

20             THE COURT:  It seems to me there must be a very direct

21    way to deal with that issue.  I would think that somebody could

22    take a sample of that material before the knife and after the

23    knife.

24             MR. HORWITZ:  No, your Honor.

25             THE COURT:  No?

C517NEX6                          Cole - cross

1              MR. HORWITZ:  No.

2              THE COURT:  You can't do that?

3              MR. HORWITZ:  It's within fractions of fractions of a

4    second that it changes and changes back.  You can calculate

5    things, but you cannot measure that.

6              THE COURT:  Wait a minute.  Wait a minute.  Please,

7    sit down.

8              Look, you say changes and changes back.  I didn't

9    think anything changed.

10             MR. HORWITZ:  What I'm saying is that when shear is

11   applied to a polymer and the polymer is shear thin, as soon as

12   the shear is removed there is a very, very quick return to the

13   original viscosity.

14             THE COURT:  OK.

15             MR. HORWITZ:  And so, your Honor, if we could take a

16   piece of it and measure it, that would be easy.  That can't be

17   done, because even if there was a lot of shear it would be back

18   to its original viscosity so quickly you couldn't measure that.

19             THE COURT:  Well, let me just -- give me a little

20   preview.  How do you prove your case?

21             MR. HORWITZ:  Two ways, your Honor.

22             THE COURT:  OK.

23             MR. HORWITZ:  Well, three ways.  One is even if they

24   are -- even if there is shear thinning, what is being done is

25   the volume of solvents is so high that they have disclaimed

C517NEX6                          Cole - cross

1    that part of the claim, period.  So, it doesn't matter what we

2    shear, we have enough solvents that they have said that much

3    solvents, that's not our patent.

4          Number two, we have a professor of both physics and

5    mathematics from NYU who will come and testify that shear

6    thinning is not an instantaneous issue.  Creating shear

7    thinning, it takes a little bit of time.  He will testify that

8    the amount of time the fabric is under the knife to be sheared

9    is so small that it would take I think 100 times more time to

10   actually make it shear.

11         And, your Honor, that's equivalent to saying I have a

12   flame and I've got a kettle of water, if I go like that, I'm

13   not going to boil the water even if I kept it on there for a

14   while, it could boil.  So, shear thinning can't be done like

15   that.  That's why the patent -- the patent that they developed

16   have thick knives so that there is a long time under the knife

17   to get it to shear then.

18         THE COURT:  Well, now, what I was hoping is that --

19   and you said you would get your witness or witnesses tomorrow

20   --

21         MR. HORWITZ:  Yes, your Honor.

22         THE COURT:  -- to talk about your machine.

23         MR. HORWITZ:  Yes.

24         THE COURT:  What it does and so forth.  And I assume

25   you still have that.

C517NEX6                         Cole - cross

1           MR. HORWITZ:  Yes, your Honor.  We could bring a fact

2     witness to describe what the machine does.  We can bring this

3     expert to describe shear thinning.  And then there is a third

4     expert who we're trying to get in touch with, but I think he

5     has classes and there may be a problem with tomorrow.  What he

6     did was he said let's put this same polymer into the fabric

7     with pressure.  So, instead of having it go this way with

8     shear, it was pressured in, and basically it's got the same

9     characteristics.

10          The second thing he did was he took a polymer --

11          THE COURT:  Is he the fellow who will testify about

12    time?

13          MR. HORWITZ:  No, the time is the professor of

14    rheology, and he will testify in terms of what shear is about

15    and how it cannot happen.

16          The second expert is an expert on fabrics, and what he

17    did, he said, well, listen, let's figure out if I put a polymer

18    in the machine that cannot be shear thinned, and I run the

19    machine the exact same way, what am I going to end up with?

20    And he ended up with approximately the same thing.  That's

21    number one.

22          Number two, what he did was he said if it doesn't go

23    in without shear thinning, let's just pressure it in straight

24    up and down, no movement this way, just a press.  Again the

25    polymer went in approximately the same way, the same

C517NEX6                    Cole – cross

1   characteristics.

2           THE COURT:  All right.  Look, let's say this:  I

3   certainly have no intention of being arbitrary as far as time

4   limits, so I think, Dr. Cole, you need to return tomorrow.  We

5   will start at 10 o'clock, and there will be some more

6   cross-examination.  But let's have the cross really relate very

7   directly to what she observed, tested, whatever, and then you

8   will go ahead with your witnesses.  All right?

9           MR. HORWITZ:  Thank you, your Honor.

10          MR. MURPHY:  Can we find out who the witnesses' names

11  are?

12          THE COURT:  You can share that information tonight.

13          MR. HORWITZ:  Would your Honor rather have the fact

14  witness first or the expert?

15          THE COURT:  I would think the fact witness would be

16  helpful.

17          MR. HORWITZ:  We will do that.  Thank you.

18          MR. KORNICZKY:  We asked at the break; they refused to

19  tell us.

20          MR. HORWITZ:  I didn't know who was available at the

21  break.  I told you who the options were, and I told you I was

22  trying to figure out availability of exactly who.

23          THE COURT:  Share the information.

24          MR. HORWITZ:  I did, your Honor.

25          THE COURT:  OK, good night.

C517NEX6                        Cole – cross

1              MR. KORNICZKY:  Your Honor, we don't have the

2    information.

3              (Trial adjourned to May 2, 2012 at 10:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       INDEX OF EXAMINATION
2    Examination of:                              Page
3    RANDY MEIROWITZ PhD
4    Direct By Mr. Korniczky  . . . . . . . . . . 159
5
6    CHRISTINE W. COLE PhD
7    Direct By Mr. Korniczky  . . . . . . . . . . 190
8    Cross By Mr. Horwitz . . . . . . . . . . . . 282
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        PLAINTIFF EXHIBITS

 2   Exhibit No.                                    Received

 3    699   . . . . . . . . . . . . . . . . . . 203

 4    701   . . . . . . . . . . . . . . . . . . 205

 5    702   . . . . . . . . . . . . . . . . . . 205

 6    703   . . . . . . . . . . . . . . . . . . 206

 7    717   . . . . . . . . . . . . . . . . . . 208

 8    715   . . . . . . . . . . . . . . . . . . 211

 9    722   . . . . . . . . . . . . . . . . . . 217

10    728   . . . . . . . . . . . . . . . . . . 222

11    727   . . . . . . . . . . . . . . . . . . 223

12    683   . . . . . . . . . . . . . . . . . . 226

13    690   . . . . . . . . . . . . . . . . . . 233

14    713   . . . . . . . . . . . . . . . . . . 263

15    714   . . . . . . . . . . . . . . . . . . 263

16    715   . . . . . . . . . . . . . . . . . . 264

17    729   . . . . . . . . . . . . . . . . . . 279

18                         JOINT EXHIBITS

19   Exhibit No.                                    Received

20    21                                          221

21

22

23

24

25
```