C547NEX1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    NEXTEC APPLICATIONS, INC.,

4                   Plaintiff,

5           v.                              07 Civ. 6901

6    BROOKWOOD COMPANIES, INC.,

7                   Defendant.

8    ------------------------------x

9                                           May 4, 2012
                                            10:30 a.m.
10
     Before:
11
                         HON. THOMAS P. GRIESA,
12
                                            District Judge
13
                              APPEARANCES
14
     SHEPPARD MULLIN RICHTER & HAMPTON
15        Attorneys for Plaintiff
     BY:  STEPHEN KORNICZKY
16        DANIEL YANNUZZI
          MICHAEL MURPHY
17        RENA ANDOH

18   KING & SPALDING
          Attorneys for Defendant
19   BY:  ETHAN HORWITZ
          JONATHAN BALL
20        NATASHA MOFFITT
          KEVIN DINAN
21        JOHN CALABRO

22

23

24

25

C547NEX1

1          (Trial resumed)

2          THE COURT:  Good morning.  Let's resume.

3          MR. HORWITZ:  Once again, can we just do a minor bit

4   of housekeeping?

5          THE COURT:  Yes, OK.

6          MR. CALABRO:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. CALABRO:  Just with your indulgence we would like

9   to keep the record clear and move some exhibits into evidence.

10          THE COURT:  Very good.

11          MR. CALABRO:  Yesterday we referred to Dr. Hauser's

12   report, Exhibit E.  That occurs on the trial transcript at page

13   558.  We seek to move that in as Defendant's Exhibit 1781E.

14          MR. MURPHY:  Dr. Hauser has not come in to

15   authenticate his report.

16          THE COURT:  Is he going to testify?

17          MR. CALABRO:  Yes, your Honor.

18          THE COURT:  Well, I think probably to accommodate my

19   desire to expedite things there has been some testimony by this

20   witness based to some extent on the Hauser report, and so I'm

21   going to receive it subject to connection.  I assume there will

22   be a connection.

23          MR. HORWITZ:  Yes, your Honor.

24          THE COURT:  But I think that the record would be in

25   better order to receive it into evidence now, because it's been

C547NEX1

1     referred to a lot.

2               MR. CALABRO:  Thank you, your Honor.

3          (Defendant's Exhibit 1781E received in evidence)

4               MR. CALABRO:  We also ask that you receive as

5     Defendant's Exhibit 1781F, Exhibit F to Dr. Hauser's report,

6     which is referred to on page 558 of the transcript.

7               THE COURT:  All right, received.

8          (Defendant's Exhibit 1781F received in evidence)

9               MR. CALABRO:  We seek to do the same with Dr. Hauser's

10    report Exhibit G, seek to move it in as Defendant's Exhibit

11    1781G.  That can also be found on page 558 of the transcript.

12              THE COURT:  Received.

13         (Defendant's Exhibit 1781G received in evidence)

14              MR. CALABRO:  To make a correction, Mr. Horwitz

15    yesterday in error referred to Dr. Pine's Exhibit C cross.

16    That occurs on page 559.  That should be Dr. Cole's Exhibit C

17    cross.  And we seek to admit that as DX1152.

18              THE COURT:  All that is approved.  Received.

19         (Defendant's Exhibit 1152 received in evidence)

20              MR. CALABRO:  Dr. Pine's Exhibit L2 reference appears

21    on page 561 of the transcript.  We seek to admit as Defendant's

22    Exhibit 1797.

23              THE COURT:  Received.

24         (Defendant's Exhibit 1797 received in evidence)

25              MR. CALABRO:  Dr. Hauser's report, Exhibit M, referred

C547NEX1

1   to on page 565 of the transcript, we seek to have admitted as

2   1781M, as in Mary.

3              THE COURT:  Received.

4              (Defendant's Exhibit 1781M received in evidence)

5              MR. CALABRO:  Dr. Cole, Exhibit Z cross 7, referred to

6   on page 566 of the transcript, we seek to have admitted as --

7   pardon me, I believe 729 has already been admitted.

8              Dr. Hauser report Exhibit AB, referred to on page 570

9   of the transcript, we seek to have admitted as DX1781AB, as in

10  apple, bear.

11             THE COURT:  Received.

12             (Defendant's Exhibit 1781AB received in evidence)

13             MR. CALABRO:  Thank you, your Honor.

14             THE COURT:  All right.  Let's resume the

15  cross-examination.

16   DAVID PINE, resumed.

17  CROSS EXAMINATION (Continued)

18  BY MR. YANNUZZI:

19  Q.  Good morning, Dr. Pine.

20  A.  Good morning.

21  Q.  Please put up 1803.

22             Dr. Pine, I would like to refer you back to the

23  highlighted sentence on this exhibit.  And to refresh what we

24  were discussing yesterday, this is page 6 of the chapter that

25  is cited in your expert report, from chapter 8 Rheology of

C547NEX1                         Pine - cross

1    Complex Fluids.  Again, to go over this sentence so that we are

2    starting --

3    A.  Do you want me to read it?

4    Q.  No, I will walk you through it.  It says basically at the

5    beginning:  In polymeric liquids, apart from the small time

6    scale -- that they're referring to above -- it says there is an

7    important time scale associated with large scale motions of the

8    whole polymer itself, in the liquid they are suspended in.

9            It says this time scale they are referring to for

10   these large scale motions can be from microseconds to minutes.

11   Do you see that?

12   A.  Yes, I do.

13   Q.  Then below this, the last sentence in this document, it

14   says the relaxation time -- and I believe you testified about

15   the relaxation time yesterday -- the relaxation time is the

16   time associated with these large scale motions in the structure

17   of the polymer.

18            Do you see that?

19   A.  Yes, I do.

20   Q.  It says they denote this time scale by Lamda.

21   A.  Yes.

22   Q.  If we refer back to the table that you relied on in your

23   report, which is at page 9 of this exhibit -- 1803-10 is the

24   exhibit number -- can you blow up the table.  Thank you.

25            You will see the approximation that you relied on.  .1

C547NEX1                          Pine - cross

1  seconds for relaxation time is also referred to as Lamda.  Is

2  that correct?

3  A.  That's correct.

4  Q.  Let's go back to the previous page, please, I believe it

5  was 1803-7.  I want to talk about this variation of this time

6  scale from microseconds to minutes.

7          Your Honor, may I approach?

8          THE COURT:  Sure.

9  Q.  What's a microsecond, Dr. Pine?

10 A.  It's one millionth of a second.

11 Q.  Can I write this on the board to makes sure I get this

12 right.  It's .000001 seconds, right?

13 A.  Yes.

14 Q.  OK.  Now, you testified yesterday that the amount of time

15 when you were doing the -- well, let me start over again.  You

16 testified yesterday that the amount of time the polymer spends

17 under the blade is two milliseconds, correct?

18 A.  Right.

19 Q.  So, that would be .002 seconds, correct?

20 A.  That's correct.

21 Q.  So, if the relaxation time were as low as one microsecond,

22 how many times longer is the two milliseconds under the blade

23 than one microsecond?

24 A.  2000.

25 Q.  2000 times longer.  And it was your testimony yesterday

C547NEX1                    Pine - cross

1    that with the approximation of the relaxation time of .1

2    seconds -- let me put that here -- .1 seconds, that this was

3    too long to fall within.

4    A.  Yes.

5    Q.  OK.  But given that the range of actual relaxation times

6    can be from a millionth of a second up through seconds, it

7    certainly is possible that with two milliseconds of time under

8    the blade and a low enough relaxation time there can be enough

9    time for shear thinning, correct?

10   A.  No, that is not correct, there is no possibility.

11            THE COURT:  A little louder.

12   A.  There is no possibility in this polymer, in the 52668, that

13   the relaxation time is as short as a microsecond.

14   Q.  OK.  Dr. Pine, I have other questions, thank you.

15            MR. YANNUZZI:  Can we put up Exhibit 728-12.

16   Q.  Now, I believe you testified yesterday that this is an

17   uncured polymer, is that correct?

18   A.  Yes.

19   Q.  And you testified that it was uncured because you could see

20   flaking of the polymer, correct?

21   A.  Well, there is a few reasons that you can see that it's

22   uncured.  I mean because it's not that sole reason.

23   Q.  OK, Dr. Pine, I'm going to walk through your testimony

24   yesterday.  OK?  When Mr. Horwitz led you to the gap between

25   the fibers here and here, you said that was evidence that it

C547NEX1                         Pine - cross

1    was uncured because once it's cured it adheres tightly to the

2    fiber.  Isn't that correct?

3    A.  That is correct.

4    Q.  OK.  Thank you, Dr. Pine.

5            Can you please put up 727-12.

6            Now, this a cured or an uncured polymer, Dr. Pine?

7    A.  It looks like the polymer adheres to the fibers, so there

8    is no evidence from that that it's uncured.

9            MR. YANNUZZI:  Can we put them side by side.

10   Q.  Now, you pointed to areas here and the one next to it over

11   here, I believe, as showing separation.

12   A.  Um-hum.

13   Q.  I would like to point you over here as one example.  Does

14   that appear to be an area where the fiber did not adhere to the

15   polymer?

16   A.  Sorry, let me look at this.  Yes, it does.  It's a little

17   bit --

18   Q.  Thank you, Dr. Pine.

19           MR. HORWITZ:  Excuse me.  Could you let the witness

20   finish his answer?

21           MR. YANNUZZI:  He answered my question.

22           MR. HORWITZ:  No, he was in the middle of answering

23   your question when you interrupted him.

24           THE COURT:  Right, let's not interrupt.

25   A.  It's just that it's such a big separation that it's not

C547NEX1                           Pine - cross

1   clear if the polymer ever came in contact with that fiber.

2   It's also just one fiber amongst many.  If you look at the

3   large number of fibers there, in general it looks that the

4   polymer is adhering to the fiber, whereas in the other case you

5   can find many examples where the polymer has pulled away from

6   the fiber usually by a lesser amount.  So, you don't want to

7   just cherry pick one small example; you want to look at the

8   whole sample.

9   Q.  Let's look at -- you agree that these two are approximately

10  the same sample size, correct?

11  A.  I'm sorry?

12  Q.  When you talk about a sample, you are talking about on this

13  particular image or a sampling of the fabric?

14  A.  Right.  Here I was talking about looking at the multiple

15  fibers that are visible in these pictures.

16  Q.  OK.

17          THE COURT:  It would help when these things are

18  brought back to give some background.  I have no memory sitting

19  here of what these photographs are.  I mean I've seen them,

20  I've seen at least the one on the right, but what they are and

21  who testified about them, you have to reckon with the fact that

22  a lot has gone on in this trial, and I just don't remember.

23          MR. YANNUZZI:  Yes, your Honor.

24          THE COURT:  So, who said what about this, and does it

25  come off the KK1 machine, or is it an experiment or what?  I

C547NEX1                         Pine - cross

1    have no memory.

2           MR. YANNUZZI:  Yes, your Honor, I apologize.

3    Sometimes we forget that others haven't been involved in this

4    case as long as we have.

5           THE COURT:  Fair enough.

6           MR. YANNUZZI:  Both of these fabrics -- both of these

7    images, excuse me -- are cross-sectional images of the fabric

8    that was made using the polymer composition 52668.  So, this

9    would be the sample of the fabric that Dr. Cole testified to as

10   indicating infringement by Brookwood.

11          THE COURT:  Both occur after the knife, right?

12          MR. YANNUZZI:  Say that again.

13          THE COURT:  Both occur --

14          MR. YANNUZZI:  Yes.  So, this is fabric that's coated.

15   And, you know, from my simple mind if you think of it as

16   spaghetti that's been cut, the things sticking out of the

17   picture that look like ends of spaghetti, that would be the

18   fibers in the fabric.  You see there are lots of them.  The

19   stuff that's in the middle of them I think of like as tomato

20   sauce, that's the polymer, and that's the polymer that's

21   coating these fibers.

22          THE COURT:  All right, fine.

23          MR. YANNUZZI:  That's been coated by the operation of

24   the KK1 coater on these fabrics using the 52668 polymer.

25          THE COURT:  All right, thank you.  What's the question

C547NEX1                    Pine – cross

1    now about these photographs?  About whether the polymer has

2    been cured?

3            MR. YANNUZZI:  Yes.

4            THE COURT:  Well, that's the issue about that?

5            MR. YANNUZZI:  Well, yesterday, your Honor, Dr. Pine

6    testified that the fabric on the right was not cured, and the

7    reason he could tell that was because he saw separation of

8    fibers from the polymer.  You can see the spaces between the

9    fibers and the polymer where it appeared there was bad

10   adhesion, the polymer was not adhering to the fibers.

11           THE COURT:  OK, go ahead.

12           MR. YANNUZZI:  And I asked if the indications of the

13   fiber separation from the polymer on the left side was also an

14   indication that the left-hand fabric had been uncured.

15   Q.  Now, Dr. Pine, you testified that we didn't look at enough

16   samples.

17   A.  No, no, no, not enough samples.  I was just saying in this

18   photograph on the left you see that where there is polymer most

19   of the fibers are well coated, and it looks like it's adhering

20   well.

21           This one is so far away I'm not sure whether it ever

22   got near enough to the fiber to adhere.  But most of them are

23   well coated.  Whereas, if you look on the one on the right, you

24   see things like this in many places, not just in one place.

25   You see it here.  You see it here.  You see it here.  You see

C547NEX1                              Pine - cross

1    it here.  You see it up here.  So, I was just referring on that

2    one photograph on the right you see it in many places.

3    Q.  OK.  Now your first point was -- well, let me address the

4    second point first.  Let's take a look at this section over

5    here.  There appears to be several other areas where the fiber

6    did not adhere.

7            Now, when you say it never got close enough to adhere,

8    when I look at both this sample and this sample -- and in this

9    sample I think it's especially clear -- you can see the shape

10   of the polymer that looks like at one point it was molded

11   around the circumference of the fibers so that at some point

12   there was adhesion.

13   A.  At some point it did appear to come in contact, that's

14   correct.

15   Q.  Thank you, Dr. Pine.  I don't have any further on these

16   exhibits.

17           THE COURT:  All right.

18           MR. YANNUZZI:  Let's put up Exhibit 226-4.  Can you

19   blow up in the lower half of that so we can see it.  Thank you.

20   Q.  Now, do you recall that this is the rheology chart that you

21   looked at yesterday for the M1074B composition?

22   A.  Yes, it looks like the same data.

23   Q.  OK.  And yesterday you compared the shear rate of the

24   polymer composition at rest, and you looked at the shear rate

25   at 160 reciprocal seconds on the end of this curve?

C547NEX1                    Pine - cross

1   A.  Yes.

2   Q.  And then you showed the judge examples of two samples and

3   compared the viscosity of the at-rest sample to the viscosity

4   at 160 reciprocal seconds.

5   A.  That's right.

6   Q.  Now, I just want to be sure I recall this correctly.  You

7   estimated the shear rate of the KK1 coater to be 1200

8   reciprocal seconds, is that correct?

9   A.  Something like that, yes.

10  Q.  OK.  And this chart doesn't go up to 1200 reciprocal

11  seconds, does it?

12  A.  No.

13  Q.  OK.  Let's put up 692-5.  Now, this is a rheology chart

14  from Mr. Capwell's deposition.

15  A.  Yes.

16  Q.  And similar, this is for the 52668 polymer composition

17  showing a drop in viscosity from the starting point to

18  approximately, would you say that's about 370 reciprocal

19  seconds?

20  A.  Yeah, 360, 370, yeah.

21          THE COURT:  What is meant by reciprocal seconds?

22          MR. YANNUZZI:  Reciprocal seconds is the shear rate,

23  your Honor.  It's the amount of shear that's put on the

24  polymer.

25          THE COURT:  I can't recall, what's the meaning --

C547NEX1                        Pine - cross

1    maybe the witness is familiar with this exhibit -- what is the

2    meaning of this exhibit?  What's the significance of this

3    exhibit?  I just don't recall.

4              THE WITNESS:  Is that a question to me?

5              THE COURT:  Yes, it is.

6              THE WITNESS:  It's simply a measurement of the

7    viscosity of the 52668 compound between the the shear rates of

8    a few inverse seconds up to about 360 or 370 inverse seconds.

9    So, it's a measurement of the viscosity.

10              THE COURT:  This document comes from where?

11              MR. YANNUZZI:  This document comes from a deposition

12    of Brookwood's 30(b)(6) witness on the polymer composition.

13              THE COURT:  Is it a Brookwood document?

14              MR. YANNUZZI:  Yes, it is, your Honor.

15              THE COURT:  OK.

16              MR. YANNUZZI:  And, your Honor, if you recall,

17    yesterday Dr. Pine testified about the rheology of the

18    composition before it is shear thinned and then the rheology of

19    the composition here at the end of this curve, and showed you

20    two samples of polymer at each viscosity so you could look at

21    the difference between the two viscosities.

22              THE COURT:  What are the two viscosities?

23              MR. YANNUZZI:  They were approximately just over 4,000

24    centipoise.

25              And then, Dr. Pine, I don't remember exactly what you

C547NEX1                      Pine - cross

1    call this, but --

2                THE WITNESS:  It's like maybe 3200.  It's a little

3    hard to draw a straight line, but it's on that order.

4                MR. YANNUZZI:  And the point I was looking to draw

5    out, your Honor, is that this curve doesn't show the viscosity

6    of the polymer composition at the actual shear rate that was

7    estimated by Dr. Pine which was 1200 reciprocal seconds,

8    somewhere farther to the right of this curve.

9                THE COURT:  The shear rate you testified about was

10   occurring when and because of what?

11               THE WITNESS:  You want me to answer that?

12               THE COURT:  Yes, yes.

13               THE WITNESS:  I said that when the fluid passes under

14   the knife it momentarily reaches a shear rate of around 1200

15   inverse seconds.  It only reaches that shear rate on the order

16   of one or two milliseconds, one or two thousanths of a second,

17   but it goes up to that shear rate and then down to nothing as

18   it passes through under the blade.

19               THE COURT:  Well, I hesitate to ask this but, anyway,

20   maybe there was something that wasn't clear to my mind

21   yesterday, but I will just go ahead and ask it.

22               I thought you were testifying that there was no -- I

23   think you testified there was no shear thinning going on.

24               THE WITNESS:  Under the blade, that's correct.

25               THE COURT:  But is it correct that you did testify

C547NEX1                        Pine - cross

1    that there was shearing going on?

2              THE WITNESS:  There is shearing going on, that's

3    correct.

4              THE COURT:  And does the shearing go on when the

5    fabric is moving under the polymer before it even gets to the

6    blade?  Is there some shearing going on?

7              THE WITNESS:  Negligible amount of shearing.

8              THE COURT:  OK.  But under the blade there is some

9    shearing.

10             THE WITNESS:  Yes, a momentary -- it is sheared

11   momentarily.  The distinction I tried to draw yesterday is that

12   relogical curves such as the one we are seeing on the screen

13   right now are only valid for things that have been sheared for

14   a good while, at least a few seconds.

15             So, these curves don't pertain to the rheology of the

16   52668 compound when it's under the knife, because in order for

17   these to be valid the liquid has to have been sheared for a

18   second or so.  And they are only sheared for something like

19   2000ths of a second.  So, these curves simply don't pertain to

20   what goes on underneath the blade.

21             I mean in rheology, your Honor --

22             THE COURT:  In other words, these curves we are

23   looking at would show -- in other words, the shear rate is the

24   horizontal axis and viscosity is the vertical axis.

25             THE WITNESS:  Yes, that's correct.

C547NEX1                    Pine - cross

1          THE COURT:  And it's simply saying if you achieve a

2   shear rate of, say, 360 you will reduce the viscosity a little

3   bit, right?

4          THE WITNESS:  If you achieve that shear rate for a

5   while.  It doesn't happen instantaneously; it takes a while.

6          THE COURT:  Well, the "a while" isn't on this chart.

7          THE WITNESS:  No, it isn't.  This chart -- these data

8   were taken very slowly.  That is, there was many seconds

9   between each data point.

10          So, here the 52668 compound, at every point it had

11   been sheared for many seconds before the data were recorded.

12   So, it's taken under very different circumstances than those

13   that exist underneath the blade of the Brookwood KK1 coater.

14          THE COURT:  Do you know this from some description, an

15   accompanying exhibit, or what?

16          THE WITNESS:  Know what?

17          THE COURT:  Know what you are telling me now, that

18   this involved --

19          THE WITNESS:  Yes.

20          THE COURT:  -- a very slow --

21          THE WITNESS:  Yes.  There is a chart giving the data,

22   and it shows how long it was in between each data point.  I

23   also know --

24          THE COURT:  So, there is another chart.

25          THE WITNESS:  Yeah.  But there is also another thing.

C547NEX1                        Pine - cross

1   I know how these rheometers work, that is, the instruments that

2   make these measurements, and those rheometers are incapable of

3   making measurements on time scales faster than a second or so.

4          THE COURT:  So, it's simply a function of the -- in

5   other words, to get this data --

6          THE WITNESS:  Right.

7          THE COURT:  -- it is inevitable that some time is

8   used.

9          THE WITNESS:  Yes.  And it's the standard way of doing

10  it.  It is the standard methodology for measuring viscosity.

11  In many cases that's what you are interested in.

12         In this case what we have is what we call a transient

13  flow, that is, a flow that doesn't last very long.  And

14  transient rheology and transient flow is very different from

15  steady flow.  This is steady flow.  Transient flow has very

16  different rheology.

17         THE COURT:  What's transient flow?  What actually

18  happened under this knife?

19         THE WITNESS:  Yeah, transient just means that it took

20  a short time, that is, it doesn't endure very long.

21         THE COURT:  OK, back to the questioning.

22         MR. YANNUZZI:  Thank you, your Honor.

23  Q.  I'd like to turn to the experiments, Dr. Pine, that you did

24  making fabric samples using pressure with the press.  Do you

25  recall that?

C547NEX1                    Pine - cross

1   A.  I didn't do those experiments.

2   Q.  Oh, you did not do those experiments?

3   A.  No, those experiments were not done by me.

4   Q.  Thank you.  I would still like to discuss that.

5   A.  Sure.

6   Q.  Yesterday you showed us Dr. Hauser's image, I believe it

7   was 1781-J2.  Could I see that, please.

8         Do you recall that's the image that you showed us?

9   A.  You're going to have to orient me a little bit.  Which

10  image is this?

11  Q.  Sorry.  This is an image from Dr. Hauser's report.  I

12  believe it was Exhibit -- I don't want to misspeak.  It might

13  have been Exhibit J to Dr. Hauser's report.

14  A.  It says J1 down at the bottom.

15  Q.  OK, yeah, I'm not sure if that number is from Hauser or --

16  you both have the same photograph.

17  A.  Yes, OK.

18  Q.  And this was a sample that was reported to us as having

19  been made by putting the Agility fabric onto a press with the

20  52668 polymer composition and using pressure to push down onto

21  the fabric.

22        MR. HORWITZ:  Your Honor, I think the testimony was

23  about J2 which is -- that's the photograph there, yes.

24        THE COURT:  Have we now got J2 on the screen?

25        MR. YANNUZZI:  That is what is on the screen, yes.

C547NEX1                              Pine - cross

1   It's the lower right-hand corner.

2            THE COURT:  So, this was a result of the press, right?

3            MR. YANNUZZI:  Yes, that's correct.

4            THE COURT:  Go ahead with your questioning.

5   Q.  Now, you and Dr. Hauser in your reports had three images of

6   this fabric made using the press, is that correct?

7   A.  I don't remember the exact number, but we had a few

8   photographs of it.

9   Q.  OK.  Do you recall whether you had any other images?  They

10  were all cross sections.  I don't know if you recall that.

11  A.  Yes, I do recall that.

12  Q.  Did you take any images of the application side of the

13  fabric after the polymer had been applied?

14  A.  Like I said, I didn't take any images; I looked at images.

15  I didn't do the press, and I didn't take the SEMs.

16  Q.  Do you know whether the person who took the SEMs took

17  images of the application side?

18  A.  I don't recall.

19  Q.  Do you know whether the person who took the images took any

20  images of the nonapplication side?

21  A.  Boy, I don't recall.  It's been a while since I looked at

22  all of these images.

23  Q.  Do you know whether the person who took the images did any

24  line scans of the fabric sample?

25  A.  What do you mean by line scans?  There are lots of

C547NEX1                    Pine - cross

1  different kinds of line scans.  I'm just not sure what you are

2  referring to here.

3  Q.  Have you seen Dr. Cole's report, Dr. Pine?

4  A.  Yes, I have.

5  Q.  And have you seen the line scans that are in her report?

6  A.  What I'm trying to remember is -- it would be nice if you

7  put the data up there.  Were these line scans?  Were these FDIR

8  line scans?  Were these electron microscope line scans?

9  Q.  Electron microscope line scans.

10  A.  OK.  What's the question?

11  Q.  Do you recall if any electron microscope line scans of

12  these fabric samplings were taken?

13          THE COURT:  What is a line scan?  I don't remember

14  what it is.

15          MR. YANNUZZI:  Let's pull one up.

16          MR. HORWITZ:  Your Honor, I don't think there has been

17  any testimony as to what one is.  I don't think Dr. Cole

18  testified as to those line scans in her report.  I don't

19  believe so.

20          MR. YANNUZZI:  I don't recall.  I thought maybe she

21  did.

22          MR. HORWITZ:  Your Honor, my memory is that she

23  didn't, but I will stand corrected.

24          MR. YANNUZZI:  Well, let's withdraw the question and

25  let me ask you this:

C547NEX1                    Pine - cross

1   Q.  Are there any line scans of this fabric sample either in

2   your expert report or Dr. Hauser's?

3   A.  I don't recall there having been any, but I would not be

4   able to say definitively.  There are lots of images in these

5   things, and it's hard to recall all of them.

6   Q.  That's fine.  Thank you.  Now I'd like to put up Exhibit

7   657.  Oh, so, one second, please.  Can you put up J1.

8          So, Dr. Pine, I realize it's hard for you to remember

9   from one day to the next, so I don't mean to disparage you by

10  this, but for the record the exhibit that you talked about

11  yesterday was actually J1, not as Mr. Horwitz said J2.

12  A.  OK.

13         MR. HORWITZ:  It's as you said, not me.  Whatever the

14  transcript says, your Honor.

15         THE COURT:  Please.

16  Q.  This is the one that's in the transcript.

17  A.  Actually it looks more familiar to me.  That's fine.

18  Q.  Thank you.  Thank you.

19         So, I'd like to put up Exhibit 657.  Now, this is a

20  scanning electron micrograph image that Dr. Cole took of the

21  same fabric sample.  Do you see this?

22  A.  Yes.

23  Q.  Now, do you see polymer composition on this side of the

24  fabric?

25  A.  Where you are pointing to with the yellow arrow?

C547NEX1                       Pine – cross

1    Q.  And I didn't mean to point; I just meant to identify

2    basically the top surface.

3    A.  So, I'm just having difficulty understanding what part of

4    the sample you are talking about.

5    Q.  OK.

6    A.  So, maybe you can circle it or something.  I don't want to

7    --

8              THE COURT:  Again, what is this photograph?

9              MR. YANNUZZI:  This is a photograph of the sample of

10   the fabric that was made with the 52668 polymer composition,

11   made using the press experiments that were conducted by

12   Brookwood.

13             MR. HORWITZ:  Is this the same fabric as the fabric we

14   saw before?

15             MR. YANNUZZI:  This is a sample of the fabric that was

16   provided to us by Brookwood.

17             MR. HORWITZ:  There are a number of fabrics that were

18   supplied to you.  The question I have is are we comparing

19   apples and apples.

20             MR. YANNUZZI:  We are comparing apples to apples.

21   Thank you, Mr. Horwitz.

22   Q.  This is the same fabric made using the same operation as

23   the image that we looked at that was in your report, just to be

24   clear.

25   A.  Oh, yes, OK.

C547NEX1                         Pine – cross

1          MR. YANNUZZI:  Thank you for clarifying.

2     Q.  Now, do you see polymer composition on this side of the

3     fabric, Dr. Pine?

4     A.  Yes, I do.

5     Q.  OK.  Now I'd like to direct you to the lower side of the

6     fabric.  Do you see polymer composition on the other side of

7     the fabric?  I can move the arrow out of the way.

8     A.  It looks like in some places there is some.  I'm a little

9     bit -- just give me a second to look at the micrograph.  I

10    haven't seen that before.

11    Q.  Do you see any down in this area, Dr. Pine?

12    A.  It looks like there is some there, yes.

13    Q.  And do you see in here, in this area?

14          THE COURT:  This was some fabric that was subjected to

15    a press, right?  Is the press higher or on the lower side of

16    what we see here?

17          MR. YANNUZZI:  The fabric, if I understand the

18    experiment, was pressured between two plates, so the polymer

19    composition --

20          THE COURT:  But there was a press, wasn't there?

21          MR. YANNUZZI:  Yes, that's correct.

22          THE COURT:  And was the press applied to what we see

23    here on the top, or what we see here on the bottom, or what?

24          MR. YANNUZZI:  What you see on the top is the side

25    that the polymer was applied to.  The report indicates that the

C547NEX1                    Pine - cross

1  polymer was drizzled on top of the fabric.  So, the orientation

2  of this image is that the application side of the fabric would

3  have been on the top side, and the press pressed down on the

4  top side of this fabric.

5        THE COURT:  OK, thank you.

6  Q.  Do you see polymer in this area, Dr. Pine?

7  A.  That's what's less clear to me.  There are chunks of

8  something or other, and I don't know if that's polymer or not.

9        MR. YANNUZZI:  Let's compare it to some of the

10 production fabric.

11       Can you put up for me Exhibit 729-39.  Would you blow

12 that up?  Thank you.

13       Now, your Honor, just to be clear, this is the

14 production fabric of the same Agility fabric made, applying the

15 same polymer composition, the 52668 polymer composition, where

16 the polymer was applied on the top side of the fabric -- the

17 top side being the top of the photograph -- and it was applied

18 using the KK1 coating apparatus in normal operation.

19       THE COURT:  OK.

20       MR. YANNUZZI:  Now, I'd like to compare side by side,

21 please, this image with the previous image.

22       Actually, before do you that, let's not do that.  It

23 will be easier to see if we just leave this enlarged.  And if

24 the court would like to see them side by side, we can certainly

25 show that.

C547NEX1                    Pine - cross

1    Q.  Dr. Pine, I would like to ask you, do you see polymer

2    composition at the bottom edge of the fabric on this production

3    sample?

4    A.  There doesn't appear to be any.  No, I don't.

5    Q.  OK, thank you.  Now, you don't recall if there were any

6    SEMs taken of the nonapplication side of the fabric, but I

7    would like to show you one that Dr. Cole took.

8            Could you please put up Exhibit 658, please.

9            Dr. Pine, what is strike-through?

10   A.  I guess in the textile industry it is referred to when the

11   fluid being pressed into the fabric goes all the way through

12   the fabric.

13   Q.  Are you aware that Brookwood tries to avoid strike-through

14   in the products that are involved in this case?

15   A.  That really goes a little bit beyond my expertise.  I think

16   that that's correct, but that's a little bit outside of my

17   expertise.

18           MR. YANNUZZI:  OK, thank you.

19           Now, for the court I would like to explain that this

20   fabric sample is again the same fabric sample that was made by

21   Brookwood's experiment, taking the Agility base fabric,

22   applying the 52668 polymer composition, using the press.  This

23   is the bottom of the fabric.  In other words, the polymer was

24   applied to the top side of the fabric and pressed in.  This is

25   an image of the bottom side of the fabric, and as can you see

C547NEX1                          Pine - cross

1   from this image polymer has appeared to come all the way

2   through the fabric.

3   Q.  Is that correct, Dr. Pine?

4   A.  That is correct.

5              MR. YANNUZZI:  Can we put up 727-15.

6              Now, your Honor, 727-15, this is the fabric that was

7   manufactured by Brookwood, the production fabric, using the

8   same Agility substrate, the same polymer composition.

9              Could we put them side by side, please.

10             THE WITNESS:  Sorry.  Could you repeat that?  I was

11  distracted.

12             MR. YANNUZZI:  I'm sorry.  Yes.  What I showed, in

13  fact what appears to be on the left-hand side of the image now,

14  is the fabric, the production fabric that was made using the

15  52668 polymer composition.  So, on the left you have the

16  production fabric of the same Agility substrate and the same

17  polymer, and on the right you have the fabric from your

18  experiment -- or Brookwood's experiment, to be clear -- with

19  the same Agility substrate and the same polymer composition.

20             THE WITNESS:  So, I want to understand, so just let me

21  repeat to make sure I understand.  So, you are saying that the

22  fabric on the right is the bottom side of a fabric that was

23  coated with the KK1 coater with 52668 compound.

24             MR. YANNUZZI:  No.

25             THE WITNESS:  OK, that's why I want to understand.

C547NEX1                         Pine - cross

1              MR. YANNUZZI:  Thank you.  I may have said right.  I

2     meant the other right.

3              THE WITNESS:  Oh, that's on the left.  I screwed up.

4     I screwed up.  I'm a little dyslexic sometimes.  So, yes, so

5     the stuff on the left is the bottom side of a fabric that was

6     coated with 52668 compound using the KK1 coater.

7              MR. YANNUZZI:  Correct.

8              THE WITNESS:  All right, I understand.

9              MR. YANNUZZI:  And the one on the right was from

10    Brookwood's experiment.

11             THE WITNESS:  Yes, thank you.

12    Q.  They are both the same side.  They are both the

13    nonapplication side.

14    A.  Right.

15    Q.  All right.  Do you see the same level of polymer

16    penetration to the back side of the fabric on the left as you

17    do on the right?

18    A.  No, they're different.

19             MR. YANNUZZI:  OK, thank you.  Now, I also have a

20    photo micrograph of the application side.  I believe you said

21    you weren't aware of there being any.

22             Could you put up 656, please.

23             Now, for the court again, this is the same test sample

24    that was made by Brookwood's pressure experiment, so this is

25    the same piece of fabric that was made, the ability substrate,

C547NEX1                         Pine - cross

1   the 52668 polymer composition made with the fabric press.  This

2   time we are looking at the top of that sample where the polymer

3   composition was drizzled on before it was pressed into the

4   fabric.

5           THE COURT:  This is a cross section or just the top?

6           MR. YANNUZZI:  This is top down, your Honor.

7           THE COURT:  All right.

8           MR. YANNUZZI:  Please put up 727-3.

9   Q.  Now, this fabric is the production fabric, again the same

10  substrate, the same 52668 polymer composition made using the

11  Brookwood coating apparatus.

12          So, again I'm going to put these side by side now, if

13  you would, and compare what was made with the pressure

14  experiment on the same fabric with the same polymer to what was

15  made in production of the same fabric substrate and the same

16  polymer.  Sorry.  That's not the correct one.  You want to

17  compare that to 727-3.

18          Now, do these appear to be the same?

19          THE COURT:  Are both of those top-down views?

20          MR. YANNUZZI:  These are both top-down views.

21  Q.  Do you see the same level of polymer penetration on the

22  left as you do on the right?

23  A.  You can't say too much about penetration.  What you can say

24  is these images are obviously different and that the one done

25  with the press leaves more polymer material sort of above the

1    fibers than the KK1 coater does.

2    Q.  OK, thank you.  Now, you also did -- not you, Brookwood,

3    excuse me -- Brookwood also conducted the same experiment using

4    the M1074B composition, is that correct?

5    A.  Yeah, I believe so.

6    Q.  And the experiment, I believe, was conducted, if I

7    understand the expert reports, the same way.  The fabric was

8    applied -- for the benefit of the court -- to a press.  The

9    polymer was drizzled on the top side of the fabric and pressed

10   between two plates.  Correct?

11   A.  Yes.

12   Q.  Now, yesterday we compared I believe it was Exhibit 17-17.

13           Can you put that up, please.

14           Mr. Horwitz, I'm going to ask you to confirm that this

15   is correct.

16           Do you recall comparing this?

17           MR. HORWITZ:  I would have to look it up.  I don't

18   recall.

19           MR. YANNUZZI:  OK.  It was C cross that you put up.  I

20   believe it was this image.  This is the fabric that was made

21   and identified as fabric C.

22   Q.  Now, you compared that to 1781-J2.  Can you put that up,

23   please.  Do you recall that comparison, Dr. Pine?

24   A.  Yes.

25   Q.  Now, for the record, to make sure --

C547NEX1                          Pine - cross

1              THE COURT:  What are these two images?

2              MR. YANNUZZI:  I was just going to explain that.  For

3      the record the polymer composition on the right -- excuse me --

4      the image on the right is an image of the fabric sample that

5      was made using the same pressure experiment, but this time,

6      your Honor, we have moved on from the 52668 polymer

7      composition, and we are going to be looking at images that were

8      made in the experiment using the other polymer in this case,

9      which is the M1074B composition.

10             THE COURT:  All right.

11             MR. YANNUZZI:  So, the image on the right is the image

12     of the fabric sample that was made using Brookwood's pressure

13     experiment, and the image on the left is the image that Mr.

14     Horwitz asked Dr. Pine to compare.  The image on the left is a

15     production fabric, your Honor.

16     Q.  Now, do you recall looking at these two images yesterday,

17     Dr. Pine?

18     A.  Yes.  I mean I don't recall the exact numbers, but this

19     seems familiar.

20     Q.  And it was C cross, correct, to be clear?

21     A.  You know, I don't remember.  I take your word for it that

22     this is correct.

23     Q.  The record will reflect.  That's fine.  You don't have to

24     recall.  Now, what polymer composition is used to make fabric

25     C?

C547NEX1                         Pine – cross

1              THE COURT:  Fabric C?

2              MR. YANNUZZI:  The fabric C.

3   A.  I thought you represented to me that it was 52668.

4   Q.  I did not?

5   A.  No, you said it was the older formulation.  I'm sorry.  I

6   don't remember the number.

7   Q.  OK.  I might not have asked a clear question.  The image on

8   the right, I just want to make sure the record is clear.  The

9   image on the right is the image from your experiment using the

10  M1074B.

11             The image on the left that you compared it to, the

12  production fabric, do you know what polymer composition is used

13  in that fabric?

14  A.  I don't recall.  You have to tell me what the record says.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

C541nex2                    Pine - cross

1   BY MR. YANNUZZI:

2   Q.  It's not the M-1074B polymer composition.

3   A.  Okay.

4   Q.  So to use Mr. Horwitz' metaphors here, are we comparing

5   apples to apples in these images?

6   A.  It's not quite clear yet.  What I would like to know is

7   what the viscosities of the two materials are.

8   Q.  Okay.  Thank you.

9           Let's stick with this.  Even though it's a different

10  polymer composition, let's stick with Fabric C.

11          MR. HORWITZ:  I'm sorry.  What was the viscosity?

12          THE COURT:  What is Fabric C?

13          THE WITNESS:  Yeah, I can make a comparison, but you

14  need to tell me what the viscosities are.

15          THE COURT:  Before you get to that, what is Fabric C?

16          MR. YANNUZZI:  Fabric C is a fabric that's accused in

17  this case.  It's made on the --

18          THE COURT:  I think the lawyers were going to give me

19  the list of the fabrics.  Did you get that list?

20          MR. CALABRO:  Your Honor?

21          THE COURT:  Yeah.

22          MR. CALABRO:  Mr. Murphy and I discussed this earlier

23  today with Mr. Berge and let him know that the process of

24  putting together the list isn't quite as straightforward as we

25  would hope -- the list and the images as well.  It's not quite

C541nex2                           Pine - cross

1   as straightforward as we had hoped, but we will have all of the

2   images and the list of information you need in the court's

3   hands by Monday morning.

4            THE COURT:  Very good.  But in the meantime, what is

5   Fabric C?

6            MR. MURPHY:  Your Honor, Fabric C is a fabric that --

7   Brookwood created a developmental fabric.  It's used as the

8   substrate for the GEN III Level V and it is treated with a

9   polymer composition that's designated FR767 plus several

10  silicon additives to it.  So it is a -- it's what we described

11  during the second day of trial that is the developmental

12  GEN III Level V fabric.

13           THE COURT:  I don't quite get what you're saying.  Is

14  it a fabric that -- we had the V and the VII --

15           MR. MURPHY:  It was never put into --

16           THE COURT:  -- and we had the -- don't you have that

17  little list?

18           MR. HORWITZ:  Your Honor, if I may.  It's on the -- I

19  believe the first page of plaintiff's docket -- the second page

20  of docket 230, which is a list of accused fabrics.

21           THE COURT:  Where is that?

22           MR. HORWITZ:  Plaintiff's document.  We can put that

23  up, if you want, your Honor.

24           THE COURT:  Does somebody have a piece of paper with

25  it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C541nex2                         Pine - cross

1          MR. CALABRO:  We will get it, your Honor.

2          MR. HORWITZ:  But your Honor, if I could explain what

3     this fabric is?

4          THE COURT:  Please.

5          MR. HORWITZ:  In the early 1980s, there was a fabric

6     that Brookwood developed called Ken Rain.  This was a fabric

7     that was developed for raincoats, high-quality raincoats that

8     would be breathable, would be waterproof, or water resistant,

9     and have a good hand.

10          THE COURT:  Can I just interrupt you.  All I want to

11     know is, is Fabric C another designation for one of the fabrics

12     or one of the materials that is at issue here?

13          MR. MURPHY:  It is at issue.  Your Honor --

14          THE COURT:  Yeah.

15          MR. MURPHY:  It is at issue.  It was a GEN III Level V

16     fabric that was never put into sales.  It was not put into

17     production.  It was developed as a potential production fabric.

18          THE COURT:  And we have testimony and photographs

19     about Fabric C?

20          MR. MURPHY:  Yes, Judge, photographs and Fabric C were

21     part of Dr. Cole's expert report and she --

22          THE COURT:  Was it part of her testimony?

23          MR. MURPHY:  No, your Honor, because we didn't move on

24     to the other accused products.  We focused on the 52668 when

25     you asked that we move on to cross.

C541nex2                          Pine - cross

1              THE COURT:  Yes, and I gave you the opportunity to

2      re-call her.  Did you go into Fabric C when you re-called her?

3              MR. MURPHY:  Your Honor, we did not go into the other

4      fabrics when we re-called her because we stopped when we

5      finished the 52668.  You asked that we move on at that point

6      because the other fabric --

7              THE COURT:  Please don't tell me that.  I gave you the

8      opportunity to put her back on to do anything you wished to do.

9      So by saying you could put her back on, it opened to whatever

10     you wished to put on, so please, the record should show that.

11             Now we're starting on Fabric C and we're spending a

12     lot of time.  I don't recall any testimony about Fabric C.  Why

13     are we getting into Fabric C now?

14             MR. YANNUZZI:  Because Dr. Pine testified to Fabric C

15     comparing it to the pressure experiment made using the M-1074B.

16             THE COURT:  All right.  Fair enough.

17             MR. YANNUZZI:  And to be -- to clarify this, your

18     Honor --

19             MR. HORWITZ:  Your Honor, may I please.  This is

20     not --

21             MR. YANNUZZI:  There are a couple different -- there

22     are -- just so you're clear, your Honor, there are three

23     different polymer compositions: the 52668; the M-1074B; and

24     then there's this third composition -- I believe it's FR767.

25             THE COURT:  Right.  Let me make a list so that --

C541nex2                    Pine - cross

1    52668; right?

2           MR. YANNUZZI:  Yes, that's correct, your Honor.

3           THE COURT:  And then there's the --

4           MR. YANNUZZI:  M-1074B.

5           THE COURT:  1074B.  1074B.  And then now we've got

6    this other one?

7           MR. YANNUZZI:  It's FR -- I believe it's 767.

8           THE COURT:  And have we had testimony about FR767?

9           MR. HORWITZ:  No, your Honor.

10          MR. MURPHY:  Your Honor, you asked that we not go into

11   repetitive explanations on Wednesday, and it is in Dr. Cole's

12   reports and it is --

13          THE COURT:  But I'm not talking about Dr. Cole's

14   report.  I'm talking about testimony at the trial.

15          MR. MURPHY:  We've not had testimony directly on the

16   FR767 composition that is shown in Fabric C at this point in

17   the trial, your Honor.

18          THE COURT:  Well, then we're starting all over about

19   some new fabric and new polymer?

20          MR. YANNUZZI:  The reason I brought this up, your

21   Honor, is because yesterday Dr. Pine compared the sample that

22   was made with the pressure experiment using M-1074B to a fabric

23   sample that was made on the KK-1 coater using a different

24   polymer composition, this FR767, so I wanted to look at more

25   images of this sample.

C541nex2                        Pine - cross

1              THE COURT:  All right.  He did.  He did.  All right.

2              MR. YANNUZZI:  Thank you, your Honor.

3              MR. HORWITZ:  Your Honor -- your Honor, I do want to

4     clear the record.  This is not a production fabric, was never

5     intended to be a production fabric.  What this is is that in

6     the 1980s, a fabric was made called Ken Rain.  It was made for

7     raincoats, high-quality raincoats that had good hand, water

8     resistant, and breathable, just like the fabrics that plaintiff

9     is claiming it had.  So what happened was, is, we had a sample

10    of the Ken Rain fabric but we didn't have much of it.  The

11    exact polymers that were available then were no longer

12    available, so we substituted something that was exactly

13    equivalent to it and we made this.

14             THE COURT:  Were these Dr. Pine's experiments or --

15             MR. HORWITZ:  No, this was our own internal

16    experiment.  We had one run of this just to see what it looked

17    like.  They then accused of infringement.  This is not a

18    commercial product.  This -- the only type of commercial

19    product it was was back in the early 1980s --

20             THE COURT:  I want to continue with testimony, and I

21    didn't really mean to introduce a lot of argument.  So you go

22    ahead.  You're saying that this does relate to Dr. Pine's

23    direct; right?  Right?

24             MR. YANNUZZI:  That's correct, your Honor.

25             THE COURT:  Let's go ahead with it.  Go ahead with it.

1           MR. YANNUZZI:  And your Honor, at some point we made

2    need to correct Mr. Horwitz's statements, but I will not do

3    that now for the benefit of this court.

4           THE COURT:  All right.  They'll go uncorrected now.

5    All right.  Go ahead.

6           MR. YANNUZZI:  Well, if you'd like --

7           THE COURT:  No, no, no.

8           MR. YANNUZZI:  Because they do misrepresent the

9    fabrics in this case.

10          THE COURT:  All right.

11   BY MR. YANNUZZI:

12   Q.  Okay.  So let's look at the coated side of the pressure

13   sample that you've -- let's reset.  Where are we?

14   A.  I would very much like to reset, and let's just get clear

15   what these two samples are and how they were prepared.

16   Q.  Okay.  So --

17          THE COURT:  Who's going to do that; you or the

18   lawyers?

19          THE WITNESS:  They're going to do it.

20          THE COURT:  Okay.

21          THE WITNESS:  I hope.

22          MR. YANNUZZI:  I don't think Mr. Pine is clear on

23   where we are right now, your Honor.

24          THE WITNESS:  Yeah.  I just want to know what these

25   samples are so I know what I'm commenting on.

C541nex2                         Pine - cross

1            THE COURT:  Sure.

2            MR. YANNUZZI:  Okay.  Yes, your Honor.

3    BY MR. YANNUZZI:

4    Q.  The -- and again, previously we covered the pressure test

5    using the 52668.  We've now moved on to Brookwood's test where

6    they pressured the fabric between two plates using the polymer

7    composition M-1074B.

8    A.  So are both of these --

9    Q.  No, they are not both M-1074B.

10   A.  Okay.

11   Q.  But this -- the series of photomicrographs I'm going to

12   show you relate to the experiments that you made using the

13   pressure that Brookwood made -- thank you -- using the pressure

14   experiment with the 52 -- with the M-1074B polymer composition.

15   It's difficult to keep them straight sometimes.

16            Now -- and we've already established on the record

17   that the polymer composition used to make C Cross is a

18   different polymer composition from 52668.  It's the FR767.

19   Just to keep the record clear.  You don't have to answer that.

20   Just a statement to say where we are.

21            And so I'd like to move on.  I believe earlier you

22   testified that you don't recall whether there were top-down

23   samples of your pressure -- of Brookwood's pressure experiment

24   using the M-1074B, so I'd like to put one of those up.

25            MR. YANNUZZI:  Can we put up 659, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C541nex2                    Pine - cross

1        659?  Okay.

2   Q.  And this is a photomicrograph of the fabric made by

3   Brookwood's pressure experiment by applying the M-1074B polymer

4   composition pressuring the composition into the fabric between

5   two plates.  What we're looking at here is the application side

6   of the fabric.  That's the side on which the polymer was

7   applied.  This is not a cross-section.  It's basically a

8   top-down view, if you will.

9        Now I'd like to compare that to -- and again, because

10  Brookwood compared to Fabric C, I'd like to compare the

11  application side view with Fabric C.

12       MR. YANNUZZI:  Your Honor, may I please have a few

13  minutes to confer with counsel?

14       THE COURT:  Okay.

15       (Counsel conferring)

16       THE COURT:  Let's take a break now, a little break

17  now, and then we'll return after that until lunch.

18       MR. YANNUZZI:  Thank you, your Honor.

19       (Recess)

20       (In open court)

21       THE COURT:  Go ahead.

22       MR. YANNUZZI:  Thank you, your Honor.

23       Before we jump back in, I'd like to take a moment to

24  correct the record.

25  Q.  Earlier, Dr. Pine, I asked you if we had compared C Cross

C541nex2                        Pine - cross

1   to what I thought -- to 1781G2 and we put the two up side by

2   side.  And reviewing the record, actually yesterday's

3   transcript reveals that you were comparing the C Cross exhibit

4   to 1781G3.  So I just want to make sure the record is clear on

5   that.

6          So I'd like to move on and compare your pressure --

7   Brookwood's pressure experiments where Brookwood used the

8   Agility substrate coated with the M-1074B formulation -- I'll

9   wait until the court is ready.

10          THE COURT:  Yeah.  Start that again.  Start that

11   again.

12          MR. YANNUZZI:  Yes, you bet.  Your Honor, I'm going to

13   go back to where we were with the pressure experiment done by

14   Brookwood where the Agility substrate was coated with the

15   M-1074B polymer composition with the parallel press.  Okay?

16   And what I'd like to do is compare that test sample with

17   Brookwood's production fabric made with the same substrate and

18   the same M-1074B coating formulation.

19          So can you please put up 661.  Do you have a -- I have

20   a better version of that.

21          Maybe we're better off -- this looks a little bright

22   on my screen.

23   BY MR. YANNUZZI:

24   Q.  This is an image of the uncoated side of the production

25   fabric made using the M -- excuse me.  Strike that.

C541nex2                        Pine - cross

1            This is an image of the uncoated side, the bottom side

2   of the fabric that was made using the pressure experiment where

3   the Agility substrate was coated with the 52668 polymer

4   composition.  Do you see strike-through in this image,

5   Dr. Pine?

6            THE COURT:  I thought you were going to go into the

7   M-1074B.

8            MR. YANNUZZI:  Yes, sir.  Did I misspeak?  This is

9   M-1074B.

10           THE COURT:  You said 52668.

11           MR. YANNUZZI:  I'm sorry, your Honor.

12           THE COURT:  Okay.  Let's start again.

13  Q.  Okay.  So this is the uncoated side, back side of the

14  fabric sample that was made in the pressure experiment in which

15  M-1074B polymer composition was applied.  And I'd like to

16  compare this to the production version of the fabric which is

17  21-2.

18           MR. YANNUZZI:  You can put them up side by side.

19           In fact, I think this -- this one here is easier to

20  see than the one that's on the Elmo.

21  Q.  Okay.  So the left-hand side is the nonapplication side of

22  the fabric that is the production version of the fabric made

23  using M-1074B.  The right-hand image is, again, the bottom

24  side, the nonapplication side of the sample that was made using

25  Brookwood's pressure experiment with the M-1074B.  Do you see a

C541nex2                          Pine - cross

1    difference in level of strike-through between the left and the

2    right images, Dr. Pine?

3    A.   Yes, I do.

4    Q.   In fact, can you detect any strike-through in the left-hand

5    image?

6    A.   It doesn't -- I don't see any.

7    Q.   Thank you.

8                MR. YANNUZZI:  I'd like to put up 659, please.

9    Q.   659 is the application side of the fabric made by

10   Brookwood's pressure experiment using the M-1074B polymer

11   composition.  So this is looking top down at the fabric made

12   with the pressure experiment.  I'd like to compare that to

13   21-10, which is the top-down view of the production fabric made

14   using the M-1074B.  Can you see the differences in that?

15   A.   I'm sorry.  So are these both 1074 -- 1074B, is it?

16   Q.   They are.

17   A.   And the --

18               THE COURT:  Which is the production and which is the

19   pressure?

20               THE WITNESS:  The one on the right is the production

21   version, the one on the left is the version made using the

22   pressure experiment.

23               THE COURT:  The question is, again, please?

24   Q.   Do you see a higher concentration of polymer composition on

25   the image on the one on the left?

C541nex2                    Pine - cross

1    A.  Yes, the one on the left has more polymer on it than the

2    one on the right.

3              MR. HORWITZ:  Your Honor, if I may?

4              THE COURT:  Right.

5              MR. HORWITZ:  We -- we never claimed that using the

6    press would produce identical fabric.  If that would happen, we

7    would use a press in production.  The reality is the press was

8    done for a specific purpose having nothing to do with whether

9    the fabrics look alike.  I don't know what's being attempted to

10   prove here.  The press was done solely for the purpose of

11   showing that with a press -- with only pressure and no shear

12   thinning, the polymer would go into the fabric.  How much it

13   would go in and how it would look depends upon the amount of

14   pressure, the time and so on, but this -- but what the

15   plaintiff is doing here is really, so what?  It's got nothing

16   to do with what the experiment was done for.

17             MR. YANNUZZI:  You'll have a chance on redirect,

18   Mr. Horwitz.

19             THE COURT:  Well, I have to say my reaction is pretty

20   much what Mr. Horwitz has said.  I would assume that there

21   wouldn't be exactly the same result from a completely different

22   operation.  It would have some bearing simply to show that the

23   polymer could get down into the fabric, but I would assume it

24   would not be the same result.

25             MR. HORWITZ:  Thank you, your Honor.

C541nex2                    Pine - cross

1          MR. YANNUZZI:  Your Honor, the reports by Dr. Hauser,

2    when he compared these two fabrics, he says he -- he indicates

3    that the same images show the same characteristic features, and

4    indeed, yesterday, the witness testified, using a limited

5    sample of images, that they appeared to be similar.  So we're

6    pointing out differences between the test version and the

7    production version.

8          MR. HORWITZ:  I don't think that's what the witness

9    said at all.  The witness was talking about how you could see

10   that the pressure pushed it in.  What he said was -- is from a

11   single SEM you can't tell because there are thousands of SEMs

12   that could be taken and a random one doesn't show it, but what

13   you could tell from a single SEM is that pressure is enough to

14   push it in without any shear thinning, and that's what these

15   experiments were designed to do, not to show that there's a

16   different production method that can create the exact same

17   fabric.

18         MR. YANNUZZI:  Your Honor, I think you'll recall that

19   yesterday you questioned whether or not we should even get into

20   this discussion, and Mr. Horwitz made the representation to you

21   that the reason he wanted to look at the pressure experiments

22   was because he said that if you have experiments where you're

23   doing the exact same thing and changing only one feature -- and

24   he said, if I change that one feature and I do the exact same

25   things and I ended up with the exact same result, that one

C541nex2                    Pine - cross

1  feature can't be the cause of the result.  And these other

2  comparisons that were not included in Dr. Pine's report show

3  you that if you look at the features of the fabric, such as

4  controlled level of penetration, if you look at the features of

5  the fabric such as encapsulation of individual fibers with the

6  discrete thin film, you don't get the exact same result, and if

7  you look at the features that they're trying to bring in with

8  regard to strike-through, again, you don't end up with the

9  exact same result.  That was the only point of these images,

10  your Honor.

11          MR. HORWITZ:  Your Honor, this comment has --

12          THE COURT:  The witness is on the stand, we've got

13  cross-examination going on, and if you feel that the

14  cross-examination is necessary, you go ahead and do it.

15          MR. YANNUZZI:  Thank you, your Honor.  I'm actually

16  through with the comparisons.

17          THE COURT:  Okay.  All right.  Go ahead.

18  BY MR. YANNUZZI:

19  Q.  And I want to be clear.  You previously testified that you

20  have no idea whether Brookwood seeks to avoid strike-through

21  when manufacturing fabrics; is that correct?

22  A.  That isn't -- yeah, that isn't my expertise and what kind

23  of fabric is trying to be produced.

24  Q.  Is a capillary rheometer a transient flow rheometer,

25  Dr. Pine?

C541nex2                    Pine - cross

1    A.  No.  The idea is to measure steady flow.  In fact, what one

2    does is one makes some corrections so that the transient

3    effects don't ruin or confound the intended measurement, which

4    is a steady flow measurement.

5            MR. YANNUZZI:  I have no further questions, your

6    Honor.

7            THE COURT:  Any redirect?

8            MR. HORWITZ:  Yes, your Honor.

9            THE COURT:  Okay.

10           MR. HORWITZ:  Your Honor, could I have Exhibit 692-5

11   put up, please.

12   REDIRECT EXAMINATION

13   BY MR. HORWITZ:

14   Q.  You were asked about --

15           MR. HORWITZ:  No, don't make it larger.

16   Q.  You were asked about this rheology curve?

17   A.  Yes.

18   Q.  And you spoke about the data being gathered over seconds as

19   opposed to small amounts of time?

20   A.  Yes.

21   Q.  Let's go earlier in the document.

22           MR. HORWITZ:  Go to the beginning of the document.

23   A.  Yes.

24           MR. HORWITZ:  Next page.  All right.  Could you take

25   one of the columns -- doesn't matter which one -- and just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C541nex2                         Pine - redirect

1    highlight it, make it larger.  One of the -- no, no, no.  I

2    meant rows then.  Take a couple of rows and just highlight it.

3           THE WITNESS:  I think you want to go higher.  You

4    don't have the columns.

5           MR. HORWITZ:  Oh, yeah.

6    Q.  Okay.  Now what's in the first column?

7    A.  That's the time at which the measurement was taken in units

8    of seconds.

9    Q.  Okay.  So the first one, if I'm reading correctly, was

10   taken at 3 seconds?

11   A.  That's correct.

12   Q.  And the second one at 6?

13   A.  Right, right.

14   Q.  And so on down, so it's in increments of three seconds?

15   A.  Yes.  So there was three seconds between each measurement.

16   Q.  Okay.  So -- and then let's go to the graph.  And can you

17   enlarge the bottom of the graph.  So when I look on the graph

18   at the bottom, I see a bunch of triangles.

19   A.  Yes.

20   Q.  What is each triangle?

21   A.  Each one of those is one of the data points in the chart,

22   and so there's three seconds between each adjacent point.

23   Q.  And why do you leave three seconds between each adjacent

24   point?

25   A.  It takes some time for the rheometer to make the

C541nex2                         Pine - redirect

1    measurement and so there's a -- there's actually two reasons.

2    One is, you want to avoid any transients, you want to make sure

3    that both the sample and the instrument have settled down, and

4    then it makes a measurement.  So it's for those two reasons

5    that you wait, that there's a few seconds between each

6    measurement.

7    Q.  Let's move on.  I'm not going to show you the comparisons,

8    but you remember plaintiff's attorney just showed you --

9    A.  Yes.

10   Q.  -- a whole bunch of comparisons between the press and the

11   fabrics that are used?  Was the purpose of the experiment to

12   recreate the fabric with the press versus the KK-1 machine?

13   A.  No.  That wasn't my understanding of the questions.

14   Q.  Okay.  What was the purpose of the experiment and what did

15   you learn from the experiment?

16   A.  The purpose of the experiment was to show that you could

17   get the various liquids into the fabric merely by applying

18   pressure without any shearing force to shear thin the fluid.

19   Q.  Okay.  And were there other experiments done on the KK-1

20   machine where plaintiff's counsel quoted me as saying one

21   element was changed?

22   A.  I'm not sure I understand the question.

23   Q.  Plaintiff read a quote from me about one element being

24   changed in the experiment.

25   A.  Yes.

C541nex2                    Pine - redirect

1   Q.  Were there other experiments that were also done by

2   Dr. Hauser that related to having Newtonian fluids run through

3   the KK-1 machine?

4   A.  Yes.

5   Q.  And that one -- one factor that's been changed?

6   A.  Yes.

7   Q.  Okay.  Now can you tell me your experience with SEMs,

8   please.

9   A.  We use them regularly.  I've used them for -- I've used

10  them my whole career.  I've used them for 35 years to

11  characterize samples of all sorts.

12  Q.  Okay.  Now Dr. Cole discussed an experiment she did where

13  she just drizzled the -- I forget whether it was 1074B or 52668

14  or both on the fabric, and from that she concluded that it did

15  not go in by itself.

16  A.  Yes, I remember that.

17  Q.  And how does that compare to the experiment that was done

18  with the press?

19  A.  Well, the difference is that with the press, pressure

20  was -- pressure was applied, a larger pressure than would be

21  applied by the force of gravity, which would be the principal

22  force --

23  Q.  Okay.

24  A.  -- in the other case.

25  Q.  Can you tell from an SEM -- even if you took enough SEMs to

C541nex2                    Pine - redirect

1    get a proper representative sample, could you tell from an SEM

2    whether the polymer has been put there by pressure, by shear

3    thinning, by having an injection, by any of hundreds of

4    different ways?

5    A.   There's no -- there's no signature of it having been

6    sheared.   There's no obvious signature of having been sheared

7    that would allow you to just look at the sample itself and say

8    how it got in there.   What you can tell is where it is -- I

9    mean, that's normally how it's -- how SEMs are used.   You learn

10   where it is and that's about it.

11   Q.   So for example, if we look at that chair that's facing

12   backwards over there --

13   A.   Yes.

14   Q.   -- you can tell it's facing backwards --

15   A.   Yes.

16   Q.   -- but you can't tell who made it that way, turned it that

17   way.

18   A.   Yeah, that's an apt analogy.

19   Q.   Okay.   Now did you see any evidence at all of shear

20   thinning in the KK-1 coater when it made the 52668 or the 10 --

21   1074B fabrics?

22   A.   Sorry.   I need to take a drink.

23         I don't see any evidence of shear thinning in the

24   fluids that -- the 52668, for example, fluid that's run through

25   the KK-1 coater, none of the rheology data that has been

C541nex2                      Pine - redirect

1   presented suggests -- would suggest that.

2   Q.  Okay.  Do you have an opinion as to whether the polymer got

3   into the fabric due to it being dissolved in solvents in

4   pressure or shear thinned?  Do you have an opinion as to that?

5   A.  Yes.

6   Q.  What is your opinion?

7   A.  The role of the -- the principal role of the solvent is to

8   reduce the viscosity of the solution to a level whereby it can

9   be pressed in simply by pressure.  That's the role of the

10  solvent.  And adding -- I mean, adding solvent, if anything,

11  reduces -- it reduces the effect of shear.  Shear is less

12  effective in polymer solutions than it is in polymer melts,

13  so --

14          THE COURT:  Than in polymer what?

15          THE WITNESS:  Than in pure -- polymer melts.  Excuse

16  me, your Honor.  I just used a technical term.  Just meaning

17  polymers that have no solvent in it -- in them have much larger

18  shear thinning effects than polymers that are dissolved in a

19  solvent, where you dissolve them in a solvent and any shear

20  thinning effects you might have got are reduced in magnitude.

21  Q.  And I know you've been through it, but could you briefly

22  explain the basis for that opinion.

23  A.  Okay.  I would like to go to the board to answer this.

24          MR. HORWITZ:  Your Honor, would this --

25          THE COURT:  All right.

C541nex2                          Pine - redirect

1    A.   This pertains to the question of what the relaxation time

2    is in these samples.  And it's been stated that a typical

3    relaxation time in a semidilute polymer solution is on the

4    order of a 10th of a second.

5              THE COURT:  Say that again.

6    A.   It's been stated that the relaxation time -- this is taken

7    from a book that was in -- cited in my report -- that the

8    typical relaxation time for a semidilute polymer solution --

9    and that's the kind of polymer solution that we're talking

10   about here -- is about a 10th of a second.

11             MR. HORWITZ:  Do you want me to put up that exhibit?

12   1803-7?

13             THE WITNESS:  It's --

14             THE COURT:  You used a term, semidiluted?

15             THE WITNESS:  All right.  I'm sorry.  When you

16   dissolve a polymer into a solvent, all right, depending upon

17   how much polymer you put into the solvent, there are terms that

18   are used in the field to describe the type of -- the type of

19   solution you have.  Because different solutions behave --

20   different kinds of solutions behave differently.  They behave

21   differently rheologically.  So just to give an example so that

22   you understand, a dilute polymer solution behaves very -- has

23   very, very little shear thinning.  A semidilute polymer -- and

24   it has very short relaxation time.  A semidilute polymer

25   solution has much longer relaxation time.  So that's just a way

C541nex2                    Pine - redirect

1    of characterizing a class of solutions that have similar

2    properties.

3            THE COURT:  All right.  Go ahead.

4            THE WITNESS:  All right.  So that's why I say these

5    are semidilute polymer solutions.

6            So bear with me.  There's just a couple things.  The

7    viscosity of toluene, it's actually one of the most -- least

8    viscous solvents that I know of.  It's about 0.59 centipoise,

9    all right?  Which is a very small viscosity.  Viscosity of

10   water is 1 centipoise.  So the viscosity of toluene is a little

11   bit less than water.  The viscosity of -- becomes -- for

12   semidilute, the rule of thumb is, if you add polymer to the --

13   to the solvent, it becomes semidilute when the viscosity is

14   doubled, so when it becomes roughly 1.2 centipoise, that would

15   be the beginning of the semidilute regime.  The viscosity --

16           THE COURT:  Wait a minute.  You're --

17           THE WITNESS:  All right.  So semidilute --

18           THE COURT:  Viscosity, semidilute, meaning a polymer

19   and toluene.

20           THE WITNESS:  Yes.  So you start adding polymer to

21   toluene, and when you've added enough polymer, as you add

22   polymer, the viscosity of the solution will go up.  And

23   eventually you will have added enough to double the viscosity

24   of the solution.

25           THE COURT:  From?

C541nex2                    Pine - redirect

1              THE WITNESS:  From that of the -- of the solvent

2    alone.

3              THE COURT:  Okay.

4              THE WITNESS:  And that's called -- once it reaches

5    that concentration, concentrations above that are semidilute.

6              Now the viscosity of the 52668 compound is 4,000

7    centipoise.  So the point I want -- that's important here, the

8    technical issue that's important is that this isn't -- that

9    this isn't just a little bit into the semidilute regime.  It's

10   a lot into the semidilute regime.  Its viscosity has increased

11   by a factor of -- from the solvent by a factor of 6 or 7,000,

12   so --

13             THE COURT:  Now does the 52668 have toluene in it?

14             THE WITNESS:  Yes, toluene is the principal solvent in

15   52668.  That's why I chose it.

16             So what that means, since it's so far into the

17   semidilute regime, it is absolutely unimaginable that the

18   relaxation time is any shorter than about a second.  That's the

19   shortest it could be, because it's so far into -- it's so --

20   it's 4,000 times more concentrated, or -- yeah, roughly, maybe

21   3,000 times more concentrated than it needs to be to be

22   considered semidilute.  So this is very far into the semidilute

23   regime, farther than typical.  A 30 percent solution is a

24   rather highly concentrated semidilute suspension.  So what

25   this --

C541nex2                        Pine - redirect

1              THE COURT:  There's something I don't understand.

2              THE WITNESS:  Yes.

3              THE COURT:  I thought you said that the less you

4      dilute, the more chance you have for shear thinning.

5              THE WITNESS:  Yeah.  So --

6              THE COURT:  The less you dilute, in other words, the

7      thicker the substance, the better it can have shear thinning.

8              THE WITNESS:  That's true.  That's true, in the

9      steady -- in the steady -- when you do steady shear.  All

10     right?  That is, you know, the shear where you're shearing it

11     for a second or two to see what the viscosity looks like, like

12     in the data that we just talked about.  And that's why, in the

13     data we just talked about, you see that -- a small amount of

14     shear thinning.  It's because it is semidilute.  But the point

15     is that the relaxation time is going to be greater than one

16     second for this system, and that's important because it says

17     that when the solution goes under the knife in the KK-1 coater,

18     it says that all the rheological measurements that have been

19     presented in this case just aren't relevant to describing what

20     goes on underneath that knife.  What goes --

21             THE COURT:  Why is that?

22             THE WITNESS:  Because -- because they -- because what

23     goes on underneath this knife is, it is sheared for only 2/1000

24     of a second.  And you really need to shear it for about a

25     second or so to get a reliable -- to get a measurement -- no.

C541nex2                    Pine - redirect

1    Let me pause.

2              You only see shear thinning when you shear it for on

3    the order of a second or longer.  Shearing it for just 2/1000

4    of a second isn't going to shear thin it.  So even -- even -- I

5    would point out that even when you look at the rheology curve,

6    and for the cases where you shear it on the time scale of a

7    second or longer, even then the shear thinning is fairly

8    moderate.  But under here, it's going to be nonexistent.  So

9    that's the point I wanted to make, and it's based on this

10   relaxation time.  When I was questioned, I was asked about the

11   relaxation times of all polymer solutions, and in those cases

12   they can range over quite a wide range, but they don't here.

13              THE COURT:  Go ahead.

14              THE WITNESS:  So that's all I wanted to say.

15   BY MR. HORWITZ:

16   Q.  Could you just --

17              MR. HORWITZ:  Your Honor, if it would be helpful --

18   Q.  Could you just remind us, using the Silly Putty, what

19   relaxation is versus shear and so on.

20   A.  Well, the relaxation time just has to do -- you can see how

21   it behaves differently.  If you try and deform it slowly, you

22   can make it -- or you put it on the desk, you can make it flow,

23   but if you try and deform it quickly, you know, it bounces.

24   Right?  That's the point that I wanted the court to appreciate.

25   So it bounces when it's deformed quickly.

C541nex2                    Pine - redirect

1              THE COURT:  I still don't understand what you were

2       talking about with respect to the dilution.  In other words, if

3       you've got pure toluene, that was a very low viscosity; right?

4              THE WITNESS:  Right.

5              THE COURT:  And then if you put in the polymer, you

6       can obviously increase the viscosity.

7              THE WITNESS:  Exactly, sir.

8              THE COURT:  And --

9              THE WITNESS:  What happens -- I can -- if you want

10      just a little bit more of a picture --

11      BY MR. HORWITZ:

12      Q.  Maybe in terms of what's happening here, why don't you talk

13      about, if you have the polymer and you add the solvent.

14      A.  Well, that's the other thing.  If you have the pure

15      polymer, it's going to be extremely viscous.  The pure polymer,

16      my guess is that it's as viscous as the Silly Putty.  So you

17      start adding -- you start adding toluene to it and its

18      viscosity is reduced.  It's reduced from something very large,

19      something on the order of 10, 20 million centipoise, it's

20      reduced down to a few thousand centipoise.  So it becomes -- it

21      will go from looking like something like this, that's this

22      viscous, to something that looks like this (indicating).

23      That's the difference.  So that's why solvent is added.

24      Solvent is added to reduce the viscosity so that it can be

25      pressured into the fabric.  And like I said yesterday, this

C541nex2                    Pine - redirect

1    blade is optimized by having -- by virtue of having a small

2    area -- by being very sharp, to apply a large pressure, and it

3    is not optimized to shear the material.  So it shears it only a

4    little and it pressures it a lot.

5              THE COURT:  Repeat that last part.

6              THE WITNESS:  All right.  So just -- this is just

7    reviewing what I said yesterday.  Because the tip of this blade

8    is sharp in the KK-1 coater, what it does is, by having a sharp

9    tip, the pressure, which is the force of the fabric onto the

10   tip, divided by the area -- the pressure is the force divided

11   by the area -- since the area of the tip is very small, the

12   pressure is very high.  So the fluid is pushed with a good deal

13   of pressure into the fabric.  On the other hand, when it goes

14   through, this is not a very effective way of shearing the

15   liquid.  You would want a much wider knife if you wanted to

16   shear the liquid.

17             THE COURT:  Let's suppose that you set out to use

18   shear thinning.  Now would there be a particular viscosity that

19   you would want in the polymer, and would there be a particular

20   size blade and would there be a particular speed, in other

21   words?  But let's start with the viscosity.  I mean, just say

22   you were recommending how to do this with shear thinning.

23             THE WITNESS:  Right.

24             THE COURT:  What would you recommend as far as the

25   viscosity of the polymer --

C541nex2                    Pine - redirect

1              THE WITNESS:  Okay.

2              THE COURT:  -- or the degree of dilution or whatever

3    you want to call it?

4              THE WITNESS:  Right.  I'll answer -- I'm going to

5    answer the question as best I can, so please just ask me more

6    questions.  If it doesn't seem like I'm getting to your

7    point --

8              THE COURT:  Okay.

9              THE WITNESS:  -- I would -- so I'm going to invert

10   your question a little bit because I think it makes sense

11   inverted a little bit.

12             If I have some material I want to put into the fabric,

13   if its viscosity is less than something like 20 or 30,000

14   centipoise, I would pressure it into the fabric.  If the

15   material I wanted to put into the fabric had a viscosity that

16   was higher, say it was a hundred thousand centipoise or a

17   million centipoise, then it becomes difficult to pressure it

18   into the fabric, and in that case, if the material shear

19   thinned, I would consider using a method whereby I shear

20   thinned the material.  So the only way in which I've inverted

21   it is I've just said, look, you don't need it when it's below

22   20 or 30,000 centipoise.

23             THE COURT:  Yeah, but I'm just asking you to assume

24   for some reason --

25             THE WITNESS:  Okay.

C541nex2                          Pine - redirect

1          THE COURT:  -- you want to do it --

2          THE WITNESS:  All right.

3          THE COURT:  -- whether it's reasonable or wonderful,

4     but just, you've decided that you want to do shear thinning.

5          THE WITNESS:  All right.  If you want to do shear

6     thinning, then one of the most important things you're going to

7     want to do is you're going to want to make sure of a couple

8     things, neither of which are true in the KK-1 coater.  You're

9     going to want to have a blade --

10          THE COURT:  Yeah, but I'm --

11          THE WITNESS:  All right.  So --

12          THE COURT:  I'm trying to get a little better

13     understanding of the viscosity and the role of solvents,

14     solvents.  That is an important issue in the case.  And so --

15          THE WITNESS:  The principal -- the principal reason to

16     use solvents --

17          MR. HORWITZ:  Could I ask a question that I think will

18     clarify it, your Honor?

19          THE COURT:  Go back to my question.

20          THE WITNESS:  All right.

21          THE COURT:  Let us assume -- whether it's good

22     business, bad business or whatever, let's assume you have

23     decided to do this by shear thinning.

24          THE WITNESS:  Okay.

25          THE COURT:  For some reason.

C541nex2                          Pine - redirect

1              THE WITNESS:  Right.

2              THE COURT:  Now where I'm asking you to start with

3     is --

4              THE WITNESS:  Right.

5              THE COURT:  -- is there a particular degree of

6     solvents that you use?  Or can you describe that viscosity,

7     solvents, that feature.  Does it make a difference or doesn't

8     it make a difference?

9              THE WITNESS:  In terms of the shear thinning, adding

10    solvent reduces the amount of shear thinning, all right?

11    Adding solvent reduces the amount of shear thinning.  So if

12    your sole purpose is to use shear thinning, then adding solvent

13    doesn't help you.  In some cases it might not.

14             THE COURT:  In other words, if you are trying to use

15    shear thinning --

16             THE WITNESS:  Yes.

17             THE COURT:  -- then are you saying you wouldn't use

18    any solvent or you'd use a small amount or what --

19             THE WITNESS:  For the purposes of shear thinning, I

20    wouldn't use any solvent.  There may be --

21             THE COURT:  But you want a high viscosity.

22             THE WITNESS:  Now there may be other reasons why you

23    would want to use solvent, but if all I want to do is use shear

24    thinning, then there's no -- adding solvent doesn't help you

25    out.

C541nex2                          Pine - redirect

1          THE COURT:  What you're saying is that you want a

2     pretty high viscosity.

3          THE WITNESS:  If your purpose were to just use shear

4     thinning, then that's true.

5          THE COURT:  All right.  Okay.  I think that answers my

6     question.

7          MR. HORWITZ:  Okay.  And just one.

8     BY MR. HORWITZ:

9     Q.  If your object was to use shear thinning versus pressure,

10    what kind of a blade would you use?

11    A.  Yes.  The -- what you want to make sure you do is two

12    things.  You want to make sure that you shear it for a long

13    enough time for something comparable to or longer than the

14    relaxation time, and you want to make sure that the distance --

15    the width of the blade is large compared to the thickness of

16    the fluid.  If the width of the blade is not large compared to

17    the thickness of the fluid, you won't get -- you won't get good

18    shear thinning.  So you want to make sure that this is thin,

19    that the thickness is thin and that the blade is wide.

20    Q.  Would one of the ways to make sure that the thickness is

21    thin is to use high tension on the fabric?

22    A.  Yes.  You might -- you might increase the tension so as to

23    make -- make this -- the fluid layer there thinner.  You could

24    also use multiple blades.  But the main thing is to make the

25    width of the blade large compared to the thickness of the

C541nex2                    Pine - redirect

1   fluid.

2          THE COURT:  All right.  Go ahead.

3          MR. HORWITZ:  Okay.

4   Q.  Now just very briefly, so let's talk about patent versus

5   Brookwood's system.  Speak about the blades of the patent

6   versus Brookwood's blades.

7   A.  Well, Brookwood's --

8          MR. YANNUZZI:  And your Honor, again, I'd like to

9   object to this exhibit.  This compares the blade to example

10  embodiments in the patent.  It does not compare the blade to

11  the elements of the claim.

12         THE COURT:  It doesn't compare what?

13         MR. YANNUZZI:  The test for infringement, your Honor,

14  is to test the accused product against the patent claims

15  themselves, and this chart compares the accused product on the

16  left to example embodiments that are found in the 30 or 40

17  columns of the patent claims, not -- excuse me -- the patent

18  specification, not what is actually in the patent claims.  In

19  other words, the patent claims don't require these particular

20  blade profiles that are shown on the right-hand side.

21         MR. HORWITZ:  Your Honor, what's going on here is a

22  patent claim tells you what the invention is.  The

23  specification tells you how to accomplish the invention.  What

24  I want to do is to have this witness compare how the patent

25  says you should accomplish this invention versus what Brookwood

C541nex2                      Pine - redirect

1    is actually doing.

2           THE COURT:  Well, I would think that the explanation

3    of the specification would have some relevance.  Ultimately the

4    legal issue is I'm sure what Mr. Yannuzzi says, but it would be

5    very helpful to have some discussion of the specification.  The

6    specification is not irrelevant.  The objection is overruled.

7           THE WITNESS:  Okay.  There's -- just looking at the

8    figure that's on the screen --

9           THE COURT:  Is that figure from the patent

10   specification?

11          THE WITNESS:  Yes, I believe it is.

12          MR. HORWITZ:  Yes, your Honor.

13          THE COURT:  Where is that?

14          MR. HORWITZ:  One of them is the '841 Figure 4b.

15          THE COURT:  All right.  Let me get that.

16          Okay.

17          MR. HORWITZ:  Your Honor, it comes from Exhibit 4b,

18   the specification.  E is the width of the blade, your Honor,

19   and --

20          THE COURT:  Let's have the witness testify.

21   BY MR. HORWITZ:

22   Q.  So I would refer you to Exhibit 4b, and then I would also

23   refer you to the explanation of 4b, which is at -- which is at

24   column 33, lines -- start from about 22 to about 27.

25          MR. HORWITZ:  Could you pull that up.  Pull up

C541nex2                      Pine - redirect

1    column 33, lines like 22 through --

2              THE COURT:  I see.  All right.

3              MR. HORWITZ:  See where it says, your Honor, it's

4    about -- it says -- it mentions A, B, C, D and E, typically

5    exemplified, and it lists E as 5/16 of an inch, about -- okay?

6    And then looking at the '902 patent --

7              THE COURT:  Just a minute.

8              MR. HORWITZ:  I'm sorry?

9              THE COURT:  Is this saying that dimension E is at 5/16

10   of an inch?

11             MR. HORWITZ:  Yes, your Honor.

12             THE COURT:  Let's go ahead with your question.

13   BY MR. HORWITZ:

14   Q.  Okay.  And then I would refer you to patent '902, lines --

15   about column 9, line 24, to about line 32.  And there you

16   look --

17             MR. HORWITZ:  Your Honor, if you see, on number 4, on

18   the screen, it says blade thickness is .33 inches for blade 1

19   and .50 inches for blade 2.  And so those are the blade

20   thicknesses you see in the exhibit.

21             THE COURT:  Okay.  Go ahead.

22   A.  Okay.  What I would say is that one thing that the graphic

23   makes clear is that the blades -- the three blades on the

24   right, which have thicknesses of .3 to .5 inches, they're much

25   wider than the Brookwood blade, which here is shown the thicker

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C541nex2                    Pine - redirect

1   of the two that they use.  This is 17/1000 of an inch and the

2   other one I believe was 13/1000 of an inch, so it was even

3   thinner.  And so the point is here that when you would send a

4   solution under these Nextec blades, they would -- two things

5   would happen that are important.  The blades will be much wider

6   than the thickness of the fluid, so they will be sheared enough

7   that shear thinning can happen, and they will -- excuse me --

8   and they will -- the polymer solution will be under the blade a

9   much longer time so that shear thinning might occur.  So those

10  are the relevant points.  So it would seem -- it seems to me

11  that there are some clear design differences in terms of what

12  these blades achieve.

13          THE COURT:  All right.  Go ahead.

14  Q.  And then let's go to the last factor, which is, you said

15  that this distance of the fabric -- of the polymer mattered as

16  well.

17  A.  Right.  That matters as well because you have to actually

18  stretch out the polymer far enough for it to shear thin, and

19  the -- this -- this is a -- when it goes -- when it goes under

20  the blade and the fabric is moving along, the polymer, which

21  over here is just sort of a coil, gets stretched out.  But it

22  can only get stretched out to the degree that this length is

23  much longer than this height.  You have some entrance effects,

24  you have some exit effects, and so to really get this, you want

25  this -- you want this length to be, oh, a factor of 10 or so.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C541nex2                        Pine - redirect

 1    It's the same thing that occurs in a capillary rheometer.  To

 2    get rid of end effects, they make a capillary rheometer at

 3    least 10 times its width.  That's what you want here.

 4            The -- in the Brookwood machine, the width is about

 5    2.8 times the height.  And so it's virtually all entrance and

 6    exit effects.  There's -- there's no sort of steady straining

 7    of it.  And so it's just -- it's just another reason why this

 8    isn't going to be effective as a blade for shear thinning a

 9    material, even if the material, under other circumstances,

10    could be shear thinned.

11            THE COURT:  We'll take our lunch.

12            MR. HORWITZ:  Your Honor, just one more question and

13    I'll be done with the witness.

14            THE COURT:  All right.

15    BY MR. HORWITZ:

16    Q.  You talked about that distance being important, and the

17    smaller the distance, the better.

18    A.  For shearing -- for shear thinning.

19    Q.  For shearing.  And in order to get a smaller distance, you

20    would apply more tension on the fabric?

21    A.  Yes, that's correct.

22    Q.  And I believe that there's been testimony the Brookwood

23    fabric has about 80 some odd pounds of tension?

24    A.  Yes.

25    Q.  And let's look at the '902 patent, column 11, about

C541nex2                        Pine - redirect

1    lines 27 through 34, 33.

2              And there it says, "Preferred web tensions are from

3    200 to 500 pounds, more preferably 3 to 400 pounds."  I think

4    we can stop right there.  So using the patented tension or the

5    tension in the patent, you would get more shear thinning than

6    you would with the Brookwood tension?

7    A.  Well, I mean, the purpose -- one effect of increasing this

8    tension is to try and make that liquid layer sufficiently thin

9    so that you get shear thinning.

10             THE COURT:  Are we finished with this witness?

11             MR. HORWITZ:  Yes, your Honor.

12             THE COURT:  All right.  Thank you very much.  2:15.

13   What's next?

14             MR. HORWITZ:  Your Honor, could we just take a picture

15   and mark it as an exhibit?

16             THE COURT:  Sure.  Of course.

17             (Pause)

18             MR. HORWITZ:  And your Honor, after lunch we have an

19   expert, Dr. Colosanto, who is an expert in coating machines --

20   he spent his entire career doing that -- to explain things.

21             MR. CALABRO:  Mr. Horwitz just asked to mark this as

22   an exhibit.  For the record, it should be marked as DX 2120.

23             THE COURT:  All right.  Very good.

24             (Luncheon recess)

25

1                  A F T E R N O O N   S E S S I O N

2                          2:15 p.m.

3           THE COURT:  We have another induction at four, so we

4     will run for an hour and a half and break until Monday.

5           Let's have the next witness.

6           MR. BALL:  Brookwood calls Thomas Colasanto.

7     THOMAS COLASANTO,

8         called as a witness by the defendant,

9         having been duly sworn, testified as follows:

10          THE COURT:  State your name.

11          THE WITNESS:  My name is Thomas Colasanto.

12          THE COURT:  How do you spell the last name?

13          THE WITNESS:  C-o-l-a-s-a-n-t-o.

14    DIRECT EXAMINATION

15    BY MR. BALL:

16    Q.  Mr. Colasanto, could you begin by just telling us a bit

17    about your educational background?

18    A.  My educational background is a Bachelor of Science degree

19    from the University of Connecticut and some graduate work at

20    various colleges in the Hartford area, greater Hartford area in

21    chemistry.

22    Q.  What was the focus of your study?

23    A.  Initial biological sciences, but then it transitioned into

24    a greater interest in chemistry and advanced organic chemistry,

25    polymer chemistry and specifically polyurethanes.

C547NEX3                        Colasanto – direct

1    Q.  Could you tell us a little --

2            THE COURT:  Are you Mr. Ball?

3            MR. BALL:  Yes, your Honor.

4    Q.  Could you tell us a little bit about your background in the

5    textile industry.

6    A.  My exposure to the textile industry occurred on my first

7    professional part of my career which started in '77, so it's

8    been about 35 years.  And I became employed by a small chemical

9    manufacturer who is a supplier of coating compositions to the

10   fabric coating industry primarily, and I started there as a

11   bench chemist.

12   Q.  Sorry.  What was that company?

13   A.  Mace Adhesives and Coatings.

14   Q.  OK.  In connection with Mace Adhesives and Coatings, were

15   you working with textiles and textile coatings?

16   A.  That's correct, and adhesives.

17   Q.  OK.  And were you working with textile equipment that one

18   might find in a factory for coating textiles?

19   A.  Yes.  Much of my work entailed working in the laboratory of

20   course, because that's where you concentrate on the

21   compositions themselves, but my work would also extend to

22   providing technical support to the coaters in basically the

23   Northeast of the United States who had coating machines or who

24   were bonding together products.

25   Q.  And approximately how long were you employed at Mace?

1   A.  Up until '93.

2           THE COURT:  What was the name of the company again?

3           THE WITNESS:  Mace Adhesives and Coatings.  M—a—c—e.

4   Q.  And then after Mace, were you employed anywhere else?

5   A.  Yeah, I went from Mace to actually a customer of Mace,

6   Enterprise Coatings Company, and that company I was with

7   approximately nine years, but they had changed names a few

8   times during my employment there, changed ownership as well,

9   and they were involved also with textile coating and laminating

10  primarily in the high performance apparel markets.

11  Q.  But what was the nature of your actual work with that

12  company?

13  A.  Well, to continue the development of polymer compositions,

14  polyurethane polymers, their use in textile coating and

15  laminating, adapting it to the equipment that this company had,

16  and to produce very high performance products.

17  Q.  And you mentioned polyurethane polymers, and just for

18  clarity is that the same type of polymer, same general class

19  that's at issue in one of these coating compositions in this

20  case?

21  A.  Yes, yes.

22  Q.  And did you work on textile coating equipment and

23  machinery?

24  A.  Yes, I did.  I mean part of my job was to follow through --

25  after developing products that customers might be interested in

C547NEX3                          Colasanto – direct

1    -- to actually visit their facilities and to offer assistance

2    in getting that product to run on their fabrics, to attain the

3    kinds of performance calls they wanted to attain.  So, I would

4    stick with the product as much as possible to get it to run

5    right basically.

6    Q.  OK.  And then after that employment, can you describe --

7    A.  The company had changed names from Enterprise to Dartex.  I

8    had left there in 2002 to go off on my own and become a

9    consultant, basically doing the same sorts of things I was

10   doing but for multiple people, for any clients that might be

11   interested in those services.

12   Q.  And the consulting company, the name of that just for the

13   record?

14   A.  Yeah, that's my company, Tolland Coated Systems, LLC,

15   T-o-l-l-a-n-d.

16   Q.  You said it's your company.  You mean you are the

17   proprietor?

18   A.  Yes, I'm the sole member of this LLC.

19   Q.  I understand.  And so with Tolland --

20   A.  Tolland Coated Systems.

21   Q.  -- Tolland Coated Systems, can you describe a little bit

22   what you do and what sort of equipment that you deal with on a

23   day-to-day basis, or just what you do with that consulting.

24   A.  Basically clients hire me to either help them with a

25   problem they're having in their production process, usually

1    it's to help new applications for polyurethanes mainly, and I

2    do whatever is necessary.  I might use their laboratory

3    facilities to help in the development of these products, but in

4    most cases I'm at their coating equipment, you know, running

5    trials and testing the products out to attain certain

6    properties that they're looking for.

7    Q.  So, you are in the customer's factories --

8    A.  Yes.

9    Q.  -- working with the coating equipment.

10   A.  Yes.

11   Q.  OK.

12   A.  Almost always.

13   Q.  Now, just as a rough approximation, how many different

14   types of coating equipment would you estimate that you have

15   seen in your career?

16   A.  How many types?

17   Q.  Well, fabric coating equipment.

18   A.  Well, I mean primarily for fabric coating there is either

19   knife-over-air -- which is also called floated-knife coating --

20   there is transfer coating, and there is knife-over-rubber-roll.

21   Those seem to be the common coating machines out there.

22        THE COURT:  Give me the terminology again.

23        THE WITNESS:  Floating knife, which can also be called

24   knife over air.

25        THE COURT:  Just a minute.

1          THE WITNESS:  They're synonymous.

2          THE COURT:  Just a minute.  And what was the second?

3          THE WITNESS:  Transfer coating.

4          THE COURT:  And the third?

5          THE WITNESS:  Knife-over-roll.  That's not a complete

6    list, but it's by and large the coaters that you come across in

7    coating for fabrics.

8    Q.  And you worked on these types of equipment that you just

9    described?

10   A.  Yes, all of them.

11   Q.  OK.  And, incidentally, the KK1 coater, you are familiar

12   with the KK1 coater?

13   A.  I am.

14   Q.  And which of those types that you just described was the

15   KK1 coater?

16   A.  That would be the knife-over-air or floating-knife coater.

17   Q.  And, sir, you are familiar with the KK1, and I just want to

18   start with a few questions about that.  When most recently have

19   you had the opportunity to see the KK1 coater?

20   A.  The last time I saw the KK1 coater was during an

21   inspection, Dr. Cole's inspection in January of this year.

22   Q.  OK.  And you were at that inspection?

23   A.  I was present, yes.

24   Q.  OK.  And what was happening that day?  Can you just

25   describe in general what was happening that day during Dr.

1    Cole's inspection with the KK1 coater?

2    A.   Yes.   I was under the impression Dr. Cole was coming in to

3    inspect the process of coating 52668 polymer on the new Agility

4    substrate fabric for the GEN III program, and she was going to

5    inspect the machine and take some measurements, and I was asked

6    to try to confirm those measurements and to just, you know,

7    supervise the inspection and report on it.

8    Q.   OK.   And during the inspection you said Dr. Cole took some

9    measurements?

10   A.   Yes.

11   Q.   Was there fabric moving through the machine when she took

12   the measurements, or can you describe how her measurements were

13   done?

14   A.   Eventually there was fabric moving through the machine, but

15   initially upon presentation of the equipment to Dr. Cole the

16   fabric was cut at that point so that the coating head, the

17   coating station where coatings are applied, could be viewed and

18   measured and manipulated.   Because when you have the product

19   running on the running fabric some measurements would be very

20   hard if not impossible to take.   So, that's how it began.

21   Q.   Sure.   Was there actually a coating run that was done?

22   A.   Yeah.   Then after the initial measurements were made, the

23   fabric which had been cut was resewn together.   It was already

24   basically threaded through the machine, but it was cut for the

25   purposes of getting at the head.   It was put together and sewn

C547NEX3                         Colasanto - direct

1     together and then the machine was started up by the normal

2     procedures.  The coating compound was applied, and the product

3     was run.

4     Q.  OK.  And the product, just real quickly, I think you

5     already said, 52668?

6     A.  Correct.

7     Q.  Was this your understanding a production run of the GEN

8     III?

9     A.  Yes, that's the understanding I had.

10    Q.  Do you know whether it was Level 5 or Level 7?

11    A.  Level 5.

12         THE COURT:  Just a little louder if you could.

13    A.  I believe it was Level 5.

14    Q.  Level 5, OK, thanks.  So, after the production run

15    commenced, can you just describe some of what you did and

16    perhaps the measurements you took and how those events

17    happened?

18    A.  OK.  After the production run was run for a while, I

19    believe Dr. Cole and Nextec left the premises.  I had had a

20    video trained on the coating station through the whole process

21    so that we could be sure that no adjustments were made between

22    the time she was there and made her measurements and when I

23    repeated these measurements later.

24         So, we then cut the fabric, and I went back and tried

25    to the best of my recollection to repeat some of those

C547NEX3                    Colasanto - direct

1    measurements that Dr. Cole made and also, you know, perhaps

2    make a few measurements of my own.

3    Q.  With the fabric in there or with the fabric removed?

4    A.  With the fabric removed.

5    Q.  Fine.  I'd like, if I could, to play just a little bit of

6    video that you just mentioned and have you describe what you

7    did and what you are seeing on that.  And this I believe has

8    already been put into evidence as DX1777.

9    A.  Where do I look?

10            THE COURT:  Is there a screen?

11            THE WITNESS:  Yes, there is a screen there.

12   Q.  OK.  Just describe very briefly what you are seeing there.

13   A.  OK.  What we're seeing is kind of an angular view at the

14   coating head on the KK1 coater.  This is actually one of two

15   coating heads.  It's the second head.  There was nothing being

16   done at the first head, but they're similar looking.

17            You just saw the knife blade being pivoted upwards to

18   make a large slot underneath it basically so that you can

19   thread fabric through.

20            In front of that knife is a flat table, and the fabric

21   would come up from the bottom right here.  The fabric would be

22   threaded up through here, go under this bar over the table

23   basically flat, and then when the knife is down it would go

24   underneath the bottom of the blade and then into the heating

25   oven.

1  Q.  OK.  The way the blade is situated here it's in a position
2  where it's been flipped up, right?
3  A.  Yes.
4  Q.  Would one be able to measure the thickness of the tip of
5  that blade if they had to, for example, a ruler?
6  A.  Well, it's such a thin blade, you know, a ruler probably
7  wouldn't be the best device to measure it with.
8  Q.  Can we go to the next clip, please.  Let's play this, and
9  please just explain what this is.
10  A.  OK.  This is of course the fabric still isn't threaded
11  through yet.  This is without the fabric.  But the blade now is
12  in the position that it would be in when product is running.
13  So, if fabric were there it would be coming up in the
14  foreground, you know, here, going up over the table and through
15  that slot, the visible slot under the knife blade.
16  Q.  And in this arrangement that we see here, is the blade
17  above the table, below the table, even with the table?  Can you
18  just describe visually.
19  A.  The blade is above the table.
20  Q.  Let's go to the next clip and describe what's going on
21  here.
22  A.  OK.  What's being done here is a plastic ID card, fairly
23  rigid, is being placed on the table in front of a knife and
24  then being slid forward attempting to go under the knife.
25  There is obviously enough room under that knife for that card

1    to slide through without distortion or without being picked up,

2    you know, bent.  I think you will see later perhaps there is a

3    view from behind showing the card protruding out the backside

4    of the knife.  But basically what this is showing is that a

5    flat path across the table, you know, can be made right under

6    the knife, and that thickness must be at least the thickness of

7    that card.

8    Q.  Were you able to measure the height of the blade above the

9    table or to make an approximation of the height of the tip of

10   the blade above the table?

11   A.  Yes.  I used a caliper supplied by Kenyon that I zeroed and

12   then measured the thickness of that ID card, and I concluded

13   that the gap under the table must be at least, you know, that

14   thickness.

15   Q.  OK.  And what was the thickness, do you recall?

16   A.  It was about one millimeter, .85 millimeters I believe to

17   be exact.

18   Q.  Now, if fabric were threaded through there -- and I am

19   talking about when the blade is down -- if fabric is threaded

20   through there, and you look at the interface there between the

21   blade and the fabric, would you be able to tell from just

22   looking at that whether it was level with the table, slightly

23   above, slightly below?  Would you be able to tell by looking at

24   that interface?

25   A.  Whether the blade was level with the table or above or

C547NEX3                          Colasanto - direct

1    below?

2    Q.  Yes.

3    A.  With just fabric running through?

4    Q.  Yes.

5    A.  Yes.

6    Q.  Now, let's talk about some of your previous experience with

7    the KK1 coater.  In or around 2008 did you have the opportunity

8    to visit Kenyon?

9    A.  Yes, I did.

10   Q.  What were the circumstances there?

11   A.  I was being introduced to the process used to make the GEN

12   III fabrics on the KK1 coater.

13   Q.  Are you aware that Dr. Cole had a visit in 2008, I believe

14   it was, to Kenyon?

15   A.  Yes.

16   Q.  And your visit that you are talking about, do you know

17   time-wise how close or --

18   A.  It was in a matter of days, I believe.

19   Q.  A matter of days before or after?

20   A.  I was there I think before.

21   Q.  And you saw the KK1 coater personally?

22   A.  Yes.

23   Q.  Was there a production run taking place?

24   A.  Yes, I actually watched the whole process from beginning to

25   end.

C547NEX3                     Colasanto - direct

1   Q.  And a production run of, do you know, was it GEN III?

2   A.  GEN III, yes.

3   Q.  Do you know if it was Level 5?

4   A.  I think we ran both.

5   Q.  OK, Level 5 and Level 7?

6   A.  And Level 7.

7   Q.  OK.  And do you know what the coating composition was that

8   was being coated onto the GEN III Level 5 and 7?

9   A.  Yeah, it was their solvent diluted silicone composition

10  M1074B.

11  Q.  OK.  And did you make any observations about the blade

12  height or the relative configuration of the tip of the blade

13  with respect to the table that day when you saw the M1074B

14  being coated onto the fabric?

15  A.  Yes.

16  Q.  And can you just tell me a little bit about what that was?

17  A.  Well, I mean it was in the same relative position.  In

18  fact, the same method was used to set the blade in 2008 that

19  was used to set the blade height when I just witnessed it in

20  January 2012.

21  Q.  The same method -- we heard testimony I think it was

22  yesterday about these popsicle sticks.

23  A.  Tongue depressors.

24  Q.  Tongue depressors that the operator uses.  Can you just

25  talk very briefly about what you saw in 2012, 2008 with the

1    tongue depressors.

2    A.  Yeah, the tongue depressor apparatus is a very crude tool.

3    I think everybody is probably used to what a tongue depressor

4    is, but if you put two of them together, tape them together so

5    it would be double thickness, and then chopped off the end of

6    just one of them, you would have a thin section that would

7    suddenly go up.

8         That tongue depressor apparatus is used as a guide to

9    set the knife blade in basically the same relative, you know,

10   height position each time, and they do that by just slipping

11   the lower one protruding tongue depressor under the blade until

12   it stops at the point where I said it was broken off, and using

13   a couple of fingers underneath it to gauge how high the angle

14   of that tongue depressor is.  So, it's a way to get the blade

15   into the same position each day and to know that the blade is

16   level left to right basically.

17   Q.  And, sir, did you make any conclusion -- sorry -- but just

18   for the record, did you make any conclusion about the blade

19   height in 2008 for the M1074B and the blade light in 2012 for

20   the 52668 GEN III production runs?

21   A.  Yes, essentially the same height.

22   Q.  You say essentially the same height.

23   A.  Well, there could be minute differences from day to day.  I

24   mean it's not exact science, it's not rocket science.  And, you

25   know, they just try to set the blade in the same position each

1   day, and it doesn't matter if it's down just a tiny bit or up a

2   tiny bit.

3   Q.  Within the accuracy of the fingers and the tongue

4   depressor, was it the same?

5   A.  Yeah, I mean they use exactly the same technique.

6   Q.  And then let's go to your first contact with the KK1.  When

7   did you first see the KK1 coater at Kenyon?

8   A.  Much earlier in my career, sometime in the '80s, I believe.

9   Q.  In the '80s?

10  A.  Yes.

11  Q.  Was it before 1987?

12  A.  Yes, in the early '80s, yeah.

13  Q.  OK.  Let's talk about that.  So, the KK1 coater when you

14  saw it in the '80s, did it have the same configuration as it

15  has today?  Did it have the table?

16  A.  Yes.

17  Q.  OK.  And the fabric moved across the table.

18  A.  Yeah, the same -- I have seen those coaters before; it's

19  very typical.

20  Q.  And it had the blade?

21  A.  Yes, it has the blade, it has the table, it has the dams on

22  the left and the right that kind of restrict whether the

23  coating can fall off the sides of the fabric or not.  The dams

24  confine it.  It's all very typical of floating knife coaters.

25  Q.  Did you witness a run on it?  Did you ever see anything

C547NEX3                          Colasanto – direct

1   being made on it?

2   A.  I did.  The reason I was there was I had made a coating

3   composition for coating nylon codura, I think -- I don't really

4   remember the fabric -- that I accompanied to Kenyon to assist

5   if they needed my help to get that run, because I wanted them

6   to evaluate this new coating to see if they would be interested

7   in buying it.

8   Q.  Was the fabric tensioned when you saw the run?

9   A.  The fabric had the normal tension that I see on

10  floating-knife coaters.

11  Q.  OK.  And the normal tension you see.  Have you ever had the

12  opportunity to measure the tension on the KK1 coater?

13  A.  Well, I did specifically, yes.

14  Q.  OK.  And tell me a little bit about that.

15  A.  I mean it's not something I do routinely, but we did

16  specifically make a run of the GEN III type fabric, and then

17  prior to actually doing the running they replaced one of the

18  rolls, the roll that I showed you in the foreground when we

19  were looking at the coating head, they replaced that with one

20  that had a pressure transducer in it so that we can actually

21  read out the tension that was on the fabric.  And this

22  transducer, this pressure sensitive roll, had a read-out,

23  digital display or whatever, and we could see that there was

24  about 85 pounds of tension on that fabric.

25  Q.  OK, 85 pounds.  Do you have a sense, is that a high amount

C547NEX3                    Colasanto – direct

1    of tension?  Is it normal?  Conventional?  Can you just

2    characterize that for us?

3    A.  Well, to me from my familiarity with floating-knife coaters

4    it looks and feels look a normal amount of tension, because you

5    can just tell by seeing the fabric move how taut it might be.

6    It looks perfectly normal and, you know, certainly not the

7    tension that is talked about in the Nextec patents that's

8    described in there, which is much higher.

9    Q.  Much higher.  Do you know offhand what the tension from the

10   Nextec -- we can pull that up, but I think --

11   A.  I think it's like 200 pounds plus or something.

12   Q.  And again what did you say the tension was?

13   A.  About 85, 83, something like that.

14   Q.  OK.  Do you have an opinion as to whether 83 pound of

15   tension is sufficient tension to distort the web?

16   A.  Well, I mean I don't think of the tension used on

17   floating-knife coaters as distorting the web; I think of it as

18   giving the web some control under the knife.  You know,

19   certainly not enough to distort the fibers apart, you know, the

20   yarns apart, or anything like that.

21   Q.  So, let's talk a little bit about your experience in the

22   '80s.  Let me ask you this:  Are you familiar with a fabric

23   that is termed in this case the Ken Reign fabric?

24        THE COURT:  The what?

25        MR. BALL:  Ken Reign.  K-e-n, as in the name Kenyon,

C547NEX3                     Colasanto - direct

1   and Reign, I hesitate to spell it but I think it's R-e-i-g-n, I

2   believe.  Ken Reign.

3   Q.  Are you familiar with that fabric.

4   A.  Yes.

5   Q.  Can you tell us what the Ken Reign fabric is.

6   A.  The Ken Reign fabric is, to the best of my knowledge, a

7   polyurethane-coated fabric made, you know, back in the '80s or

8   earlier that was produced and marketed successfully by Kenyon,

9   and it was intended on being a waterproof performance fabric.

10  Q.  OK. the Ken Reign, do you know what kind of coating was

11  on -- sorry, was the Ken Reign a coated fabric?

12  A.  Yes, it was polyurethane.

13  Q.  And do you know what machine the Ken Reign was made on?

14  A.  Yes, I have been told it was always made on the KK1 coater,

15  the same coater.

16          THE COURT:  Let me just interrupt.  Is polymer kind of

17  a shorthand for polyurethane?

18          THE WITNESS:  Your Honor, polymer includes many

19  different types of, you know, chemistry.  Polyurethane is one

20  of those chemistries.  You may have heard people talk about

21  silicone, for instance.  That's another polymer.  Just about

22  every plastic you see and feel every day or synthetic fabric is

23  made of a polymer.  One type of polymer is polyurethane.  A

24  very important class of polymers is polyurethane.

25  Q.  And again earlier I heard you say this case deals with some

C547NEX3                         Colasanto - direct

1    polyurethane polymers.

2    A.  Yes, it does.

3    Q.  And have you had an opportunity in connection with your

4    work on this case to look at these photo micrographs, the SEM

5    photo micrographs of the Ken Reign fabric?

6    A.  Yes, I have seen them.

7    Q.  What I would like to do, I would like to pull up, if we

8    could, a photo micrograph of the Ken Reign fabric.

9         And while we're doing that, let me just ask you this:

10   Have you also been involved in the preparation of some

11   additional fabric samples in connection with this case?  Are

12   you aware of some additional fabric samples that have been made

13   in connection with this case?

14   A.  Yes.  I visited Kenyon on another occasion after that

15   original visit to witness the GEN III fabrics, and that was to

16   run a series of trials on present-day Ken Reign, trying to

17   reproduce Ken Reign, the historical Ken Reign.

18   Q.  So, do you mean taking --

19        MR. MURPHY:  Your Honor, we have an objection to this.

20   We have a motion in limine.  These recreated Ken Reign fabrics,

21   they use a different polymer.  The deposition of the 30(b)(6)

22   witness from All Coat actually explained that the main resin in

23   the polymer itself had changed, and he testified that each

24   resin provides different properties to the polymer.  And we

25   have filed a motion in limine on that.

C547NEX3                      Colasanto - direct

 1            THE COURT:  Why are you getting into Ken Reign at all?

 2            MR. BALL:  Your Honor, let me explain briefly.

 3            Kenyon has been doing this since --

 4            THE COURT:  Kenyon --

 5            MR. BALL:  Kenyon is the manufacturing subsidiary of

 6       Brookwood, and that is where the KK1 coater is located, at the

 7       Kenyon, Rhode Island facility.

 8            So, in other words, Kenyon has been making fabrics on

 9       the KK1 coater now for 50 years, and one of those fabrics is

10       the Ken Reign fabric.  And as part of his work on this case the

11       witness has compared old historic actual samples coated on the

12       KK1 coater with recreated ones that were made for the purposes

13       of this litigation so he could see how that has changed, or

14       form an opinion as to whether it's the same today as it was 30

15       years ago, 20 years ago, 50 years ago.

16            MR. MURPHY:  Your Honor --

17            MR. BALL:  And that's what he is going to talk about

18       with these images.

19            MR. MURPHY:  Your Honor, may I address that?

20            THE COURT:  Yes.

21            MR. MURPHY:  First of all, it's black letter law that

22       you cannot compare an accused process to prior art.

23            THE COURT:  A little louder.

24            MR. MURPHY:  It's black letter law that you cannot

25       compare an accused process to prior art.  I have three federal

 1    circuit cases on point.

 2              THE COURT:  You cannot --

 3              MR. MURPHY:  You cannot compare an accused product to

 4    the prior art.  And I have the three leading federal circuit

 5    cases.

 6              THE COURT:  Well, I don't know that that's what is

 7    being done.

 8              MR. MURPHY:  It's also --

 9              MR. BALL:  Your Honor, if I may, these aren't accused

10    products.

11              THE COURT:  I don't think he is even trying to do

12    that.

13              MR. MURPHY:  Well, what he is also trying to do is he

14    is trying to take recreated fabrics and say they are the same

15    as the old fabrics, but the recreated fabrics --

16              THE COURT:  No, I don't think he is trying to do that.

17              MR. MURPHY:  I will wait then until those questions

18    are asked.

19              THE COURT:  Why don't you do that.

20              Go ahead.

21    Q.  Well, we just discussed this, but could you tell us then

22    the recreated fabric that we are talking about, can you tell us

23    a little bit about what that coating composition is and how

24    that fabric was made?

25              THE COURT:  Let's just step back.  You are asking him

C547NEX3                          Colasanto - direct

1    about Ken Reign.

2              MR. BALL:  Ken Reign.

3              THE COURT:  K-e-n?

4              MR. BALL:  R-e-i-g-n, your Honor.

5              MR. MURPHY:  Your Honor, also we object.  This is

6    moving into validity, and we understood you wanted us to focus

7    on infringement issues at this point.

8              MR. BALL:  Your Honor, we are not offering this for

9    validity at all right now.  He is testifying that the machine,

10   the settings, and the processing of the machine is the same as

11   it was before.  That's what this testimony is about.

12             THE COURT:  And Ken Reign is a fabric that was made

13   some time ago, right, many years ago?

14             MR. BALL:  Yeah, '70s, '80s, certainly in the early

15   '80s Kenyon produced the Ken Reign fabric.

16             THE COURT:  All right, go ahead.

17             MR. BALL:  Let's go ahead and talk about some

18   recreated Ken Reign --

19             THE COURT:  I have some things on the screen.  Did you

20   testify about those images?

21             THE WITNESS:  I think this left one is --

22             THE COURT:  Well, just slow down a little bit.  We

23   have had this discussion.  Just go back a little bit and start

24   with Ken Reign again.

25             MR. BALL:  Sure, your Honor.

C547NEX3                          Colasanto – direct

1  Q.  Could you just tell us again what the Ken Reign fabric was,

2  please.

3  A.  Yes.  Well, it was a woven taffeta fabric with a

4  polyurethane coating applied by the KK1 coater.

5  Q.  OK.  And the time period that you are aware of that it was

6  manufactured?

7  A.  Yeah, 1980 or around there.

8  Q.  OK.  And you said polyurethane coating?

9  A.  Polyurethane coating is similar to the 52668 that is being

10  talked about here.

11  Q.  And then you are aware of some recreated Ken Reign fabrics

12  as they have been called in this case.

13  A.  Yes.

14  Q.  Can you tell us a little bit about what the recreated Ken

15  Reign fabrics are?

16  A.  Yeah.  That is, you know, present-day woven fabric just

17  like as best a match as you could get today from what they were

18  using in 1980, and the current same compound applied to it

19  using the KK1 coater.

20         MR. MURPHY:  Your Honor, we object to that.  The

21  30(b)(6) witness from the manufacturer who supplied the

22  compound actually provided documents that show it is not the

23  same compound.

24         MR. BALL:  He says it's not --

25         THE COURT:  Well, you can have cross-examination.

C547NEX3                        Colasanto - direct

1             MR. MURPHY:  OK.  We have a motion in limine on this.

2             THE COURT:  Well, it's such a horrible waste of time.

3    There are huge amounts of paper.  A few points come up along

4    the way during the trial and we rule, that's the way to do it.

5    OK.

6    Q.  Mr. Colasanto, have you formed an opinion about the coating

7    composition that was used in the recreated Ken Reign fabric, as

8    to whether or not that is the same as the coating composition

9    used in what is termed the historical Ken Reign sample?

10   A.  Yes, in all material respects it's the same coating.  It

11   couldn't possibly be exactly the same because some of the

12   components have gone through evolution, like materials were no

13   longer available so they had to get the next closest thing, but

14   these were minor ingredients.  So, for all material purposes

15   such as viscosity, solids content, type of solvent, type of

16   polymer in general, I formed the opinion that these were

17   essentially materially the same.  Yes, they were not exactly

18   every molecule the same.

19   Q.  OK.  But the way they coat onto the fabric, the basic --

20   A.  Yeah, the rheological properties, the solids content, the

21   viscosity, anything that would matter, was essentially the

22   same.  That's what I meant by materially the same.

23   Q.  These SEMs, did you see these before, these photo

24   micrographs?

25   A.  Yes.

C547NEX3                    Colasanto – direct

1    Q.  The one on the left is the historical, the one on the right

2    is the recreated.

3    A.  OK.

4            MR. BALL:  I would ask these be moved into evidence as

5    the historical Ken Reign sample.  The photo micrograph on the

6    left is DX2118, and the one on the right, the recreated Ken

7    Reign, as DX2119.

8            THE COURT:  Received.

9            MR. MURPHY:  We object to the one on the right.

10           THE COURT:  Received.

11           (Defendant's Exhibits 2118 and 2119 received in

12   evidence)

13   Q.  Just tell me a little bit about what your opinion is on

14   comparison of the SEM on the left and the SEM on the right.

15   A.  Yeah, I mean they look like you are looking at the same

16   fabric.  They have the same, you know, general --

17           The coating, by the way, your Honor, is kind of the

18   whiter contrasting material along the top and, you know, going

19   slightly in.

20           THE COURT:  You know, it's always hard for me to see

21   the coating material because on these photographs it just looks

22   like -- I mean if somebody said to me do you see coating there,

23   I'd say no, because all I see is little specks of white here

24   and there.

25           THE WITNESS:  It takes some knack to identify it if

C547NEX3                        Colasanto – direct

1    you are not, one, used to looking at coating fabrics and, two,

2    not used to looking at SEMs.  But, you know, the whiter looking

3    brighter material above the fibrous cross section, that's the

4    coating.  So, anyplace you really see that bright stuff is some

5    of the coating.

6               THE COURT:  And I guess it's so magnified.

7               THE WITNESS:  It's very magnified, yes.

8               THE COURT:  Go ahead.

9               THE WITNESS:  So, generally the thickness, the

10   distribution, the penetration of that coating is the same in

11   both of those pictures essentially.

12              So, you know, what that sort of tells me is that, you

13   know, if we are using approximately the same basic composition,

14   and we are coating on the same fabric, and we did one, you

15   know, today, and one was obviously done in 1980, then, you

16   know, it's more than likely the process was exactly the same

17   back then.

18   Q.  I'm sorry.  So then restate, please, for us what your

19   opinion is about comparing the one on the left to the right,

20   about what you just said about the process in 1980 versus the

21   recreation in 2008 with the Ken Reign fabric.

22   A.  Yeah, they must have been highly similar to produce fabrics

23   that are so alike.

24   Q.  Have you reviewed the 902 patent in this case?

25   A.  Yes, I have.

C547NEX3                    Colasanto – direct

1   Q.  What I would like to do is pull up the 902, if we could.

2   Could you go to column 2, please, and just highlight or zoom in

3   on the paragraph between line 40 and line 53.

4          OK.  Have you seen read this paragraph before as

5   background of the 902 patent?

6   A.  I'm sure I have, yeah.

7          THE COURT:  Wait a minute.  I missed something.  What

8   column is this?

9          MR. BALL:  Your Honor, it's column 2 of the 902

10  patent, and it starts at about line 40.

11         THE COURT:  Go ahead.

12  Q.  In this paragraph, can you just read the first sentence and

13  explain to the court what your understanding is as a person of

14  skill in this field, in this art.  Can you explain what your

15  understanding of that sentence is?

16  A.  OK.  Well the sentence reads:  Prior treatments of webs

17  that force a composition into the spaces of a web while

18  maintaining some breathability have relied on using low

19  viscosity compositions or solvents to aid in the flow of the

20  composition.

21  Q.  Let's just stop there.  What does that mean?

22  A.  Well, it means that in order to attain these kinds of

23  fabric properties, to get the coatings to go into the web,

24  prior art has relied on lower viscosity materials and those

25  that contain solvents, and it suggests to me that this is going

C547NEX3                         Colasanto – direct

1   to talk about not using solvents.

2   Q.  I see.  And the next sentence begins with a U.S. patent

3   number 3,594,213.  Do you see that?

4   A.  Yes.

5   Q.  Could you just read what that says, the discussion of that

6   patent.  Just read it.

7   A.  Yeah.  To myself?

8   Q.  Can you read it out loud.

9   A.  U.S. patent number 253 describes a process for impregnating

10  or coating fabrics with liquified compositions to create a

11  breathable fabric.

12  Q.  Just the rest of the discussion of that 213 patent.

13  A.  Thus, the method of this patent imparts no energy into the

14  composition to liquefy it while forcing it into the spaces of

15  the web, because the composition is substantially liquified

16  before placement into the web.  U.S. patent number 614

17  teaches --

18  Q.  Let's stop there for a second, Mr. Colasanto.  So, what you

19  just read to us then, that it imparts no energy to the

20  composition to liquefy it, etc., because it is substantially

21  liquified before placement, what does that mean?

22  A.  Well, it would be like when you have solvents in coatings,

23  these coatings flow under their own weight.  They don't require

24  extra energy to have them flow into the web.  So, they are

25  distinguishing themselves from these compositions.

C547NEX3                        Colasanto – direct

1   Q.  OK.  But does this say that this 213 patent doesn't shear

2   thin?  Is that how you read this?

3   A.  Well, it suggests it may not shear then, but it probably

4   could include some shear thinning.

5   Q.  OK.

6   A.  It's immaterial to how you can get the material in.

7   Q.  OK.  And the distinction that you draw from this as one

8   skilled in the art versus what the patentee is saying is the

9   invention of this 902 patent versus the distinction of the 213,

10  can you just articulate that?

11  A.  Well, they're separating themselves from the prior art on

12  the fact that it isn't solvent that gets the material into the

13  web in their case, it's something else, shearing forces.

14  Q.  The 213 patent, do you know what that patent is?

15  A.  It's Rudman probably.

16  Q.  The Rudman patent?

17  A.  Yeah.

18  Q.  OK, that's fine.

19          MR. BALL:  Could we pull that up?  Could you pull up

20  the Rudman patent?

21          MR. MURPHY:  Your Honor, I am not sure what this has

22  to do with infringement.  It's a validity issue.  It's prior

23  art.

24          THE COURT:  Well, it's sort of educational, so let's

25  just go along.  It's helpful, it seems to me.

C547NEX3                      Colasanto - direct

1    Q.  And the paragraph -- just to clean up on this issue.  The

2    paragraph you were just reading that said that the method of

3    Rudman imparts no energy to liquefy it because it's already

4    liquified, what do you understand when it says imparts no

5    energy?  What kind of energy is that referring to?

6    A.  Well, they are suggesting there is no shear force going on

7    on this coating apparatus in this particular patent.

8    Q.  OK.  So, then this is the 213, the Rudman patent.  Have you

9    had a chance to study this patent?

10   A.  I have, yes.

11   Q.  OK.  What I would like to do --

12        Your Honor, if I could approach just to hand the

13   witness a copy.

14        Mr. Colasanto, what kind of coater is Rudman?

15   A.  Well, as depicted in figure 1, which is an overview of this

16   crude machine, it's a floating-knife coater or a

17   knife-over-air.  Those two terms are synonymous.

18   Q.  Could you describe a little bit in figure 1 some of the

19   components of what you see there in Rudman?

20   A.  Yeah, very similar to what we sort of see on KK1 coater and

21   other floating-knife coaters.

22        MR. MURPHY:  Excuse me, your Honor.  The witness has

23   now begun comparing the prior art patent to the KK1 coater.  As

24   I say said, there is black letter law that that is improper.  I

25   have the three leading federal circuit cases highlighted here.

C547NEX3                        Colasanto - direct

1   Would you like to see them?

2          THE COURT:  No.  Overruled.  You are raising the same

3   points, and my ruling is the same.  I think ultimately we can

4   figure out how to apply the evidence, but I would like to hear

5   the evidence.

6   Q.  Go ahead.  Just continue describing, if you would, figure

7   1.

8   A.  Generally you have the fabric going over -- and this is a

9   very simplified diagram that the inventor has made here -- but

10  you have a fabric, you know, tensioned to some degree between

11  two rollers.  The fabric is moving, you know, from wherever it

12  is supplied from over the first roller basically to the second

13  roller, but in between is a knife blade similar to what you

14  might see on any floating-knife coater, even the KK1.  It has

15  dams on either side like the KK1 coater does to contain the

16  coating composition.  And the coating composition is right

17  here, number 5.  I'm having a hard time getting this thing to

18  move.

19          So, the fabric proceeds under the knife, and the

20  coating flows under the knife into the fabric, and, you know,

21  this is their process for controlling porosity.

22  Q.  In figure 2, just briefly if you could explain where the

23  knife is and what that arrangement is.

24  A.  Now we are looking at a side view of this portion here.

25  So, if we look down here, this is the mounting bracket that

C547NEX3                    Colasanto – direct

1   everything is attached to, and 5 points to the blade.

2   Q.  And is there anything underneath the blade?  You said this

3   was a floating or a knife-over-air, so could you just explain

4   the relationship between the blade, the fabric and the machine.

5   A.  Yeah.  The fabric is proceeding under the blade that's

6   being depressed by the blade.  The blade has these slashed

7   lines through it.  This bracket here doesn't actually go

8   through the web; it's just how they depicted it.  But the

9   fabric is proceeding under the blade; the blade is deflecting

10  it.

11          THE COURT:  Where is the knife?

12          THE WITNESS:  This slashed line thing here in yellow.

13  Thank you.

14  Q.  Could we then go to figure 3 of Rudman, just the last

15  figure, the one on the bottom.  OK.  Could you describe what

16  you see in figure 3.

17  A.  Yeah.  Well, figure 3 is a really blown-up area of where

18  the blade contacts the moving fabric.

19          So, the fabric is 1, the coating compound is 5 which

20  has been deposited by a reservoir above.  It's not shown here.

21  And then this is the actual, you know, bottom portion of the

22  knife blade in contact with and pressing against the fabric,

23  generally parallel to the fabric.

24  Q.  You said in contact with.  So, in this instance the knife

25  blade is pressing into the fabric?  Just explain that.

1    A.  Well, actually, if you look closely, it looks like it is

2    pressing into the fabric.  The top surface of the fabric is

3    depressed around it on both sides, and it certainly looks like

4    it's in contact with it in any case, and it also is deflecting

5    the web, so there is some pressure against the fabric.

6    Q.  I would like to go, if we could, to column 2 of Rudman.

7    Let's blow up the part, if we could, between line 28 and 36.

8                THE COURT:  Column what?

9                MR. BALL:  Your Honor, column 2, lines 28 to 36.

10               THE COURT:  Of Rudman.

11               MR. BALL:  Of Rudman.

12   Q.  What does it mean here in this paragraph that in order to

13   effect an impregnation, which is not visible on the fabric, a

14   metering blade will have a contact width, etcetera, etcetera?

15   What does it mean not visible on the fabric?

16   A.  That, that it's dropped in below the top surface of the

17   fabric, impregnated.

18   Q.  Rather than on the surface?

19   A.  Rather than the surface coating.

20   Q.  I see.  Could we then just quickly go to the next

21   paragraph.  If you could blow that up starting at figure 3.

22   OK.  This is a description here of figure 3 which we were just

23   looking at, and could you just explain what this sentence is:

24   The leading edge 8 of the blade.  Explain what that means.

25   A.  The leading edge 8 of the blade embeds the coating solution

C547NEX3                          Colasanto - direct

1    6 in the fabric.  The leading or upstream edge of the blade

2    will have a keen configuration.

3    Q.  What does that mean?

4    A.  The keen configuration to me means, you know, a sharp right

5    angle to the leading edge of the blade.

6    Q.  OK.  What type of coating compositions does Rudman talk

7    about using?

8    A.  I recall Rudman talking about many of the similar coating

9    compositions we have been talking about for the KK1 coater, and

10   that is solvent solutions of polymers, including polyurethane,

11   of the same basic solids content of the KK1, you know, the

12   52668, and also silicone materials.

13   Q.  Silicone materials.  Do, any of the accused products in

14   this case use silicone materials, just for clarity?

15   A.  Yeah, the products that use M1074B, which is the original

16   GEN III fabrics that I saw in 2008.

17   Q.  And you mentioned solids content.  Can you explain what

18   that means.

19   A.  Well, solids content is the inverse way of saying solvent

20   content.  The two together equal a hundred if they were

21   expressed in percentages.  So, when I say --

22              THE COURT:  Sorry, I'm just lost.  Can you go back.

23              MR. BALL:  Sure, your Honor.  Maybe just to clarify,

24   if I could just pull up a couple paragraphs, and we can

25   highlight the text that he is referring to.  It might be

C547NEX3                    Colasanto - direct

1    helpful.

2              Could we look at column 2 of Rudman, and let's start

3    at line 60 and go to the bottom of that column.

4    Q.  OK.  And what is this paragraph of Rudman describing, or

5    these three paragraphs?

6    A.  Yeah, I mean Rudman is basically saying any substantially

7    liquified coating material can be used --

8              THE COURT:  Any substantial what?

9              THE WITNESS:  Liquified coating material.

10   Q.  What does that mean again, a liquified coating material?

11   A.  Well, that's one, you know, that basically flows on its own

12   without any additional energy.

13   Q.  OK.  And does Rudman talk about any polyurethane silicones,

14   the ones you mentioned?

15   A.  Yeah, underneath that is an example of the polymeric

16   materials.  Remember before I said polymers can be many

17   different types of plastics.  You know, he has examples here of

18   some of the solutions he has used or can be used:  Beaded dying

19   polymers, urethanes, polyurethanes.  And then resulting from

20   the reaction of toluene diisocyanate -- that's a polyurethane

21   raw material precursor -- with relatively short linear

22   polyester molecules.  I didn't mean to get into this technical

23   stuff.  It's just a way of saying polyurethanes basically.

24   Q.  So, Rudman talks about coating with polyurethanes?

25   A.  Yes.

C547NEX3                    Colasanto – direct

1   Q.  And you said Rudman talks about coating with silicone

2   polymers?

3   A.  Yes.  I think below that it goes into organo silicone

4   compositions, and I remember later on it talks about

5   specifically polysiloxanes or siloxanes which is a fancy way of

6   saying silicones.

7   Q.  Now, I would like to skip ahead, because you mentioned

8   something about solid content, solids content, and maybe we can

9   clarify a little bit about what that means.

10          If we could go to column 6, please.  This is one of

11  the experimental examples from the Rudman patent.  Example 3,

12  let's just go to line 20 down to 37, please, just highlight

13  that.

14          So, for instance, do you see here where it says this

15  treated fabric was coated with a 40 percent solids solution?

16  A.  Yes.

17  Q.  What does that mean that it was a 40 percent solids

18  solution?

19  A.  OK.  Well, typically it means by weight.  It could be by

20  volume too, but if nothing is said I assume it's by weight.

21  What that basically means is in 100 grams, or 100 pounds, or

22  100 tons of this coating composition, 40 grams, pounds, tons is

23  solids, and solids would be made up primarily of the polymer,

24  in this case polyurethane.  The balance, the 60 grams, 60

25  pounds, 60 tons, would be whatever the solvent is.

```
 1              THE COURT:  Would be what?
 2              THE WITNESS:  Would be whatever the solvent happens to
 3    be, the diluting solvent.  And we have talked about toluene
 4    being a common diluting solvent.
 5    Q.  So, in this example, example number 3 where we have 40
 6    percent solids, what is the amount of solvent in this example?
 7    A.  As I just explained, it would be 60.  And, you know, that's
 8    not even as much as in the KK1 coating compounds which are
 9    about 70.
10    Q.  Then let's just back up a second, because I want to give a
11    little bit more context to Rudman that you have explained.
12    What kind of fabrics is Rudman concerned with making?
13    A.  Well, among other things he talks about making waterproof
14    breathable fabrics that have a soft hand.  And, you know --
15    Q.  Let me just blow this up so you can explain it from the
16    text.
17              Could we go to column 4 of Rudman, starting on about I
18    think line 59, going to line 64.
19              OK.  Is this what you were referring to?
20    A.  Give me a second.  Yes, this is exactly.  And so, you know,
21    he was aware of these properties being important.
22    Q.  Which properties?
23    A.  The properties of breathability, waterproofness and
24    desirable fabric hand.
25    Q.  And explain that term desirable fabric hand.  Can you
```

C547NEX3                          Colasanto - direct

1   explain that?

2   A.   Yeah.   Hand in the industry is basically how a fabric --

3   whether it's coated or not coated -- feels holding it in your

4   hand.   If something has a particularly firm hand, that's

5   usually undesirable for things like apparel.   If it has a very

6   soft supple hand, that's usually desirable.

7   Q.   OK.   Can you tell us how these properties that you have

8   just -- how do these relate to the Nextec patents?

9   A.   Well, I mean they are essentially the basic properties that

10  Nextec is trying to achieve as well.

11  Q.   Now, I'd like to go to column 5, please, of Rudman, and

12  let's look at line 25 to the end of that short paragraph.   OK.

13  This paragraph talks about these natural voids, interstices.

14  A.   Yes.

15  Q.   What is an interstice and a natural void?

16  A.   Sure.   If you envision a fabric in front of you, it's a

17  porous structure.   The stuff that is air and not polymer is a

18  result of the fact that the structure of the fabric is made up

19  of filaments, very small filaments that are bundled together

20  into yarns, and then these yarns are in turn woven, or knitted,

21  or whatever is done with the fabric.   But the fact that they're

22  in close proximity to each other but not completely touching

23  leaves voids, and these are called interstices.   And you might

24  have very small interstices between the fine filaments, and you

25  might have a slightly larger interstices formed by the one yarn

1    next to the other, especially in a crisscrossing pattern.

2    That's what is refer to as interstices.

3    Q.  But what does it mean that microscopic voids are achieved?

4    A.  Well, Rudman is talking about being able to, you know,

5    control basically the size of these voids, how much filling he

6    does, and turning macroscopic, somewhat larger voids, into

7    very, very small microscopic voids by using his method.

8    Q.  Are you familiar with the term encapsulation that is in the

9    Nextec patents, the 902, the 841 patent?

10   A.  Yes.

11   Q.  OK.  And how does this relate to this concept of

12   encapsulation?

13   A.  Well, I mean it sounds very similar because, you know, he

14   is obviously impregnating the pores of a fabric with a coating

15   composition, and it must be coating these things to some degree

16   to reduce the voids.

17   Q.  So, I'd like to skip down then to example 2, starting on

18   column 5 of Rudman.  Let's get example 2 starting on line 70 to

19   line 76 or so, please.  OK.  This is talking about determining

20   the porosity of the fabric.  Just at the top there this is

21   talking about determining porosity.  Can you explain a little

22   bit about what this says.

23   A.  At the top?

24   Q.  Yes, please, just the top.

25   A.  I mean Rudman, in example 2 Rudman is talking about varying

C547NEX3                         Colasanto – direct

1   the solids content or the solvent content –– you can say it

2   either way –– and the width of the coating blade as being

3   variables that determine how much porosity comes from the

4   coated web, the treated web.  So, he is actually, you know,

5   supplying the variables necessary to vary the porosity.

6   Q.  OK.  And so one of those variables is the solvent content?

7   A.  That's correct.

8   Q.  To vary porosity?

9   A.  Yeah, indirectly he is saying solids content but that means

10  also solvent content.

11  Q.  And the other method you mentioned or that he mentions to

12  vary porosity?

13  A.  Is the contact width of the blade.

14  Q.  What does that mean, the contact width of the blade?

15  A.  That would be the tip of the blade in contact with the

16  fabric.  The bottom edge.

17  Q.  Does Rudman specify any blade widths in this example?

18  A.  In this ––

19  Q.  You can look at the bottom part down there.

20  A.  It's the same example?  OK.

21  Q.  Yeah.

22  A.  Yes, 19 mils, 11 mils and 40 mils, quite a variety, yeah.

23  Q.  19 mils and 11 mils.  Do you have a sense as to how that

24  relates to the contact width of the blade of the KK1 coater?

25  A.  It's right there.  I believe the KK1 coater's blade width

C547NEX3                          Colasanto - direct

1   is 13 or 17 mils, right in between the 11 and 19.  Yeah, the

2   same blade thicknesses.

3   Q.  OK.  And then just quickly, what does Rudman conclude then

4   about the use of these blades of this thickness 11 to 19 mils,

5   etc.?

6   A.  Well, is that he can control the porosity of the web by

7   varying that blade thickness with a given coating composition.

8   Q.  OK.  And let's --

9            THE COURT:  You know, what is the significance of

10  Rudman?  I'm sure you have talked about it, but I don't recall.

11  What is the significance of Rudman?

12           MR. BALL:  Sure.  Rudman is a prior art patent that

13  Nextec talks about in the background of its own patent, and

14  they say that it's highly liquified before it's applied to the

15  fabric due to the use of solvents.  Then again during

16  prosecution of the 902 patent, the very patent we are talking

17  about --

18           THE COURT:  Is that the point, that Rudman is heavy on

19  the use of solvents?

20           MR. BALL:  Yes, but in fact the KK1 coater uses even

21  more solvents.

22           THE COURT:  I'm asking you about Rudman.

23           MR. BALL:  Yes, sir.  Yes, your Honor.

24           THE COURT:  Then why do we have to go into all of

25  these other things about Rudman?

C547NEX3                              Colasanto – direct

1          MR. BALL:  OK.  Your Honor, Rudman has a blade that is

2     the same width as the Brookwood blade, and he uses solvent

3     compositions and coating compositions that are nearly

4     identical.

5          THE COURT:  All right, go ahead.

6          MR. BALL:  And this informs the witness's

7     understanding of the KK1 coater.

8          THE COURT:  All right.

9     Q.  So, let's move on if we could.  Let's just go down to

10    example 4, please.  Could you go back up to example 3 where we

11    just were.  Highlight that paragraph.

12         OK.  In example 3, in the second line there is a

13    mention of Scotchgard.  Do you see this?

14    A.  Yes.

15    Q.  Can you just tell us very briefly what that is and what's

16    happening here?

17    A.  Scotchgard is a water repellant, possibly a stain repellant

18    too, that is used to treat fabrics, to give them repellancy.

19    And Rudman is talking about pretreating it.  And this is a

20    fluorochemical typically.  Rudman is talking about using a

21    fabric that has been pretreated with water repellency to go

22    through this process.

23    Q.  Is that what has been referred to as a prefill in this

24    case?

25    A.  Yes, Brookwood refers to, you know, such pretreatment of

1    fabrics as prefilling, yes.

2    Q.  That's fine.  So, then I would like to move on to example

3    4.  Do you see the description here of an eight degree open

4    angle blade?

5    A.  Yes.

6    Q.  Could you tell me what that means, an open angle blade?

7    A.  Yeah.  When we describe blades that are basically

8    perpendicular exactly to the path of the fabric, to the plane

9    of a fabric, if you were to face the front of a blade where the

10   coating goes on and tip the blade back slightly, you would

11   create an open angle, like the entry angle of the fabric going

12   under the blade.  I think what I understand Rudman is doing

13   here is he is comparing a blade that's been, you know, tipped

14   back so it has an open angle to his preferred method, his

15   invention of having the blade completely flat with the plane of

16   the fabric.

17   Q.  OK.  Do you have a sense as to the angle of Brookwood's

18   blade, the KK1 coater, and whether it's an open-angle blade?

19   A.  Yeah.  I mean we have talked about the Brookwood blade

20   being substantially, you know, perpendicular to the fabric, but

21   in fact it is actually tilted back, you know, slightly.  So,

22   there is a slight open angle.

23            And, you know, as I recall --

24            THE COURT:  What is the reason for that?

25            THE WITNESS:  Well, I think from what I have seen in

C547NEX3                        Colasanto - direct

1    floating-knife coating machines, that's just typically done

2    because for some reason there is better physics of the material

3    going under it.  It's a sweeter part of the blade kind of --

4            THE COURT:  Is it tilted?

5            THE WITNESS:  The top of the blade is tilted back, so

6    the bottom of the blade is tilted up slightly, so there is a

7    slight angle.

8            THE COURT:  And the bottom is going in what direction?

9            THE WITNESS:  The bottom is going from an angle of --

10   to down.  It's going from up to down.

11           THE COURT:  I know, but is it towards the fabric?  Is

12   it running in?

13           THE WITNESS:  Yeah, as the fabric is running in,

14   that's where it's open, correct.  And Rudman is referring to

15   this as -- back then he is referring to this as the

16   conventional, you know, coating method, is to use this open

17   angle.  And he prefers his invention, which he says he gets

18   better control and permeation of the web if he tilts it back --

19   I mean keeps it flat, excuse me, no open angle.

20   Q.  Then I would just like to conclude here on Rudman.  Can we

21   look at example 6, and that's on column 7, from about line 41

22   and let's go down to line 65, please.  OK.  In the middle here

23   this is reference to an impregnation with a silicone material.

24   A.  Yes.

25   Q.  And reference to the silicone material had a viscosity of

C547NEX3                     Colasanto – direct

1    25,000 centipoise.  Can you explain that and what that means in

2    relation perhaps to the products at issue in this case.

3    A.  Yeah, I mean this is even a little bit higher than any of

4    the materials, you know, used on the Brookwood coater, and it's

5    also a silicone material.  I think that's what is significant

6    about it.

7            MR. BALL:  OK.  Your Honor, we'd ask to move Rudman

8    into evidence as DX1011.

9            THE COURT:  Received.

10            (Defendant's Exhibit 1011 received in evidence)

11            MR. BALL:  Your Honor, this is an office action

12    response that Nextec filed in connection with the 902 patent.

13    During prosecution of the 902 patent the examiner had rejected

14    the claim over this Rudman patent.  I'm sorry.  In a related

15    case the examiner had rejected the claim over the Rudman

16    patent, and Nextec was telling the examiner from the 902 what

17    had happened there, and this is their description of Rudman and

18    the alleged distinctions over Rudman.

19    Q.  Could you read this and explain what this is saying,

20    Mr. Colasanto.

21    A.  Yeah, the teaching of Rudman would be expected to produce

22    an impregnated fabric with little control of porosity.  The

23    liquid material utilizes solvents and would be expected to

24    saturate the fabric resulting in a different product than

25    described by the present patent application.

C547NEX3                    Colasanto - direct

1              Yeah, I mean Nextec is trying to say, you know, they

2     don't use solvents and if you do use solvent you don't have

3     this kind of control over porosity.

4     Q.  OK.  Could you read the title of the Rudman patent that you

5     have.

6     A.  Process for Controlling Porosity in Fibrous Webs.

7     Q.  And again what is Nextec saying here about porosity and

8     control?

9     A.  You know, you can't have a material that's already starting

10    out a liquid to do that; it has to contain, you know, no

11    solvents basically.

12    Q.  OK.  And based on this, based on the 902 patent, what it

13    says about Rudman, what you have read here from Rudman, and

14    what you have read here what Nextec has said about Rudman, have

15    you formed an opinion as to the products that Brookwood makes

16    in relation to infringement of the Nextec patents?

17    A.  Well, yeah, the products Brookwood makes is nearly

18    identical to what Rudman is describing.  They contain more

19    solvent than what is talked about in Rudman, and they're

20    substantially already liquified.

21    Q.  OK.  What aspect of the patent claim -- let's look at the

22    902 patent claim -- what aspect of the 902 patent claim do you

23    see that makes that distinction?

24    A.  Yeah, I mean you need sufficient -- excuse me.  You know,

25    that you need a shear thinnable material, first of all, and

1  sufficient shear thinning energy as being the cause of the

2  shear thinnable material to flow in the web; not that the

3  material on its own would flow into the web.

4  Q.  Sorry.  Could you just repeat that again and point to the

5  limitation of this claim that reflects this aspect of control.

6  A.  You need to supply a sufficient shearing energy to cause it

7  to flow into the web.  In other words, it must be the shear

8  thinning that causes it to go into the web, to encapsulate, not

9  the solvents.

10  Q.  OK.  And what about the beginning part of this claim, a

11  method of controlling the effective pore size?  Do you have any

12  understanding of what that means based on the arguments you

13  have read that Nextec made to the patent office?

14  A.  Well, I mean that must be, you know, somewhat different

15  than just porosity, because, you know, you can't do it without

16  using the shear energy.

17       MR. BALL:  OK.  Now, let me just step back, your

18  Honor.  I didn't move this into evidence, but the response to

19  the office action that we were just discussing, we ask that

20  that be admitted into evidence as DX1769.

21       THE COURT:  Received.

22       (Defendant's Exhibit 1769 received in evidence)

23  Q.  Now, I would like to go back to column 2 of the 902 patent.

24  This paragraph we were talking about beginning on line 40,

25  there is another patent that's referenced there.  It says U.S.

C547NEX3                    Colasanto – direct

1    patent No. 4,588,614.  Are you familiar with that patent?

2    A.  Yes, I believe that's Lauchenauer.

3    Q.  Can you read what it says here about Lauchenauer, please.

4    A.  U.S. patent 614 teaches a method for incorporating an

5    active agent into a porous web.  This process utilizes a

6    solvent to aid in the incorporation of the active agent into

7    the web.  The active agent is a noncurable agent since the

8    addition of heat aids in the reduction of viscosity.

9    Q.  OK.  And what is your understanding about the reference to

10   the solvents in this discussion of Lauchenauer?

11   A.  That, you know, it's the solvent that's necessary to get it

12   to go in the web with Lauchenauer.

13   Q.  OK.  I would like to, if we could, just look at Lauchenauer

14   briefly.

15           If you could pull up DX1010, please, the Lauchenauer

16   patent.

17           The title of Lauchenauer is Pseudoplastic Gel

18   Transfer.  Could you explain what a pseudoplastic gel is?

19   A.  Yeah, pseudoplastic is a synonymous term to shear

20   thinnable.

21   Q.  It is shear thinnable?  It means the same thing?

22   A.  Yes.

23           MR. BALL:  Your Honor, could I approach the witness to

24   hand him a copy of Lauchenauer?

25           THE COURT:  Yes.

1   Q.  I'd like to flip to the claim of Lauchenauer.  That starts

2   on column 7.  Let's just highlight, if you would -- just blow

3   up the claim so it's easier to read.

4           OK.  Could you explain what this process of

5   Lauchenauer that's described here is, please.

6   A.  Yeah.  Basically he takes a composition and makes a gel out

7   of it, or in his case he is calling it pseudoplastic which is

8   synonymous with shear thinnable, and shearing it into a web,

9   you know, by applying that gel to the fabric, and moving it,

10  and applying shear to it to get it to drive in and to cause

11  that penetration.

12  Q.  What does it mean to cause the pseudoplastic gel to

13  penetrate said pore structure to a depth determined by said

14  applied shear?  Could you explain what that means?

15  A.  Well, it means that he can then control these variables to

16  predict how much penetration he is going to get, so he can sort

17  of predetermine where he wants it and then put it there by

18  controlling the variables, yeah.

19  Q.  So, is he using shear thinning to control the depth of

20  penetration?

21  A.  Yes.

22  Q.  What I would like to do then is go back to the patent

23  itself, please.

24           (Continued on next page)

25

C541nex4                    Colasanto – direct

1    BY MR. BALL:

2    Q.   Okay.  I'm sorry.  The second to last line there, what does

3    that say about solvents?

4    A.   Where are we?

5    Q.   The second to last line of claim 1 of Lauchenauer.

6    A.   Oh.  "Evaporating the solvent from said penetrated

7    pseudoplastic gel."

8    Q.   Okay.  So the Lauchenauer material, the shear thinnable

9    material had a solvent?

10   A.   Yes, yes, significant solvent, as in like the KK-1

11   materials.

12   Q.   Okay.

13          MR. MURPHY:  Your Honor, sorry to interrupt.  I just

14   want to continue the same objection we had before.

15          THE COURT:  Overruled.

16   Q.   Okay.  Now very quickly, if we could, could we go to

17   Lauchenauer then, column 4, please.

18          I'm sorry.  Column 2, starting on line 53 to the end

19   of that column.

20          Okay.  Could you -- have you had a chance to read this

21   paragraph before, talking about wrapping of yarns and

22   filaments?

23   A.   Yes, let me look for it.

24   Q.   Sure.

25   A.   Yes.

C541nex4                      Colasanto - direct

1   Q.  Okay.  And could you just explain what Lauchenauer's saying

2   here about wrapping yarns and filaments.

3   A.  Yeah, he's basically saying that he's causing penetration

4   of these agents from the pseudoplastic gel to a predetermined

5   depth in his, you know -- in these webs, and he's wrapping, you

6   know -- the yarns, the filaments, are being enveloped,

7   basically, by the -- by the agent, and this is all very similar

8   to the kind of encapsulation I read about in the Nextec

9   patents.

10          MR. BALL:  Okay.  If you would, could you pull up

11  please DX 1040.

12          And I'm sorry.  Just housekeeping.  I'd like to

13  move -- we ask that DX 1010, the Lauchenauer patent, be

14  admitted into evidence.

15          THE COURT:  Received.

16          (Defendant's Exhibit 1010 received in evidence)

17  BY MR. BALL:

18  Q.  Okay.  Have you seen this document before?

19  A.  Yeah, I'm sure I have.

20  Q.  Okay.  This is a response to an office action that Nextec

21  filed in one of the cases that led to the '902 and '841

22  patents, where the claim was rejected over Lauchenauer, and

23  could you explain what Nextec is saying here about Lauchenauer.

24  A.  Yeah, that Lauchenauer is, you know, relying on solvents to

25  get the gel to penetrate and that, you know, they clearly do

C541nex4                    Colasanto – direct

1   not utilize solvents to do this and it must be shear that

2   causes the -- the penetration of the web --

3   Q.   Okay.

4   A.   -- and the enveloping of the product.  And these are very,

5   very high viscosity materials.

6        MR. BALL:  Okay.  Your Honor, I'd like to move into

7   evidence DX 1040.

8        THE COURT:  Received.

9        (Defendant's Exhibit 1040 received in evidence)

10       MR. BALL:  Could we pull up DX 1770.

11       Okay.  And could we go to page 15 of that document.

12  Q.   Okay.  Now what this is, this is an office action that was

13  filed in the identical patent application filed the same day as

14  the '902 application, and again, the examiner in that case

15  rejected the claim over Lauchenauer, and can you explain to the

16  court what Nextec said about Lauchenauer.

17  A.   Yeah, that basically these materials, you know, flow

18  because of the amount of solvent in them and not -- and not

19  because of, you know -- not because of shearing and -- and that

20  the applicant Nextec does not utilize solvents.

21  Q.   Okay.  And there's some reference to viscosities there.  Do

22  you see these?

23  A.   Yeah, they're very large viscosities, hundreds of

24  thousands, and the solvent-containing products used by

25  Brookwood, you know, are far lower than that, 20,000

C541nex4                          Colasanto - direct

1   centipoise --

2   Q.  Okay.

3   A.  -- as opposed to thousands or even millions.  So clearly,

4   you know, you know, they're not really talking about the

5   Brookwood type materials being used for this purpose.

6   Something special has to be done to -- to create this.

7           MR. BALL:  Okay.  Your Honor, I'd like to move DX 1770

8   into evidence.

9           THE COURT:  Received.

10          (Defendant's Exhibit 1770 received in evidence)

11          MR. BALL:  Now could we pull up, please, DX 1103.

12  Okay.  And let's go to page 11 of that.

13  Q.  Have you seen this before?

14  A.  Yeah, yes.

15  Q.  Could you explain --

16          MR. BALL:  And for the court, this is that same '004

17  application, the identical application filed the same day as

18  the '902 patent, and again, the claim stood rejected over

19  Lauchenauer, and these are the arguments that Nextec made about

20  Lauchenauer.

21  Q.  Can you explain what Nextec was saying here, Mr. Colasanto.

22  A.  Yeah, that Lauchenauer, again, is a -- contained

23  significant solvents and flows, you know, on its own and that

24  it's --

25  Q.  What does it mean that this type of solvent-based process

C541nex4                    Colasanto - direct

1   is difficult to control and difficult to reproduce because a

2   part of the process is out of the operator's control?  What is

3   Nextec trying to say there?

4   A.  Yeah, that it can't be done when it has significant

5   solvents like -- like Brookwood, when it's already liquefied.

6   Q.  Okay.  And the last sentence that's highlighted, do you see

7   where it says, "The degree of control necessary to control the

8   effective pore size of a web to reproducible conditions --"

9            MR. BALL:  Can you go on to the next page.

10  A.  Oh, this is in contrast to what Lauchenauer claims is being

11  able to control, you know, the porosity.

12  Q.  Okay.  Now --

13  A.  Not porosity but impregnation.

14  Q.  If I understood your testimony, Lauchenauer is a shear

15  thinnable material?

16  A.  Yes.

17  Q.  And Lauchenauer shear thins to put the material to a

18  predetermined depth --

19  A.  Yes.

20  Q.  -- in the fabric?

21  A.  Yes.

22  Q.  Okay.

23  A.  So, you know, it must not shear thin, you know --

24  Q.  What is then -- and Lauchenauer had solvents; correct?

25  A.  Yes.

C541nex4                          Colasanto – direct

1  Q.  Okay.  So what is the distinction that Nextec is drawing

2  here for products that shear thin some and have solvents as

3  compared to a process that only shear thins?  Do you have an

4  opinion as to what Nextec is saying in that regard?

5  A.  Yeah, but it must be the shear itself that causes it, not

6  the shear and solvent impregnation -- impregnate to cause the

7  impregnation.

8  Q.  Okay.  Now based on your understanding of that, for the --

9  for the Nextec patents at issue in this case, do you have an

10  opinion as to whether a solvent-based process like Brookwood's

11  process infringes the claims at issue in this case?

12  A.  Yeah.  I mean, they -- they utilize these solvents, you

13  know, and because it would flow on its own anyways, it couldn't

14  possibly -- it couldn't possibly infringe.

15          MR. BALL:  Okay.  No further questions.  Thank you

16  very much.

17          THE COURT:  Okay.  I'm at five to 4, and we have an

18  induction ceremony, so we'll recess until 10:00 Monday.

19          MR. KORNICZKY:  Your Honor, may I have one question on

20  procedure in the case so we can prepare for next week?

21          THE COURT:  Okay.

22          MR. KORNICZKY:  As we start to near the close of the

23  infringement case, will we proceed directly into the next

24  stage, or how did you want to handle that?

25          THE COURT:  Of course.

C541nex4

```
1            MR. KORNICZKY:  Okay.  I wasn't sure if you wanted to

2    bifurcate or trifurcate or --

3            THE COURT:  Oh, no, no, no.

4            MR. KORNICZKY:  Okay.  Thank you.

5            MR. HORWITZ:  Your Honor, we have just a few more

6    witnesses on the infringement issue: the woman who heads up the

7    research that developed this in terms of how it works; and then

8    Dr. Hauser, who was coming back as the expert --

9            MR. KORNICZKY:  We do as well.  I wasn't suggesting it

10   was over, yeah.

11           THE COURT:  All right.  Okay.  See you Monday.

12           (Adjourned to May 7, 2012, at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   DAVID PINE

 4   Cross By Mr. Yannuzzi . . . . . . . . . . . 586

 5   Redirect By Mr. Horwitz . . . . . . . . . . 630

 6   THOMAS COLASANTO

 7   Direct By Mr. Ball . . . . . . . . . . . . . 653

 8                    DEFENDANT EXHIBITS

 9   Exhibit No.                          Received

10    1781E   . . . . . . . . . . . . . . . . . . 585

11    1781F   . . . . . . . . . . . . . . . . . . 585

12    1781G   . . . . . . . . . . . . . . . . . . 585

13    1152   . . . . . . . . . . . . . . . . . . 585

14    1797   . . . . . . . . . . . . . . . . . . 585

15    1781M   . . . . . . . . . . . . . . . . . . 586

16    1781AB   . . . . . . . . . . . . . . . . . 586

17   2118 and 2119  . . . . . . . . . . . . . . 677

18    1011   . . . . . . . . . . . . . . . . . . 697

19    1769   . . . . . . . . . . . . . . . . . . 699

20    1010   . . . . . . . . . . . . . . . . . . 703

21    1040   . . . . . . . . . . . . . . . . . . 704

22    1770   . . . . . . . . . . . . . . . . . . 705

23

24

25
```