SEAN J. KIRBY
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, New York  10112
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701

STEPHEN S. KORNICZKY, Cal. Bar No. 135532 (*Pro Hac Vice*)
NAGENDRA SETTY, Georgia. Bar No. 636205 (*Pro Hac Vice*)
EDWARD ANDERSON, Cal. Bar No. 83148 (*Pro Hac Vice*)
DANIEL N. YANNUZZI, Cal. Bar No. 196612 (*Pro Hac Vice*)
MICHAEL MURPHY, Cal. Bar No. 234695 (*Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, California  92130
Telephone:  (858) 720-8900
Facsimile:  (858) 509-3691


Attorneys for Plaintiff
NEXTEC APPLICATIONS, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEXTEC APPLICATIONS, INC., a Georgia corporation,<br><br>                         Plaintiff,<br><br>        v.<br><br>BROOKWOOD COMPANIES, INC., a Delaware corporation,<br><br>                         Defendant. | Case No. 07CV6901 (TPG)<br><br>**PLAINTIFF'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT** |

Notice is hereby given that Plaintiff Nextec Applications, Inc. ("Nextec") in the above-named case hereby appeals to the United States Court of Appeals for the Federal Circuit from the following:

- The Rule 54(b) final judgment finding non-infringement entered in this action on June 22, 2012 (Dkt. No. 387), with respect to the issue of infringement, attached hereto as Exhibit A;

- The Court's order entered August 14, 2012 (Dkt. No. 394) attached hereto as Exhibit B, denying Nextec's Motion to Amend the Court's Finding of Non-Infringement or in the Alternative for New Trial (Dkt. No. 388); and

- The Court's order entered March 31, 2010 (Dkt. No. 118) attached hereto as Exhibit C, granting-in-part Brookwood Companies, Inc.'s Motion for Summary Judgment on Infringement and Invalidity (Dkt. No. 89).

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

*//*

Dated:    September 12, 2012

**SHEPPARD MULLIN RICHTER & HAMPTON** LLP

By:    *s/ Stephen S. Korniczky*

STEPHEN S. KORNICZKY (admitted *pro hac vice*)
NAGENDRA SETTY (admitted *pro hac vice*)
EDWARD ANDERSON (admitted *pro hac vice*)
DANIEL N. YANNUZZI (admitted *pro hac vice*)
MICHAEL MURPHY (admitted *pro hac vice*)
12275 El Camino Real, Suite 200
San Diego, CA 92130
Telephone:    (858) 720-8900
Facsimile:    (858) 509-3691
E-mail:    skorniczky@sheppardmullin.com
          nsetty@sheppardmullin.com
          dayannuzzi@sheppardmullin.com
          mmurphy@sheppardmullin.com

and

*s/Sean J. Kirby*

SEAN J. KIRBY
30 Rockefeller Plaza
New York, New York  10112
(212) 653-8700 (phone)
(212) 653-8701 (fax)

Attorneys for Plaintiff
NEXTEC APPLICATIONS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of September, 2012, I caused copies of the foregoing NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, with exhibits, to be served by upon all counsel of record by the Court's Electronic Case Filing System.

_____*s/Sean J. Kirby*_____
Sean J. Kirby

-3-

# EXHIBIT A

Jun-18-2012 11:58 AM King & Spalding 2125562222

3/4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

NEXTEC APPLICATIONS, INC.,                        )
                                                  )
                  Plaintiff,                      )          CIVIL ACTION NO. 07-cv-6901 (TPG)
                                                  )
         v.                                       )
                                                  )
BROOKWOOD COMPANIES, INC.,                        )
                                                  )
                  Defendant.                      )
                                                  )

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 6/21/12

## ORDER AND FINAL JUDGMENT

The trial in the above-captioned matter having come before the Honorable Thomas P. Griesa, United States District Court Judge; the Court having considered the evidence and arguments presented by the parties; the Court, on June 1, 2012, having orally rendered its opinion finding Plaintiff had not proven infringement of the patents-in-suit, and that Defendant had not proven invalidity of the patents-in-suit;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

Defendant does not infringe, directly or indirectly, Claim 1 of U.S. Patent Number 5,954,902 and Claims 1 and 57 of U.S. Patent No. 6,289,841;

Claim 1 of U.S. Patent Number 5,954,902 and Claims 1 and 57 of U.S. Patent No. 6,289,841 are not invalid; and

Costs are awarded to defendant.

The Clerk of the Court shall enter this Order and Final Judgment pursuant to Rules 58 and 79(a) of the Federal Rules of Civil Procedure.

Jun-18-2012 11:58 AM King & Spalding 2125562222                                          4/4

THIS IS A FINAL JUDGMENT

SIGNED this 21st day of June , 2012.

THOMAS P. GRIESA
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
                                                 :
NEXTEC APPLICATIONS, INC.,                       :
                                                 :
                              Plaintiff,          :        07 Civ. 6901 (TPG)
                                                 :
              – against –                        :        **ORDER**
                                                 :
BROOKWOOD COMPANIES, INC.                        :
                                                 :
                              Defendant.          :
                                                 :
------------------------------------------------x

     Plaintiff recently moved to amend the court's finding of non-infringement or, in the alternative, for a new trial. The court has examined the motion prior to determining whether defendant must respond. The court rules that the motion should be denied. There is no need for defendant to respond. This order resolves docket item number 388.

     SO ORDERED.

Dated:  New York, New York
        August 14, 2012

                                                  Thomas P. Griesa
                                                  U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/12

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

NEXTEC APPLICATIONS,

                        Plaintiff,

          -against-                                    07 Civ. 6901 (RJH)

                                               **MEMORANDUM OPINION
                                                     AND ORDER**

BROOKWOOD COMPANIES, INC.,

                        Defendant.

----------------------------------------

## TABLE OF CONTENTS

I.  BACKGROUND ............................................................................................... 1
    A.   Factual Background ................................................................................ 1
    B.   Procedural History ................................................................................ 5
    C.   The Pending Motions ............................................................................ 6
         1.   Nextec's Motion for Partial Summary Judgment ................................. 6
         2.   Nextec's Motion for Partial Summary Judgment that the Asserted
            Claims are Not Anticipated Under 35 U.S.C. § 102 by the Rudman
            Patent, the Smith Patent, and/or the Historical Ken Reign Fabric ........ 6
         3.   Brookwood's Motion for Summary Judgment of Non-Infringement
            and Patent Invalidity ............................................................................ 7
         4.   Brookwood's Contingent Motion for Partial Summary Judgment on
            Damage-Related Issues ........................................................................ 8

II.  STANDARD OF REVIEW .............................................................................. 8
    A.   Summary Judgment ............................................................................. 8

III.  DISCUSSION ................................................................................................... 9
    A.   Claim Construction .............................................................................. 9
         1.   Applicable Legal Standards ................................................................. 9
         2.   Construction of "Thixotropic" ........................................................... 14
         3.   Construction of "Shear Thinning" and "Shear Thinnable" ................. 26
    B.   Infringement ....................................................................................... 35
    C.   Patent Invalidity ................................................................................. 45
         1.   Whether the Asserted Claims are Anticipated by the Rudman Patent,
            the Smith Patent and/or the Ken Reign Fabric ................................... 45
         2.   Whether Claims 1 and 57 of the '841 Patent are Anticipated by the
            KK-1 Coater ....................................................................................... 56
         3.   Whether Claim 1 of the '902 Patent is Invalid Based on Double
            Patenting and/or Anticipation ............................................................ 62
    D.   Brookwood's Contingent Motion for Summary Judgment on Damage-
        Related Issues ..................................................................................... 70

IV.  CONCLUSION ............................................................................................... 72

V.  APPENDIX A – ASSERTED CLAIMS ........................................................... 73

Richard J. Holwell, District Judge:

In this action, plaintiff Nextec Applications, Inc. ("Nextec") alleges that

defendant Brookwood Companies, Inc. ("Brookwood") violated various Nextec patents

relating to the application of materials to fabrics to produce weather-resistant fabrics.

Before the Court are four motions for full or partial summary judgment—two filed by

each party—relating to ten individual patent claims stemming from four patents assigned

to Nextec: United States Patent Nos. 5,418,051 (the "'051 patent"), 5,869,172 (the "'172

patent"), 5,954,902 (the "'902 patent"), and 6,289,841 (the "'841 patent"). This Opinion

sets forth the Court's rulings on the four pending motions.


## I.    BACKGROUND

**A.    Factual Background**[1]

Nextec manufactures various patented breathable water-resistant fabrics. Nextec

holds several patents covering the fabrics it makes, the methods of making those fabrics,

and the systems for making the fabrics. Nextec's fabrics are sold to garment

manufacturers that use the fabrics to produce a variety of consumer and military goods,

including windshirts, parkas, and tents.

Nextec's fabrics are produced by taking them through a fabric coating operation.

Broadly speaking, that operation consists of rollers that pull the fabric through a machine,

somewhat similar to a movie projector threading a film through a reel. At one point in

the process, there is a blade or knife that is positioned transverse to the fabric. A coating

composition, typically a polymer composition, is deposited in front of the blade, and the

---

[1] The description provided in this section is not intended to be comprehensive or to be a construction of any disputed claim terms. Rather, it is intended to provide background useful to a proper understanding of the discussion to follow.

blade is then used to apply the composition to result in treatment of the fabric. A series

of parameters in this coating operation can be adjusted to achieve the desired fabric

properties, including: the tension of the fabric, the speed of the fabric, the sharpness of

the blade, the depth of the blade as it impacts the fabric, the polymer composition and

rheology, and the weave of the fabric. (*See* Transcript of Oral Argument, February 17,

2010 (hereinafter "Tr.") at 5-6.)

Nextec is the assignee of the '051, '172, '902 and '841 patents (collectively, "the

patents-in-suit").[2] The '051 patent, which is entitled "Internally Coated Webs," is

directed to "an improved process . . . for treating a porous web (especially fabric) to

produce a novel silicone polymer internally coated web." The Abstract to this patent,

which was filed on February 16, 1993, summarizes this process as follows:

> In the process, a starting curable liquid silicone polymer is coated under
> pressure upon one surface of the web, and the web is then subjected to
> localized shear forces sufficient to move the silicone polymer composition
> into interior portions of the web and to distribute the silicone polymer
> composition generally uniformly therwithin [sic] in such planar region.
> Excess silicone polymer composition is wiped away from a web surface.
> Thereafter, the resulting web is heated or irradiated to cure the silicone
> polymer. Preferably a web is preliminarily impregnated with a
> fluorochemical. Webs procured by this process are breathable, waterproof
> or highly water repellent, and flexible.

The '172 patent, filed on May 17, 1995, is entitled "Internally-Coated Porous

Webs with Controlled Positioning of Modifiers Therein." It covers "processes . . . for

treating a porous substrate (especially a fabric) to produce novel internally coated

materials." The Abstract of this patent summarizes the process as follows:

> During treatment, a curable thixotropic material and one or more
> modifying materials are applied to the porous substrate as an impregnant.

---

[2] Nextec is also the assignee of U.S. Patent No. 5,004,643 (the '643 patent), which was filed on March 10, 1989 and issued on April 2, 1991. This patent is not directly in issue in this litigation, but is relevant to the Court's analysis of the validity of the '902 patent.

2

> The treatment imparts specific properties to the end product material.
> Selection of the modifier material is based on the particular end use
> application. Sufficient energy is directed to the impregnant and porous
> substrate to cause the impregnant to flow into the porous substrate and
> force the modifier to specific positions within the substrate.

The '902 patent, filed on June 7, 1995, is entitled "Controlling the Porosity and

Permeation of a Web." The invention is summarized in the Abstract as follows:

> Products and methods for controlling the porosity and permeation of a
> web are provided using a curable thixotropic shear thinnable polymer
> composition that preferably encapsulates a plurality of fibers of the web
> and/or forms an internal layer within the web. Webs suitable for several
> different uses are featured, for example medical garments resistant to
> permeation by a virus or bacteria. The effective pore size of the web is
> controlled by regulating various factors such as the thickness of the
> polymer composition encapsulating the fibers and the thickness and
> placement of the internal polymer layer. Other factors include the
> polymer density, structure, and crosslinking orientation, as well as the
> diffusion, permeation, and sorption of the polymer.

The '841 patent, filed on November 30, 1997, is entitled "Method and Apparatus

for Controlled Placement of a Polymer Composition Into a Web." It relates to "an

apparatus for controlling the placement of a curable, shear-thinnable polymer

composition into a porous web." It is summarized in the Abstract as follows:

> The apparatus comprises means for applying tension, means for applying
> the polymer composition to one surface of the tensioned web, and means
> for shear thinning the composition and placing it into the web to
> encapsulate at least some of the structural elements of the web, leaving
> most of the interstitial spaces open. A preferred apparatus includes one or
> more process heads that has mounted thereto a rigid knife blade for
> engagement with the web. The knife blade is movable vertically and
> rotationally. The process head is movable horizontally along the path of
> the web. The invention also relates to an apparatus for selectively placing
> the polymer composition into a substantially continuous region extending
> through the web so that the polymer composition fills the interstitial
> spaces and adheres adjacent structural elements of the web in the region.
> In the areas of the web above and below the filled region, at least some of
> the structural elements are encapsulated and most of the interstitial spaces
> are open.

Three of the patents-in-suit (the '051, '172, and '902 patents) claim their earliest priority filing date in the United States Patent and Trademark Office ("USPTO") from applications filed with the USPTO on March 14, 1988, including Application Serial Number 167,630 (the "'630 application"). (Docket Entry (hereinafter "D.E.") 91 ¶ 31.) The fourth patent-in-suit (the '841 patent) claims priority to March 10, 1989. (*Id.* ¶ 46.) Three of the patents-in-suit (the '172, '902, and '841 patents) claim priority through a chain of applications that includes Application Serial No. 08/407,191, which was filed on March 17, 1995 and which issued as U.S. Patent No. 5,876,792 ( "the '792 patent") on March 2, 1999. (*See id.* ¶ 10.)

Brookwood is a competitor of Nextec in the sale of certain products that are at issue in this action. Brookwood, through its affiliates, has been using coating equipment to coat textile fabrics for over forty years. (*See* Kirby Decl. Ex. 2 (Expert Report of Thomas Colasanto) (hereinafter "Colasanto Rep.") ¶ 7.) In 2006, Brookwood was approved to supply garments to the United States military that meet the specifications of the military's extreme cold weather garment clothing system, known as "Generation III" or "Gen III." At that time, Nextec was already an approved supplier to the government under the Gen III program. The present dispute arose not long after Brookwood began supplying coated fabrics to government sub-contractors as part of the Gen III program. The Brookwood products at issue are known as the Agility Storm-Tec X-Treme and Eclipse Storm-Tec X-Treme products (collectively, the "Storm-Tec Products"). They were produced on a coating apparatus known as the "KK-1 coating apparatus" or the "KK-1 coater" at a Kenyon, Rhode Island facility operated by a Brookwood affiliate, Kenyon Industries. (*See id.*)

4

**B.    Procedural History**

Nextec filed the present lawsuit in July 2007, accusing the Storm-Tec Products of

infringing various Nextec patents.  Pursuant to a procedure established by the Court with

the input of the parties, Nextec narrowed the number of claims for purposes of expert

discovery and then for dispositive motions.  (*See* D.E. 82; D.E. 88.)  As a result, Nextec's

claims have been narrowed to ten individual patent claims ("the Asserted Claims") from

the four patents-in-suit.  The Asserted Claims are as follows: claims 20, 27, and 86 of the

'051 patent; claims 1, 47, 88, 99 and 110 of the '172 patent; claim 1 of the '902 patent;

and claims 1 and 57 of the '841 patent.[3]  (D.E. 102 ¶ 3.)

The parties then proceeded with expert discovery relating to the remaining

claims.[4]  Dr. Christine Cole submitted expert reports on behalf of Nextec, and Thomas

Colasanto, Dr. Peter Hauser, and Michael Platek submitted expert reports on behalf of

Brookwood.  On July 17, 2009, after discovery had been completed and the parties had

exchanged expert reports relating to the ten Asserted Claims, the parties filed the cross-

motions currently before the Court.  Oral argument was held on February 17, 2010.

---

[3] The language of the ten Asserted Claims is quoted in full in Appendix A, attached hereto.
[4] On June 30, 2008, Brookwood filed for partial summary judgment seeking to dismiss any infringement
claims based on its manufacture or sale of fabrics in furtherance of a contract between it and the U.S.
government pursuant to 28 U.S.C. § 1498(a).  Under this provision, "[w]henever an invention described in
and covered by a patent of the United States is used or manufactured by or for the United States without
license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by
action against the United States in the United States Court of Federal Claims for the recovery of his
reasonable and entire compensation for such use and manufacture . . . For the purposes of this section, the
use or manufacture of an invention described in and covered by a patent of the United States by a
contractor, a subcontractor, or any person, firm, or corporation for the Government and with the
authorization or consent of the Government, shall be construed as use or manufacture for the United
States."  28 U.S.C. § 1498(a).  By Order dated January 6, 2009, the Court granted that motion, except
where the record showed that certain fabrics were not delivered to and accepted by the United States
government.  (D.E. 82.)

C.    The Pending Motions

1.    Nextec's Motion for Partial Summary Judgment

Nextec moves for partial summary judgment on the question of infringement,

alleging that there is no genuine issue of material fact that the Storm-Tec Products

infringe claim 110 of the '172 patent and claim 1 of the '902 patent.  Resolution of this

motion depends in part upon the Court's construction of the terms "thixotropic" and

"shear thinning" (and "shear thinnable"), as used in these claims.  Nextec has not moved

for summary judgment of infringement with respect to the other eight Asserted Claims.

(*See generally* D.E. 99, Pl. Mem. in Supp. of Mot. for Partial Summ. Judg. that Storm-

Tec Extreme Products Infringe U.S. Patent Nos. 5,869,172 and 5,954,902 (hereinafter

"Pl. Infringement Br.").)

2.    Nextec's Motion for Partial Summary Judgment that the Asserted Claims
      are Not Anticipated Under 35 U.S.C. § 102 by the Rudman Patent, the Smith
      Patent, and/or the Historical Ken Reign Fabric

Nextec also moves for summary judgment that Brookwood cannot establish that

any of the ten Asserted Claims are invalid by anticipation under 35 U.S.C. § 102 based

on three specific items of alleged prior art: U.S. Patent No. 3,594,213 (the "Rudman

Patent"), U.S. Patent No. 3,434,854 (the "Smith Patent"), and a fabric swatch

manufactured by Brookwood in the 1980s that Nextec refers to as the historical Ken

Reign Red Fabric (the "Ken Reign Fabric").  The scope of this motion is narrow; it does

not seek a declaration that none of Nextec's patents are anticipated by *any* items of prior

art, but simply that they are not anticipated by the three specific prior art items that are

the subject of the motion.  (*See generally* D.E. 99, Pl. Mem. in Supp. of Mot. for Partial

Summ. Judg. that Asserted Claims are Not Anticipated under 35 U.S.C. § 102.)

6

3.    **Brookwood's Motion for Summary Judgment of Non-Infringement and Patent Invalidity**

Brookwood moves for summary judgment of non-infringement as to all ten Asserted Claims, or in the alternative, for summary judgment of non-infringement as to seven of the ten Asserted Claims and for a declaration that the other three Asserted Claims are invalid. (*See generally*, D.E. 90.)

As an initial matter, Brookwood argues that all ten Asserted Claims should be construed as excluding coating processes that use material concentrations of solvent in the coating composition, and that so construed, Brookwood's products do not infringe any of the claims as a matter of law. (*Id.*) Resolution of this aspect of Brookwood's motion requires the Court to construe the term "shear thinning" (and "shear thinnable"), as used in the Asserted Claims.

Alternatively, Brookwood advances various arguments that affect some, but not all, of the Asserted Claims. First, Brookwood contends that the Storm-Tec Products do not infringe the '051 and '172 patents (representing seven of the ten Asserted Claims) because they are not manufactured using processes that utilize "thixotropic" polymer compositions. Resolution of this aspect of Brookwood's motion hinges on the Court's construction of the term "thixotropic," as used in the claims of the '051 and '172 patents. Second, Brookwood argues that claims of the '841 and '902 patents (representing the other three Asserted Claims) are invalid as a matter of law. Brookwood contends that claims 1 and 57 of the '841 patent are invalid because they are anticipated by prior art— specifically, by Brookwood's own KK-1 coating apparatus. Brookwood also contends that claim 1 of the '902 patent is invalid under one of two alternative theories depending on how the claim is construed. If the claim is limited to processes utilizing polymeric

7

compositions, Brookwood contends it is invalid based on double patenting in light of the

'792 patent. If the claim is not so limited, Brookwood argues that it is invalid because it

is anticipated by the '643 patent. *(Id.)*

**4.   Brookwood's Contingent Motion for Partial Summary Judgment on Damage-Related Issues**

Finally, Brookwood argues that if the Court does not dismiss Nextec's claims

under the '841 and '902 patents on the basis of non-infringement or invalidity, then any

claim for damages based on these two patents must be dismissed as a matter of law

pursuant to 28 U.S.C. § 1498(a). *(See generally*, D.E. 97.)

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits, show that there is no genuine issue as to any material

fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). Partial summary judgment is permitted under Rule 56(d) and is governed by the

same standards as a motion for summary judgment under Rule 56(c). *See* James W.

Moore et al., Moore's Federal Practice, § 56.40[2] (3d ed. 2008). In reviewing the record

on a summary judgment motion, the district court must assess the evidence in "the light

most favorable to the non-moving party," resolve all ambiguities, and "draw all

reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725,

728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The

moving party must demonstrate that no genuine issue exists as to any material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). As to an issue on which the non-

8

moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party satisfies its burden of proof, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *see Celotex*, 477 U.S. at 322–23. In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256–57; *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial. *See Celotex*, 477 U.S. at 324; *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991).

## III.    DISCUSSION

### A.    Claim Construction

### 1.    Applicable Legal Standards

In order to resolve the issues raised by the pending motions, the Court must first determine the proper construction of selected terms that appear in the Asserted Claims. The parties have requested construction of two disputed terms: "thixotropic" and "shear

9

thinning" (and "shear thinnable"). Claim construction is a question of law that is

appropriate to resolve on summary judgment. *See George v. Honda Motor Co.*, 802 F.2d

432, 434 (Fed. Cir. 1986). The standards governing the construction of patent claims are

familiar and well established. *See generally Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.

Cir. 2005) (summarizing and restating doctrine). Because patents are addressed to

practitioners in the field of the patented invention, a court should usually construe claim

language consistent with its "ordinary and customary meaning" to a person of ordinary

skill in the relevant art as of the effective filing date of the patent application. *Id.* at

1312–13. "Such a person is deemed to read the words used in the patent documents with

an understanding of their meaning in the field, and to have knowledge of any special

meaning and usage in the field." *Id.* at 1313 (quoting *Multiform Desiccants, Inc. v.*

*Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

    To determine the "ordinary and customary meaning" of a claim term, a court

should first consult the intrinsic evidence—the claims, the specification, and the

prosecution history. *See, e.g., Primos, Inc. v. Hunter's Specialties, Inc.*

451 F.3d 841, 847–48 (Fed. Cir. 2006); *Markman v. Westview Instruments, Ltd.*, 52 F.3d

967, 979 (Fed. Cir. 1995). Prior art cited to the examiner during prosecution is

considered part of the prosecution history. *See Phillips*, 415 F.3d at 1317.

    "A fundamental rule of claim construction is that terms . . . are construed with the

meaning with which they are presented in the patent document. Thus claims must be

construed so as to be consistent with the specification . . . ." *Merck & Co., Inc. v. Teva*

*Pharms. USA, Inc.*, 347 F.3d. 1367, 1371 (Fed. Cir. 2003) ("*Merck I*") (citations

omitted). Therefore, the patent specification has been called the most important guide to

10

claim construction. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

("[T]he specification is always highly relevant to the claim construction analysis.

Usually, it is dispositive."); *Phillips*, 415 F.3d at 1315 ("[T]he best source for

understanding a technical term is the specification from which it arose, informed, as

needed, by the prosecution history.") (quoting *Multiform Desiccants*, 133 F.3d at 1478).

      The specification may show that a patentee has provided its own definitions for

claim terms or has narrowed the scope of the claims through disclaimer. *See Phillips*,

415 F.3d at 1316. In such cases, the claim is construed according to the patentee's

expressed intent even if the resulting construction departs from the ordinary meaning of

the claim language. *See, e.g., id.* ("[T]he specification may reveal a special definition

given to a claim term by the patentee that differs from the meaning it would otherwise

possess. In such cases, the inventor's lexicography governs."); *Honeywell Int'l, Inc. v.*

*Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007) ("When a patentee

defines a claim term, the patentee's definition governs, even if it is contrary to the

conventional meaning of the term."). A patentee may redefine a term either explicitly or

implicitly. *See, e.g., Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.

Cir. 2003) ("The applicant may also act as his own lexicographer and use the

specification to implicitly or explicitly supply new meanings for terms."); *Bell Atl.*

*Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir.

2001) ("[T]he specification may define claim terms 'by implication' such that the

meaning may be 'found in or ascertained by a reading of the patent documents.'")

(citation omitted). In order for the Court to depart from the ordinary meaning, the

intrinsic evidence must clearly express the patentee's intent to redefine claim terms away

from their ordinary meaning. *See Merck & Co. v. Teva Pharms. U.S.A., Inc.*, 395 F.3d 1367, 1370 (Fed. Cir. 2005) ("*Merck II*") ("the statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term") (citations omitted); *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2001) (in order to depart from the ordinary meaning of a term, the specification must exhibit an "express intent to impart a novel meaning") (citation omitted); *Reinshaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (to depart from the ordinary meaning, the patentee's must appear "with reasonable clarity, deliberateness, and precision") (citations omitted).

Though claims should be interpreted in light of the specification, it is generally inappropriate to import limitations from the specification into the claims. *See, e.g., N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001) (describing the reading of a limitation from the written description into the claims as "one of the cardinal sins of patent law"). For example, the scope of a claim is usually not limited to the particular embodiment or embodiments described in the specification. *See, e.g., Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364–65 (Fed. Cir. 2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.")

The specification may show that a patentee has narrowed the scope of the claims through disclaimer. *See Phillips*, 415 F.3d at 1316. And while it is generally inappropriate to important limitations from the specification into the claims, "[w]here the

specification makes clear that the invention does not include a particular feature, that

feature is deemed to be outside the reach of the claims of the patent, even though the

language of the claims, read without reference to the specification, might be considered

broad enough to encompass the feature in question." *SciMed*, 242 F.3d at 1341. In other

words, "[c]laims are not correctly construed to cover what was expressly disclaimed." *Id.*

at 1341-42 (citation omitted). The rationale for this rule is clear: "[t]he public notice

function of a patent and its prosecution history requires that a patentee be held to what he

declares during the prosecution of the patent." *Springs Window Fashions LP v. Novo*

*Indus. LP*, 323 F.3d 989, 995 (Fed. Cir. 2003). However, the doctrine of disclaimer will

only be applied to limit the construction of a claim if the disclaimer is "clear and

unmistakable"—in other words, it must be unambiguous—when the patent claims,

specification, prosecution history and other evidence are considered as a whole. *See, e.g.,*

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003); *Invitrogen*,

327 F.3d at 1367.

The prosecution history, also part of the intrinsic evidence, may "inform the

meaning of the claim language by demonstrating how the inventor understood the

invention and whether the inventor limited the invention in the course of prosecution,

making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at

1317. "Yet because the prosecution history represents an ongoing negotiation between

the PTO and the applicant, rather than the final product of that negotiation, it often lacks

the clarity of the specification and thus is less useful for claim construction purposes."

*Id.*

"Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics*, 90 F.3d at 1584. While a district court may consult extrinsic evidence as part of the claim construction analysis, such evidence is considered less reliable than the intrinsic evidence. *See, e.g., Phillips*, 415 F.3d at 1317-19 ("[T]he court should keep in mind the flaws inherent in each type of [extrinsic] evidence and assess that evidence accordingly.").

These guidelines are not exhaustive. As the Federal Circuit has noted, "there is no magic formula or catechism for conducting claim construction," and a court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324. "[W]hat matters is for the court to attach the appropriate weight . . . to those sources in light of the statutes and policies that inform patent law." *Id.*

## 2.    Construction of "Thixotropic"

The parties disagree on the proper construction of the term "thixotropic," as used in the Asserted Claims of the '051 and '172 patents. The Asserted Claims of the '051 patent disclose the use of a "shear thinning thixotropic polymer composition" and the Asserted Claims of the '172 patent disclose the use of "shear thinnable thixotropic polymeric material" to treat a porous web.

By way of background, the parties agree that in the field of polymer chemistry, the terms "shear thinnable" and "thixotropic" have generally accepted technical definitions (hereinafter, the "conventional chemistry definition(s)"). Under the conventional chemistry definitions, both terms refer, at the broadest level, to liquid flow

14

behavior in which the viscosity of a material is lowered by the application of energy

thereto—in this context, shear energy imparted by a blade or knife across the fabric being

treated. (*See* D.E. 105 at ¶¶ 26-30; Tr. at 10, 59.) The distinction between the two is that

a shear thinnable material will experience a reduction in viscosity in response to the

application of an *increasing* rate of shear, whereas a thixotropic material will experience

a reduction in viscosity over time in response to a *constant* or *steady* shear force.[5] (*See*

D.E. 105 at ¶¶ 26-30 (citing expert testimony and technical treatises).) The two terms are

not necessarily mutually exclusive. A material whose viscosity decreases in response to

either a constant shear force or an increasing shear force would be both thixotropic and

shear thinnable. (Tr. at 23-24.) On the other hand, a material whose viscosity decreases

in response to an increasing shear force but not in response to a constant shear force

would be shear thinnable but not thixotropic.[6]

Brookwood urges the Court to adopt the conventional chemistry definition of

thixotropic in construing the Asserted Claims of the '051 and '172 patents. It argues that

ordinarily skilled artisans would have understood that the inventor was incorporating the

---

[5] Put somewhat differently, "the basic difference between the two is that shear thinning is dependent on shear rate, whereas thixotropic behavior is independent of shear rate, but dependent on time at a fixed shear rate." (*See* D.E. 105 ¶ 29 (citing treatise relied on by Dr. Cole).)

[6] The Court opens with this discussion of the ordinary meaning of these terms in the chemistry field to provide context for the discussion that follows, including background regarding the knowledge and understanding that an ordinarily skilled artisan would have brought to the table when reviewing the intrinsic record relating to the '051 and '172 patents. *See Phillips*, 415 F.3d at 1318, 1319 (noting that extrinsic evidence may be useful "to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field" and to "help the court to determine what a person of ordinary skill in the art would understand claim terms to mean"); *id.* at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term.") In doing so, the Court is not suggesting that extrinsic evidence regarding the meaning of the disputed terms has been given greater weight than the intrinsic evidence in construing those terms. To the contrary, the Court's claim construction is based primarily on the intrinsic evidence, as it would be understood by a person knowledgeable in the field of polymer chemistry. The Court has relied on extrinsic evidence only to the extent necessary to understand the technology and the ordinary meaning of the claim terms to an ordinarily skilled artisan.

conventional definitions when he used the terms "shear thinnable" and "thixotropic" in

the Asserted Claims in light of the patent specifications themselves and the '630

application from which both the '051 and '172 patents claim priority.

Nextec, on the other hand, argues that the inventor provided a "special definition"

of the term "thixotropic" in the '172 patent that differs from the conventional chemistry

definition described above. Nextec contends that "the inventor's lexicography governs"

the construction of the term "thixotropic" in the '172 patent, thereby supplanting the

conventional chemistry definition. Nextec also argues that the alleged "special

definition" in the '172 patent should be applied retroactively to the construction of term

"thixotropic" in the claims of the related '051 patent, from which the '172 patent claims

priority, even though the '051 patent issued years before the '172 patent.[7]

Nextec's argument in support of its proposed construction is unpersuasive. First,

and most importantly, while Nextec maintains that the inventor clearly provided a

"special definition" of thixotropy that supplants its conventional chemistry definition, a

review of the intrinsic record relating to the '051 and '172 patents suggests that the

passage that Nextec maintains is a "special definition" would not have been viewed by an

ordinarily skilled artisan as such. Nextec argues that the "special definition" in the '172

patent includes a detailed statement of the results achieved by the use of a thixotropic

polymer in the claimed process. But this over-reads the language employed and conflates

a rather straightforward definition of thixotropic (in terms of viscosity and liquid flow

behavior) with the specialized results that the patented process ultimately achieves

(encapsulation of fibers, creation of an internal layer of polymer composition within the

---

[7] The '172 patent (filed on May 17, 1995 and issued on February 9, 1999), claims its priority through a
chain of applications beginning with the '630 application (filed on March 14, 1988) and including the '051
patent (filed on February 16, 19993 and issued on May 23, 1995).

porous web, etc.). Properly read, the reference to thixotropy in the '172 patent is nothing more than an introduction to the concept of thixotropy in broad terms; it would not be understood as a specialized definition that supplants the ordinary meaning of the term "thixotropic" in the field of chemistry.

Second, while Nextec has argued adamantly throughout these proceedings that the inventor's "lexicography" governs the construction of the term "thixotropic" in the patents-in-suit, Nextec conspicuously ignores the fact that the inventor described the term "thixotropy" in the '051 patent in the same broad language used in the '172 patent, but omitted the description of the results of the patented process that is also found in the '172 patent. When the '051 and '172 patents are read side by side, it seems obvious that the inventor intended to use the term "thixotropy" in both patents in its conventional sense, and that the added language in the '172 patent was not intended to create a specialized, indeed unique definition, but simply to note that the use of a thixotropic polymer (in its ordinary sense) in the patented process achieves the desired results.

As noted above, the Court's central task at the claim construction stage is to determine how a person of ordinary skill in the relevant art—here, the art of fabric coating—would construe the claims as of the effective filing date of the relevant patent application. *See Phillips* at 1312–13. In this case, the critical question the Court must answer is whether the intrinsic record relating to either the '051 patent or the '172 patent would reasonably put an ordinarily skilled artisan on notice that the inventor provided a special definition of thixotropic that supplants or excludes its ordinary meaning in the field of chemistry. *See Merck II*, 395 F.3d at 1370 (the patentee must express his or her intent to redefine a particular term with "sufficient clarity to put one reasonably skilled in

17

the art on notice that the inventor intended to redefine the claim term."). The Court

concludes, based on its review of the applicable intrinsic evidence—the claims, the

specification, and the prosecution history—that the record does not clearly reveal such an

intent to redefine the meaning of thixotropic.

     (a)    The '051 Patent

     The Asserted Claims of the '051 patent disclose substrates which have been

treated with a "curable, shear thinning thixotropic polymer composition." In seeking to

give meaning to these claims terms, the Court looks first to the specification. *See, e.g.,*

*Vitronics Corp.,* 90 F.3d at 1582. So far as the Court is aware, the specification of the

'051 patent does not define shear thinning. On the other hand, the specification does set

forth what appears to be a short-hand definition of thixotropy in a section describing the

preferred embodiments. That definition is as follows: "[t]he word 'thixotropy' refers

herein to liquid flow behavior in which the viscosity of a liquid is reduced by shear

agitation or stirring." ('051 patent, Col. 41, ll. 41-43.) This statement is not inconsistent

with the conventional chemistry definition. Indeed, it is perfectly consistent with that

definition, but is incomplete in that it lacks the concept that the reduction in viscosity is

achieved over time in response to a steady shear force. Under these circumstances, the

mere inclusion of this general statement in the specification would not, without more,

reasonably put the reader of the patent on notice that the patentee intended to deviate

from the ordinary meaning of the term "thixotropic" within the field of polymer

chemistry. *See Merck II,* 395 F.3d at 1370; *Vitronics Corp.,* 90 F.3d at 1582 ("it is

always necessary to review the specification to determine whether the inventor has used

any terms in a manner *inconsistent with* their ordinary meaning.") (emphasis added).

Moreover, if the inventor intended to create a new definition of thixotropic to refer to liquid flow behavior in which the viscosity of the liquid is reduced by any rate of shear agitation (constant or increasing), the term "shear thinning" in the Asserted Claims of the '051 patent would appear to provide no added meaning because in its broadest sense, shear thinning also refers to the reduction in viscosity of a liquid by the application of shear energy thereto. (*See* '172 patent at Col. 17, ll. 65-67; '902 patent at Col. 7, l. 66 to Col. 8, l. 1; '841 patent at Col. 17, ll. 4-6; D.E. 105 ¶¶ 28-29.) Thus, the terms "shear thinning" and "thixotropic" would be duplicative of one another in the Asserted Claims of the '051 patent. However, it is a well-established principle of claim construction that "all claim terms are presumed to have meaning in a claim." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim"). In view of the overlap between this "definition" of thixotropic and the meaning of the term "shear thinning," and in view of its lack of specificity, an ordinarily skilled artisan would more likely view the above-quoted passage in the '051 patent as a providing a general reference to the concept of thixotropy, rather than defining the term in a way that supplants its ordinary meaning.

Review of the '630 application from which the '051 patent claims priority further suggests that the reference to thixotropy in the '051 patent would not be understood by a reasonably skilled artisan as a redefinition of that term, to the exclusion of the conventional chemistry definition. The '630 application, which is identified as a parent application on the cover page of the '051 patent, is part of the intrinsic record relating to the '051 patent. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004)

19

(parent application is part of a patent's prosecution history); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001) ("The prosecution history of a related patent can be relevant if . . . it addresses a limitation in common with the patent in suit"); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999) (the prosecution history of parent application is relevant to the construction of a continuation-in-part application if both applications contain common subject matter).[8] The discussion of thixotropy in the '630 application makes clear that the alleged "definition" in the '051 patent is not really a definition at all. The first time the inventor mentioned thixotropy in the '630 application, he explained that, "[t]he word thixotropy, derived from two Greek words, means (literally 'change by touch') flow behavior in which the viscosity is reduced by agitation or stirring is called thixotropic." [sic] ('630 Application at 87:1-4.) This sentence, the reader will observe, is almost identical to the "definition" of thixotropy that was provided in the '051 patent. After introducing the concept of thixotropy in this way, the inventor went on to provide several more paragraphs of detail about thixotropy, in which the concept was more fully explained and defined. Thus, the passage in the '630 application describing the etymology of the term "thixotropy" was not a comprehensive definition, but rather an introduction of the idea of thixotropy at its most general level. The corresponding statement in the '051 patent

---

[8] Moreover, the '630 application is explicitly incorporated by reference in the '172 patent. (*See* '172 patent at Col. 1, ll. 7-18 ("This application is a continuation in part of . . .U.S. patent application Ser. No. 08/017/855 filed on Feb. 16, 2003, now U.S. patent No. 5,418,051 . . . which is a continuation-in-part of U.S. patent application Ser. Nos 167,630, 167,643, 167,797, and 167,869. . . *all of which are incorporated by reference herein in their entirety.*")) (emphasis added). Thus, not only is the '630 application part of the prosecution history of the '172 patent, but it is to be treated as if it were part of the '172 patent specification itself. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) ("When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein.")

would be understood in the same way by an ordinarily skilled artisan reading that patent in the context of the '630 application from which it claimed priority.

Moreover, in the '630 application, the inventor made a number of statements that indicated that he was using the terms "shear thinning" and "thixotropic" consistently with their conventional chemistry definitions. For example, the inventor explained that "impregnants that decrease in viscosity with *increased* shear stress (shear thinning) are described as pseudoplastic."[9] (Arroyo Decl. Ex. 18 ("'630 Application) at 85:28-86:1.) (emphasis added). This suggests that the inventor was using shear thinning as that term is conventionally understood in the field of chemistry—*i.e.*, to mean a reduction in viscosity in response to an increased shear stress. Similarly, the inventor used the term "thixotropic" consistently with its conventional chemistry definition. After describing tests that can be performed to determine whether a liquid is thixotropic or not, the inventor stated: "[i]t is always somewhat disconcerting to take a viscosity reading *under a constant shear rate* and find that the viscosity *drifts downward under this steady shear rate* condition. With time, a minimum of the test and a given rest period, the structural viscosity rebuilds, although the recovery may never be complete. *This type of flow is typical of thixotropic systems.*" (*Id.* at 87:22-88:2.) (emphasis added). Thus, the inventor employed a conventional definition of the term. In the next sentence, the inventor stated that "Rheopexy is the opposite of thixotropy in that under a *constant shear rate,* the viscosity increases . . ." (*Id.* at 88:3-4.) If an *increase* in viscosity under a constant shear rate reflects the opposite of thixotropy, it follows that thixotropy is a *decrease* in viscosity under the same conditions—*i.e.,* under a constant shear rate.

---

[9] The parties agree that the term "pseudoplastic" is synonymous with "shear thinnable." (D.E. 105 ¶ 36.)

That the inventor was using the terms "shear thinning" and "thixotropic" as they are conventionally understood in the '630 application is confirmed by a chart provided in that application summarizing various types of "non-Newtonian behavior" (*i.e.*, changes in viscosity in response to shear stress).[10]  The chart depicted the following:

| Imposed Condition | Decrease [in viscosity] | Increase [in viscosity] |
|---|---|---|
| Increased shear rate | Pseudoplastic (shear thinning) | Dilitant (shear thickening) |
| Increased shearing time | Thixotropic | Rheopatic |

It is obvious from this chart that where a liquid is exposed to an increased shear rate and experiences a decrease in viscosity, the inventor considered that to be "shear thinning." And while not explicit, it is equally clear that the reference in the chart to the imposed condition of "increased shearing time" assumes a constant shear rate, given the inventor's previous definition of "rheopexy" as an increase in viscosity in response to a constant shear rate and his placement of "rheopatic" in this chart.  It follows that thixotropy refers in this chart to a decrease in viscosity over time at a constant shear rate.

In light of the foregoing textual analysis, the Court does not believe that a reader of the '051 patent would interpret the inventor's reference to thixotropy as "liquid flow behavior in which the viscosity of a liquid is reduced by shear agitation or stirring" as a redefinition of the term "thixotropy."  Because the inventor did not clearly supplant or exclude the conventional chemistry definition of thixotropy in the '051 patent, the Court construes the term consistently with its ordinary and customary meaning within the relevant field. *See Merck II*, 395 F.3d at 1370.  Accordingly, the Court construes the

---

[10] A liquid whose viscosity changes in response to shear forces is known as a "non-Newtonian" liquid.  In contrast, a liquid whose viscosity remains constant even under a broad range of shear force at any given temperature is said to be "Newtonian" in nature. (*See* Arroyo Decl. Ex. 18 at 85.)

term "thixotropic" in the '051 patent to mean: "having liquid flow behavior in which the

viscosity of a liquid decreases over time in response to the application of a constant or

steady shear force."

      (b)    **The '172 Patent**

The Court also concludes that the inventor did not redefine the term "thixotropic"

with sufficient clarify in the '172 patent to warrant departing from the conventional

chemistry definition in construing the Asserted Claims of that patent. The Court's

reasoning is similar to that employed in interpreting the identical term in the '051 patent,

though there are certain differences between the two patents that warrant further

discussion.

The Asserted Claims of the '172 patent disclose articles that have been treated

with "a curable, shear thinnable, thixotropic polymeric material" and a method of

applying a combination of treating materials, including "a curable, shear thinnable,

thixotropic material," to a porous web. The '172 patent contains a short-hand definition

of thixotropy that incorporates *in haec verba* the language used in the '051 patent but,

notably, adds a statement of the results of the patented process which, of course, uses a

thixotropic material. The relevant passage states:

> The word "thixotropy" refers herein to liquid flow behavior in which the
> viscosity of a liquid is reduced by shear agitation or stirring so as to allow
> the placement of the liquid flow to form: (a) a thin film of polymer
> composition encapsulating the structural elements (i.e., the fibers or
> filaments) making up the web leaving at least some of the interstitial
> spaces open; (b) an internal layer of a polymer composition between the
> upper and lower surfaces or the web; or (c) some combination of the
> foregoing.

('172 Patent at Col. 18, ll. 28-36.)

23

Nextec argues that the inventor clearly set forth a "special definition" of thixotropic in this passage that supplants the conventional chemistry definition. The Court disagrees. The description of thixotropy provided in this passage is not actually inconsistent with the conventional chemistry definition. As with the term's use in the '051 patent, the inventor begins with an introduction to the concept of thixotropy at its most general level. The further explication of the *results* of the patented process is just that; it would be a most unusual reading of this passage to interpret it as a special definition of thixotropy itself.[11]

Other intrinsic evidence supports a conclusion that the above-quoted passage was not intended to be a radical redefinition of the term "thixotropic," to the exclusion of its ordinary meaning. The '172 patent specification explicitly incorporated the '630 application and the '051 patent by reference, such that those documents are effectively part of the '172 patent specification. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001); *see also* note 8, *supra*. As discussed extensively above, the '630 application clearly used thixotropic in its conventional chemistry sense. By incorporating the '630 application by reference into the '172 patent specification, the inventor thus incorporated the usage of thixotropic reflected in that application. *See id.* Moreover, the Court has concluded that ordinarily skilled artisans would construe thixotropic in the '051 patent according to its conventional definition as well, as the inventor failed to clearly supplant that definition. Because claim terms appearing in related patents should generally be construed consistently across related patents, the term "thixotropic" should be similarly construed in the '172 patent. *See NTP, Inc. v. Research*

---

[11] Moreover, plaintiff's own expert testified that the fact that a polymer achieves the results described in this passage does not necessarily mean that it is not thixotropic in its conventional sense. (*See* Cole Depo. at 568:10-12.)

*in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive

from the same parent application and share many common terms, we must interpret the

claims consistently across all asserted patents.").

Finally, while Nextec's proposed "special definition" of thixotropic in the '172

patent would not necessarily render that term redundant in relation to the term "shear

thinnable" in the Asserted Claims, it would likely render other elements of claim 47 of

the '172 patent superfluous, in violation of the well-established principle that claims

should be construed so as to give effect to all limitations therein. *See Bicon, Inc.*, 441

F.3d at 950; *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307

(Fed. Cir. 2000). Claim 47 of the '172 patent discloses:

> A porous article comprising:
> a porous web having a plurality of web members with interstices
> therebetween;
> an at least partially cured material derived from a curable, shear thinnable,
> thixotropic polymeric materials which forms:
> > *a thin film substantially encapsulating* at least some of the web
> > members leaving at least some of the interstices open, or
> > *a substantially continuous internal layer*; and
> one or more modifiers, wherein said modifer(s) is selectively positioned
> within the web.

('172 patent at Col. 72, ll. 25-36) (emphasis added). Thus, the claimed *results* of using a

"shear thinnable, thixotropic polymeric material" (*i.e.* "a thin film substantially

encapsulating. . . at least some of the members" or an "internal layer") are listed as an

additional elements of claim 47. If those results were actually part of the operative

definition of the term "thixotropic," these additional elements of claim 47 would be

redundant because the requirement to obtain those results would be subsumed within the

meaning of thixotropic.

25

For these reasons, the Court believes that an ordinarily skilled artisan reviewing the

purported "special definition" relied on by Nextec in the context of the claims asserted in

the '172 patent specification and the prior related filings would not view it as a

redefinition of the term "thixotropic" that supplants its ordinary meaning within the field

of chemistry. This passage simply introduces the concept of thixotropy in its broadest

sense, and then describes the results obtained in the patented process by the application of

shear energy to a polymer that is thixotropic in its conventional sense. Consequently, the

Court construes the term "thixotropic" in the Asserted Claims of the '172 patent, as it did

in the Asserted Claims of the '051 patent, to mean: "having liquid flow behavior in which

the viscosity of a liquid decreases over time in response to the application of a constant or

steady shear force."

3.    Construction of "Shear Thinning" and "Shear Thinnable"

The parties also disagree over the proper construction of the terms "shear

thinning" and "shear thinnable," at least one of which appears in each of the ten Asserted

Claims. The specifications of three of the patents-in-suit state that, "[t]he term 'shear

thinning,' in its broadest sense, means the lowering of the viscosity of a material by the

application of energy thereto."[12] ('172 patent at Col. 17, ll. 65-67; '902 patent at Col. 7,

l. 66 to Col. 8, l. 2; '841 patent at Col. 17, ll. 4-6.) Nextec argues that shear thinning

should be construed in accordance with that statement, and that consequently, the term

"shear thinnable" would mean, in its broadest sense, "capable of having its viscosity

lowered by the application of energy thereto."

---

[12] According to counsel, the "energy" being referred to in this definition is the result of the forces of the
blade in the coating apparatus as it intersects and pushes down on the fabric. (See Tr. at 10, 59.)

Brookwood contends, however, that the patentee specifically disclaimed the use

of solvents (or, at minimum, the use of material concentrations of solvents) in the

specifications and during the prosecution history of the patents-in-suit, such that the

claim terms "shear thinning" and "shear thinnable" must be read as containing an

additional limitation that excludes from the scope of the patents-in-suit any coating

formulations or processes in which solvents (or at minimum, material concentrations of

solvents) are used in the coating composition.[13] The Court must thus decide whether the

claim terms "shear thinning" and "shear thinnable" contain such a limitation on solvent

use.

As noted above, claim construction begins with the claims themselves, the written

description in the specification, and the prosecution history. *See Primos, Inc.*, 451 F.3d at

847-48. While "[c]laims are not correctly construed to cover what was expressly

disclaimed," *SciMed*, 242 F.3d at 1341-42, the doctrine of disclaimer will only be applied

to limit the construction of a claim if the disclaimer is "clear and unmistakable." *See,*

*e.g., Omega Eng'g*, 224 F.3d at 1326. The question, therefore, is whether any such

disclaimer of solvent use occurred here when the evidence is viewed as a whole.

The Court looks first to the language of the Asserted Claims. The word

"solvents" does not appear in any of the ten Asserted Claims, and there is nothing in the

language of the Asserted Claims themselves that can be construed as an explicit or

implicit disclaimer of the use of solvents. This weighs against a finding of disclaimer.

Moreover, at least one of the ten Asserted Claims (claim 88 of the '172 patent) contains a

---

[13] It is not entirely clear whether Brookwood is arguing that Nextec disclaimed *any* use of solvents or that
Nextec disclaimed only the use of material concentrations of solvents. At times, Brookwood appears to
argue the former; at other times, Brookwood appears to argue the latter. This Court interprets
Brookwood's papers as raising both arguments in the alternative.

reference that could be understood as a reference to solvent use. Claim 88 of the '172

patent discloses: "[t]he article of claim 47, wherein said curable, thixotropic material

containing one or modifiers therein comprises *a diluent*." ('172 patent, Col. 74, ll. 47-49)

(emphasis added). As the parties appear to agree that the word "diluent" can be

understood in this context as a reference to solvents, the reference in claim 88 to diluents

provides a good indication that a person of ordinary skill in the art would have

understood that the inventor was not expressly disclaiming the use of solvents in its

inventions (and certainly not in that particular claim).[14]

Patent claims must also be read in light of other intrinsic evidence, beginning with

the specification. *See Markman*, 52 F.3d at 979-80; *Phillips*, 415 F.3d at 1315–16. In the

specifications of the '172, '902, and '841 patents, shear thinning is defined as follows:

"[t]he term 'shear thinning,' in its broadest sense, means the lowering of the viscosity of

a material by the application of energy thereto." ('172 patent at Col. 17, ll. 65-67; '902

patent at Col. 7, l. 66 to Col. 8, l. 2; '841 patent at Col. 17, ll. 4-6.) Nothing in this

statement expressly disclaims the use of solvents, or even alludes to a requirement that

the polymers used in the coating composition be solvent free. However, Brookwood

alleges that Nextec disclaimed solvent use elsewhere in the specification (and during the

relevant prosecution history). Specifically, Brookwood contends that the background

sections of the specifications of the patents-in-suit distinguished certain prior art coating

techniques based on the fact that those techniques use solvents to aid in the incorporation

of the coating composition in the web, whereas Nextec's processes do not use solvents.

---

[14] Nextec uses the terms "diluent," "solvent" and "viscosity reducing agent" interchangeably throughout its briefs. Brookwood's briefs do not challenge Nextec's assertion that when the patent specifications refer to "diluents," that could be construed as a reference to solvents (even if that is not the sole possible construction).

For example, Brookwood points to the following excerpt from the '841, '172 and '902

patent specifications:

> *Prior art treatment of webs that force a composition into the spaces of the*
> *web while maintaining some breathability have relied on using low*
> *viscosity compositions or solvents to aid in the flow of the composition.*
> U.S. Pat. No. 3,594,213 [Rudman] describes a process for impregnating or
> coating fabrics with liquefied compositions to create a breathable fabric.
> *This patent imparts no energy into the composition to liquefy it while*
> *forcing it into the spaces of the web.* The composition is substantially
> liquefied before placement onto and into the web.  U.S. Pat. No. 4,588,614
> teaches a method for incorporating an active agent into a porous substrate.
> *This patent utilizes a solvent to aid in the incorporation of the active agent*
> *into the web.*

('841 patent, Col. 3, ll. 11-22; '172 patent, Col. 3, ll. 26-37; '902 patent, Col. 2, ll. 40-52)

(emphasis added).

The Court does not agree that this passage is the type of clear and unambiguous

disclaimer of solvent use that would support a conclusion that such a limitation should be

read into the definition of shear thinning.  At no point in this passage does the patentee

expressly state that its processes do not use solvents, diluents or viscosity reducing

agents.  Nor does Brookwood point to any passage in the specification where an explicit

disclaimer of this type occurred.  In fact, the specifications of two of the patents-in-suit

state clearly that additives, including diluents (*i.e.* solvents), may be added to the coating

composition for various purposes, including to control its rheology and viscosity,

undermining any suggestion that an ordinarily skilled artisan would view this passage as

a general disclaimer of all solvent use.  *See* '172 patent at Col. 47, ll. 17-21 ("When a

diluent is incorporated into the polymer composition, the additives and/or modifiers may

be moved by controlling the volatization of the diluent . . . Appropriate diluents include

water and low molecular weight silicones *and solvents . . .*") (emphasis added); '051

patent at Col. 24, l. 66 to Col. 25, l. 1 ("In such compositions useful in the present

invention, a control of compositional rheology, and particularly of complex viscosity, is

accomplishable, if desired, by the selective addition of diluents and additives."); *id.* at

Col. 61, ll. 56-59 (asserted claim covering "the method according to claim 47 that

between the saturating and the pressuring further comprises adding diluents as required to

the impregnant to decrease viscosity. . ."). Such references to the addition of diluents to

the coating composition would make little sense if the inventor had generally disclaimed

solvent use in the above-quoted passage or elsewhere. Thus, reading in a limitation on

solvent use into the terms "shear thinning" and "shear thinnable" seems untenable. *See*

*Bicon, Inc.*, 441 F.3d at 950 ("claims are interpreted with an eye toward giving effect to

all terms in the claim").

The Court also looks to the prosecution history of the patents-in-suit and related

patents in order to determine whether the inventor disclaimed the use of solvents (or

material concentrations of solvents) when seeking to obtain these patents. *See Advanced*

*Cardiovascular*, 265 F.3d at 1305. Brookwood argues that during the prosecution history

of the patents-in-suit and related patents—particularly during the prosecution history of

the '792 patent, on which the '172, '841 and '902 patents rely for priority—the inventor

distinguished certain prior art techniques from its invention on the basis that those

techniques relied on solvents, whereas Nextec's processes do not. Nextec disagrees,

arguing that when the prosecution history is viewed as a whole, no unambiguous

disclaimer of solvent use occurred.

The Court finds that the prosecution history is, at best, ambiguous with respect to

whether Nextec represented that it did not use solvents in its processes. There are

30

certainly statements made in the prosecution history of the '792 patent that, read in

isolation, might lead a reader of the patent to believe that the invention did not cover

processes in which solvents are used. For example, the inventor stated to the USPTO:

> In addition to the above, Lauchenauer (4,588,615) utilizes solvents to aid
> in the penetration of the gel into the porous substrate . . . The solvent plays
> a critical role in the amount of penetration of the gel (see abstract). Once
> the solvent is evaporated, the degree of penetration is halted. *Applicant
> does not utilize solvents* and shear thins viscous materials in the order of
> hundreds of thousands ($10^5$) to millions ($10^6$) of centipoise. . .

> . . . Baer and Lauchenauer rely on plasticizers, wetting agents, liquids, or
> solvent based solutions to help penetrate the material into the web and
> achieve complete saturation or impregnation, without any control over the
> placement of said materials. *Applicant's invention does not rely on
> viscosity reducing agents.* It is not obvious to one of ordinary skill in the
> art that Lauchenauer's method of penetrating a solvent based gel into a
> web, combined with Baer's radio frequency would allow one to control
> the degree of encapsulation and polymer placement of a highly viscous
> material into a web through the use of shear thinning.

(D.E. 92, Ex. 12 (May 6, 1997 Response to Office Action in Serial No. 08/407,191 ('792

patent)), at 14, 15) (emphasis added). Nextec maintains, however, that when this

explanation is read as a whole, it is clear that the distinction being drawn by the inventor

was not that the prior art used solvents and the patented invention did not, but simply that

the prior art *relied* on solvents *for the purpose of controlling or aiding in the flow of the

composition and/or in the incorporation of the active agent into the web*, whereas this

invention relied on shear thinning for those purposes. Yet the language used to draw that

distinction in the above-quoted passage lacked such precision. Read in isolation, the

unqualified statement that "applicant does not utilize solvents" could lead a person of

ordinary skill in the art of fabric coating to understand that the inventor had disclaimed

any use of solvents in the '792 patent (and subsequent applications claiming priority

therefrom).

31

However, claim construction does not turn on interpretation of isolated excerpts from a patent's prosecution history, as an ordinarily skilled artisan would look to the entire prosecution history, as well as the claim language and the specification in attempting to discern the scope of a claim. *See Phillips*, 415 F.3d at 1313-17. And other aspects of the prosecution history of the '792 patent undermine the notion that the inventor disclaimed solvent use. *See Inverness v. Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (refusing to find prosecution history disclaimer where the prosecution history was ambiguous). As Nextec pointed out, during the prosecution history of the '792 patent, the patent examiner added three dependent claims covering "a method of controlled placement of a curable, shear-thinnable polymer composition into a porous web as set forth in claim [X], *whereby the polymer composition is essentially free of solvent*." (Kirby Decl. Ex. 17) (emphasis added). Under the doctrine of claim differentiation, there is a presumption that different claims are different in scope. *See Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005). The presumption is at its strongest where, as here, the limitation sought to be read into an independent patent claim already appears as a dependent claim. *Id.* Thus, the addition of dependent claims during the prosecution history of the '792 patent containing an additional limitation that the polymer composition be essentially free of solvent gives rise to a presumption that the independent claims in that patent contained no such limitation on solvent use. *Phillips*, 415 F.3d at 1315 ("[t]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.") To hold that the terms "shear thinning" and "shear thinnable" contain an implicit limitation on solvent use would

32

render the dependent claims of the '792 patent redundant, a result that is to be avoided under well-established claim construction principles. *See Phillips*, 415 F.3d at 1315; *Seachange*, 413 F.3d at 1368-69.

Properly understood, the Court believes that the above-quoted passages from the specifications and prosecution history of the patents-in-suit and related patents can be understood as drawing a more subtle distinction between prior art processes and the patented processes than Brookwood would have this Court adopt. That distinction is as follows: whereas prior art processes for treating fabrics with coating materials relied on solvents to lower the viscosity of the coating composition sufficiently to enable the composition to flow and/or be incorporated into the web of the fabric (without imparting any energy into the composition to temporarily lower its viscosity), what animates the patented processes and renders them unique in relation to the prior art is that they apply energy to the coating composition (which may or may not include solvents) after it is placed on the surface of the fabric to temporarily lower its viscosity, thereby aiding the incorporation of the composition into the web and enabling the manufacturer to control the flow of the composition into the web of the fabric. In other words, what animates the patented process is not how much (if any) solvent is in the coating composition to begin with, or what that composition's viscosity is at the moment that it is first placed on the surface of the fabric; rather, the animating element is that energy is applied to the coating composition to temporarily reduce its viscosity, thereby enabling the composition to flow into the web in a different and more controlled fashion than was taught in the prior art processes.

In conclusion, the Court finds that the intrinsic evidence relating to the construction of the terms "shear thinning" and "shear thinning" does not support a conclusion that the inventor clearly disclaimed the use of solvents in the patents-in-suit. The remaining question, then, is how the terms "shear thinning" and "shear thinnable" should be construed. Three of the patents-in-suit state that, "[t]he term 'shear thinning,' in its broadest sense, means the lowering of the viscosity of a material by the application of energy thereto." Nextec asks the Court to treat this passage as a definition of shear thinning and to construe the claims accordingly. The Court, however, finds this description of shear thinning, like the description of thixotropic in the '051 and '172 patents, to be a general statement of concept, not a special definition that supplants the ordinary meaning of the term within the relevant filed. Treating the general description of shear thinning as such would render the term meaningless in relation to the term "thixotropic" in the seven Asserted Claims that require the use of a polymer that is both shear thinnable (or shear thinning) and thixotropic.[15] It is only by applying the ordinary definitions of those terms that both terms can be given effect in the Asserted Claims. *See Elekta*, 214 F.3d at 1307 (claims should be construed so as to give effect to all limitations therein). Consequently, the Court construes the term "shear thinning" to mean: "the lowering of the viscosity of a material by the application of an increasing rate of shear." The Court construes the term "shear thinnable" to mean: "having liquid flow behavior in

---

[15] The Court notes, for the record, that the claims of the '172 patent were originally presented to the USPTO as referring only to a "thixotropic material," but were amended in response to a rejection by the patent examiner to refer to a "shear thinnable, thixotropic material." In the remarks accompanying the amendment of the claims, counsel represented that, "[applicant] has amended independent Claims 1, 47, and 102 to specify that the curable thixotropic material *is also shear thinnable*." (*See* Arroyo Decl. Ex. 19 (Amendment Under 37 C.F.R. § 1.1115) at 4 (emphasis added).) This prosecution history suggests that the inventor intended the terms "shear thinnable" and "thixotropic" to have independent meaning.

which the viscosity of a liquid decreases in response to the application of an increasing

rate of shear."

## B.   Infringement

Having construed the disputed terms in the Asserted Claims, the Court must now

decide two pending motions relating to infringement: (1) Brookwood's motion for

summary judgment of non-infringement as to all ten (or, alternatively, seven) Asserted

Claims, and (2) Nextec's motion for partial summary judgment that the Storm-Tec

Products infringe claim 110 of the '172 patent and claim 1 of the '902 patents. On

summary judgment, the Court must determine whether or not, drawing all justifiable

inferences in favor of the non-moving party, the evidence could enable a reasonable jury

to return a verdict for the non-movant. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365,

1373 (Fed. Cir. 2006). Whereas claim construction is a question of law, the

determination whether infringement has occurred is a question of fact, with the burden of

proof on the patentee to show infringement. *See Baxter Healthcare Corp. v. SpectraMed,

Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995); *Under Sea Indus., Inc. v. Dacor Corp.*, 833

F.2d 1551, 1557 (Fed. Cir. 1987). Infringement occurs when a properly construed claim

"reads on" the accused product. *Baxter*, 49 F.3d. at 1582. Literal infringement—the type

of infringement at issue here—requires that each and every limitation in the claim read on

(*i.e.*, be found present in) the accused device or process. *Id.*

Brookwood has moved for summary judgment of non-infringement as to all ten

Asserted Claims, arguing that its products do not infringe any of the Asserted Claims

because they do not exhibit shear thinning, if that term is construed, as Brookwood urges,

so as to exclude from its scope any processes in which solvents are used in the coating

35

composition. Brookwood argues that since the Storm-Tec Products are made using a

process that uses solvents to aid in the flow of the composition, they do not exhibit shear

thinning. The Court, however, has declined to read a limitation into the claim term

"shear thinning" (or "shear thinnable") that would exclude its application to processes in

which solvents are used. Rather, the Court has construed shear thinning to mean the

lowering of viscosity by the application of an increasing rate of shear—a notion that

would appear to cover processes in which the viscosity of a coating composition, whether

or not it includes solvents, is lowered at least in part by shear forces. Therefore,

Brookwood is not entitled to summary judgment of non-infringement merely because it

uses solvents as part of the coating composition when making the Storm-Tec Products if

the evidence also establishes that Brookwood shear thins the coating composition. It

follows that Brookwood's motion for summary judgment of non-infringement must be

denied as to the three Asserted Claims of the '841 and '902 patents, those motions being

premised entirely on a claim construction of the term "shear thinning" that this Court has

rejected.

     In the alternative, Brookwood has moved for summary judgment of non-

infringement as to the seven Asserted Claims that contain the term "thixotropic" on the

ground that the Storm-Tec Products were not made using compositions that are

thixotropic if that term is construed, as Brookwood argues, consistently with its

conventional chemistry definition. Brookwood points out that Nextec has not introduced

any evidence demonstrating that the polymer compositions it used are thixotropic in the

conventional sense. Dr. Cole's entire opinion that the Storm-Tec Products infringe the

Asserted Claims of the '051 and '172 patents appears to have been premised on an

assumption that the Court would adopt Nextec's proposed special definition of

thixotropic. Dr. Cole offered no alternate opinion that Brookwood's products would be

infringing if the term "thixotropic" was construed in its conventional sense because she

did not perform any tests to determine whether any of the polymer compositions used

were thixotropic in the conventional sense.[16]   (*See* D.E. 105 ¶ 43.)   Because the Court

agrees that the claim term "thixotropic" includes a requirement that the material exhibit a

reduction in viscosity over time in response to a constant shear force, and because Nextec

has not offered any evidence from which a jury could conclude that the coating

composition used by Brookwood is thixotropic under the Court's construction of that

term, Brookwood's motion for summary judgment of non-infringement of the seven

Asserted Claims of the '051 and '172 patents is granted.[17]

The Court now turns to Nextec's motion for summary judgment that the Storm-

Tec Products infringe claim 110 of the '172 patent and claim 1 of the '902 patent.  That

motion is denied as to claim 110 of the '172 patent, as Nextec failed to establish that the

accused processes utilize a polymer that is thixotropic, as the Court has construed that

term.  With respect to claim 1 of the '902 patent, Nextec bears the burden of showing, by

a preponderance of the evidence, that each limitation of the claim is found in the Storm-

Tec Products.  *See Baxter*, 49 F.3d at 1582; *Under Sea*, 833 F.2d at 1557.  To meet its

burden, Nextec relies primarily on the testimony of its expert, Dr. Cole, who opined that

---

[16] Moreover, tests performed on Brookwood's polymer composition indicate that it was not thixotropic in the conventional sense since the composition did not evidence any material decrease in viscosity over time in response to a constant shear force—a fact that Nextec does not appear to dispute. (*See* D.E. 105 ¶ 44.)

[17] The Court notes, for the record, that Nextec opposed Brookwood's motion for summary judgment of non-infringement of the seven Asserted Claims of the '051 and '172 patents solely by arguing for the application of a special definition of thixotropic.  Nextec's briefs did not offer any argument that the Storm-Tec Products would be infringing if the Court rejected its proposed claim construction and adopted the conventional chemistry definition.  Having placed all its eggs in the claim construction basket, and having lost on that issue as to the seven Asserted Claims of the '051 and '172 patents, Nextec is left with no basis upon which to proceed with an infringement action against these seven Asserted Claims.

the Storm-Tec Products satisfied each element of this claim. (*See* Kirby Decl. Ex. 2

(Cole Rep., App. C) at 10, 18.) Dr. Cole reached this conclusion by, among other things,

examining cross-sectional photomicrographs of fabric samples of the Storm-Tec Products

to observe their structure and the positioning of the coating therein; taking a tour of the

Kenyon Industries plant at which these fabrics were made to observe the method of

manufacturing; and examining the specifications and properties of the polymer formula

and modifier used in the coating process. (*See id.* at 1,2, 9-10, 18, 29-30; Kirby Decl. Ex.

4 (Cole Rep. App. D) at 9-10, 18-19, 30-31.)

> Claim 1 of the '902 patent discloses the following:
>
> A method of controlling the effective pore size of a web, wherein said web
> has a three dimensional structure comprising structural elements with
> interstitial spaces therebetween and a top surface opposed from a bottom
> surface, comprising the steps of:
> tensioning the web;
> applying a curable, shear thinnable material to said web; and
> subjecting said shear thinnable material to sufficient shear thinning energy
> to cause the shear thinnable material to flow into the web, selectively
> position within the web and form a thin film substantially encapsulating at
> least some of the structural elements of said web, wherein most of the
> interstitial spaces between structural elements of said web remain open.

Nextec contends, relying on Dr. Cole's report and testimony, that the method by which

the Storm-Tec Products are made follows the same steps as recited in this claim and

thereby reads on each element of the claim. (D.E. 99, Pl. Infringement Br. at 14-15; Cole

Rep., App. C at 9-10.) Nextec argues that the Storm-Tec products are fabrics (*i.e.*

"webs") that have a top surface opposite to ("opposed from") a bottom surface and

include fibers (*i.e.* "structural elements") forming a three-dimensional structure with

pores (*i.e.* "interstitial spaces" between the fibers)—a structure which can allegedly be

observed in scanning electron miscroscopy photomicrographs ("SEMs") attached to both

38

parties' expert reports. (Cole Rep. App. C at 9.) Dr. Cole observed during her tour of

the Kenyon plant that these fabrics are subjected to tension (*i.e.* "tensioning the web"),

then treated with a polymer known as the formula M-1074-B polymer. (*Id.* at 10.) Dr.

Cole observed that the polymer is then subjected to energy by the knife of the KK-1

coater and opined that such energy was "shear thinning energy." (*Id.*) According to Dr.

Cole's review of SEMs of the end product of this process, the shear forces result in a

reduction in viscosity of the polymer, which causes it to flow into the fabric and be

positioned within the fabric so as to substantially surround (*i.e.* "encapsulate") fibers in

the region bordering the application surface of the fabric (*i.e.* "selective positioning") but

leaving most of the spaces between the fibers open. (*Id.*) Dr. Cole opined that the

polymer used is a "curable, shear thinnable material" because its initial viscosity was too

high for it to flow into the fabric to the extent exhibited in the SEMs, such that it can be

inferred from the fact that it did flow into the fabrics to the degree exhibited that its

viscosity was reduced by the shear thinning energy of the KK-1 coater's knife blade. (*Id.*

at 1, 2, 10.) Dr. Cole further observed that after application of the polymer, the fabric is

transferred to an oven where it is cured. (*Id.* at 10.) This method allegedly results in

control of the pore size of the fabric. (*Id.*)

Brookwood argues that Nextec's motion is not supported by sufficient evidence to

support the granting of summary judgment, as it depends entirely on conclusory

statements by Dr. Cole that themselves raise disputed issues of material fact. Brookwood

argues without citation that "in order to sustain a claim for alleged patent infringement,

Nextec must demonstrate a materially significant step or result in the accused process and

products that could be differentiated from the corresponding prior art techniques," and

contends that Nextec's evidence fails to satisfy that requirement. (D.E. 101 at 16-17.)
Nextec counters that whether Brookwood's processes and products exhibit similarities to
the prior art is not directly relevant to the literal infringement analysis since "there is no
'practicing the prior art' defense to literal infringement." (D.E. 109 at 8 (citing *Tate
Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed.
Cir. 2002).) The relevant inquiry, Nextec maintains, is whether each element of claim 1
of the '902 patent is found in Brookwood's processes.

The Court turns first to the parties' disagreement over whether "practicing the
prior art" is a valid defense to a claim of patent infringement. It is clear under Federal
Circuit precedent that if a patentee shows by a preponderance of the evidence that every
limitation in a patent claim is found in the accused product, thereby making out a *prima
facie* claim of literal infringement, a finding of infringement cannot be defeated simply
by alleging that one "practices the prior art" and proving that by a preponderance of the
evidence. *See Tate Access*, 279 F.3d at 1365-66; *Baxter*, 49 F.3d at 1582-83. However,
it is axiomatic that a party cannot be liable for infringement if the patent claim in question
is invalid. *See, e.g., Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065,
1069-70 (Fed. Cir. 1997). Invalidity is an affirmative defense to infringement. *Titan Tire
Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). A party seeking
to establish that a patent claim is invalid must overcome the presumption that patents are
valid by clear and convincing evidence. *See id.* at 1376; *Abbott Labs. v. Baxter Pharm.
Prods., Inc.*, 471 F.3d 1363, 1367 (Fed Cir. 2006) (patent claims are presumed valid
under 35 U.S.C. § 282). One way to show that a patent claim is invalid is by showing
that the claim in question was anticipated by prior art. *See, e.g., Zenith Elec. Corp. v.*

40

*PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008). To do so, the party

challenging the validity of the claim must prove that "each element of the claim at issue,

properly construed, is found in a *single* prior art reference." *See id.* at 1363 (emphasis

added). If the accused infringer can make such a showing, it will have established

invalidity, thereby precluding liability for infringement.

As this discussion suggests, to the extent that Brookwood is arguing it cannot be

found to have infringed claim 1 of the '902 patent because it is "practicing the prior art,"

such an argument, without more, is insufficient. *See Tate Access*, 279 F.3d at 1367;

*Baxter*, 49 F.3d at 1583. Since Nextec has introduced evidence tending to show that each

and every limitation in claim 1 of the '902 patent is found in the Storm-Tec Products,

Brookwood can only avoid summary judgment for infringement by (a) pointing to

evidence that raises a triable issue of material fact as to whether each element of that

claim is, in fact, found in the Storm-Tem Products, or (b) establishing by clear and

convincing evidence that claim 1 of the '902 patent is invalid (for instance, because it is

anticipated by a single item of prior art).[18]

While Brookwood's papers are not as clear as they could be, it appears that

Brookwood is not simply arguing, as Nextec contends, that "practicing the prior art" is a

formal defense to an infringement claim. Brookwood is also arguing that Nextec has not

established a prima facie case of infringement because there is a disputed issue of fact

regarding whether Brookwood employed every limitation in claim 1 of the '902 patent,

---

[18] Thus, as a formal matter, Brookwood is incorrect when it states that to make out an *infringement* claim,
Nextec needs to "demonstrate a materially significant step or result in the accused process and products that
could be differentiated from the corresponding prior art techniques." To make out an infringement claim,
Nextec need only demonstrate that every limitation in its patent claims are found in the accused product.
Whether Nextec's patent claims differ sufficiently from the prior art to warrant patent protection goes to
their *validity*, not to the question of infringement (though of course a finding of invalidity will negate
liability for infringement).

including the element of shear thinning, as opposed to employing prior art practices which can allegedly achieve similar results without exhibiting shear thinning. (*See* D.E. 101 at 18.) Framed in this way, Brookwood's argument is legally viable. Brookwood is simply attempting, by referring to prior art practices, to raise a question of fact as to whether plaintiffs have met their burden of proving that the Storm-Tec Products were made through shear thinning.

Nextec's evidence of infringement, the reader will recall, consisted primarily of testimony and reports by Dr. Cole in which she opined that infringement had occurred. Brookwood disputes the sufficiency of that evidence. Brookwood does not offer any affirmative evidence that its products do *not* infringe; instead, Brookwood attempts to raise a triable issue of fact on infringement by pointing to alleged flaws and inconsistencies in Dr. Cole's testimony. Most significantly, Brookwood contends that Dr. Cole did not do sufficient work to determine whether Brookwood in fact shear thinned the coating composition into its fabrics, or merely "pressured" or "urged" it into the fabrics using prior art techniques such as those taught by the Rudman Patent. Brookwood suggests that Dr. Cole could not reliably opine that Brookwood's processes utilized shear thinning because she did not perform any tests on the various coating compositions used to make the accused products, or conduct any experiments utilizing materials known to have been shear thinned to compare them to materials in which the polymer was pressured (but not shear thinned) into the fabric. Brookwood also points to testimony by Dr. Cole that it was not possible to determine whether a polymer has been pressured or shear thinned into the fabric simply by examining the finished fabric itself or SEMs thereof. (*See* Cole Depo. at 239:15-240:17; 279:10-280:2.) Based on these pieces

42

of evidence, Brookwood contends that there is at least a triable issue as to whether the accused products employed shear thinning or the non-infringing technique of pressuring the coating compositions into the fabric.

Nextec responds that one can, in fact, tell whether shear thinning occurred from the evidence, and that to the extent Brookwood suggests otherwise, they have taken Dr. Cole's testimony out of context. Nextec points out that Dr. Cole did not testify that there is no way to tell whether a product was made by shear thinning as opposed to pressuring; she merely testified that although one cannot tell just by looking at the fabrics, one can tell if one also knows the chemistry and the rheology of the coating composition, which she did know. (*See* Cole Depo. at 243:7-13; 550:5-25; 279:10-280:2.) Similarly, although Nextec admits that Dr. Cole testified that "[o]ne could certainly make a fabric where the coating is pressured into it, rather than being shear thinned," Nextec maintains that Dr. Cole did not testify that *the accused fabrics* could have been made by pressuring the coating into them. (*See id.* at 194:12-14.)

Brookwood also attempts to raise a triable issue of fact on the question of infringement by critiquing Nextec's reliance on testimony by Brookwood's own expert, Dr. Hauser. Dr. Hauser acknowledged that he had observed minor penetration of the coating formulations within one of the Storm-Tec Products, and Nextec contends this shows that the penetration of the coating composition in the accused products was a result of "sufficient shear thinning energy to cause the shear thinnable material to flow into the web." Brookwood discounts this testimony as insufficient to support an inference that Brookwood's process involved "sufficient shear thinning energy to cause the shear thinnable material to flow into the web" by pointing out that Dr. Hauser also testified that

43

the prior art makes clear that the coating composition could also have been "urged" into the surface regions of the fabric by the action of the coating blade, rather than shear thinned. Brookwood points out that Dr. Hauser himself stated that the minor degree of coating penetration observed within the Storm-Tec products was consistent with customarily coated fabrics. (*See* Hauser Depo. at 198:5-9 ("the amount of potential or possible penetration at least in the Brookwood fabrics in my opinion is so minimal and so random that it looks like it is from a standard conveniently (sic – convential[ly]) coated fabric.").) From this testimony, Brookwood would ask the jury to infer that the penetration in the Storm-Tec products was produced through customary coating processes which use urging or pressuring, rather than through shear thinning.

The Court finds that, when the testimony and reports of Drs. Cole and Hauser are considered as a whole and viewed in the light most favorable to Brookwood, there is a triable issue of material fact as to whether the Storm-Tec Products were produced using "sufficient shear energy to cause the shear thinnable material to flow into the web," thereby infringing claim 1 of the '902 patent. A reasonable jury could conclude that Nextec has not proven by a preponderance of the evidence that the Storm-Tec Products are created through shear thinning, as opposed to merely pressuring or urging the coating into the fabric. *See Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed. Cir. 2006). A reasonable juror might conclude, for instance, that Dr. Cole did not really know whether Brookwood's fabrics had been made using shear thinning or pressuring, given that she did not perform tests on the coating compositions, and given that she admitted that a porous web whose coating composition was pressured into the pores could look the same as a product whose coating composition was shear thinned into it. Since a

reasonable jury could return a verdict in favor of Brookwood on the question of

infringement of claim 1 of the '902 patent, Nextec is not entitled to summary judgment of

infringement of this claim.[19]

## C.    Patent Invalidity

Both parties have raised issues relating to the validity of Nextec's patents. Nextec

has moved for summary judgment that none of the ten Asserted Claims are anticipated by

(and therefore invalidated by) three prior art references: the Rudman Patent, the Smith

Patent, and the Ken Reign fabric. Brookwood has also moved for summary judgment

that the claims of the '841 and '902 patents are invalid as a matter of law under various

theories of invalidity.

Under 35 U.S.C. § 282, patents are presumed to be valid. *See Abbott Labs.*, 471

F.3d at 1367.  The party seeking to show that a claim is invalid must prove facts

supporting invalidity by clear and convincing evidence.  *Id.*  There are various grounds

on which a patent may be declared invalid, two of which are at play in the pending

motions: invalidity by anticipation and invalidity based on double-patenting.

## 1.    Whether the Asserted Claims are Anticipated by the Rudman Patent, the Smith Patent and/or the Ken Reign Fabric

Nextec has moved for summary judgment that none of the ten Asserted Claims

are anticipated by the Rudman Patent, the Smith Patent, and/or the Ken Reign Fabric.

Because the Court has granted summary judgment of non-infringement to Brookwood on

seven of those claims, the Court declines to consider Brookwood's affirmative defense of

---

[19] The Court notes, in addition, that it is not clear on the present record whether Dr. Cole has offered testimony that the polymer used by Brookwood is "shear thinnable," as the Court has construed that term. While Dr. Cole's report opined that the viscosity of the M-1074 polymer used by Brookwood was reduced by the application of shear energy, so far as the Court is aware, Dr. Cole did not offer an opinion regarding the rate of shear necessary to achieve that result. The Court, however, has does not have the benefit of the full record. Therefore, the Court cannot say conclusively whether Dr. Cole offered an opinion that could support a finding of infringement under the Court's construction of shear thinning and shear thinnable.

invalidity by anticipation as to those seven claims and Nextec's corresponding motion for summary judgment of non-anticipation as to those claims. *See, e.g., Nystrom v. TREX Co.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003) (court faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice); *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) (district court has discretion to dismiss counterclaims of patent invalidity and unenforceability as moot where it finds no infringement).[20] Therefore, the discussion that follows is directed to the three Asserted Claims as to which the Court has not granted summary judgment of non-infringement: claims 1 and 57 of the '841 patent and claim 1 of the '902 patent. The Court must decide whether the Rudman Patent, the Smith Patent, and/or the Ken Reign Fabric disclose all the elements of any (or all) of these claims.

As a threshold matter, the parties disagree over the applicable burden of proof on the present motion. Brookwood argues that in order to prevail on its motion, Nextec must present the Court with affirmative evidence, for instance a supporting declaration, demonstrating that each element of a patent claim is not actually disclosed in the Rudman Patent, the Smith Patent or the Ken Reign Fabric. But invalidity by anticipation is a defense as to which Brookwood bears the burden of proof at trial. *See Tate Access*, 279 F.3d at 1367. Although Nextec is the moving party on the motion for summary judgment of non-anticipation, Nextec can satisfy its burden by "showing—that is, pointing out" that there is not enough evidence in the record for Brookwood to prove invalidity by anticipation by clear and convincing evidence. *See Celotex*, 477 U.S. at 325; *see also Eli*

---

[20] For the sake of clarity, Brookwood's affirmative defense of anticipation as to these seven claims is dismissed without prejudice.

*Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) ("a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."). Since patents are presumed valid, *see* 35 U.S.C. § 282, Nextec is under no obligation to present affirmative evidence to rebut Brookwood's contention that the patents-in-suit are invalid unless Brookwood has introduced facts that could lead a reasonable fact-finder to conclude that Brookwood can prove invalidity by clear and convincing evidence. *See Eli Lilly & Co.*, 251 F.3d at 962.

Turning to the merits of the parties' dispute, under 35 U.S.C. § 102, a patent may be invalid on the basis that it was anticipated by prior art. To demonstrate that a patent is anticipated by the prior art, the party seeking a declaration of invalidity must show that each element of the claim at issue, properly construed, is disclosed, whether explicitly or inherently, in a single prior art reference. *See Zenith*, 522 F.3d at 1363 ("Anticipation requires a showing that each element of the claim, properly construed, is found in a single prior art reference."); *Telemac Cellular*, 247 F.3d at 1327 ("A prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently, to anticipate."); *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("a prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it").

Anticipation is a question of fact. *Zenith*, 522 F.3d at 1356. Whether the prior art anticipates every element of the claimed invention depends on the Court's construction of the claim elements in question. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239

F.3d 1343, 1351 (Fed. Cir. 2001). Typically, evidence concerning anticipation takes the

form of testimony from one skilled in the art that identifies each claim element, states the

witness' interpretation of the claim element, and explains in detail how each claim

element is disclosed in the prior art reference. *Schmer v. Lab. Computer Sys, Inc.*, 308

F.3d 1304, 1315 (Fed. Cir. 2002). The testimony is insufficient if it is merely conclusory.

*Id.* (denying summary judgment of anticipation where the expert witness merely set forth

his understanding of the operation and steps performed by the item of prior art and

described what he considered to be known to one of ordinary skill prior to the patented

invention, but did not clearly describe the operative steps of the method recited in the

patent claim nor how those steps were performed by the prior art item); *see also*

*Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 2007)

(rejecting expert testimony as insufficient to satisfy the "rigors of [proving] anticipation"

where it was conclusory and unsupported by documentary evidence).

Moreover, the burden of establishing invalidity by anticipation will be more

difficult to discharge if the prior art before the court is the same as the prior art that was

before the USPTO—as is the case with the Rudman Patent. Under such circumstances,

the party challenging the validity of the patent "has the added burden of overcoming the

deference that is due to a qualified government agency presumed to have properly done

its job, which includes one or more examiners who are assumed to have some expertise in

interpreting the references and to be familiar from their work with the level of skill in the

art and whose duty it is to issue only valid patents." *Am. Hoist & Derrick Co. v. Sowa &*

*Sons, Inc.*, 725 F.2d 1350, 1359 (Fed Cir. 1984); *see also Impax Labs., Inc. v. Aventis*

*Pharms., Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006).

Because anticipation requires a showing that each element of the claim at issue is found in a single prior art reference, the legally operative comparison is between the patent claims and the item of prior art—not between the allegedly infringing product and the item of prior art. *See Zenith*, 522 F.3d at 1363 ("It is the presence of *the prior art and its relationship to the claim language* that matters for invalidity") (quoting *Tate Access*, 279 F.3d at 1367) (emphasis added). "[M]ere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute clear and convincing evidence" that the claim alleged to have been infringed is invalid. *Zenith*, 522 F.3d at 1363. In other words, the assertion that one is "practicing the prior art" will not, without more, support a finding of invalidity by anticipation. *Id.* That being said, "[w]here an accused infringer is clearly practicing only that which was in the prior art, and nothing more, and the patentee's proffered construction reads on the accused device [it] should not prove difficult" to establish by clear and convincing evidence that the patentee's claims are invalid. *Tate Access*, 279 F.3d at 1367. Nonetheless, a finding of invalidity is not a foregone conclusion in such circumstances. A party seeking a declaration of invalidity on the ground of anticipation remains obligated to prove that each of element of the patentee's claims is found in a single prior art reference. *See Zenith*, 522 F.3d at 1363. That party cannot conflate numerous prior art references and then argue that "the prior art" in general disclosed every limitation of a particular patent claim.[21] *See id.*

When the item alleged by one party to be anticipating prior art is the exact same item that the other party contends infringes, the party seeking to prove invalidity by

---

[21] If Brookwood can show that the patents-in-suit would have been obvious from the combined teachings of the prior art, those patents may be invalid under 35 U.S.C.§ 103 based on obviousness. The issue of invalidity based on obviousness, however, is not before the Court on the pending motions.

anticipation can establish invalidity without actually performing an element by element comparison of the claim to the prior art item in question. *See Vanmoor v. Wal-mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000). Because the entire basis of the infringement claim under these circumstances is the patentee's contention that the accused product contains every limitation of the patented claim, if the accused infringer can prove that the accused product actually existed before the filing date of the asserted patent, the accused infringer's evidentiary burden to prove invalidity by anticipation will be satisfied at by the patentee's claims of infringement against that product. *Id.; Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997); *see also Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'") (citations omitted).

Nextec argues that Brookwood cannot establish by clear and convincing evidence that each element of any of the Asserted Claims is found in the Rudman Patent, the Smith Patent, and/or the Ken Reign Fabric because Brookwood relied on the misguided notion that it can establish anticipation by proving as a general matter that it was "practicing the prior art" when it made the accused products. Nextec contends that Brookwood failed to conduct an adequate element by element comparison between the Asserted Claims and the three items of prior art in question, and thus cannot show that each limitation of the Asserted Claims was disclosed in these items of prior art. It is undisputed that in their reports, Brookwood's experts did not provide an element by element comparison between three Asserted Claims still in issue in this action (claims 1 and 57 of the '841 patent and

50

claim 1 of the '902 patent) and the Rudman Patent, the Smith Patent, and/or the Ken Reign Fabric.

Brookwood eschews such an analysis, and argues that "practicing the prior art" effectively provides a valid basis for a finding in this case that the patents-in-suit are invalid. It argues that its expert testimony that its processes and products are the same in all material respects to those practiced and disclosed in the prior art—including, for example, the Rudman Patent, the Smith Patent, and/or the Ken Reign Fabric—is sufficient to establish the invalidity of the Asserted Claims *if* those claims are found to read on Brookwood's products. (*See* D.E. 104 at 4-8.) In support of this contention, Brookwood relies on *Vanmoor*, 201 F.3d 1363 and *Evans*, 125 F.3d 1448, discussed above. But *Vanmoor* and *Evans* are not directly on point in this context. *Vanmoor* and *Evans* stand for the proposition that where infringement claims are directed against *the very item* that is alleged to be anticipatory prior art, the infringement claims themselves suffice to establish that every element of the claim is found in the accused item. Here, however, Nextec's infringement claims are directed against Brookwood's Storm-Tec Products, and its non-anticipation motion is directed to three different pieces of prior art. In this context, Nextec's infringement claims against the Storm-Tec Products do not themselves prove that the Rudman Patent, Smith Patent and/or the Ken Reign Fabric contain each and every limitation of the Asserted Claims. Rather, Brookwood must introduce facts sufficient to enable a jury to find by clear and convincing evidence that one or more of these items of prior art discloses every element of the three remaining Asserted Claims. *See Zenith*, 522 F.3d at 1363.

51

With respect to the Rudman Patent and the Smith Patent, the Court concludes that Brookwood has failed to do so. Brookwood relies almost entirely on testimony by its expert, Mr. Colasanto, that "if the various claims that are asserted in this case are applied to the accused Brookwood fabrics as claimed by Nextec (or the processes/equipment utilized by Brookwood), then any claim applied in this manner is also invalid [on the ground that it covers a process or product that 'is found in the prior art or that would have been 'obvious' to a person skilled in the relevant field. . .']."[22] (*See* Colasanto Rep. ¶¶ 16, 13.) Similarly, Dr. Hauser testified that, "I concur in Mr. Colasanto's assessment that, to the extent the claims of the Nextec patents are applied in a manner that would extend to the accused fabric products manufactured by Brookwood (or the related equipment or processes used in their manufacture), these claims would also apply to relevant disclosures in the prior art (e.g. the Rudman patent and historical fabrics and processes used by Kenyon Industries itself)." (Kirby Decl. Ex. 4 (Hauser Rep.) ¶ 4). This testimony compares the accused products to the prior art, rather than comparing the elements of the Asserted Claims to the prior art and thus is insufficient to establish invalidity by anticipation. *See Zenith*, 522 F.3d at 1363 ("anticipation cannot be proved by merely establishing that one 'practices the prior art.'") (citation omitted); *Tate Access*, 279 F.3d at 1367 ("it is the presence of the prior art and its relationship to the claim language that matters for invalidity"). Indeed, the argument being made by Brookwood is precisely the argument rejected by the Federal Circuit in *Zenith*. *See* 522 F.3d at 1363; *see also Cordance Corp. v. Amazon.com, Inc.*, --- F.Supp.2d ---, 2010 WL 605260, at *18

---

[22] Mr. Colasanto elaborated on this view as follows: "For example, as noted previously, the coating apparatus used by Brookwood to manufacture the various fabrics that are accused in this case has been in use for this purpose literally for decades, as have similar coaters used for this purpose by various fabric converters. As also noted, the coating compositions used by Brookwood are themselves of the same general type as have been used for decades in the coating of fabric products. . ." (Colasanto Rep. ¶ 16.)

52

(D. Del. 2010) (rejecting as an unpersuasive "practicing the prior art defense" expert

testimony that if the accused system were found to infringe the asserted claims under

plaintiff's theories, then the prior art system would have performed each and every

element of the asserted claims under those same theories).[23]

Moreover, although Mr. Colasanto did perform some semblance of an element by

element comparison between certain Asserted Claims of the '051 and '172 patents and

the Rudman Patent and the Smith Patent, he failed to perform such a comparison for the

only three Asserted Claims remaining in this action (claim 1 of the '902 patent and

claims 1 and 57 of the '841 patent).  Consequently, there is simply no evidence in the

---

[23] Even if this type of general testimony comparing the prior art to the accused products and processes was admissible to establish invalidity, Mr. Colasanto's testimony would nonetheless be insufficient on the present record to establish that the Asserted Claims are anticipated by the Rudman Patent and/or the Smith Patent.  Mr. Colasanto's report is conclusory and is filled with vague generalizations for which he has failed to articulate an adequate basis of support.  *See Schmer*, 308 F.3d at 1315 (invalidity cannot be established by conclusory testimony).  Second, the above-quoted excerpt from Mr. Colasanto's report reveals that in forming his opinion that the claims in question would be invalid in light of the prior art if the accused products are found to infringe those claims, Mr. Colasanto conflated two distinct bases for establishing patent invalidity: anticipation by prior art under 35 U.S.C.§ 102 (which requires a showing that the patented claim is anticipated by a *single* prior art reference) and obviousness under 35 U.S.C.§ 103 (in which a patent may be found invalid based on the combined teachings of various items of prior art).  *See Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003) ("obviousness and anticipation are related, but are legally distinct and separate challenges to a patent's validity").  Nextec's present motion, however, does not seek a ruling of validity based on non-obviousness; it simply seeks a ruling that the claims in question are not anticipated by certain items of prior art.  Because Mr. Colasanto's opinion of invalidity is premised on a conflation of the concepts of anticipation and obviousness, it does not appear that he has any basis to offer an independent opinion that the Asserted Claims are anticipated by a single item of prior art (as opposed to being rendered obvious by the combined teachings of the prior art).  Indeed, throughout his deposition, Dr. Colasanto conflated various items of prior art, suggesting that he had not properly determined that the Asserted Claims are anticipated by a single item of prior art.  (*See, e.g.*, Colasanto Depo. at 185:21-186:2 ("Well, again, you know, to the extent that Nextec claims that Brookwood's accused fabrics have additives selectively positioned within them, then those, you know, additives were also added to the coatings in prior art at Kenyon and at other places."); 197:2-9 ("I would say that to the extent Nextec claims sufficient shear energy has occurred to selectively position and form this so-called substantial encapsulation of web members and the other language, to the extent that feature is applied to the Brookwood products, against that would have occurred in the prior art of Kenyon and Rudman."); 201:10-14 ("And if that so-called [e]ncapsulation or internal layer, if you will, occurs in the accused fabrics, then that would have occurred in the prior art fabrics as made not only by Kenyon, by Rudman, by others.").)  As Dr. Hauser merely concurred in Mr. Colasanto's opinions and does not appear to have performed any independent analysis of his own—at least with respect to the Rudman Patent and the Smith Patent—his testimony is similarly inadequate.

record, other than Mr. Colasanto's conclusory testimony, from which a juror could

conclude that each element of these three claims was disclosed in either the Rudman

Patent or the Smith Patent. *See Motorola*, 121 F.3d at 1473 ("An expert's conclusory

testimony, unsupported by the documentary evidence, cannot supplant the requirement of

anticipatory disclosure in the prior art reference itself."). Brookwood's contention that

the element by element comparison Mr. Colasanto performed with respect to certain

Asserted Claims of the '172 and '051 patents would apply equally to the Asserted Claims

of the '902 and '841 patents is inadequate. Under 35 U.S.C. § 282, "each claim of a

patent . . . shall be presumed valid *independently of the validity of other claims*."

(emphasis added). Thus, Brookwood cannot discharge its burden of introducing

sufficient evidence from which a jury could conclude that claim 1 of the '902 patent

and/or claims 1 and 57 of the '841 patent are anticipated by the Rudman Patent and/or the

Smith Patent merely by pointing to an analysis that compares the elements of other patent

claims to the disclosures in the Rudman Patent and the Smith Patent. *See Enzo Biochem.,*

*Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1379 (Fed. Cir. 1999) ("While evidence of

invalidity regarding the claims of one patent may certainly apply to those of another, a

party may not avoid its burden of proof by making a blanket statement that its proofs with

respect to one patent apply to another and not provide a formal analysis as to why that is

true. Calgene failed to perform such analysis below and even continues to make that

error here. We note that if Calgene had undertaken the formality' of a proper invalidity

analysis. . . with respect to the '065 patent claims, it may well have obtained the same

result as it did with the '931 and '149 claims, in view of their substantially similar scope.

However, that is not a function for this court to perform."); *see also Amazon.com*, 239

54

F.3d at 1351 ("infringement and validity analyses must be performed on a claim-by-claim basis"). Because Brookwood has not designated any evidence from which a reasonable juror could conclude that every element of the three remaining Asserted Claims is disclosed in either the Rudman Patent or the Smith Patent (or both), Nextec is entitled to summary judgment that these claims are not anticipated by the Rudman Patent and/or by the Smith Patent. *See Eli Lilly*, 251 F.3d at 962 (summary judgment is appropriate where the party who bears the burden of proof at trial failed to produce clear and convincing evidence on an essential element of a defense of patent invalidity).

Turning to Nextec's motion for summary judgment that the Asserted Claims are not anticipated by the Ken Reign Fabric, that motion appears to be moot in light of the fact that the Court has granted summary judgment to Brookwood that seven of the ten Asserted Claims are not infringed by the Storm-Tec Products, since the three remaining Asserted Claims in this action are all directed to *systems* and *methods* for producing fabrics, not to fabrics themselves.[24] (*See* '902 patent, claim 1 ("method for controlling the effective pore size of the web. . ."); '841 patent, claim 1 ("system for controlling the placement of a shear-thinnable polymer composition into a porous web. . ."); '841 patent, claim 57 ("system for controlled placement of a shear-thinnable polymer composition into a porous web. . .").) And to the extent that Nextec's motion is directed to the process used to make the Ken Reign Fabric (*i.e.*, to the KK-1 coater), that issue is addressed separately in the next section as part of the Court's analysis of Brookwood's motion for summary judgment that the claims of the '841 patent are anticipated by the KK-1 coater.

---

[24] The Ken Reign Fabric is a fabric that was produced on Kenyon Industries' KK1-coater beginning in the early 1980s. (D.E. 93 ¶ 6.)

55

2.    Whether Claims 1 and 57 of the '841 Patent are Anticipated by the KK-1
      Coater

The '841 patent relates to an apparatus for controlling the placement of a curable,

shear-thinnable polymer composition into a porous web. Brookwood contends that

claims 1 and 57 of the '841 patent are invalid because they are anticipated by

Brookwood's KK-1 coater. As noted, in order to establish invalidity under this theory,

Brookwood is required to establish that each element of Asserted Claims 1 and 57 is

found in a single prior art reference—in this case, in the KK-1 coater. *See Zenith*, 522

F.3d at 1363.

Both of these Asserted Claims are "means plus function" claims, a form of claim

permitted by 35 U.S.C. §112, ¶ 6, in which the elements of a machine are stated as a

"means" for performing a specified function. To support a finding of anticipation of a

means-plus-function claim, there must be evidence to establish that "the assertedly

equivalent structure performs the claimed function in substantially the same way to

achieve substantially the same result as the corresponding structure described in the

specification." *See Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,

389 F.3d 1370, 1378 (Fed. Cir. 2004) (citation omitted); *see also Transclean Corp. v.

Bridgewood Services, Inc.*, 290 F.3d 1364, 1372 (Fed. Cir. 2002) ("To anticipate a claim

reciting a means-plus-function limitation, the anticipatory reference must disclose the

recited function identically."); *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d

1440, 1445 (Fed. Cir. 1984) ("The limitations which must be met by an anticipatory

reference are those set forth in each statement of function. Such a limitation cannot be

met by an element in a reference that performs a different function, even though it may

be part of a device embodying the same general overall concept.") (citation omitted). In

56

other words, "[i]n the context of a means-plus-function claim, the invalidating prior art must disclose not simply a means for achieving the desired function, but rather the particular structure recited in the written description corresponding to that function, or an equivalent thereof." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1361 (Fed. Cir. 2001) (citing *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1193 (Fed. Cir. 1994)).

In this case, Brookwood contends that the very item that Nextec alleges infringes the asserted claims of the '841 patent (the KK-1 coater) is actually prior art that invalidates that patent because the KK-1 coater has been in use since at least the mid-1980s, before the claimed priority date for the '841 patent. Brookwood has not performed a formal element by element comparison of between the KK-1 coater and claims 1 and 57 of the '841 patent in order to show that the KK1-coater disclosed means for performing identical functions to those claims. Brookwood appears to contend that such a comparison of the KK-1 coater and claims 1 and 57 of the '841 patent is not necessary in this scenario under the logic of *Vanmoor*, 201 F.3d 1363, and *Evans*, 125 F.3d 1448. That is, Brookwood argues that since Nextec's infringement claims are directed to the exact same apparatus that Brookwood contends is prior art (*i.e.*, the KK-1 coater), Nextec's infringement contention against the KK-1 coater itself establishes that every limitation of claims 1 and 57 of the '841 patent is found in the KK-1 coater, thereby establishing the invalidity of those claims. (D.E. 90 at 18.) Nextec responds that the KK-1 coater that was in use prior to the issuance of the '841 patent is not the "exact same apparatus" that it alleges infringes the '841 patent because the KK-1 coater has been modified since the 1980s, such that *Vanmoor* and *Evans* are inapposite.

57

Given the parties' positions, the question for the Court is whether the there is a triable issue of fact as to whether the KK-1 coater has been modified since the issuance of the '841 patent, such that it no longer performs the same means and achieves the same functions that the pre-1988 KK-1 coater did. If the answer to that question is no—*i.e.*, if the KK-1 coater that predated the '841 patent performed the same functions as the current KK-1 coater using the same means—then Nextec's accusation of infringement against the current KK-1 coater would suffice to establish that each element of claims 1 and 57 of the '841 patent is found in a single prior art reference (*i.e.*, the KK-1 coater) and those claims would be invalid. *See Vanmoor*, 201 F.3d at 1366; *Evans*, 125 F.3d at 1451. If the answer to that question is yes—*i.e.*, if the current KK-1 coater contains different structures or performs different functions than the version of the KK-1 coater that is alleged to have predated the '841 patent—then *Vanmoor* and *Evans* are inapplicable since Nextec's allegations of infringement are directed to the current KK-1 coater and would thus not suffice to establish that the different pre-1988 KK-1 coater contained every limitation of claims 1 and/or 57 of the '841 patent.

Brookwood contends that the KK1-coater today operates in the same way as the KK-1 coater that was in use before the '841 patent was issued. Brookwood points to declarations of relevant Kenyon Industries personnel, as corroborated by various documents, stating that each of the mechanisms presently used in the KK-1 coater were in use prior to the earliest filing date of the '841 patent. (*See* D.E. 90 at 18-19.) Brookwood also points to testimony by its expert, Mr. Colasanto, that "nothing on the KK-1 coater has changed since – since the prior art fabric, the historic Ken Reign fabric, for instance." (*See* Colasanto Depo. at 177:7-10; *see also* Colasanto Rep. ¶ 18 ("these

58

fabrics were produced on the same coating apparatus under the same operating

conditions").)

In response, Nextec argues that sometime in 2006, in order to meet the

government's specifications for the Gen III program, which were issued in late 2005,

Brookwood reconfigured its coating system with a combination of new polymer and/or

machine settings so as to result in encapsulation. (D.E. 100, Pl. Opp. to Def. Mot. for S.J.

at 17.) Nextec contends that it was only after that reconfiguration that Brookwood

infringed the '841 patent for the first time. Nextec has no direct evidence that

reconfigurations took place and does not know what those alleged reconfigurations were.

However, Nextec's expert, Dr. Cole testified that the Storm-Tec Products were

"dramatically different" from the fabrics produced by the KK-1 coater in the past and

concluded, therefore, that modifications must have been made to the KK-1 coater in order

to achieve such different results. (See D.E. 102; Kirby Decl. Ex. 9 (Cole Depo.) at

398:23-402:9.) Such modifications, she opined, could have included adjustments to the

blade depth, the line speed, the tension, and/or the polymer composition.[25] (Kirby Decl.

Ex. 1 (Cole Rebuttal Rep.) ¶ 42.)

Nextec points to two letters from Brookwood to the U.S. government to buttress

its theory that the KK-1 coater was reconfigured sometime in early 2006. In the first

letter, dated February 26, 2006, Brookwood asked that the Gen III specifications be

adjusted from 15% dynamic absorption to 35% dynamic absorption because "[i]t is

---

[25] Dr. Cole observed during her tour of the Kenyon Industries facility that the KK-1 coater was outfitted with computerized controls and had various mechanisms that could be adjusted. She opined that adjustments must have occurred since the mid-1980s since the "computerized monitoring and control devices were clearly not in existence in the mid-1980s." (Kirby Decl. Ex. 1 (Cole Rebuttal Rep.) ¶ 11.) But during her deposition Dr. Cole stated that she could not rule out the possibility that the alleged modifications were made to the KK-1 coater ten or twenty years ago. (See Cole Depo. at 402:10-403:10.)

impossible to meet the Dynamic Absorption requirements without violating [the '902 and '841 patents] and potentially other Nextec patents." (Kirby Decl. Ex. 16 (February 26, 2006 Ltr. from Brookwood) at 1.) Approximately two weeks later, Brookwood wrote a second letter which informed the government that "we have now successfully produced a product to a level that is consistent with [the government's] original specified requirements of 15% [Dynamic Absorption], dated 12/02/05." (Kirby Decl. Ex. 17 (March 10, 2006 Ltr. from Brookwood) at 1.) Given that it is undisputed that the government did not adjust its dynamic absorption requirements between the time of the two letters, Nextec argues that the only inference that can be drawn is that Brookwood adjusted the KK-1 coater in late February or early March 2006 so as to produce new fabrics that would meet the Gen III specifications. Nextec maintains that when it did so, Brookwood for the first time infringed Nextec's patents. (*See* D.E. 100, Pl. Opp. to Def. Mot. for S.J. at 4.)

Brookwood responds that Nextec's contention goes wide of the mark because the asserted claims of the '841 patent are directed to machines, not fabrics. (D.E. 106 at 7-8.) Brookwood maintains that "the point is, this is a machine claim." (Tr. at 85.) This argument itself misses the mark, and mischaracterizes Nextec's point. The Asserted Claims of the '841 patent, as Brookwood correctly points out, are expressed as "means" for performing particular functions—one of which is encapsulation of at least some of the structural elements of the porous web. (*See* '841 patent, Col. 66, ll. 6-10, Col. 69, ll. 7-12.) Nextec's position is that the while the prior art version of Brookwood's KK-1 coating machine may have used similar or identical means to those claimed by the '841 patent, it did not and could not achieve the recited functions of the Asserted Claims (for

instance, encapsulation) and thus was non-infringing. Nextec contends, however, that

Brookwood adjusted its equipment in 2006 so as to achieve the recited function of the

Asserted Claims (*i.e.*, encapsulation). Nextec points to an examination of the Storm-Tec

Products that reveals encapsulation of the fibers therein, and concludes that the KK-1

coater must now be achieving encapsulation, thereby infringing the '841 patent. (*See*

D.E. 100, Pl. Opp. to Def. Mot. for S.J. at 17.)

Viewing the evidence in the light most favorable to Nextec, the Court concludes

that there is a triable issue of material fact as to whether Brookwood's KK-1 coating

apparatus was modified between 1988 and the time that the Storm-Tec Products were

produced. While Nextec's evidence in support of its contention that the KK-1 coater was

reconfigured in 2006 is circumstantial and somewhat limited, a reasonable fact-finder

could make such an inference based on the following evidence: (i) Dr. Cole's testimony

that the Storm-Tec Products were "dramatically different" than fabrics produced by the

KK-1 coater in the past, (ii) Dr. Cole's testimony that the KK-1 coater had numerous

features that could be adjusted and computerized controls indicating that at least some

adjustments had been made since the 1980s, (iii) the 2006 letters between Brookwood

and the government, and (iv) the fact that Brookwood was only able to achieve

compliance with the Gen III specifications for the first time in 2006.

Because Brookwood's argument for invalidity hinges on a conclusion that the

KK-1 coater was not modified between the 1980s and the time that the Storm-Tec

Products were produced, Brookwood has failed to carry its burden of proving that there is

no genuine issue of material fact that the claims of the '841 patent are invalidated by the

KK-1 coater. *See Celotex*, 477 U.S. at 323–25. Brookwood's motion for a declaration

that claims 1 and 57 of the '841 patent are invalid is denied.[26]

**3.      Whether Claim 1 of the '902 Patent is Invalid Based on Double Patenting and/or Anticipation**

Brookwood also argues that claim 1 of the '902 patent is invalid on two

alternative grounds depending on how the claim is construed. If the claim is limited to

processes that use polymeric compositions, Brookwood contends that it is invalid based

on double patenting in light of the '792 patent. If the claim is not so limited, Brookwood

argues that it is invalid because it is anticipated by the '643 patent. *(Id.)* Each contention

will be addressed in turn.

**(a)      Double Patenting**

Under 35 U.S.C. § 101, an inventor may not obtain more than one patent for the

"same invention." *Perricone v. Medicis Pharm. Group*, 432 F.3d 1368, 1372-73 (Fed.

Cir. 2005). Double-patenting is a basis for a finding of patent invalidity, and like other

invalidity claims, the party asserting it must establish facts supporting a conclusion of

invalidity by clear and convincing evidence. *See Symbol Techs., Inc. v. Opticon, Inc.,*

---

[26] Brookwood also points out, without explaining how these facts fit into its invalidity argument, that the claims originally presented in the application for the '841 patent were rejected by the USPTO on the basis that a prior art apparatus, U.S. Patent 3,254,529, disclosed each of the "means" elements and would be capable of operating in the manner claimed. (D.E. 90 at 17.) It was only after the claims were amended to further add a "means for pretreating and impregnating the porous web with a fluorochemical" that the '841 patent was approved. *(Id.)* Brookwood contends that Nextec has acknowledged that it was known prior to the '841 patent to treat fabrics with a fluorochemical water repellant, and argues that the equipment defined by the '841 patent is therefore customary in nature. *(Id.)* It is not clear precisely what legal conclusions Brookwood seeks to have this Court draw from these facts. Perhaps Brookwood is arguing that since the patent examiner found that U.S. Patent 3,254,529 disclosed all but one of the means disclosed in the claims of the '841 patent, and since the only additional means added to the claims of the '841 patent allegedly is also part of the prior art, that proves that the claims of the '841 patent are anticipated by the prior art under 35 U.S.C.§ 102. However, that argument fails because Brookwood has not shown that each element of any claim of the '841 patent was contained in a *single* item of prior art, as is required to show invalidity by anticipation. *See Zenith,* 522 F.3d at 1363. If Brookwood is arguing instead that the claims of the '841 patent are obvious in light of the prior art under 35 U.S.C.§ 103, that argument has not been considered by the Court as Brookwood failed to present it as such and the parties have not briefed the issue of obviousness.

935 F.2d 1569, 1580 (Fed. Cir. 1991). The fact that two patents use different language does not preclude a finding that they cover the "same invention." *In re Vogel,* 422 F.2d 438, 441 (C.C.P.A. 1970). When a party alleges that two claims cover the "same invention," the relevant inquiry is "whether one of the claims could be literally infringed without literally infringing the other."[27] *Id.; see also Studiengesellschaft Kohle mbH v. N. Petroleum Co.,* 784 F.2d 351, 355 (Fed. Cir. 1986) (applying *In re Vogel's* test for "same invention"); *Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 940-41 (Fed. Cir. 1983) (applying *In re Vogel's* test for "same invention"); *see also Shelcore, Inc. v. Durham Indus., Inc.,* 745 F.2d 621, 628 (Fed. Cir. 1984) (where device made according to '780 design patent might well infringe the '831 utility patent, but device could be readily constructed that would infringe claims of the '831 utility patent without infringing claim of '780 design patent, trial court did not err in holding that the '780 patent was not invalid for double patenting). If the answer is no, then the two claims are directed to the same invention. *In re Vogel,* 422 F.2d. at 441.

Here, Brookwood contends that claim 1 of the '792 patent and claim 1 of the '902 cover the "same invention," such that the later-filed claim is invalid. Claim 1 of the '792 patent discloses:

> A method of controlled placement of a curable, shear-thinnable, polymer
> composition into a porous web, having three dimensional structure of a
> plurality of structural elements within interstitial spaces therebetween
> comprising:

---

[27] There are actually two types of double-patenting. As set forth in *Perricone,* "[s]tatutory, or 'same invention,' double patenting is based on the language in § 101 of the Patent Act mandating 'a patent' for any new and useful invention . . . Non-statutory, or 'obviousness-type,' double patenting is a judicially created doctrine adopted to prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." 432 F.3d at 1372-73 (citations omitted). Brookwood appears to assert only the former type of double-patenting and the Court's analysis will accordingly be limiting to statutory or "same invention" double-patenting.

63

applying tension to the porous web;
applying a polymer composition onto one surface of the tensioned porous
web; and
shear thinning the polymer composition sufficiently to reduce its viscosity
and selectively place the viscosity reduced polymer composition into the
tensioned web to encapsulate at least some of the structural elements,
leaving most of the interstitial spaces open.

Claim 1 of the '902 patent discloses:

A method of controlling the effective pore size of a web, wherein said web
has a three dimensional structure comprising structural elements with
interstitial spaces therebetween and a top surface opposed from a bottom
surface, comprising the steps of:
tensioning the web;
applying a curable, shear thinnable material to said web; and
subjecting said shear thinnable material to sufficient shear thinning energy
to cause the shear thinnable material to flow into the web, selectively
position within the web and form a thin film substantially encapsulating at
least some of the structural elements of said web, wherein most of the
interstitial spaces between structural elements of said web remain open.

Brookwood argues that the active steps required to perform the methods covered

by these two claims are identical and that they, therefore, cover the same invention.

Brookwood points to the testimony of Nextec's Rule 30(b)(6) witness, who agreed that

the steps defined by these two claims were "very similar" and who, according to

Brookwood, was unable to identify any material difference between the steps recited by

the two claims that would avoid infringement. (See D.E. 92, Ex. 9 (Meirowitz Depo.) at

781:3-786:11.) Plaintiff disputes the latter contention. (D.E. 105 ¶ 69.)

Nextec contends that the scope of the two inventions are different on their face, as

one covers a "method of controlled placement" of the polymer composition and the other

covers a "method for controlling the effective pore size of a web." Nextec points to

certain differences between the two claims from which an inference can be drawn that it

would be possible to infringe one without the other. Specifically, Nextec points out that

64

claim 1 of the '792 patent and claim 1 of the '902 patent differ based on the surface to

which the coating composition is applied; while claim 1 of the '792 patent requires the

composition to be applied to "one surface" of the web, claim 1 of the '902 patent does not

specify the surface of application. Nextec also points out that the materials used in the

two patents are different; claim 1 of the '792 patent recites the application of a "polymer

composition," but claim 1 of the '902 patent recites an arguably broader use of materials

by referring to "a curable, shear thinnable *material*" (but states that such materials are

"preferably polymers").

  Brookwood asks the Court to construe claim 1 of the '902 patent as limited in its

scope to polymer compositions (as claim 1 of the '792 patent is limited) despite the fact

that the claim on its face contains no limitation to polymeric compositions. (D.E. 90 at

26.) Brookwood's argument is essentially that the written description in the '902 patent

did not disclose any specific materials other than polymeric compositions, and that

accordingly it cannot cover non-polymeric compositions. The Court finds this argument

to be unpersuasive, and declines to read in such a limitation into the clear language of

claim 1 of the '902 patent. Neither the claim language nor the specification contains any

express exclusion of non-polymeric compositions. In fact, the specification specifically

states that, "In general, *any curable, thixotropic material may be used* to treat the webs of

the present invention. Such materials are *preferably polymers*, more preferably silicone

polymers." ('902 patent, Col. 6, ll. 40-43) (emphasis added). This clearly indicates that

the claim was intended to cover "*any* curable thixotropic material" and that the materials

did not have to be polymers. While the descriptions in the specification focus on

polymeric compositions, this in itself does not provide a basis for reading such a

limitation into claim 1 of the '902 patent. *See SciMed*, 242 F.3d at 1340 (describing the reading of a limitation from the written description into the claims as "one of the cardinal sins of patent law"); *Pfizer Inc. v. Ranbaxy Labs.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) ("[I]mport[ing] limitations from the specification into the claims . . . should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'") (quoting *Phillips*, 415 F.3d at 1323).[28]

The difference in scope between claim 1 of the '902 patent and claim 1 of the '792 patent is substantial. As Dr. Cole testified, "There are lots of – there are potentially lots of shear thinnable materials that are not polymer compositions." (Cole Depo. at 450:13-15.) Similarly, Dr. Cole testified that the surface to which the coating composition is applied is another relevant distinction between the '792 and '902 patents. "The 792 patent makes it quite clear that you're applying the polymer composition to one surface. That distinction is not made in claim 1 of the 902 patent. So in both the – both the application surface potentially as well as what one is expected to apply can be substantially different between the 792 patent and 902 patents." (*Id.* at 450:16-451:3.) From Dr. Cole's testimony, one could reasonably infer that it would be possible to infringe one of the two claims in question without infringing the other, either in terms of the material to be applied or the surface of application. Accordingly, Brookwood has not

---

[28] In addition, Brookwood argues that the earlier applications from which the '902 patent claims priority only refer to the use of polymers as the treating composition, and that claim 1 of the '902 patent must be correspondingly limited in order to render the descriptions in earlier applications adequate under 35 U.S.C. § 112 to warrant granting the '902 patent the benefit of its claimed priority filing date. However, whether the written description in the priority applications is adequate to entitle a later-issued patent to the benefit of an earlier filing date is a separate legal issue from claim construction, and is to be analyzed separately after the claims have been construed. *See Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010) ("A district court must base its analysis of written description under § 112 on proper claim construction . . . On remand, the district court must construe [the disputed term in the '751 patent] in light of the '751 patent written description *and then determine* whether the [predecessor] application's written description satisfies § 112. . . ") (emphasis added); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911-12 (Fed. Cir. 2004) ("because the proper construction of the claims is clear, the questions of priority and validity are separate issues that must be addressed on remand).

met its burden of proving by clear and convincing evidence that claim 1 of the '902

patent is invalid based on double patenting in relation to the '792 patent. *See Symbol*

*Techs.*, 935 F.2d at 1580.

    (b)    **Anticipation by the '643 Patent**

    Brookwood argues that claim 1 of the '902 patent is also invalid because it is

anticipated by the '643 patent. (*See* D.E. 90 at 23-26.) By way of background, the '902

patent was filed in June 7, 1995 but claims priority through a chain of applications that

includes, among others, the '630 application (filed on March 14, 1988), the '643 patent

(filed on March 10, 1989), and the '792 patent (filed on March 17, 1995). Brookwood

contends that if the Court construes the '902 patent as including processes employing

"curable, shear thinnable material[s]" other than polymeric compositions —as the Court

has done—then the '902 patent is only entitled to the actual filing date of the '902

specification (June 7, 1995) because the description in the earlier applications is

inadequate to warrant granting the '902 patent the benefit of an earlier priority filing date.

Brookwood further argues that if the '902 patent's priority filing date is found to be June

7, 1995, then the claims therein would be rendered invalid by anticipation in light of the

intervening publication of the '643 patent, which allegedly constitutes prior art that

discloses the concept of shear thinning a polymer and encapsulating a fabric. Nextec

counters that the earlier applications from which the '902 patent claims priority are not

limited to polymeric compositions and, therefore, do adequately describe claim 1 of the

'902 patent. Consequently, Nextec argues, the '902 patent is entitled to its earliest

priority filing date of March 14, 1988 and any argument that the '902 patent is anticipated

by the intervening publication of the '643 patent in March 1989 is moot.

It is well settled that "[c]laims found in a later-filed application are entitled to the filing date of an earlier application if, *inter alia*, the disclosure in the earlier application provides an adequate written description of the later-filed claims under 35 U.S.C. § 112." *In re Curtis*, 354 F.3d 1347, 1351 (Fed. Cir. 2004); *see also* 35 U.S.C. § 120. The earlier application "need not describe the claimed subject matter in exactly the same terms as used in the claims," *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995), but it must "reasonably convey to one of ordinary skill in the art that the inventors possessed the later-claimed subject matter when they filed the earlier application." *In re Curtis*, 354 F.3d at 1351; *see also Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) ("To fulfill the written description requirement, the patent specification 'must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'") (citation omitted). Whether an application adequately describes a claim is a question of fact. *In re Curtis*, 354 F.3d at 1352.

The question, therefore, is whether the earliest applications from which the '902 patent claims priority (dated March 14, 1988) adequately disclose the use of non-polymeric compositions, such that someone of ordinary skill in the art would understand that the inventor possessed the subject matter of the '902 patent when the inventor filed the earlier applications. *See id.* at 1351. On its face, the earliest priority application from which the '902 patent claims priority (the '630 application) is not expressly limited to polymers. The first page of the '630 application discloses "a method of controlled saturation and impregnation of webs, typically fabrics, with *viscous materials, typically polymers*." ('630 Application at 1:11-13 (emphasis added).)

68

On the other hand, the '630 application itself did not identify any non-polymeric compositions that could be used in the invention. The '630 application and the other applications in the '902 patent's priority chain also focus on processes involving polymeric compositions. (*See, e.g.*, '792 patent, Abstract ("The present invention relates to methods for controlled placement of a curable, shear thinnable *polymer composition* into a porous web.")) (emphasis added). Indeed, in the '630 application itself, the inventor explained directly after disclosing that the application relates to "viscous materials, typically polymers," that the three other applications filed on that date a teach (i) "a fabric within which the individual fibers are encapsulated with a *polymer* empregnant; (ii) "an apparatus . . . that impregnates fabrics with compositions of viscosity greater than 5,000 CPS. . ., and particularly with *polymer* compositions containing silicone;" and (iii) "a high viscosity composition of matter made from a *polymer* (typically silicone), and other ingredients." ('630 Application at 1:14-28 (emphasis added).) Thus, the related applications filed simultaneously with the '630 application appear to relate to processes that use only polymeric compositions. This evidence could support a conclusion that despite the broad statement at the beginning of the '630 application that it covered "viscous materials, typically polymers," when that application and other related applications are considered as a whole, it becomes apparent that inventor did not adequately disclose the use of non-polymeric compositions, such that the '902 patent does not benefit from the filing date of the '630 application. *See In re Curtis*, 354 F.3d at 1353-54 (upholding Board of Patent Appeals and Interferences decision to deny inventor the benefit of an earlier filing date for failure to provide an adequate written description of a later-claimed genus of friction-enhanced coatings for

dental floss in the priority application because the priority application conveyed only one

type of friction enhancing coating).

Considering all the evidence in the light most favorable to Nextec, there is a

disputed issue of material fact as to whether the '630 application adequately describes the

use of curable shear thinnable materials other than polymers and, therefore, whether

claim 1 of the '902 patent is entitled to a priority filing date established by the filing of

the '630 application on March 14, 1988. *See Emory University v. Glaxo Wellcome Inc.*,

No. 96 Civ. 1868, 1997 WL 817342, at *6-8 (N.D. Ga. July 14, 1997) (genuine issue of

material fact as to the adequacy of the written description precluded summary judgment).

If priority is appropriate, then the claims of the '902 patent would not be invalid, as its

filing date would precede publication of the '643 patent (filed on March 10, 1989 and

issued on April 2, 1991), which Brookwood claims to be prior art rendering the claims of

the '902 patent invalid.  For these reasons, Brookwood's motion for a summary judgment

that claim 1 of the '902 patent is invalid is denied.

**D.    Brookwood's Contingent Motion for Summary Judgment on Damage-
Related Issues**

The final motion before the Court is Brookwood's "contingent" motion for

summary judgment dismissing the claims arising out of the '841 and '902 patents if these

patents are not found invalid.  Brookwood argues that Nextec's claims under the '841 and

'902 patents must be dismissed as a matter of law under 28 U.S.C. § 1498(a).  The parties

agree—at least for purposes of this motion—that § 1498(a) provides that patent claims

against government contractors or subcontractors must be brought in the United States

Court of Federal Claims where use of the invention "necessarily results from compliance

by the contractor or the subcontractor with (i) the specifications or written provisions

70

forming a part of [the contractor or subcontractor's] contract with the United States." *See*

28 U.S.C. § 1498(a); Federal Acquisition Regulation, Title 48 of the Code of Federal

Regulations, Section 52.227-1(a); D.E. 100, Pl. Opp. to Def. Mot. for Summ. Judg. on

Damage-Related Issues at 4.

Brookwood contends that Nextec has taken the position in this litigation that

Brookwood necessarily practices the methods and equipment encompassed by the '841

and '902 patents in order to meet the specifications established by the government in its

Gen III contract with Brookwood, such that the claims relating to those two patents must

be brought in the Court of Federal Claims. Nextec disagrees, maintaining that it has

never argued that it is necessary to infringe the '841 and '902 patents in order to comply

with the Gen III specifications. Nextec argues that Brookwood mischaracterizes the

work and testimony of Nextec's experts, who were merely asked to *assume*, without

analyzing or deciding the issue, that there were no non-infringing alternatives that would

enable Brookwood to meet the specifications of the Gen III contract with the government.

Nextec also maintains that there is obviously a disputed issue of fact as to whether it is

necessary to infringe the '841 and '902 patents in order to comply with the Gen III

specifications since Brookwood is arguing that it complied with those specifications but

did *not* infringe any of the patents-in-suit.

The Court concludes, at least at this stage of the proceedings, that Brookwood's

motion should be denied. The Court is not convinced on the present record that Nextec

has made a material admission that infringement of the '841 and '902 patents necessarily

results from compliance with the Gen III contract. In fact, Nextec has expressly

represented to the Court that it is *not* so arguing, and the testimony Brookwood points to

71

does not clearly contradict that contention. Taking Nextec's representation at face value, the Court finds that Brookwood's motion is premature. At least theoretically, it seems plausible for a jury to conclude that it is not necessary to infringe the '841 and '902 patents in order to comply with the Gen III specifications, while at the same time concluding that Brookwood did infringe these two patents. If a jury so concludes, then Nextec would prevail on infringement and the claim would properly be in this Court.

## IV.    CONCLUSION

For the reasons stated above: (1) Nextec's Motion for Partial Summary Judgment that the Storm-Tec Products Infringe Claim 110 of the '172 Patent and Claim 1 of the '902 Patent [99] is DENIED; (2) Nextec's Motion for Partial Summary Judgment that the Asserted Claims are Not Anticipated Under 35 U.S.C. § 102 by the Rudman Patent, the Smith Patent, or the Historical Ken Reign Fabric [99] is GRANTED to the extent that it has not been mooted by the other rulings set forth herein; (3) Brookwood's Motion for Summary Judgment on Infringement and Invalidity [89] is GRANTED in part and DENIED in part; and (4) Brookwood's Contingent Motion for Partial Summary Judgment on Damage-Related Issues [96] is DENIED.

SO ORDERED.

Dated: New York, New York
       March **31**, 2010

Richard J. Holwell
United States District Judge

72

# V.    APPENDIX A – ASSERTED CLAIMS

**Claim 1 of the '841 Patent:**
System for controlling the placement of a shear-thinnable polymer composition into a porous web, having a three dimensional structure of a plurality of structural elements with interstitial spaces therebetween, comprising:
means for pretreating and impregnating the porous web with a fluorochemical; means for applying tension to the porous web;
means for applying a curable, shear-thinnable polymer composition onto one surface of the tensioned web; and
means for shear thinning the polymer composition to substantially reduce its viscosity and selectively place it into the tensioned web to encapsulate at least some of the structural elements of the porous web by enveloping exposed surface portions of the structural elements.

**Claim 57 of the '841 Patent**
System for controlled placement of a shear-thinnable polymer composition into a porous web, having a three dimensional structure of plurality of structural elements with interstitial spaces therebetween, comprising:
means for penetrating and impregnating the porous web with a fluorochemical;
means for advancing the porous web;
means for applying tension to the porous web;
means for applying a curable, shear-thinnable, polymer composition to the web;
means for shear thinning the polymer composition to reduce the viscosity and place it to encapsulate at least some of the structural elements of the porous web by enveloping the exposed surface portions of the structural elements;
means for controlling the tension of the porous web during shear thinning of said polymer composition into said web; and
means for curing the polymer composition within the porous web.

**Claim 20 of the '051 Patent:**
A fluorochemical and shear thinning thixotropic resin treated porous substrate which is breathable, water resistant and rewashable comprising:
(A) a tensionable porous substrate having opposed, substantially parallel surfaces and comprised of a matrix having open cells therein:
(B) said substrate having been preliminarily generally uniformly impregnated with a fluorochemical; and
(C) said substrate having been thereafter impregnated under tension with a shear thinning thixotropic polymer composition that is present in amount in the range from about 5 to about 200 weight percent of the weight of the untreated substrate, with at least some of said cells remaining open."

**Claim 27 of the '051 Patent:**
The substrate of claim 20 which is characterized by having:
(A) a water drop contact angle in the range of about 90° to about 160°;
(B) a rewash capability of at least about 3;
(C) a breathability of at least about 35% of untreated substrate fabric; and
(D) a water repellency rating of at least about 80 prior to washing.

**Claim 86 of the '051 Patent:**

73

A flexible, porous substrate having a matrix with open cells therein, at least some of said cells being at least partially individually lined with a curable shear thinning thixotropic polymer composition in an approximately planar region spaced from and generally parallel to at least one major surface of said substrate, and at least some of said lined cells being open.

**Claim 1 of the '172 Patent:**
An article comprising a porous web that has been treated with a curable, shear thinnable, thixotropic polymeric material and with one or more modifiers, said material being at least partially cured, said modifiers being selectively positioned within the web, and at least some of the pores of said web being open.

**Claim 47 of the '172 Patent:**
A porous article comprising:
a porous web having a plurality of web members with interstices therebetween;
an at least partially cured material derived from a curable, shear thinnable, thixotropic polymeric materials which forms;
a thin film substantially encapsulating at least some of the web members leaving at least some of the interstices open, or
a substantially continuous internal layer; and
one or more modifiers, wherein said modifer(s) is selectively positioned within the web.

**Claim 88 of the '172 Patent:**
The article of claim 47, wherein said curable, thixotropic material containing one or more modifiers therein comprises a diluent.

**Claim 99 of the '172 Patent:**
The article of claim 47, wherein said internal layer has a thickness in the range of 0.01 micron up to 50 microns.

**Claim 110 of the '172 Patent:**
A method of controllably applying a combination of treating materials to a porous web, said method comprising;
applying a curable shear thinnable, thixotropic material to said porous web;
applying one or more modifiers to said porous web; and
subjecting said thixotropic material and modifier(s) to sufficient energy to cause the thixotropic material and modifier(s) to flow into the porous web, and selectively position said modifier(s) within the web, wherein at least some of the interstitial spaces of said web remain open.

**Claim 1 of the '902 Patent:**
A method of controlling the effective pore size of a web, wherein said web has a three dimensional structure comprising structural elements with interstitial spaces therebetween and a top surface opposed from a bottom surface, comprising the steps of:
tensioning the web;
applying a curable, shear thinnable material to said web; and
subjecting said shear thinnable material to sufficient shear thinning energy to cause the shear thinnable material to flow into the web, selectively position within the web and form a thin film substantially encapsulating at least some of the structural elements of said web, wherein most of the interstitial spaces between structural elements of said web remain open.